# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

**RODNEY REED**,

       *Petitioner,*

    *v.*

**BOBBY LUMPKIN**, Director, Texas
Department of Criminal Justice,
Correctional Institutions Division,

       *Respondent.*

Case No. 1:24-cv-726

\* Death Penalty Case \*

---

## SECOND OR SUCCESSIVE PETITION FOR WRIT OF HABEAS CORPUS
## PURSUANT TO 28 U.S.C. § 2244

---

Andrew F. MacRae
State Bar No. 00784510
MacRae Law Firm PLLC
3267 Bee Cave Rd.,
Suite 107, PMB 276
Austin, TX 78746
(512) 565-7798 (telephone)

George H. Kendall*
Carine M. Williams*
Nicola Cohen*
Squire Patton Boggs (US) LLP
1211 Avenue of the Americas, 26th Floor
New York, NY 10036
(212) 872-9800 (telephone)

Barry C. Scheck*
Jane T. Pucher*
The Innocence Project
40 Worth St., Suite 701
New York, NY 10013
(212) 364-5340 (telephone)

Parker Rider-Longmaid*
Skadden, Arps, Slate,
   Meagher & Flom LLP
1440 New York Ave., NW
Washington, DC 20005
(202) 371-7000 (telephone)

Jeremy Patashnik*
Skadden, Arps, Slate
   Meagher & Flom LLP
One Manhattan West
New York, NY 10001
(212) 735-3000 (telephone)

\* *Pro hac vice* motion forthcoming if Fifth Circuit grants authorization to consider this petition.

*Attorneys for Petitioner Rodney Reed*

# TABLE OF CONTENTS

**Page**

I.  STATEMENT OF THE CASE .................................................................. 1

II.  PROCEDURAL POSTURE ................................................................... 3

    A.  Conviction ............................................................................................ 3

    B.  State Postconviction ............................................................................ 4

    C.  Previous Federal Litigation ................................................................. 6

    D.  Pending Matters ................................................................................... 7

III.  FACTUAL BACKGROUND – CONVICTION ..................................... 8

    A.  Initial Investigation ............................................................................. 8

    B.  Law Enforcement's Initial Focus on Mr. Fennell ............................... 10

    C.  Mr. Reed's Arrest ............................................................................... 12

    D.  Mr. Reed's Trial ................................................................................. 12

IV.  FACTUAL BACKGROUND – POST-CONVICTION ......................... 16

    A.  CCA's Remand of Mr. Reed's Tenth State Habeas Petition .............. 17

    B.  State's Decades-Late Disclosure Only Weeks Before the Evidentiary Hearing ............................................................................................... 18

    C.  July 2021 Evidentiary Hearing .......................................................... 19

        1.  Eight Credible Witnesses Confirmed a Relationship Between Ms. Stites and Mr. Reed ...................................................... 21

            a.  Ms. Stites's H-E-B Co-Workers ....................................... 21

            b.  Ms. Stites's Family ........................................................... 23

        2.  A Dozen Credible Witnesses, Including Law Enforcement, Offered New Evidence Implicating Mr. Fennell ................................... 23

            a.  Law Enforcement Knew About, but Never Disclosed, Mr. Fennell's Abusive Conduct Toward Ms. Stites ........................................................................ 25

            b.  The State Suppressed Information from Mr. Fennell and Ms. Stites's Downstairs Neighbor About Their Volatile Relationship ........................................................ 26

            c.  Other Witnesses Testified that Mr. Fennell and Ms. Stites's Relationship Was Broken and Mr. Fennell Was Abusive ................................................ 28

            d.  Law Enforcement Finally Conceded that It Inadequately Investigated Mr. Fennell as a Suspect ......... 29

           e.     Witnesses Testified that Mr. Fennell Confessed to Having Murdered Ms. Stites ............................................... 30

           f.     Mr. Fennell Is Not Credible ..................................... 30

     3.    Forensic Experts Testified that the State Presented False and Misleading Expert Testimony at Trial ...................................... 31

           a.     Spermatozoa.................................................... 32

           b.     Dating Bruises................................................. 33

           c.     Rectal Injury.................................................. 33

           d.     Time of Death ................................................ 34

V.     FACTUAL BACKGROUND – INADEQUATE STATE COURT REVIEW ............ 35

    A.    Trial Court's Rubberstamped FFCL ...................................... 35

    B.    CCA Unreasonably Denies Mr. Reed's Tenth State Habeas Petition ................. 38

    C.    CCA Unreasonably Denies Mr. Reed's Eleventh State Habeas Petition.............. 46

VI.    GROUNDS FOR RELIEF ............................................. 49

    A.    MATERIAL NEWLY DISCOVERED EXCULPATORY EVIDENCE WAS SUPPRESSED IN VIOLATION OF *BRADY V. MARYLAND* ................. 49

     1.    Suppression of Exculpatory Statements by Co-Workers Suzan Hugen, Andrew Cardenas, and Ron Haas.................................. 50

     2.    Suppression of Exculpatory Information Possessed by Law Enforcement about Mr. Fennell and Ms. Stites's Volatile Relationship ............................................... 55

     3.    Suppression of Favorable Evidence from Mr. Fennell and Ms. Stites's Downstairs Neighbor Regarding Their Volatile Relationship ............................................... 60

    B.    THE STATE SOLICITED FALSE TESTIMONY AT MR. REED'S TRIAL.......................................................... 67

     1.    Solicitation of False Factual Testimony from Law Enforcement............. 68

     2.    Solicitation of False Forensic Testimony ................................. 73

VII.    CONCLUSION AND PRAYER .................................................. 80

# I. STATEMENT OF THE CASE

1. Like a cold case investigator, who relies on the passage of time for new witnesses to emerge, or old witnesses to be willing to come forward; serendipitous leads to appear; or for technological advances to render old evidence more probative, Petitioner Rodney Reed has steadily pressed on, with the assistance of *pro bono* counsel, in his effort to vindicate himself, and to identify the true culprit of Stacey Stites's murder.

2. As a result, since this case was last before this Court, an unusual group of witnesses rarely seen as defendant witnesses in capital murder cases came forward with evidence that both bolsters Mr. Reed's case that he did not commit this crime, and makes clear that Jimmy Fennell, Jr., the victim's then-fiancé, very likely is responsible for her death.

3. Many of these witnesses were co-workers and friends of Ms. Stites, the victim. Others were former law enforcement officials who knew and had worked with Mr. Fennell when he was a deputy sheriff. And others were former inmates who served time with Mr. Fennell when he served nearly a decade in prison. What they all had in common was they did not know Mr. Reed nor have any reason to aid him or to frame Mr. Fennell.

4. Mr. Reed presented certain of these new witnesses in a stay application and successive state writ in November 2019 to the Texas Court of Criminal Appeals (the "CCA"). That court stayed Mr. Reed's execution and remanded the case for factual development. Through that factual development, additional witnesses emerged—including as a result of last-minute *Brady* disclosures made by the State. In July 2021, after months of COVID-related delay, the state habeas trial court held a nine-day evidentiary hearing at which 47 witnesses testified.

5. The State's case against Mr. Reed was premised on the theory that he and Ms. Stites were strangers, and that Mr. Reed kidnapped, sexually assaulted, and murdered Ms. Stites on her way to work. *See Reed v. Stephens*, 739 F.3d 753, 760 (5th Cir. 2014). Just weeks before the 2021

evidentiary hearing, the State made a stunning, decades-late disclosure of exculpatory witness statement summaries showing that, even before Mr. Reed's trial, there were witnesses offering evidence of a relationship between Mr. Reed and Ms. Stites.

6.    At the hearing, more than a dozen witnesses—again, most of whom were friends, co-workers, and family of Ms. Stites and had no connection to Mr. Reed—testified on Mr. Reed's behalf, finally bringing the truth to light:

- **Mr. Reed and Ms. Stites were not strangers.**  At least eight witnesses credibly testified about Ms. Stites and Mr. Reed's consensual and intimate relationship.

- **Mr. Fennell and Ms. Stites were not a happy, loving couple**.  A dozen witnesses, including two members of law enforcement, testified that Mr. Fennell and Ms. Stites had a volatile—even abusive—relationship, and that Mr. Fennell knew that his fiancé was sleeping with a Black man.

- **Forensic evidence did not place Mr. Reed with Ms. Stites at the time of her murder.**  Mr. Reed's and the State's experts now *agree* that critical portions of the State's forensic testimony at trial was false and misleading.

The evidence presented at the hearing dismantled every factual and forensic underpinning of the State's case against Mr. Reed.

7.    However, as is explained at length *infra*, Mr. Reed was denied a fair, neutral adjudication of this evidence in the state courts. And the CCA rejected Mr. Reed's tenth and eleventh state habeas petitions in reliance on myriad unreasonable determinations of the facts, and based on legal standards that were contrary to, or unreasonably applied, clearly established Supreme Court precedent.

8. The credible and compelling new evidence detailed herein establishes Mr. Reed's right to habeas relief in light of Fourteenth Amendment due process violations. Specifically, as demonstrated below, Mr. Reed's conviction violates due process because (i) the State failed to disclose to Mr. Reed information regarding witnesses who knew of a connection between Ms. Stites and Mr. Reed; of Ms. Stites and Mr. Fennell's strained relationship; as well as of inculpatory remarks made by Mr. Fennell before and after Ms. Stites's death, and (ii) the State solicited false testimony at trial regarding the extent of the investigation into the connection between Mr. Reed and Ms. Stites and regarding the forensic evidence. Mr. Reed respectfully petitions this Court for relief from that conviction, pursuant to 28 U.S.C. § 2254 et seq.

## II.   PROCEDURAL POSTURE

### A.   Conviction

9. On April 23, 1996, Stacey Stites was found asphyxiated on the side of a country road near the border of Bastrop County, Texas. *Ex parte Reed*, 271 S.W.3d 698, 704 (Tex. Crim. App. 2008).

10. On May 21, 1997, Petitioner Rodney Reed was indicted for her murder, with charges that the murder occurred in the course of committing an aggravated sexual assault, and that Mr. Reed intentionally caused her death by strangulation. Ex. 1 (Trial Transcript Excerpts, Vol. 56) at 25:16-25, 77:20-24.

11. On May 18, 1998, an all-white jury convicted Mr. Reed of two counts of capital murder of Ms. Stites. Ex. 1 at 165:10-20.

12. On May 28, 1998, Mr. Reed was sentenced to death. Ex. 2 (Trial Transcript, Vol. 67) at 5:20-6:7.

### B. State Postconviction

13.     The CCA affirmed Mr. Reed's conviction and sentence on direct appeal. *Reed v. State*, No. AP-73,135 (Tex. Crim. App. Dec. 6, 2000).

14.     On February 13, 2002, the CCA denied Mr. Reed relief on his initial and subsequent applications for writ of habeas corpus. *Ex parte Reed*, Nos. WR-50,961-01 and WR-50,961-02 (Tex. Crim. App. Feb. 13, 2002).

15.     From 2005 to 2019, Mr. Reed diligently worked to prove his innocence, and filed several successive applications for a writ of habeas corpus before the state courts. All applications during this period were eventually dismissed or denied. *See Ex parte Reed*, 670 S.W.3d 689, 710-28 (Tex. Crim. App. 2023) (describing Mr. Reed's habeas efforts and the evidence of innocence brought forth).

16.     On June 26, 2019, the CCA denied Mr. Reed relief on all pending claims. *Ex parte Reed*, Nos. WR-50,961-08 and WR-50,961-09 (Tex. Crim. App. June 26, 2019).

17.     On July 23, 2019, the trial court entered an order setting Mr. Reed's execution date for November 20, 2019. Execution Order, Cause No. 8701 (Tex. 21st Jud. Dist. Ct. July 23, 2019).

18.     Mr. Reed moved the CCA for an order staying his scheduled execution pending a ruling by the Supreme Court on a pending petition for certiorari seeking review of the CCA's June 26, 2019, order, which the CCA denied on October 30, 2019. Order Den. Mot. for Stay of Execution, Cause No. 8701-07, WR-50,961-08 (Tex. Crim. App. Oct. 30, 2019).

19.     On November 11, 2019, Mr. Reed filed his tenth state habeas application, together with a motion to stay his scheduled execution.

20.     On November 15, 2019, the CCA stayed Mr. Reed's execution, entered an order finding that "[Mr. Reed's] *Brady*, false testimony, and actual innocence claims satisfy the

requirements of" state habeas, and remanded the claims to the state district court for further development. *Ex parte Reed*, No. WR-50,961-10, slip op. at 3-4 (Tex. Crim. App. Nov. 15, 2019).

21.     On April 20, 2021, after re-scheduling required by the global pandemic, at the parties' request, the district court set the evidentiary hearing to begin on July 19, 2021. Scheduling Order, Cause No. 8701, Crim. Ct. App. No. WR-50,961-10 (Tex. 21st Jud. Dist. Ct. Apr. 20, 2019).

22.     On June 25, 2021, the State made a previously undisclosed discovery production, pursuant to its obligations under *Brady v. Maryland*, of a statement by Suzan Hugen (née Nichols). Ex. 3 (June 25, 2021 Letter from Matthew Ottoway, Assistant Attorney General, "provid[ing] [Mr. Reed] with notice of statements made by" Suzan Hugen).

23.     Also on June 25, 2021, the State disclosed certain "witness interview summaries . . . created by the trial prosecution team in preparation for [Mr. Reed's] underlying 1998 criminal prosecution." Ex. 4 (June 25, 2021 Letter from Matthew Ottoway, Assistant Attorney General, "provid[ing] [Mr. Reed with notice of witness interview summaries"). These interview summaries referenced statements from Ron Haas, who was the H-E-B Bastrop Store Director during Ms. Stites's employment, and Andrew Cardenas, another co-worker of Ms. Stites. These materials had never been disclosed previously.

24.     The evidentiary hearing took place from July 19, 2021, through July 29, 2021, with the court assigning equal hearing time to Mr. Reed and the State. During the evidentiary hearing, the court heard live testimony from 47 witnesses.

25.     On October 8, 2021, Mr. Reed and the State each submitted Proposed Findings of Fact and Conclusions of Law. On October 18, 2021, the court heard closing arguments, and

advised the parties at the beginning of arguments that it intended to adopt, in entirety, one side's proposed findings. Ex. 5 (2021 Evidentiary Hearing Excerpts, Vol. 13) at 5:10-12.

26.     On October 31, 2021, the court issued Findings of Fact, Conclusions of Law and Recommendations. As promised, the court signed an order identical to the findings proposed by the State, including objective errors of fact that had been identified during closing arguments. *See Ex parte Reed*, 670 S.W.3d at 744 n.8.

27.     On December 17, 2021, Mr. Reed filed his eleventh state habeas petition. This petition included claims related to the State's *Brady* disclosures on the eve of the July 2021 evidentiary hearing, and an additional *Brady* violation that had been revealed by a State's witness mid-hearing.

28.     On June 28, 2023, the CCA accepted the court's Findings of Fact and Conclusions of Law and denied and dismissed all of the claims in Mr. Reed's tenth state habeas application. *Ex parte Reed*, 670 S.W.3d 689 (Tex. Crim. App.).

29.     On the same date, the CCA dismissed Mr. Reed's eleventh state habeas application. *Ex parte Reed*, No. WR-50,961-11, 2023 WL 4234348 (Tex. Crim. App. June 28, 2023)

**C.     Previous Federal Litigation**

30.     On February 12, 2010, Mr. Reed filed the final amendments to his first federal habeas petition in the United States District Court for the Western District of Texas, and on September 26, 2012, the court denied all habeas relief without issuing a certificate of appealability. *Reed v. Thaler*, No. 02-CV-142 (W.D. Tex. Sept. 26, 2012); *see also Reed v. Thaler*, No. 02-CV-142, 2012 WL 2254217 (W.D. Tex. June 15, 2012) (Report & Recommendation).

31.     The Fifth Circuit denied Mr. Reed's application for a certificate of appealability, *Reed v. Stephens*, 739 F.3d 753, 790 (5th Cir. 2014), and the Supreme Court denied certiorari, *Reed v. Texas*, 574 U.S. 973 (2014).

### D. Pending Matters

32.     On August 8, 2019, Mr. Reed commenced a civil action in the United States District Court for the Western District of Texas under 42 U.S.C. § 1983 challenging the Texas courts' approval of the State's refusal to test the murder weapon for DNA. *See Reed v. State,* 541 S.W.3d 759 (Tex. Crim. App. 2017).

33.     The district court dismissed the action on November 15, 2019, *Reed. v. Goertz*, No. 19-CV-0794, 2019 WL 12073901 (W.D. Tex. Nov. 15, 2019), and the Fifth Circuit affirmed on April 22, 2021, finding that Mr. Reed's claim was filed beyond the two-year statute of limitations, *Reed v. Goertz*, 995 F.3d 425 (5th Cir. 2021).

34.     The Supreme Court granted certiorari, 596 U.S. __, 142 S. Ct. 2645 (2022), and reversed, finding that Mr. Reed's § 1983 claim was timely, *Reed v. Goertz*, 598 U.S. 230 (2023).

35.     Mr. Reed's § 1983 case is currently pending before the Fifth Circuit, with oral argument set for August 6, 2024.  *Reed v. Goertz*, No. 19-70022 (5th Cir.).

36.     On November 22, 2023, Mr. Reed petitioned the Supreme Court for a writ of certiorari, challenging the CCA's use of an incorrect gateway-innocence standard contrary to *Schlup v. Delo*, 513 U.S. 298 (1995), and the CCA's acceptance of Findings of Fact and Conclusions of Law adopted by the trial court, which reproduced verbatim the State's proposed findings. That petition is currently pending.  Petition for Writ of Certiorari, *Reed v. Texas*, No. 23-569 (Nov. 22, 2023), 2023 WL 8260416.

37.     On December 22, 2023, Mr. Reed filed a motion in the United States District Court for the Western District of Texas under Federal Rules of Civil Procedure 60(d)(3) and 60(b)(6), requesting relief from the 2012 habeas judgement due to the State's fraud on the federal habeas court. This action stemmed from, *inter alia*, the State's repeated denial before the federal habeas court that it possessed any evidence of Mr. Reed's relationship with Ms. Stites, and later disclosure

of exactly such evidence to Mr. Reed's counsel. The State filed a response to which Mr. Reed replied. That motion is currently pending. *Reed v. Lumpkin*, No. 02-CA-142 (W.D. Tex.).

## III.  FACTUAL BACKGROUND – CONVICTION

### A.  Initial Investigation

38.     Stacey Stites, a nineteen-year-old white woman, failed to report for her shift at the H-E-B grocery store in Bastrop, Texas, at 3:30 a.m. on April 23, 1996.  Ms. Stites worked in the produce department, which required her to wake up between 2:45 and 2:50 a.m. to get ready and drive to work for her early morning shift.  *Ex parte Reed*, 271 S.W.3d 698, 702 (Tex. Crim. App. 2008).  Ms. Stites lived with her fiancé, Jimmy Fennell, Jr., a police officer, in the same apartment complex as her mother, Carol Stites.

39.     The day before Ms. Stites disappeared, she made plans with Mr. Fennell and her mother about how she would get to work the next morning.  Mr. Fennell insisted to Ms. Stites and her mother that he would drive Ms. Stites to work in the morning and pick her up after her shift so the two could run errands together.  *Id.*  Mr. Fennell declined Carol Stites's offer to let him sleep in and to drive him to Bastrop in the afternoon.  *Id.*  After that discussion, Ms. Stites and Mr. Fennell went to their apartment.  Carol Stites last saw her daughter around 8:00 p.m. on April 22nd. *Id.* at 702-03.  Mr. Fennell was the only person to see Ms. Stites for the remaining few hours of her life before her disappearance.

40.     Mr. Fennell testified that on April 22, 1996, he returned home from a baseball practice between 8:00-8:30 p.m.  *Ex parte Reed*, 670 S.W.3d 689, 701 (Tex. Crim. App. 2023). He testified that he and Ms. Stites showered together, but did not have sex because she was taking birth control pills and that "at this point in her prescription cycle, the vitamin pills she was taking allowed for a greater possibility of pregnancy."  *Id.*  He testified Ms. Stites went to sleep around 9:00 p.m., while he stayed awake.  He later told law enforcement that the plan for him to drive

- 8 -

Ms. Stites to work had changed, that he had slept in, and that Ms. Stites left for work in his truck at her usual time around 3:00 a.m. *Id.*

41.     The search for Ms. Stites began a few hours after she failed to report for her 3:30 a.m. shift at H-E-B. *Id.* at 702. Mr. Fennell's truck, which he testified that Ms. Stites had taken to drive herself to work that morning, was found in a high school parking lot at 5:23 a.m. *Id.* The truck was locked and the keys were missing.  On the ground outside of the driver's side door was a portion of Ms. Stites's woven leather belt and some papers, including carbon check copies belonging to Mr. Fennell's checkbook.  Inside the truck, the driver's seat was reclined and the seatbelt was still fastened.  Fingerprints were collected from the truck and items inside the truck; the only prints that could be identified belonged to Mr. Fennell and Ms. Stites.  Ex. 6 (Trial Transcript Excerpts, Vol. 47) at 39:8-21.   Mr. Reed was excluded as the source of all other identifiable prints. *Id.* at 42:24-43:12.

42.     Just before 3:00 p.m. that afternoon, Ms. Stites's body was found on the side of a country road near the border of Bastrop County.  The Texas Department of Public Safety Crime Laboratory ("DPS") processed the scene.  *Ex parte Reed*, 271 S.W.3d at 704.  A piece of woven belt that lay on the road near Ms. Stites's body was later determined to match the piece found outside Mr. Fennell's abandoned truck and the red marks observed on Ms. Stites's neck. *Id.* at 705.

43.     Karen Blakely, a DPS criminalist, arrived at the scene at 5:15 p.m.  She examined Ms. Stites's body and took vaginal swab samples.  Around 11:00 p.m., Ms. Blakely returned to the DPS Crime Lab and examined the vaginal swabs she had collected hours earlier.  She discovered the presence of three intact spermatozoa.  Ex. 1 at 33:23-34:4.  The autopsy report, later prepared by medical examiner Dr. Roberto Bayardo, stated his opinion that Ms. Stites died "as a result of

asphyxia due to ligature strangulation associated with sexual assault." Ex. 7 (Dr. Roberto Bayardo's Report on April 24, 1996 Autopsy) at 4.

**B.    Law Enforcement's Initial Focus on Mr. Fennell**

44.    Mr. Fennell was the last person to see Ms. Stites alive, and thus the sole source of information for law enforcement about the last hours of her life.  For several months, Mr. Fennell was actively investigated as a suspect, even though he was not a DNA match to the semen found on the vaginal swabs.  *Ex parte Reed*, 271 S.W.3d at 708.  Nevertheless, officers never searched the apartment Mr. Fennell shared with Ms. Stites.  *Id.*

45.    As part of the investigation, law enforcement learned more about Mr. Fennell's relationship with Ms. Stites, particularly that it was strained.  They learned that Mr. Fennell, then 22 years old and working as a Bastrop jailer, began dating Ms. Stites while she was in high school in May 1995.  He quickly considered the relationship to be "serious," Ex. 9 (Trial Transcript Excerpts, Vol. 45) at 62:8-19, although she continued to date other people.  Ex. 10 (Police Reports from Investigation of Stacey Stites' Murder) at 1, 10. Several of Ms. Stites's friends also told police that Mr. Fennell was jealous.  For example, Heather Flanagan, a friend of Ms. Stites, told police that "Jimmy was a jealous type person who didn't like her talking with other guys.  They cancelled their wedding. Stacey never said why." *Id.* at 15. A Bastrop County Sheriff's Office investigation file note, which appears to be from an interview with Ms. Stites's mother, also indicates that Mr. Fennell and Ms. Stites argued the night of the murder and that Mr. Fennell was "[j]ealous of [e]veryone."  Ex. 10 at 19.

46.    Unlike when Mr. Reed was later questioned, Bastrop County Sherriff's Officers and Texas Ranger Sergeant Rocky Wardlow did not video or audio record any of their interrogations with Mr. Fennell to preserve any inculpatory statements that he made. Ex. 9 at 109:24-110:24; Ex. 11 (Trial Transcript Excerpts, Vol. 46) at 125:14-25; Ex. 28 (2021 Evidentiary

Hearing Excerpts, Vol. 6) at 196:19-197:7. During his initial statement, Mr. Fennell gave inconsistent and false statements about the events leading up to Ms. Stites's murder and his actions in the immediate aftermath. For instance, Mr. Fennell gave a false statement on the morning of Ms. Stites's disappearance about the fuel level in his truck. He told police officers that he had filled the truck with gas the night before. Ex. 12 (Police Report About Jimmy Fennell's Truck) at 1. Days later, when police confronted Mr. Fennell to say the truck's gas tank was less than ¼ full, he changed his story and said it had been only ¼ full. *Id.*

47.　　Mr. Fennell also engaged in suspicious activity in the immediate aftermath of Ms. Stites's disappearance. For instance, soon after the abandoned truck was found, but before Ms. Stites's body was located, Mr. Fennell withdrew all the money in his bank account. Ex. 13 (Jimmy Fennell's Bank Records). Mr. Fennell's decision to withdraw all his funds makes no sense unless he was preparing to flee.

48.　　In addition, during the investigation, Mr. Fennell was twice found to be deceptive on polygraph tests. *Ex parte Reed*, 271 S.W.3d at 738, 742. In October 1996, Mr. Fennell was examined by licensed polygraph examiner of the Bastrop County Adult Supervision Department. Ex. 14 (Trial Transcript Excerpts, Vol. 52) at 148:7-10, 150:7-16. The examiner found Mr. Fennell to have answered deceptively to the following questions:

> Q: Did you strangle Stacey Stites on 4/23/96?
> A: No.

> Q: On 4/23/96 did you have any sexual conduct with Stacey Stites?
> A: No.

Ex. 15 (1996 Failed Polygraphs of Jimmy Fennell) at 5.

49.　　Two months later, in December 1996, Mr. Fennell took a second polygraph exam by Texas Department of Public Safety Lieutenant Gordon Moore. Ex. 14 at 8:14-19, 10:16-18; Ex. 15 at 6. Mr. Fennell was again found to have answered deceptively to the following questions:

Q: Did you strangle Stacey with her Belt?
A: No.

Q: Did you leave Stacey's body along the county road where she was found?
A: No.

Q: Anytime after April 22, 1996, did you hit Stacey's head with your fist?
A: No.

Ex. 15 at 8. When the second polygraph exam also indicated deception, Mr. Fennell requested counsel and invoked his Fifth Amendment privilege. *Ex parte Reed*, 271 S.W.3d at 738, 742-43; Ex. 15 at 7.

### C. Mr. Reed's Arrest

50. The investigation of Mr. Fennell ended only after Mr. Reed's DNA (collected in an unrelated investigation in which charges were dismissed) matched the DNA profile obtained from the vaginal swabs collected from Ms. Stites. Mr. Reed was then arrested. Upon obtaining Mr. Reed's DNA, law enforcement essentially concluded its investigation—again, without ever searching Mr. Fennell's apartment or interviewing all of Ms. Stites's co-workers at H-E-B. Moreover, the prosecution had no eyewitness who saw Mr. Reed and Ms. Stites together during the early morning hours of April 23, nor any inculpatory statement from Mr. Reed.

51. In 1997, Mr. Reed was charged with Ms. Stites's murder based on the DNA match. No other evidence—fingerprint or hair, for instance—connected Mr. Reed to Mr. Fennell's truck or the location where Ms. Stites's body was found.

### D. Mr. Reed's Trial

52. In May 1998, an all-white jury convicted Mr. Reed of two counts of capital murder in the course of committing or attempting to commit kidnapping and aggravated sexual assault, and sentenced him to death. Ex. 1 at 165:10-20; Ex. 2 at 5:20-6:7. Before Mr. Reed's trial began, the prosecution represented that the State had an open file policy:

I can state for the record that it's the State's intention to have the open-file policy in this case for the most part. Obviously, we have no intention of providing our work product, that of the [p]rosecutors in this case; however, beyond that, we intend to have an open-file policy.

Ex. 16 (Trial Transcript Excerpts, Vol. 3) at 18:4-10.

53.     Relying on the timeline provided solely by Mr. Fennell, the State's theory at trial was that Mr. Reed, who was purportedly a stranger to Ms. Stites, somehow intercepted Ms. Stites on her way to work in the early hours of April 23, 1996, gained entry into the truck, sexually assaulted her in the truck while simultaneously strangling her to death, partially redressed her body, drove to a country road, removed her from the truck, dragged her into the brush, placed her work name tag in the crook of her knee, hung a shirt in a tree, drove the truck to the Bastrop High School parking lot, locked the truck and left—all without leaving any fingerprints, hair, or other evidence in the truck. *See, e.g.*, *Ex parte Reed*, 271 S.W.3d 698, 749 (Tex. Crim. App. 2008); Ex. 1 at 33:9-13. 35:14-18, 38:2-23, 50:17-51:21, 56:2-58:10. The State further theorized that this occurred within a specific, narrow window of time between approximately 3:00 a.m., when her fiancé Mr. Fennell testified she left for work, and 5:23 a.m., when the truck was discovered. *Id.* Ms. Stites's body was found in the brush along the road around 3:00 p.m. that same day. *Ex parte Reed*, 670 S.W.3d at 703.

54.     Although Mr. Fennell had invoked his Fifth Amendment privilege before Mr. Reed was arrested, he reversed course once Mr. Reed was on trial, and became the prosecution's star witness. At trial, Mr. Fennell waived his Fifth Amendment privilege and testified to this timeline the State now set forth for the jury. Nonetheless, investigators conceded at trial that the only independent information gathered about Ms. Stites's whereabouts was the timeline provided by Mr. Fennell:

Q: The information concerning Stacey's whereabouts after 7:30 on the 22nd of April, when she left her mother's apartment and went up to hers, all of that information—where did that information come from?

A: It came from Jimmy Fennell.

Ex. 17 (Trial Transcript Excerpts, Vol. 53) at 34:3-8.

55.     A key element of the State's case was that Mr. Reed and Ms. Stites were total strangers.  The State repeatedly told the jury that, despite a purportedly exhaustive investigation, there was no evidence that Mr. Reed and Ms. Stites knew each other, let alone were having a consensual relationship. For instance, the lead investigator Rocky Wardlow testified that they talked to "hundreds" of people, including "to friends, family, co-workers, associates," ex-boyfriends, high-school classmates, and former co-workers, and found no evidence they knew each other.  *See* Ex. 11 at 112:3-23.  In its closing, the State repeated this refrain:

> So [investigators] go and they talk to everybody, every boyfriend, every co-worker, every friend, every family member, everybody.  ***Nobody, nobody connects them. Nobody.***  Folks, this secret affair was so secret that Stacey Stites didn't even know about it.  That's how secret it was because it didn't exist.

Ex. 1 at 57:8-14 (emphasis added); *see also, e.g.*, Ex. 8 (Trial Transcript Excerpts, Vol. 43) at 53:11-17 ("They weren't dating according to anyone, they weren't friends, they weren't associates.").

56.     Mr. Reed presented two witnesses who connected him and Ms. Stites.  Julia Estes testified that she had seen Mr. Reed and Ms. Stites talking together at the H-E-B, Ex. 18 (Trial Transcript Excerpts, Vol. 51) at 136:3-18, and Iris Lindley testified that while she was sitting on the front porch at Mr. Reed's mother's home, Ms. Stites came by asking for Mr. Reed, Ex. 17 at 91:17-92:19. Ms. Lindley even testified that she presumed Mr. Reed and Ms. Stites were dating

based on this interaction with Ms. Stites. *Id.* at 97:3-8.[1]  Nevertheless, based on law enforcement's purportedly exhaustive investigation, the State urged the jury to conclude that Mr. Reed had to have kidnapped and sexually assaulted Ms. Stites because no witness credibly connected Mr. Reed and Ms. Stites, and thus there was no other explanation for why his sperm was found on her.

57.     The State's case at trial also relied heavily on expert testimony—testimony that we today know to be false.  First, the State presented expert testimony that the semen found on Ms. Stites's body had to have been deposited contemporaneous with her death because spermatozoa can only remain morphologically intact for 24 hours.  DPS criminalist Ms. Blakely testified that she found three intact spermatozoa around 11:00 p.m. on April 23, and concluded that sex had occurred within 26 hours of when she saw the spermatozoa based on "published documentation that says that 26 hours is about the outside length of time that tails will remain on a sperm head inside the vaginal tract of the female." *Ex parte Reed*, 271 S.W.3d at 704-05; Ex. 9 at 16:13-16.  Meghan Clement, a serologist with Bode Cellmark Forensics Laboratory, testified that she could not "recall . . .  finding intact sperm at more than probably . . . 20 to 24 hours . . . from the time of the sexual assault and from the time the collection was made." Ex. 18 at 55:22-56:16; *Ex parte Reed*, 271 S.W.3d at 710.  And Dr. Roberto Bayardo, the Travis County medical examiner who performed the autopsy, also testified that "the significance of having found, intact, spermatozoa in this case" was that "this semen was placed in the vagina quite recently." Ex. 19 (Trial Transcript Excerpts, Vol. 48) at 122:21-24.

58.     The State emphasized this expert testimony regarding the length of time spermatozoa can survive in its closing argument:

---

[1] Mr. Reed also presented several witnesses who corroborated his relationship with Ms. Stites at his bond hearing.

[B]ingo, [Blakely] finds three fully intact spermatozoa.  At that point she knows what she's got here.  We all know what she's got here.  Because we know, from the credible evidence, that that doesn't hang around for days on end.  ***We know from the credible evidence that that tells you that semen got in that girl's body within 24 hours of that eleven o'clock moment***.  Which is when?  On her way to work.

Ex. 1 at 34:3-12 (emphasis added).  The State further emphasized that expert testimony that the semen was inextricably linked to a sexual assault that occurred contemporaneously with the murder refuted Mr. Reed's defense that he and Ms. Stites had consensual intercourse in the days before her murder.  *Id.* at 38:8-12, 61:24-62:9.  This expert testimony was not lost on the jury, which asked to see Dr. Bayardo's testimony and included a question about his opinion on the life expectancy of intact spermatozoa.  *Id.* at 153:23-154:10.

59.    Second, the State presented expert testimony to support their assertion that Ms. Stites's time of death was around 3:00 a.m.  The State focused on time of death because it had to align its case with the timeline Mr. Fennell told the jury—that Ms. Stites went to sleep around 9:00 p.m., and that he was sleeping when she left for work in his truck around 3:00 a.m., so she must have been intercepted on her way to work at some point before the abandoned truck was found.  Dr. Bayardo testified that he could estimate the time of death around 3:00 a.m.  However, Dr. Bayardo did not appear to consider any biological factor, nor mention rigor mortis, livor mortis, or the crime scene video or photographs, when testifying about the time-of-death estimate at trial.

## IV.    FACTUAL BACKGROUND – POST-CONVICTION

60.    Since Mr. Reed's conviction became final, s*ee Reed v. State*, No. AP-73, 135 (Tex. Crim. App. Dec. 6, 2000) (affirming Mr. Reed's conviction and sentence on direct appeal), Mr. Reed has worked as persistently as an indigent man on death row possibly can to develop evidence that his conviction was not only obtained wrongfully, in contravention of his constitutional fair trial rights, but is in fact wrong, because he is actually innocent.

61.     Like a law enforcement officer digging into a hard-to-solve cold-case to find the true perpetrator, Mr. Reed first had to subject the available trial evidence to careful scrutiny, examining side-by-side discrepancies in trial transcripts and variations in statements, and then use that analysis to begin to track down leads. He has sought—thus far, unavailingly, to bring advancements in technology to bear on that existing trial evidence. *See supra* ¶¶ 32-35. And he has looked assiduously for new evidence and more evidence. As often happens in ultimately successful cold-case investigations, those efforts have proven fruitful, yet they have also required a great deal of time. The time required to wait for people to change and relationships to shift such that new witnesses would be willing to come forward; for former witnesses to reconsider their past testimony (including in light of what today's modern consensus views as now outdated or erroneous scientific standards); and for new leads to be explored. *See, e.g.*, Silvia Pettem, *Cold Case Research: Resources for Unidentified, Missing, and Cold Homicide Cases* 9 (CRC Press, 2020) ("Time – sometimes decades – can give people an opportunity to mature, to overcome former fears, and to develop a different sense of right and wrong."); Richard H. Walton, *Cold Case Homicides: Practical Investigative Techniques* iii (Taylor & Francis Group, 2006) (noting that the two major factors creating opportunities to solve cold case homicides include "changes in technology and changes in relationships that came about through the passage of time").

62.     Importantly, in Mr. Reed's case, many of these new leads only came to light recently and serendipitously, via the State's belated disclosures of further exculpating evidence.

## A.     CCA's Remand of Mr. Reed's Tenth State Habeas Petition

63.     Facing an execution date of November 20, 2019, Mr. Reed filed his tenth state habeas application with the CCA on November 11, 2019, together with a motion to stay his execution. Recognizing the plausibility of several claims in the petition, the CCA entered an order on November 15, 2019 finding that Mr. Reed's "*Brady*, false testimony and actual innocence

claims satisfy the requirements of Article 11.071 § 5." *Ex parte Reed*, No. WR-50,961-10, slip op. at 3-4 (Tex. Crim. App. Nov. 15, 2019) (ORDER). The CCA, therefore, remanded these claims to the Texas trial court for further development and stayed Mr. Reed's execution pending further order. *Id.* at 4. In so doing, the CCA trusted that the trial court would make reliable and independent credibility determinations and render impartial findings of fact and conclusions of law supported by the developed record.

### B.     State's Decades-Late Disclosure Only Weeks Before the Evidentiary Hearing

64.     Only weeks before that evidentiary hearing on the remanded claims began, Mr. Reed, once again, discovered that the State had failed to disclose exculpatory evidence. On June 25, 2021, the State disclosed new and critical *Brady* material that it had previously alleged never existed: notice of statements from four of Ms. Stites's friends and co-workers, who had personal knowledge of or had heard about an association between Ms. Stites and Mr. Reed. *See* Exs. 3, 4.

65.     In one disclosure, the State provided a summary of a statement made by Suzan Hugen (neé Nichols). Ms. Hugen had worked with Ms. Stites at H-E-B for approximately six months before Ms. Stites's death. *See* Ex. 21 (2021 Evidentiary Hearing Excerpts, Vol. 4) at 12:8-13:22. The State disclosed that Ms. Hugen had seen Ms. Stites and Mr. Reed together at H-E-B about a week before Ms. Stites's death and that Ms. Stites had introduced Mr. Reed to Ms. Hugen as a "good or close friend." Ex. 3. The State further disclosed that Ms. Hugen reported that Ms. Stites and Mr. Reed "appeared friendly, giggling, and flirting" on this occasion. *Id.*[2]

---

[2] Ms. Hugen's testimony at the July 2021 evidentiary hearing confirmed that she had communicated this information to Bastrop Police Officer Paul Alexander before the trial. *See infra* ¶ 77.

66.     In addition, the State disclosed "notice of witness interview summaries . . . created by the trial prosecution team in preparation for [Mr. Reed's] underlying 1998 criminal prosecution." Ex. 4 at 1.  The first interview summary was from Ron Haas, the H-E-B Bastrop Store Director during Ms. Stites's employment.  *Id.* at 1-3.  It noted that Mr. Haas had communicated to the State that he had heard at the H-E-B that Mr. Reed and Ms. Stites knew each other, and that Mr. Reed sometimes came to H-E-B to visit Ms. Stites.  *Id.* at 2.  The second was from Andrew Cardenas, an H-E-B co-worker of Ms. Stites and the first person to express concern when Ms. Stites did not show up for her early morning shift.  *Id.* at 1, 4-5.  Mr. Cardenas had communicated to the State that Jose Coronado, another H-E-B early-morning produce employee, told him that he had seen Mr. Reed speaking to Ms. Stites at the H-E-B.  *Id.* at 5.  Mr. Cardenas got the impression from Mr. Coronado that Mr. Reed and Ms. Stites knew each other.  *Id.*

67.     Immediately following this disclosure, Mr. Reed's counsel urged the trial court to order the State to produce the prosecution team's file, noting that this disclosure makes clear there is still more exculpatory information to be disclosed decades after Mr. Reed's conviction.  Ex. 22 (2021 Evidentiary Hearing Excerpts, Vol. 1) at 18:7-19, 26:23-25.  Counsel also asked the trial court to consider Mr. Reed's new *Brady* claims, based on the State's disclosure of the three witness interview summaries and notes, at the upcoming evidentiary hearing.  *Id.* at 21:12-22:2.  The court orally denied Mr. Reed's motion.  *Id.* at 31:1-22, 33:3-5.

68.     And to date, the State had continued to refuse to turn over to Mr. Reed the full contents of the suppressed statements.

### C.     July 2021 Evidentiary Hearing

69.     In July 2021, the trial court held a nine-day evidentiary hearing on Mr. Reed's remanded claims.  Forty-seven witnesses testified in total.  Multiple forensic experts, members of law enforcement, and dozens of Ms. Stites's family and friends all testified on Mr. Reed's behalf.

Their testimony together provided clear, credible, and corroborated evidence that Mr. Reed was wrongfully convicted. And the newly presented evidence dismantled the State's case at trial against him. The State's case at trial was built on three pillars: (1) Mr. Reed and Ms. Stites were strangers, (2) Mr. Reed and Ms. Stites had sex within 24 hours of her death, and (3) Ms. Stites was murdered on her way to work in the early hours of the morning. The State presented these conclusions as inevitable. It told the jury that it had spoken to every conceivable witness and heard nothing of an affair; it said that nobody knew anything about abusive behavior by Mr. Fennell towards his fiancé. And the forensic evidence, the State argued, proved the timeline it proposed: hard science left no room for any suspect other than Reed.

70. However, at the hearing, over a dozen of Ms. Stites's acquaintances and coworkers—people the State claimed it interviewed when it assured the jury that it had spoken to everybody who knew the victim—came forward, credibly testifying that Ms. Stites and Mr. Reed knew each other, and were having an affair. Many of these witnesses—again, with no connection to Mr. Reed—testified that Mr. Fennell's relationship with Ms. Stites was volatile and abusive. What is more, new evidence presented at the hearing shows that Mr. Fennell made starkly incriminating statements in the months after his fiancé's murder, and has confessed to the crime on at least two separate occasions. And the State's own experts, after twenty-six years, now confirm that the forensic testimony offered to the jury at trial was false and deeply misleading.

71. Critically, at the evidentiary hearing, exculpatory information came forward for the first time about witnesses' knowledge of Mr. Reed and Ms. Stites's relationship and of Mr. Fennell's abusive conduct toward Ms. Stites, as well as law enforcement's inadequate investigation of Mr. Fennell as a suspect, that had been known to law enforcement for decades since before Mr. Reed's trial but never shared with the defense.

### 1. *Eight Credible Witnesses Confirmed a Relationship Between Ms. Stites and Mr. Reed*

72.     Eight witnesses credibly testified that Ms. Stites and Mr. Reed knew each other. Each of these witnesses was connected to Ms. Stites—a co-worker, friend, or family member—or former law enforcement, and thus without any incentive to testify on Mr. Reed's behalf.   *See* Testimony of Suzan Hugen, Ex. 21 at 12:8-13:5; Alicia Slater, *id.* at 276:23-25; Calvin "Buddy" Horton, *id.* at 319:15-320:8; Officer Charles Wayne Fletcher, Ex. 23 (2021 Evidentiary Hearing Excerpts, Vol. 2) at 272:12-273:13; Rene Maldonado, Ex. 24 (2021 Evidentiary Hearing Excerpts, Vol. 9) at 105:1-10; Brenda Dickinson, Ex. 25 (2021 Evidentiary Hearing Excerpts, Vol. 5) at 9:5-25; Rebecca Randall, Ex. 26 (Evidentiary Hearing Excerpts, Vol. 3) at 156:15-157:25; and Victor Juarez, *id.* at 138:2-15.   This testimony directly contradicted the State's assertion at trial that its investigators had searched high and low for evidence of a relationship between Mr. Reed and Ms. Stites, but found nothing. Ex. 1 at 56:24-57:18; *see, e.g.*, *id.* at 55:24-25 (["I]f there was something out there, you would have heard about it."); *id.* at 57:3-18 ("[We] talk[ed] to everybody who knows her, and everybody who ever knew her . . . . Nobody, nobody connects them . . . . Don't you know if there was even one grain of truth to it, just one, somebody would have come here and told you about it. A family member, a friend, somebody.").

### a.     *Ms. Stites's H-E-B Co-Workers*

73.     Alicia Slater testified that she asked Ms. Stites if she was excited to get married, to which Ms. Stites responded that she was not excited because she was "sleeping with a black man named Rodney," Ex. 21 at 278:19-22; *see also id.* at 279:21-280:1 (testifying she was certain that Ms. Stites had said that).   Ms. Slater also testified that Ms. Stites told her she didn't know what her fiancé would do if he found out and that she had to be careful.   *Id.* at 279:14-16.

74.     Other co-workers testified similarly. Brenda Dickinson testified that she saw Ms. Stites speaking with a Black man at H-E-B. She asked Ms. Stites "who's that secret admirer of yours," to which Ms. Stites giddily responded that "he's just a friend," and that his name was Rodney. Ex. 25 at 12:23-13:11. Rebecca Randall testified that she had seen Ms. Stites and Mr. Reed together at the store, and specifically recalled an instance where she saw the two "standing there in very close proximity, standing very close together, having a very quiet conversation . . . ." Ex. 26 at 159:17-22. She further testified that she recognized Mr. Reed and had previously seen him speaking with Ms. Stites. *Id.* at 159:23-25. Victor Juarez testified that he had seen Ms. Stites and Mr. Reed together in a car in a parking lot. *Id.* at 138:24-139:16.

75.     Suzan Hugen, Ms. Stites's close friend and co-worker, Ex. 21 at 12:8-13:15, 24:5-7, whose statement to law enforcement has not been disclosed to Mr. Reed, was a critical witness at the evidentiary hearing. She explained to the court that she was an H-E-B co-worker of Ms. Stites during the entire time Ms. Stites worked at the store. *Id.* at 12:8-13:15. She told the court that she lived in Pine Bluff, Arkansas, and is wheelchair bound due to multiple sclerosis; she came the long way to Bastrop to testify "[b]ecause I wanted to do the right thing for Stacey." *Id.* at 10:10-15, 22:12-13, 40:17-18. She testified that over the six months she worked with Ms. Stites, they saw each other often and developed a friendship. *Id.* at 13:21-22, 14:16-20. She was supposed to join Ms. Stites to shop for the wedding, for instance, but Ms. Stites cancelled, telling Ms. Hugen: "I am not shopping for that wedding." *Id.* at 14:21-15:8. Over time, Ms. Hugen came to suspect that Ms. Stites's relationship with her fiancé was abusive because she noticed telltale "fingerprint" bruises on Ms. Stites's lower arms. *Id.* at 16:1-17:1.

76.     Ms. Hugen further testified that shortly before Ms. Stites's death, she saw Ms. Stites standing closely to a Black man in the produce section of H-E-B. *Id.* at 17:2-14.

Ms. Stites introduced one of the men as "Rodney" and described him as "a very good friend." *Id.* at 17:16-19, 35:3-5. She testified that she observed Mr. Reed and Ms. Stites laughing and flirting with one another. *Id.* at 17:21-23, 35:3-19.

77. Ms. Hugen also testified that after Ms. Stites's death and Mr. Reed's name became public as a suspect, she sought out law enforcement to tell them that the media stories that Ms. Stites and Mr. Reed did not know each other were not true. *Id.* at 19:7-20:2. She testified that she spoke with Officer Paul Alexander, a criminal investigator for the City of Bastrop Police Department, who had been providing additional security for H-E-B. She testified that she told him Ms. Stites and Mr. Reed were not strangers and that Ms. Stites had introduced Mr. Reed to her as a good friend. *Id.* Ms. Hugen testified that she never heard from the police or anyone else associated with the case again until 2021 when the State's investigator contacted her. *Id.* at 20:3-6, 20:19-21:1.

### b. *Ms. Stites's Family*

78. Calvin "Buddy" Horton, Ms. Stites's cousin, *id.* at 319:22-320:4, testified that he saw her with a Black man in a DQ parking lot months before the murder, *id.* at 321:18-25, 322:18-22, 324:22-25. Mr. Horton tried to say hello to Ms. Stites, but she and the man quickly drove off. *Id.* at 332:7-13, 336:11-20. After seeing Mr. Reed's photo around the time of Mr. Reed's arrest, Mr. Horton testified that he was "certain" then that Ms. Stites was with Mr. Reed that day, *id.* at 333:15-25, and added that Ms. Stites had a history of dating Black men, *id.* at 323:10-12, 334:9-18.

### 2. *A Dozen Credible Witnesses, Including Law Enforcement, Offered New Evidence Implicating Mr. Fennell*

79. At trial, the State portrayed Mr. Fennell and Ms. Stites as a happy couple. Ex. 1 at 60:10-12 ("She was, by all accounts . . . extremely excited about the wedding."). They stressed

Mr. Fennell's credibility and told the jury he was closely scrutinized. *Id.* at 71:12-76:21; *e.g.*, *id.* at 76:11-12 ("It's important to note that nobody could ever find anything inconsistent with what he told you."). But information that came to light before and during the 2021 evidentiary hearing reflect that none of that was true. Credible witnesses, none of whom had any connection to Mr. Reed, testified that Mr. Fennell and Ms. Stites had a volatile, abusive relationship; Mr. Fennell was jealous and controlling and racially prejudiced; and he was motivated to kill his fiancé because he knew she was sleeping with a Black man.

80.     Over a dozen credible witnesses, none of whom are connected to Mr. Reed, came forward at the evidentiary hearing and testified that Mr. Fennell controlled, abused, and publicly threatened to kill Ms. Stites. *See, e.g.*, Suzan Hugen, Ex. 21 at 14:21-15:25, 16:1-17:1; Brent Sappington, *id.* at 193:2-6, 194:17-19, 194:20-25, 195:4-8, 197:9-22.; Vicki Sappington, *id.* at 216:5-10, 216:21-217:5; Rubie Volek, Ex. 23 (2021 Evidentiary Hearing Excerpts, Vol. 2) at 305:4-9, 308:3-20, 308:22-24, 309:1-12, 309:20-22; Alicia Slater, Ex. 21 at 278:19-22, 279:14-16; Brenda Dickinson, Ex. 25 at 10:8-16, 10:20-11:5, 12:1-22, 26:9-11, 29:22-30:3; Richard Scroggins, Ex. 21 at 168:10-169:18; Paul Espinoza, Ex. 26 at 176:7-177:13, 179:12-180:20; 181:15-19, 183:10-16, 184:24-25, 185:3-7.

81.     These witnesses also testified that Mr. Fennell knew about his fiancé's affair with Mr. Reed, and it inspired a racist, murderous rage. *See* Michael Bordelon, Ex. 26 at 108:23-109:3, 114:17-115:6, 115:15-116:10, 116:16-117:6 (testifying that Mr. Fennell said his fiancé was "screwing a n*****," but that he "took care of her" (while making a strangulation gesture) and "that damn n***** is going to do the time"); Arthur Snow, *id.* at 47:16-49:10, 55:1-3, 67:9-24 (testifying that Mr. Fennell confessed to him: "You wouldn't believe how easy a man's belt would break when you strangle a n*****-loving whore.").

82.     Indeed, two witnesses testified at the evidentiary hearing that Mr. Fennell confessed to them that he had murdered Ms. Stites.  Michael Bordelon, who served time with Mr. Fennell while he was incarcerated for sexually assaulting and kidnapping a woman in his custody while a police officer, *id.* at 108:23-109:3, testified that Mr. Fennell told him he "took care of the problem," *id.* at 114:18-20. When Mr. Bordelon asked him what he meant, Mr. Fennell replied that he "took care of her" and "that damn n***** is going to do the time," while making a strangulation gesture. *Id.* at 114:17-115:6, 115:18-116:10, 116:16-117:6.  Arthur Snow, who was also incarcerated with Mr. Fennell, *id.* at 55:1-3, testified that Mr. Fennell confessed to him too, saying: "You wouldn't believe how easy a man's belt would break when you strangle a n*****-loving whore," *id.* at 47:16-49:10, 67:9-24.

### a.     *Law Enforcement Knew About, but Never Disclosed, Mr. Fennell's Abusive Conduct Toward Ms. Stites*

83.     Indeed, two members of law enforcement came forward and testified at the 2021 evidentiary hearing about their knowledge of Mr. Fennell's abusive conduct toward Ms. Stites and that he appeared to have motive to kill her.  Charles Wayne Fletcher, a former Bastrop County Sheriff's officer and close friend and co-worker of Mr. Fennell at the time of Ms. Stites's murder, came forward with information describing the couple's deteriorating relationship and Mr. Fennell's motive for killing Ms. Stites.  Indeed, Mr. Fletcher was so close to Mr. Fennell at the time of Ms. Stites's murder that he was not permitted to work on the investigation.  Ex. 23 at 288:16-289:10.  At the evidentiary hearing, Mr. Fletcher testified that he saw Mr. Fennell and Ms. Stites fight at a social event in late March or early April 1996—just weeks before her death. He observed them speaking to each other with "voices raised" and got the impression that they were not in a good place in their relationship.  *Id.* at 274:19-275:11.  After he saw Ms. Stites

"stomp[] off," Mr. Fennell told him that he believed Ms. Stites was "fucking a n*****." *Id.* at 274:24-25, 276:10-25.

84.     Jim Clampit, a deputy in the Lee County Sheriff's Office at the time of Ms. Stites's murder and an acquaintance of Mr. Fennell, also testified. At the 2021 evidentiary hearing, he testified that he attended Ms. Stites's viewing and heard Mr. Fennell say that Ms. Stites "got what she deserved." Ex. 26 at 10:7-14, 13:3-16.

> **b.      The State Suppressed Information from Mr. Fennell and Ms. Stites's Downstairs Neighbor About Their Volatile Relationship**

85.     William Sappington, the downstairs neighbor of Mr. Fennell and Ms. Stites, knew of their volatile relationship and shared it with a both a police officer and a district attorney. Ex. 21 at 189:21-190:5, 191:9-19, 197:17-18. This information was never disclosed to Mr. Reed. Although William Sappington is now deceased, his son, Brent Sappington, and daughter-in-law, Vicki Sappington, testified at the evidentiary hearing.

86.     Brent Sappington testified that he would visit his father's apartment and hear a "commotion" coming from Mr. Fennell's apartment, which "sounded like a bunch of tables and chairs being turned over with a bunch of screaming and hollering." *Id.* at 194:12-19. Brent Sappington further testified that, upon hearing the "racket," *id.* at 193:23, his father told him: "That's Jimmy up there . . . yelling at Stacey. It goes on all the time," *id.* at 194:22-23. The yelling and commotion was, according to William Sappington, "a normal thing," and the "racket" occurred so frequently that his father wanted to move to another apartment in the complex. *Id.* at 195:5-12. The noise from upstairs was such that Brent Sappington became "really concerned" for Ms. Stites's safety. *Id.* at 195: 21-23.

87.     Vicki Sappington similarly testified that, around Ms. Stites's murder, her father-in-law William Sappington recalled "the times he heard all the noise above, Jimmy screaming at

- 26 -

Stacey. And it was very abusive language, and he said Jimmy was very aggressive." *Id.* at 216:6-10. Vicki Sappington also testified that William Sappington expressed confusion at why the police had never contacted him for information, *id.* at 216:1-4, and that she had never gone to the police herself because she was "scared of Jimmy . . . it's a cop's word against ours," *id.* at 216:16-20.

88.     After Ms. Stites was murdered, William Sappington reported the fighting he so frequently heard to two members of law enforcement: Giddings police officer Garnett Danewood, and Lee County District Attorney ("DA") Ted Weems.  *Id.* at 197:9-198:1.  Brent Sappington witnessed his father's conversations with these two men, *id.* at 197:14-15, and testified that DA Weems and Officer Danewood told his father "that they already had their suspect, that they didn't need nobody's help, to mind your own business, to hush his mouth."  *Id.* at 198:4-9.  Asked why he didn't report Mr. Fennell's apparent violence to still more law enforcement officers, Brent Sappington testified "I didn't think it would do any good . . . [b]ecause he's a law enforcement." *Id.* at 198:14-16.

89.     The Sappingtons' testimony is corroborated by former DA Weems, whom the State called at the evidentiary hearing. DA Weems confirmed that he and Officer Danewood attended church with the Sappingtons, Ex. 27 (2021 Evidentiary Hearing Excerpts, Vol. 10) at 12:7-11, and that William Sappington approached him after church one day, told him that he was a neighbor of Ms. Stites, and that "he wanted me to know that he had heard arguing there before, loud arguing many times," *id.* at 12:25-13:4.  DA Weems also testified that the Sappingtons are a "[f]ine family" and a very truthful one. *Id.* at 18:12, 19:4-11.

### c. Other Witnesses Testified that Mr. Fennell and Ms. Stites's Relationship Was Broken and Mr. Fennell Was Abusive

90.     Several other witnesses, all of whom lacked any connection to Mr. Reed, testified at the evidentiary hearing that Mr. Fennell was controlling, abusive, and even publicly threatened to kill Ms. Stites.

91.     Mr. Fennell's life insurance agent, Rubie Volek testified that Mr. Fennell told Ms. Stites: "If I ever catch you messing around on me, I will kill you and nobody'll know that I was the one that did it." Ex. 23 at 308:22-309:12.

92.     Ms. Dickinson (again, Ms. Stites's coworker and friend, *supra* ¶ 74), testified that Ms. Stites was afraid of her fiancé, and because of his jealous and controlling behavior, she had expressed doubts about wanting to get married. Ex. 25 at 10:20-11:5; 12:1-12. Ms. Dickinson recalled that Mr. Fennell "always" caused a scene yelling at Stites when he visited the H-E-B, which upset Stites. *Id.* at 12:13-18.

93.     Paul Espinoza, Ms. Stites's high school classmate and H-E-B coworker, testified that, on one occasion when he and Ms. Stites were working together, Mr. Fennell approached Ms. Stites in an "aggressive manner" and scolded her. Ex. 26 at 176:7-177:13; 183:10-16; 184:24-25. Mr. Espinoza found Ms. Stites crying after the incident. *Id.* at 185:3-7. Mr. Espinoza said this interaction stood out because it occurred shortly before Ms. Stites's murder and was the last time he saw her alive. *Id.* at 185:14-25.

94.     Former police dispatcher Cindy Schmidt testified that she heard Mr. Fennell say "at least the bitch got to wear the damn dress" to Ms. Stites's body, at her viewing. Ex. 21 at 234:16-235:1. Ms. Schmidt also testified that Mr. Fennell had told a fellow officer: "If I ever catch [Ms. Stites] fucking a n****r, I'll kill her." *Id.* at 250:6-18.

### d. Law Enforcement Finally Conceded that It Inadequately Investigated Mr. Fennell as a Suspect

95.     Remarkably, two members of law enforcement who investigated Ms. Stites's murder conceded on the stand at the 2021 evidentiary hearing that it had inadequately investigated Mr. Fennell.

96.     At trial, the State repeatedly told the jury that Mr. Fennell was thoroughly investigated, and had been cleared as a suspect after seven and a half months of scrutiny. Ex. 1 at 72:10-73:23. The truth, as testified to by law enforcement at the hearing, was that they had not taken some of the basic steps in police work in investigating Mr. Fennell.

97.     David Board, one of the case's investigators, testified that, despite the State's argument at trial that Mr. Fennell was cleared as a suspect after a thorough investigation, he never interviewed Mr. Fennell, Ex. 28 at 111:17-19, never inspected Mr. Fennell's apartment, *id.* at 111:20-22, and never tried to obtain Mr. Fennell's phone records, *id.* at 110:5-7, 111:12-16. He also testified that while he led the search for witnesses at H-E-B, he only spoke to 32 H-E-B employees—just 20% of the approximately 190 H-E-B employees at the time of Ms. Stites's death, and not the entire store as the prosecution told to the jury. *Id.* at 97:1-10.

98.     Rocky Wardlow, the State's lead investigator, *id.* at 127:21-128:25, similarly testified about the inadequate investigation of Mr. Fennell at the time of Ms. Stites's murder. He testified that investigators never requested a voluntary witness statement from Mr. Fennell— something that was done with other potential suspects in the case, *id.* at 198:14-23. Mr. Wardlow also testified that he never interrogated Mr. Fennell, but rather questioned him in "an interview, simply to gain information," *id.* at 199:12-16, and did not record any of Mr. Fennell's statements, *id.* at 196:19-197:7.

### e. Witnesses Testified that Mr. Fennell Confessed to Having Murdered Ms. Stites

99.   Mr. Fennell served a ten-year prison sentence for raping a woman he was dispatched to protect (when he was still a police officer). Two witnesses testified that while incarcerated with Mr. Fennell, he confessed to having murdered Ms. Stites.

100.   Arthur Snow, who was incarcerated in Stephenson Unit with Mr. Fennell, testified that Mr. Fennell confessed to him: "You wouldn't believe how easy a man's belt would break when you strangle a n*****-loving whore." Ex. 26 at 47:16-49:10, 67:924.

101.   Michael Bordelon, who served time in Sanders Estes Unit with Mr. Fennell, testified at the evidentiary hearing that Mr. Fennell told him that he "took care of the problem." *Id.* at 108:23-109:3. After Mr. Bordelon probed Mr. Fennell further about this, Mr. Fennell said he "took care of it" and "that damn n[-word] is going to do the time" while making a strangulation gesture." *Id.* at 114:17-115:6, 115:18-117:6. Mr. Bordelon also testified that Mr. Fennell said his fiancé was "screwing a n*****." *Id.* at 115:15-17.

### f. Mr. Fennell Is Not Credible

102.   At the evidentiary hearing, Mr. Fennell testified that every single one of Mr. Reed's witnesses—nearly two dozen, including members of law enforcement and friends of both his and Ms. Stites—were lying. Ex. 25 at 99:1-3, 273:9-274:13; *see also id.* at 59:7-15 (Mr. Horton, Ms. Hugen, and Ms. Slater were lying); *id.* at 58:1-59:6, 115:12-15, 134:18-136:3 (Mr. Fletcher was lying); *id.* at 59:18-60:1, 132:17-20 (Mr. Espinoza was lying); *id.* at 60:9-61:19, 132:12-16 (Richard Scroggins was lying); *id.* at 62:9-63:25, 112:21-24 (Ms. Volek was lying); *id.* at 65:20-66:16, 139:19-140:4, 144:10-13 (Mr. Snow was lying); *id.* at 67:4-68:4, 141:22-143:8, 210:24-211:17 (Mr. Bordelon was lying); *id.* at 68:19-70:12 (Drs. Baker and Davis were lying); *id.* at 98:7-25, 197:7-23 (Mr. Clampit was lying); *id.* at 100:13-101:1 (Mr. Juarez was lying); *id.*

at 101:6-17 (Brent Sappington was lying); *id*. at 101:18-22 (Vicki Sappington was lying); *id.* at 223:10-20 (Ms. Dickinson was lying); *id.* at 223:21-224:9, 255:4-256:3 (Ms. Schmidt was lying). Mr. Fennell's only character witnesses were members of his own family. *See* Ex. 5 at 155:15-156:5.

103.    Nonetheless, Mr. Fennell himself committed perjury at the evidentiary hearing in the following ways:

- Mr. Fennell testified that he texted with the State's investigator only once or twice before taking the stand. Mr. Reed's counsel then produced an exhibit showing that Mr. Fennell and the investigator actually texted over 100 times. *See* Ex. 25 at 284:21-285:6.

- Mr. Fennell denied emptying his bank account on the day of Ms. Stites's murder, *id.* at 102:14-25, although an April 30, 1996 police report shows that he did so **before Ms. Stites's body was found**. *See* Ex. 13.

- Mr. Fennell testified that he did not often use the "N"-word, and that anyone who said he had used it was lying. Ex. 25 at 66:17-67:2. Multiple witnesses testified to specific instances of Mr. Fennel using the "N"-word. *See, e.g.*, Ex. 26 at 110:14-18 (Mr. Bordelon); Ex. 23 at 274:24-25 (Mr. Fletcher).

### 3.    *Forensic Experts Testified that the State Presented False and Misleading Expert Testimony at Trial*

104.    Mr. Reed presented two *pro bono* experts at the evidentiary hearing who testified that the State's experts' trial testimony about the forensic evidence was false and misleading. Mr. Reed's experts explained how the State's trial experts' testified falsely in at least 4 separate ways: they testified (1) that intact spermatozoa can survive only 24-26 hours inside the vaginal cavity, (2) that Ms. Stites's bruises could be dated with accuracy, (3) that Ms. Stites had a rectal

injury caused by sexual assault during her murder, and (4) that Ms. Stites died between 3:00 and 5:00 a.m. on April 23, 1996. Mr. Reed has now disproven every aspect of this forensic case. Indeed, the State's own two (highly paid) experts at the hearing **_agreed_** with Mr. Reed's experts in two crucial respects.

### a. Spermatozoa

105. At the evidentiary hearing, Mr. Reed's experts, Drs. Baker and Davis, testified that spermatozoa can remain intact in the vaginal cavity for multiple days, and therefore the State's expert's testimony at Mr. Reed's trial that spermatozoa can remain intact only for 24-26 hours was false. *See* Ex. 23 at 133:24-134:2 (Dr. Baker); Ex. 21 at 88:17-89:10 (Dr. Davis). The State's two experts **_agreed_** with Mr. Reed's experts that the trial testimony was false. *See* Ex. 29 (2021 Evidentiary Hearing Excerpts, Vol. 8) at 116:12-117:9; 120:2-122:16 (Dr. Dana); *id.* at 209:20-23, 280:18-21 (Dr. Farley).[3] Dr. Norma Jean Farley, a forensic pathologist and a deputy chief medical examiner in Bexar County, agreed that studies show that sperm can survive much longer than 24 hours, even in deceased victims, *id.* at 279:8-12, and that the State's trial expert had misrepresented a scientific study in claiming that spermatozoa can only survive for 24-26 hours, *id.* at 280:18-21. The State's other expert, Dr. Suzanna Dana, a former medical examiner, similarly testified that it was false to say that sperm cannot survive for more than 24 hours. *Id.* at 116:24-117:9. The significance of this newly discovered evidence cannot be overstated: the State **_concedes_**, and thus the parties agree, that the presence of spermatozoa cannot be used to tie

---

[3] Dr. Bayardo, the State's medical examiner, had already recanted his trial testimony that spermatozoa can only survive for up to 24-26 hours, describing his testimony as "incorrect" and not "medically or scientifically supported." Ex. 20 (2012 Declaration by Dr. Roberto Bayardo) ¶ 4 (noting that he is "personally aware of medical literature finding that spermatozoa can remain intact in the vaginal cavity for days after death"). He also acknowledged that "the spermatozoa [he] found in Ms. Stites's vaginal cavity could have been deposited **_days before her death_**," and that the fact that he "found 'very few' . . . spermatozoa in Ms. Stites's vaginal cavity suggests that the spermatozoa was **_not_** deposited less than 24 hours before Ms. Stites's death." *Id.* (emphasis added).

Mr. Reed to Ms. Stites at the time of her death and the jury heard incredibly erroneous evidence in this regard.

### b.    *Dating Bruises*

106.    At Mr. Reed's trial, the State's experts testified that they could date bruises on Ms. Stites to the morning of April 23, 1996.  Ex. 30 (Trial Transcript Excerpts, Vol. 44) at 120:9-12.  At the hearing, all parties ***agreed*** this was junk science that misled the jury.

107.    At the evidentiary hearing, Mr. Reed's experts testified that doctors cannot accurately date when a bruise is formed, and thus the State's expert trial testimony dating Ms. Stites's bruises to the morning of April 23 was false.  *See* Ex. 23 at 148:1-20, 149:1-25, 150:1-23 (Dr. Baker); Ex. 21 at 90:1-25 (Dr. Davis).  Again, the State's two experts at the hearing ***agreed***.  *See* Ex. 29 at 128:1-129:14 (Dr. Dana); *id.* at 292:2-8 (Dr. Farley).  As one of the State's experts, Dr. Farley, testified, "I don't think you can accurately date when bruises are formed[.]"  *Id.* at 292:2-8.

### c.    *Rectal Injury*

108.    At the hearing, Mr. Reed's experts testified there is no scientific basis for the State's expert testimony at trial that (i) Ms. Stites had sustained a rectal injury, and that (ii) such injury occurred at the time of her death.  *See* Ex. 23 at 156:21-25, 158:6-21, 162:5-25, 163:1-15, 165:1-9 (Dr. Baker); Ex. 21 at 92:22-25, 93:1-25, 94:14-25, 95:1-3 (Dr. Davis).  They explained that it was a normal, post-mortem development for Ms. Stites's anus to be dilated, and thus the medical examiner mistook normal anal anatomy for an anal injury.  *See* Ex. 23 at 159:19-20 (Dr. Baker); Ex. 21 at 91:10-24, 94:2-25, 95:1-3 (Dr. Davis).  The State's experts at the hearing ***agreed***, refusing to defend the trial testimony.  *See* Ex. 29 at 12:21-14:15 (Dr. Dana declining to offer an opinion); *id.* at 283:18-284:6 (Dr. Farley stating that evidence of mere anal dilation does not support a conclusion of sexual assault).  In closing argument at the hearing, the State even conceded that

"[e]veryone agrees that dilation can occur naturally at the time of death. All four experts did agree on that." Ex. 5 at 52:22-24.

### d.    *Time of Death*

109.    At trial, the prosecution made its expert testimony regarding Ms. Stites's time of death the fulcrum of its summation: a scientific fact that inculpated Mr. Reed, Ex. 1 at 50:15-51:13, 74:9-15 ("Now we know that [Ms. Stites] didn't get killed at midnight the night before or seven o'clock or whenever…because Dr. Bayardo tells us that, that Stacey died within an hour of three o'clock [in the morning.]"), and excluded Mr. Fennell, *id.* at 74:20-75:4 ("[Mr. Fennell] would have to be [running] four and a half minute miles to have made it back to Giddings . . . . Well, I'm sorry, folks, but Jimmy Fennell does not look to me like a marathoner . . . . It's ludicrous. It's absolutely ludicrous . . . .").

110.    At the hearing, however, Mr. Reed's experts presented persuasive testimony that exact time of death is a rare and improper subject of expert testimony, and available evidence—specifically, the post-mortem changes to Ms. Stites's body—were at odds with the State's time-of-death theory at trial.  *See* Ex. 23 at 89:5-11 (Dr. Baker); Ex. 21 at 64:15-25, 65:1-8, 71:7-22 (Dr. Davis).  Drs. Baker and Davis reached this latter conclusion based on (1) evidence of minimal rigor mortis in Ms. Stites's body as captured in the crime scene video, Ex. 23 at 95:4-12, 96: 1-5, 96:17-24, 97:7-25 (Dr. Baker); Ex. 21 at 68:11-24, 69:1-8, 70:2-13 (Dr. Davis), (2) obvious signs of early decomposition, such as a green discoloration of the face, black and drying lips, and skin slippage, Ex. 23 at 108:8-13 (Dr. Baker); Ex. 21 at 70:18-25, 71:1-3 (Dr. Davis), and (3) the lividity pattern present in Ms. Stites's right arm and right shoulder, which were inconsistent with her body's position at the crime scene, Ex. 23 at 120:8-15, 125:6-15 (Dr. Baker); Ex. 21 at 82:21-25, 83:1-6 (Dr. Davis).  They also testified that the lividity pattern in Ms. Stites's body indicates that her body was moved to the roadside (where it was discovered) 4-6 hours after she was killed.

*See* Ex. 23 at 120:8-15, 120:22-121:2, 121:1-7, 121:11-16, 122:3-11, 125:6-15 (Dr. Baker); Ex. 21 at 73:23-74:5, 74:12-24, 75:8-16, 76:6-18, 82:10-84:14 (Dr. Davis). What Drs. Baker and Davis's testimony establishes is that Ms. Stites died hours before the window the State asserted at trial, and during the period **when she was alone with Mr. Fennell**.

111.     At the hearing, the State's experts did not dispute that it was rare and improper to make such a narrow time-of-death estimate.  They nevertheless stood by the assertion that Ms. Stites was killed during the narrow 3-to-5 a.m. window.  However, their testimony was based only on non-medical ancillary evidence, such as that Ms. Stites was haphazardly dressed in her H-E-B uniform when her body was found.  *See* Ex. 31 (2021 Evidentiary Hearing Excerpts, Vol. 7) at 242:12-17, 244:21-23 (Dr. Dana acknowledging ancillary evidence); Ex. 29 at 206:3-22 (Dr. Farley acknowledging ancillary evidence).[4]

## V.      FACTUAL BACKGROUND – INADEQUATE STATE COURT REVIEW

### A.      Trial Court's Rubberstamped FFCL

112.     In remanding Mr. Reed's tenth state habeas petition to the trial court, the CCA sought a neutral, unbiased, independent assessment of the factual record and witness credibility to take place in the trial court. That did not happen.

113.     Instead, the trial court abdicated entirely its role as a neutral, independent trier of fact when it presided over a two-week hearing in July 2021 where 47 witnesses testified. On October 31, 2022, the trial court recommended denial of Mr. Reed's tenth state habeas petition based on Findings of Fact and Conclusions of Law ("FFCL"), which copied and pasted the State's Proposed FFCL, and made no material changes beyond formatting and removing the word

---

[4] Dr. Bayardo already recanted this portion of his trial testimony: "My estimate of time of death…should not have been used at trial as an accurate statement of when Ms. Stites died. . . . [P]inpointing a precise time of exactly when Ms. Stites died would have been, and remains, impossible." Ex. 20 ¶ 3.

"Proposed" in the title. The court failed to make any of its own findings—including crucial witness credibility determinations—and merely adopted verbatim the State's self-serving proposed findings.

114. The findings rubberstamped by the trial court were riddled with errors, as the CCA later observed when it found that the trial "court's recommended FFCLs in this case contain multiple oversights which come directly from the State's proposed FFCLs." *Ex parte Reed*, 670 S.W.3d 689, 744 (Tex. Crim. App. 2023). Yet, as discussed further *infra* ¶¶ 122, 127, the CCA nevertheless effectively relied on the trial court's wrongfully rubberstamped recommendation. Lacking hearing audio or video, the CCA was hamstrung from making its own independent, proper findings and credibility determinations.

115. The trial court made no apparent efforts to hide its decision to rubberstamp the State's proposed FFCL. For instance, the trial court's FFCL copied the language in the State's proposed FFCL claiming that *every single* witness called by the State was credible and that *every single* witness called by Mr. Reed was not credible. *See, e.g.*, *compare* Ex. 32 (State's Proposed Findings of Fact and Conclusions of Law ("FFCL") filed on October 8, 2021) ¶ 33, *with* Ex. 33 (Findings of Fact, Conclusions of Law and Recommendations, *Ex parte Reed*, WR-50,961-10 (21st Jud. Dist. Ct. Oct. 31, 2021)) ¶ 34 (identical); *compare* Ex. 32 ¶¶ 67-72, *with* Ex. 33 ¶¶ 68-73 (identical); *compare* Ex. 32 ¶¶ 87-102, *with* Ex. 33 ¶¶ 88-103 (identical); *compare* Ex. 32 ¶ 182, *with* Ex. 33 ¶ 181 (identical). Not one of the trial court's witness credibility findings differed from the State's submission.

116. The trial court even copied falsehoods in the State's proposed FFCL, including clear factual errors about testimony given at the July 2021 hearing and erroneous conclusions of law. For instance, the trial court's FFCL verbatim adopted an erroneous statement in the State's

submission that one witness, a former co-worker and friend of Ms. Stites, "did not tell anyone, at the HEB or otherwise, at the time of the State's murder about these events," referring to her testimony that she knew Ms. Stites and Mr. Reed were friends and had seen them together at H-E-B, when that witness had reported this information to *law enforcement* around the time of Ms. Stites's murder. *See* Ex. 32 ¶ 95. And the trial court's adoption of the falsehoods in the State's submission cannot be dismissed as a mere oversight. During closing arguments, Mr. Reed pointed out the numerous falsities in the State's Proposed FFCL, and yet the trial court still adopted them in its final order.

117.    The trial court's abdication of its judicial responsibility in Mr. Reed's case cannot be overlooked here. The role of a trial judge, including in post-conviction proceedings, is to be the "fact finder," not merely a conduit of a cold record to the CCA in issuing a recommendation. *See Ex parte Evans*, 338 S.W.3d 545, 546 (Tex. Crim App. 2011). That is because, as the highest criminal court in Texas has explained, a trial judge—such as the one presiding over the July 2021 hearing—is "[u]niquely situated to observe the demeanor of witnesses first-hand," *Ex parte Reed*, 271 S.W.3d 698, 727 (Tex. Crim. App. 2008), and, thus, "is in the best position to assess the credibility of the witnesses," *Ex parte Thuesen*, 546 S.W.3d 145, 157 (Tex. Crim. App. 2017). *See Villarreal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996) ("[T]he trial court, who observes the demeanor and appearance of the witnesses, is in a better position to determine their credibility than the appellate court is by reading their testimony as it appears on the record."). It is for this very reason—the unique role of a trial judge—that the CCA remanded Mr. Reed's claims in the tenth state habeas petition to the trial court "*for further development*." *Ex parte Reed*, No. WR-50,961-10, slip op. at 3-4 (Tex. Crim. App. Nov. 15, 2019) (ORDER) (emphasis added). Indeed,

the trial court even said that it was "set[ting] the matter for a live, in-person evidentiary hearing" because "credibility is crucial in this case." Ex. 33 ¶ 8.

118. And nonetheless, the trial court ignored its mandate, adopting wholesale the State's proposed FFCL, including its errors, and failing to make any of its own credibility determinations. It is well-recognized that "[t]he quality of judicial decisionmaking suffers when a judge delegates the drafting of orders to a party." *In re Colony Square Co.*, 819 F.2d 272, 275 (11th Cir. 1987). It can, for instance, "invit[e] error by adopting such findings verbatim because they may inadequately support the decision or there may exist many detailed findings which are unnecessary or lack support in the record." *In re Sabrina M.*, 460 A.2d 1009, 1013 (Me. 1983). In addition, it creates an "utter lack of an appearance of impartiality," *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1373 n.46 (11th Cir. 1997), because it eliminates "[t]he independence of the court's thought process," *In re Las Colinas, Inc.*, 426 F.2d 1005, 1009 (1st Cir. 1970).

119. On January 31, 2022, Mr. Reed filed detailed objections to the trial court's recommendation in the Texas Court of Criminal Appeals (the "CCA") and requested oral argument. The State never filed a response.

**B.    CCA Unreasonably Denies Mr. Reed's Tenth State Habeas Petition**

120. The CCA's June 28, 2023 denial of Mr. Reed's tenth state court habeas petition, without the benefit of oral argument, was unreasonable. The CCA recognized that any independent review of the record below was hampered by the trial court's "failing to 'carefully scrutinize[]' the State's proposed [order]." *Ex parte Reed*, 670 S.W.3d at 744 (characterizing their independent review as "unnecessarily complicated"); *see also id.* at 743 (noting "the habeas court adopted the State's proposed FFCLs nearly verbatim").

121.    Because the CCA could not "rely upon" the trial court's inadequate and inaccurate recommendation, it explained that it was forced to "view the habeas court's FFCLs 'skeptical[ly]'" and could not endorse the trial court's findings "with all due confidence." *Id.* at 744.

122.    However, instead of remanding the case for an appropriately neutral, independent trial court review, or at least observing firsthand via audio or video the evidence presented, the CCA unreasonably claimed it could nevertheless "grapple with the record independently—claim by claim, item by item, witness by witness—with a view toward exercising our own judgment." *Id.* In so doing, and inconsistent with any supposedly "skeptical" consideration of the trial court's findings, the CCA inexplicably deferred to the trial court's key findings, including to the trial court's supposed credibility determinations on certain linchpin witnesses. *See id.* (explaining that it would "draw upon [the trial court's findings] where appropriate to inform our assessment of witness credibility and historical fact"). As a result, just like the trial court, the CCA unreasonably credited *all* of the state's witnesses and *none* of Mr. Reed's 19 witnesses.

123.    Notably, the CCA did so notwithstanding that Mr. Reed's 19 witnesses were, across the board, of the unlikely sort; these were men and women who owed Mr. Reed nothing and had no motive to help him. To the contrary, these witnesses were either former co-workers and friends of Ms. Stites who adored her, or former law enforcement officers who knew and worked closely with the alternative suspect in this case, Mr. Fennell.

124.    None of these witnesses had any affiliation to Mr. Reed and, if anything, would have harbored allegiances to the victim, to law enforcement, and/or to Mr. Fennell. In unreasonably rejecting the credibility of all of these unlikely witnesses, the CCA overlooked the guidance of controlling authorities, which instruct that statements incriminating an alternative suspect which are offered by witnesses "with no evident motive to lie" have more probative value

than "testimony from inmates, suspects, or friends or relations of the accused." *House v. Bell*, 547 U.S. 518, 552 (2006) (finding that the district court below wrongly declined to credit evidence offered by two eyewitnesses that the victim's husband confessed on the grounds that they waited ten years to come forward and no physical evidence corroborated his alleged inculpatory statements that he killed his wife in his kitchen because "the record indicates no reason why these two women, both lifelong friends of Mr. Muncey [the victim's husband], would have wanted either to frame him or to help House."); *see also Schlup v. Delo*, 513 U.S. 298, 316-17 (1995) (crediting as "particularly relevant" the affidavits of Black prisoners and a correctional officer in support of a white petitioner's innocence where the crime involved the racially motivated killing of a Black prisoner).

125. The CCA rejected Mr. Reed's 19 disinterested—and, therefore, especially probative and particularly relevant—witnesses without any practical means of "grappl[ing] with the record independently" to actually assess their credibility. *Ex parte Reed*, 670 S.W.3d at 744. The CCA had no access to the visual or audio recording of the hearing testimony—the very evidence needed to make its own findings and, in particular, to reach credibility determinations about the witnesses. *See State v. Ross*, 32 S.W.3d 853, 857 n.25 (Tex. Crim. App. 2000) ("Demeanor and credibility assessments are based in large part on visual and audio observations and are not usually found in the record.").

126. This was to the prejudice of Mr. Reed, who had asked the trial court to include the audio recording of the hearing in the appellate record so the CCA could hear the testimony for itself. As Mr. Reed explained, key to determining the credibility of any witness includes having insight into their tone, inflection, pace of speech, and demeanor while testifying—none of which can be conveyed via cold transcript alone. The trial court refused Mr. Reed's request, however,

barring transmission of the audio recording to the CCA. (The trial court also had previously barred broadcast of the hearing on the public court-access channel and precluded any visual or audio recording by the media during the hearing.)

127. Because it lacked the necessary insight to make its own proper credibility determinations, the CCA credited from one side of its mouth the very same rubberstamped FFCL which it had, from the other side, denounced as something it could not endorse with "all due confidence." *Ex parte Reed*, 670 S.W.3d at 744. For example, in finding not credible a witness who testified that Mr. Fennell had confessed to murdering Ms. Stites, the CCA relied on the State's proposed findings, as rubberstamped by the trial court, to conclude the witness became "cagey" on cross-examination, unreasonably and selectively concluding that on this point the trial court had independently, "observ[ed] [that witness's] testimony and demeanor firsthand." *Id.* at 752-53. Without the full record, inclusive of audio, the CCA never could have conducted the independent review it declared necessary at the beginning of its opinion. Accordingly, at this stage, a neutral decisionmaker has yet to observe and independently assess the profoundly powerful witness testimony regarding Mr. Reed's innocence that has emerged since 2019.

128. Nevertheless, following the rubberstamped FFCL, the CCA denied relief on each of Mr. Reed's three legal claims, including his innocence claims; his *Brady* claims based on the State's failure to turn over material information in the possession of Bastrop law enforcement, specifically in the possession of Charles Fletcher, Jim Clampit, and Richard Derleth, before his trial; and Mr. Reed's false testimony claim based on Mr. Fennell repeatedly testifying falsely at Mr. Reed's trial.

129. The CCA denied relief on Mr. Reed's legal claims after erring in its analysis of Mr. Reed's freestanding and gateway innocence claims. The CCA's denial of his innocence claims

was based not only on the patently unreasonable factual determinations in light of the actual evidence presented which are discussed *supra*, and further detailed below, but also on a misapplication of the *Schlup* standard. As an initial matter, for the CCA to conclude that **not one** of Mr. Reed's 19 witnesses at the July 2021 hearing was credible is facially suspicious. But looking at the CCA's (often limited) explanations for **why** it so concluded brings the unreasonableness into stark relief.

130. For example, the CCA questions the credibility of witnesses—again, who had no motive to fabricate their stories, nor any motive to either frame someone else or help Mr. Reed—who attested to Mr. Reed's consensual relationship with Ms. Stites because they "came forward after so many years." *Id.* at 747-48; *but see House*, 547 U.S. at 551 (chiding the district court below for discounting the credibility of two friends of the victim's husband who offered evidence that he had confessed to them because they "did attempt to explain their delay coming forward").

131. The CCA's contorted explanation for why delay necessarily discounts credibility is that these witnesses should not be able to remember events (such as seeing Mr. Reed and Ms. Stites together) from so long ago when they also testified that they had not realized at the time how important those events were. *Ex parte Reed*, 670 S.W.3d at 747-48 (crediting, instead, a State expert who testified that "'if you don't think something is important at the time, you're less likely to' . . . recall it later").

132. For instance, the CCA refused to credit the testimony of Ms. Hugen—who testified, *inter alia*, about seeing Mr. Reed and Ms. Stites flirting with one another at the grocery store where she and Ms. Stites worked—because the CCA considered what she witnessed to be "unremarkable, even mundane." *Id.* at 748. Yet, the record evidence establishes that Ms. Hugen and Ms. Stites were friends as well as co-workers; many would find it striking for an engaged friend and co-

worker to introduce you to, and be openly flirtatious with, someone who is not her fiancé, especially at your place of employment. Moreover, in Bastrop, Texas, in 1996, such behavior would have been particularly conspicuous if that someone was a Black man and you and your friend were white women.

133.     Even more irrationally, the CCA totally disregards that Ms. Hugen did not in fact delay coming forward—such that, whether she found what she saw mundane or not, her memory was consistent with what she told law enforcement shortly after Mr. Reed was charged with Ms. Stites's murder. *See id.* at 748 ("[T]he fact that Hugen said that she spoke with [Officer] Alexander in the 1990s does not mean that the habeas court—or this Court—must believe her."). But whether or not Ms. Hugen even needed to offer a reason for what CCA supposed was a delay in coming forward, the propensity for people generally to remember something they did not appreciate as important at the time has no bearing on whether a specific person's memory nevertheless found that same thing notable, particularly not when that specific person's testimony is further corroborated by others (including, in Ms. Hugen's case, the several others who likewise saw Rodney Reed in the company of Stacey Stites).

134.     The CCA also unreasonably rejects the testimony of certain witnesses on the grounds that the reasons for their delay in coming forward were "implausible." For example, the CCA found it implausible that fear of "going against law enforcement" could explain why former law enforcement officer Charles Fletcher delayed coming forward to tell others what Mr. Fennell had said to him at a barbeque one month before Ms. Stites was killed. *Id.* at 765; *but see House*, 547 U.S. at 550 (stating that the two friends of the victim's husband who averred that he had confessed attempting to explain their delay in coming forward by pointing, variously, to their fear of the victim's husband, and to a feeling of futility, either because they did not expect law

enforcement to listen to them, or because the case had been resolved, and "[law enforcement] had it all signed, sealed, and delivered.").

135. Mr. Flecther specifically recalled that, at the barbeque, Mr. Fennell had said he believed his fiancé was "fucking a n*****." *Ex parte Reed*, 670 S.W.3d at 765. But the CCA unreasonably found Mr. Fletcher's fear unbelievable, reasoning that fear would have been inconsistent with the fact that Mr. Fletcher drove with Mr. Fennell to attend Ms. Stite's burial. *Id.* The CCA also found Mr. Fletcher's additional testimony—that he did not want what had happened to another law enforcement officer (the suicide of Ed Selmala four months after Ms. Stites's murder) to happen to him—further diminished his believability. *Id.*

136. Yet there is absolutely no record support for the CCA's rationale: Mr. Fennell **was** then a police officer—one who subsequently went to jail and has admitted to predatory and violent conduct—an important fact that substantiates Mr. Fletcher's fear of law enforcement. Mr. Fletcher's decision to drive with Mr. Fennell to Ms. Stites's burial notwithstanding the disturbing things Mr. Fennell had said and done is consistent with Mr. Fletcher being fearful (opting to get along instead of stand or speak out). And his concern that Ed Selmala may have been murdered—even if based in conspiracy theory—is likewise consistent with Mr. Fletcher's testimony that he feared something bad might happen to him if he came forward.

137. In addition, the CCA baldly discounts what it characterizes as "this entire category of evidence (the gist of which is that Stacey openly associated with her 'secret' boyfriend Reed)," explaining only that Mr. Reed's efforts to substantiate his consensual relationship with her are inconsistent with Mr. Reed's additional evidence that Mr. Fennell was jealous and possessive. *Id.* at 748. In so doing, the Court assumes that Ms. Stites would have so assiduously avoided

Mr. Fennell's ire that she either would not have ever allowed anyone to see her in public with Mr. Reed, or she never would have had an affair with him. *Id.* at 748.

138. That assumption is not only unreasonable, it defies common sense. A jealous and possessive partner arguably creates ***more*** motive to have an affair, not less. And, whether Ms. Stites attempted to avoid his ire or not, the facts that she was sometimes seen in public with Mr. Reed (often at the place where she worked, where she might have felt more independence than otherwise), or that she mentioned him, and even once introduced him, to her own trusted friends in no way bears on their credibility.

139. Finally, the CCA flat out dismisses any corroborative value across various of Mr. Reed's witnesses because they were "so disparate in what they describe," instead of testifying to "one specific, dateable event" connecting Mr. Reed and Ms. Stites. *Id.* at 748. This is bizarre. The fact that certain of Mr. Reed's witnesses testified to the very same thing—seeing firsthand that Mr. Reed and Ms. Stites were well familiar with each other—on "disparate" occasions—seeing them together in different places at different times—***strengthens***, not weakens, the thrust of their testimony. *Id.* Moreover, their testimony is further bolstered by the testimony of others who were aware, for example, that Ms. Stites was seeing someone named "Rodney." *Id.*

140. In denying Mr. Reed's innocence claims, the CCA also unreasonably dismisses the "sizable body of evidence" adduced by Mr. Reed and, importantly, with which even the State's hearing expert ***agreed***, which showed that jurors had been wrongly informed by State trial experts who, "underestimated the length of time that spermatozoa can remain intact in the vagina." *Id.* at 749. The CCA unreasonably determined that the new evidence showing that State's trial experts testified falsely would have had no impact on a juror's decision because it did not prove the semen "actually ***was*** deposited outside that [24-26 hour] window," which is what the CCA required to

satisfy what it characterizes as a demand for "affirmative" evidence. *Id.* at 750 (emphasis in original).

141.    In so doing, the CCA wrongly supplants the actual *Schlup* gateway innocence standard—under which Mr. Reed should have been required to "show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence," *see Schlup*, 513 U.S. at 327, or, in other words, that a reasonable juror would see reasonable doubt—with a distorted, and more stringent, standard that required Mr. Reed to conclusively prove his actual innocence. *See, e.g.*, *Ex parte Reed*, 670 S.W.3d at 761 (the CCA required Mr. Reed to "affirmatively demonstrate[]" his innocence by "affirmatively show[ing] that Reed did not kill Stacey" or "affirmatively show[ing] that someone else did."); s*ee also id.* ("None of these efforts affirmatively demonstrates that Reed is innocent."); *id.* at 762 ("That being the case, the evidence in this phase does not get Reed to where he needs to go: an affirmative, fact-and-conduct-based showing of innocence."); *id.* at 769 ("Reed has failed to make an affirmative, persuasive showing that, likelier than not, he is innocent of Stacey Stites's murder.").

### C.    CCA Unreasonably Denies Mr. Reed's Eleventh State Habeas Petition

142.    The same day the CCA denied Mr. Reed's tenth state habeas petition, it also dismissed Mr. Reed's eleventh as an abuse of the writ, without remanding for further factual development. *Ex parte Reed*, No. WR-50,961-10 (Tex. Crim. App. Oct. 4, 2023).

143.    Mr. Reed filed his eleventh state habeas petition in December 2021, just five months after the July 2021 hearing.  In it, he raised three as yet unlitigated claims under *Brady* and *Napue*, predicated on information discovered either weeks before the July 2021 hearing (but was not permitted to adjudicate at the hearing) or during the hearing itself.

144.    Mr. Reed's eleventh state habeas *Brady* claims related to the two June 25, 2021 letters produced by the State on the eve of the July 2021 hearing, which are discussed *supra* ¶¶ 64-

68. The first disclosed "witness interview summaries" of statements made by Ron Haas and Andrew Cardenas—each of whom offered evidence as to rumors, existing even before Mr. Reed's trial, that Mr. Reed and Ms. Stites knew each other—as well as Jose Coronado, who denied telling anyone that he had seen Mr. Reed visiting Ms. Stites, or being the source of those rumors. Ex. 4 at 1. The second letter disclosed a statement from Suzan Hugen, a potential July 2021 hearing witness for the State Mr. Reed had never before heard of. Ex. 3. The State considered this material "conceivably . . . exculpatory or mitigating" because Ms. Hugen had told law enforcement that she saw Ms. Stites and Mr. Reed together; that Ms. Stites introduced Mr. Reed to her as a "good or close friend"; and that "they appeared friendly, giggling, and flirting." *Id.* The disclosure letter further noted that Ms. Hugen had previously provided this information to law enforcement around the time of Ms. Stites's murder. *Id.*

145. Mr. Reed's *Napue* claim related to several witnesses at his trial who, in light of the new evidence disclosed by the State, Mr. Reed now can show testified falsely.

146. The CCA's denial of Mr. Reed's *Brady* and *Napue* claims on the grounds that Mr. Reed failed to meet applicable materiality standards is unreasonable. On their own, and certainly when considered cumulatively with other *Brady* and *Napue* violations alleged by Mr. Reed, this newly disclosed evidence and that fact that certain trial witnesses could have been more robustly impeached, tends to upend the State's central theory at trial. The State repeatedly urged jurors— through the State's cross examination of the only two witnesses Mr. Reed was then able to call to testify as to Mr. Reed and Ms. Stites knowing each other, as well as through closing arguments—that Mr. Reed and Ms. Stites were strangers to one another. If information about Mr. Reed and Ms. Stites's familiarity had been immaterial, it would not have been built into the

cornerstone of the State's cross-examinations or the State's closing to argue that Mr. Reed and Ms. Stites did not know each other.

147.    Moreover, the CCA's disposition of Mr. Reed's eleventh state habeas petition unreasonably fails to recognize that Ms. Hugen, Mr. Haas, and Mr. Cardenas were each strangers to Mr. Reed, with no motive to lie, to frame Mr. Fennell, or to help Mr. Reed in any way. They were friends and co-workers of Ms. Stites, making the substance of their proffered evidence (that they had either seen Mr. Reed and Ms. Stites together or heard rumors about Mr. Reed and Ms. Stites) all the more impactful.

148.    The CCA further acted unreasonably in dismissing Mr. Reed's *Brady* claim, specifically in connection with testimony of Brent Sappington on the grounds that Mr. Reed failed to show that he could not have ascertained this information sooner. As discussed *supra* ¶¶ 85-86, Brent Sappington testified that his now deceased father, William Sappington, had lived below Mr. Fennell and Ms. Stites and heard "a racket" "all the time," including "sound[ing] like a bunch of tables and chairs being turned over with a bunch of screaming and hollering." *Ex parte Reed*, No. WR-50,961-11, 2023 WL 4234348 at *3 (Tex. Crim. App. June 28, 2023). He testified that his father shared this information with Lee County District Attorney Ted Weems. *Id.* At the July 2021 hearing, DA Weems corroborated Brent Sappington's testimony, evidencing *Brady* information that had previously been undisclosed by the State to Mr. Reed. DA Weems testified that William Sappington approached him at church and said he had heard "loud arguing many times" coming from Mr. Fennell and Ms. Stites's apartment. *Id.* The CCA appeared to credit Brent Sappington and DA Weems' testimony. *Id.* at *5. However, it unreasonably ignored the State's failure to fulfill its obligation to disclose potentially exculpating evidence, and instead placed the onus on Mr. Reed to have independently discovered that information. *Id.*

149.    The CCA's dismissal of Mr. Reed's claim that the State presented false forensic testimony at his trial (including as to the length of time that spermatozoa can survive in the vaginal cavity) was also unreasonable.  *Id.* at *7.

## VI.    GROUNDS FOR RELIEF

150.    Mr. Reed was convicted and sentenced to death in violation of the Fourteenth Amendment to the U.S. Constitution in the following respects (each of which incorporates by reference all of the foregoing alleged facts).

### A.    MATERIAL NEWLY DISCOVERED EXCULPATORY EVIDENCE WAS SUPPRESSED IN VIOLATION OF *BRADY V. MARYLAND*

151.    Prosecutors have an affirmative duty to disclose any "evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment, irrespective of the good or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  To establish a due process violation under *Brady*, an applicant must prove three elements: (1) the State failed to disclose evidence, either willfully or inadvertently, (2) the withheld evidence at issue is favorable to the accused, and (3) the evidence is material, in that there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different.  *See Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *United States v. Bagley*, 473 U.S. 667, 682 (1985).

152.    Due process demands disclosure even if there has been no request from the accused, *United States v. Agurs*, 427 U.S. 97, 106-07 (1976), and the prosecution's duty to disclose includes both impeachment and exculpatory evidence, *Bagley*, 473 U.S. at 676.  When considering due process claims under *Brady* and its progeny, all exculpatory evidence must be considered collectively, not item-by-item. *See Kyles v. Whitley*, 514 U.S. 419, 436 (1995).

153.    In his tenth and eleventh state habeas petitions, Mr. Reed raised several *Brady* claims based on the State's failure to disclose that prosecutors or police knew that (1) witnesses,

specifically friends and co-workers of Ms. Stites, had information regarding a connection between Ms. Stites and Mr. Reed, and (2) witnesses, including law enforcement, had knowledge of Ms. Stites and Mr. Fennell's strained—even abusive—relationship, and/or of inculpatory remarks Mr. Fennell made before and after Ms. Stites's death.

154.     The CCA's disposal of these *Brady* claims was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" and was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1), (2).

**1.     *Suppression of Exculpatory Statements by Co-Workers Suzan Hugen, Andrew Cardenas, and Ron Haas***

155.     The State's suppression of evidence offered by H-E-B employees that Ms. Stites and Mr. Reed in fact knew each other hindered the development of Mr. Reed's defense at trial—that Ms. Stites and Mr. Reed were engaged in a consensual affair—while bolstering the State's theory of the case that they were strangers.  The disclosure of this evidence would have, at minimum, substantiated reasonable doubt, and its suppression denied Mr. Reed a fundamentally fair trial.  *See* 28 U.S.C. § 2254(d)(1).

156.     As discussed, the State's case at trial was predicated on its theory that Ms. Stites and Mr. Reed were strangers. Proving this theory was necessary to persuade the jury that Mr. Reed's DNA was deposited on Ms. Stites contemporaneous with her murder, after she left the apartment she shared with Mr. Fennell, and while she was traveling to her job at the Bastrop H-E-B.

157.     At trial, the State claimed it provided open-file discovery. The State then told jurors that its extensive, year-long investigation—during which it allegedly spoke to countless friends, co-workers, and other acquaintances of Ms. Stites—found not one individual who confirmed that

Ms. Stites and Mr. Reed knew each other. *See* Ex. 16 at 18:4-10; Ex. 1 at 56:24-57:14. It further urged jurors to discredit two defense witnesses who testified on Mr. Reed's behalf that they had seen Ms. Stites and Mr. Reed together.

158.     In the years since his conviction, Mr. Reed has presented additional witnesses who testified they had seen the two together. In each instance, the State argued these witnesses too were not credible because its extensive investigation had identified no such relationship, and those witnesses had some connection to Mr. Reed (and were therefore biased in favor of helping him).

159.     In 2021, as Mr. Reed was preparing for the lengthy evidentiary hearing, he again moved for discovery. Once again, the State asserted it had fully disclosed all relevant discovery, and the court denied the motion. *See* Ex. 34 (State's Response in Opposition to Mr. Reed's 2021 Motion for Pre-Hearing Discovery, filed on Feb. 5, 2021) at 19 (the State insisting that it "had more than an open file policy at trial" and that "[t]he open file policy has continued since").

160.     Then, in June 2021, after more than ***two decades*** of denial, indeed even after claiming to have had an open file for the past two decades, and just weeks before the start of the evidentiary hearing, the State informed Mr. Reed that it in fact did possess information consistent with his claim that he and Ms. Stites had a consensual relationship. *See supra* ¶¶ 64-68.

161.     On June 25, 2021, the State disclosed certain "witness interview summaries . . . created by the trial team in preparation for [Mr. Reed's] underlying 1998 criminal prosecution." Ex. 4 at 1. The first summary was of an interview with Ron Haas, who was the H-E-B Bastrop Store Director during Ms. Stites's employment.

162.     This summary noted that Mr. Haas had communicated to the State that he had heard at the H-E-B that Mr. Reed and Ms. Stites knew each other, and that Mr. Reed sometimes came to the store to visit Ms. Stites. *Id.* at 2. Haas also told the State that another H-E-B employee, Andrew

Cardenas, may have mentioned that Ms. Stites and Mr. Reed were acquainted. Mr. Cardenas also spoke to the State and recalled that Jose Coronado, another H-E-B employee had told him that he had seen Mr. Reed speaking with Ms. Stites at the store. *Id.* at 5.

163. As set forth above, *see supra* ¶¶ 64-68, the State also disclosed that another H-E-B employee, Suzan Hugen, a co-worker and friend of Ms. Stites, was identified by the State in preparing for the July 2021 hearing. Ex. 3. The State disclosed that Ms. Hugen recalled she saw Mr. Reed with Ms. Stites and Ms. Stites introduced Mr. Reed to Ms. Hugen as a "good or close friend." *Id.* Ms. Hugen noted during this meeting Ms. Stites and Mr. Reed appeared "friendly, giggling, and flirting." *Id.*

164. Mr. Reed immediately sought further discovery and to add a new *Brady* claim into the petition for adjudication during the upcoming evidentiary hearing. The State objected, and the court denied further discovery or litigation of that claim. Thus, there was no occasion at the July 2021 hearing to explore why it was the State suppressed this important information for decades or to learn of the State's response to why relief should not be granted on this claim.

165. At the July 2021 hearing, much evidence was presented that is directly relevant to this *Brady* claim. *See supra* ¶¶ 72-77. Ms. Hugen testified she worked with Ms. Stites the entire time Ms. Stites worked at the H-E-B. She knew Ms. Stites was engaged, and came to believe Ms. Stites's relationship with Mr. Fennell was abusive, due to viewing "fingerprint bruises" on her arms. Ex. 21 at 16:1-17:1. Not long before Ms. Stites's death, she saw Ms. Stites standing close to a Black man in the store. *Id.* at 17:2-14. Ms. Stites asked Ms. Hugen to come and say hello, and she introduced the man as "Rodney" and described him as her good friend. *Id.* at 17:16-19, 33:3-5. Ms. Hugen testified that during this time Ms. Stites and Mr. Reed were laughing and

flirting with one another. *Id.* at 17:21-23, 35:3-19. Ms. Hugen was deeply saddened by Ms. Stites murder and attended a memorial service.

166. Months later, after local media reported that Mr. Reed was arrested for Ms. Stites's murder and that Ms. Stites and Mr. Reed did not know each other, Ms. Hugen knew this was not true. *Id.* at 19:1-19. She sought out Paul Alexander, a Bastrop police officer, who was providing security at the H-E-B. Ms. Hugen knew Officer Alexander as they occasionally took smoke breaks together. She told Officer Alexander that Ms. Stites and Mr. Reed were not strangers and that Ms. Stites had introduced Mr. Reed as her good friend. *Id.* Ms. Hugen believed Officer Alexander would file a report but heard nothing from law enforcement or from Mr. Reed's defense until 2021.

167. Ms. Hugen's account was that Ms. Stites and Mr. Reed not only knew each other but even appeared to be good, flirtatious friends. As shown *supra* ¶¶ 73-77, several other H-E-B co-workers of Ms. Stites also came forward in 2019 with similar accounts of seeing Ms. Stites and Mr. Reed together, sometimes in the store or in other locations around Bastrop, one of whom specifically recalled Ms. Stites saying she was "sleeping with a black man named Rodney."

168. Ms. Hugen does not know Mr. Reed or his family. She adored Ms. Stites and testified to set the record straight. The other H-E-B witnesses who confirmed Ms. Stites and Mr. Reed's friendship also have no connection to Mr. Reed nor any motivation to aid him.

169. Had the State not suppressed at trial the statements of Mr. Haas, Mr. Cardenas, Mr. Coronado and Ms. Hugen, defense counsel could have more fully investigated Mr. Reed's defense that he and Ms. Stites had an intimate relationship, which in turn would have supported his defense that his DNA was deposited on Ms. Stites days before her murder. Mr. Reed may well have been able to find even more H-E-B employees who would have confirmed Ms. Hugen's firsthand account and what Mr. Haas and Mr. Cardenas had heard. Testimony coming from

Ms. Stites's co-workers would have been categorically different from the only evidence that Mr. Reed offered at trial about his relationship with Ms. Stites.

170.     What's more, if the State had disclosed these witnesses' exculpatory statements before trial as it was obliged to do, that would have allowed Mr. Reed to create a more detailed record, and to more easily corroborate those details, and would have left his defense far less vulnerable to the charge that delay in coming forward made these witnesses less credible.

171.     Because the state habeas trial court did not permit this claim to be litigated on its merits in 2021, Mr. Reed sought leave from the CCA to permit litigation via his eleventh state habeas application.  The State never filed any response, nor explained why this highly material information was not provided to the defense prior to trial, or even during the past two decades of post-conviction litigation that repeatedly touched upon whether Ms. Stites and Mr. Reed knew each other, and if so, the nature of that relationship.  Indeed, the State has never openly asserted it did not suppress this material, that the material was not favorable, nor that it was not material, the three elements to a claim under *Brady*. *See Kyles*, 514 U.S. at 437.

172.     In denying his eleventh state habeas petition, the CCA delivered a merits rejection of this *Brady* claim. *Ex parte Reed*, No WR-50,961-11, 2023 WL 4234348, at *4-5 (Tex. Crim. App. June 28, 2023). It did not conclude that the State had timely revealed this information. Nor did it determine the evidence was not favorable.  After a brief, incomplete analysis, it conclusorily declared that none of the new Hugen, Haas, Coronado, and Cardenas evidence was material or would have had any significant effect upon the jury.

173.     This is an unreasonable application of the clearly established materiality analysis recognized in *Brady* and its progeny.  *See* 28 U.S.C. § 2254(d)(1). The suppression of this evidence was devastatingly prejudicial to Mr. Reed at trial.  An essential function of *Brady* is to provide the

defense notice of evidence that may be favorable to the accused, so that the defense can determine, prior to trial, whether such evidence is helpful, or whether it leads to other useful evidence.

174.    Here, the record clearly shows that Mr. Reed's defense—which hinged on Mr. Reed's assertion that he and Ms. Stites knew each other and even intimately involved—was deeply prejudiced by the State's withholding of these witness statements. The State deprived Mr. Reed of evidence showing that these co-workers and friends of Ms. Stites had confirmed that Ms. Stites and Mr. Reed were engaged in a romantic relationship at the time of her murder— information that Mr. Reed certainly would have presented to the jury.  Had this information, and any further information that access to these statements may have led Mr. Reed to, been presented to the jury, there is at least a reasonable probability that the jury would have considered Mr. Reed's defense and the State's case differently, and the outcome of the trial would have been different. *See Strickler*, 527 U.S. at 281-82.

175.    The CCA's analysis was thus an unreasonable application of U.S. Supreme Court precedent.

### 2.    *Suppression of Exculpatory Information Possessed by Law Enforcement about Mr. Fennell and Ms. Stites's Volatile Relationship*

176.    The State's suppression of information possessed by law enforcement and friends of Mr. Fennell about Mr. Fennell and Ms. Stites's strained, even abusive, relationship prevented the jury from learning the truth—that Mr. Fennell and Ms. Stites were not the happy couple that Mr. Fennell claimed in his trial testimony.

177.    The suppression further prevented Mr. Reed from impeaching Mr. Fennell on this critical point.

178.    In addition, the State suppressed inculpatory remarks that Mr. Fennell made, which if disclosed to Mr. Reed and presented to the jury could have affected the jury's reasonable-doubt

determination. This *Brady* violation, raised in Mr. Reed's tenth state habeas petition, too denied Mr. Reed a fair determination of guilt, in violation of the Fourteenth Amendment. And the CCA's disposal of this *Brady* claim—based solely on a witness credibility determination, an analysis that the CCA was in no position to conduct—relied on an unreasonable application of clearly established federal law as established by the Supreme Court and was based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1), (2).

179. At the July 2021 evidentiary hearing, two members of law enforcement, Charles Wayne Fletcher and Jim Clampit, testified regarding personal knowledge they had about Mr. Fennell and Ms. Stites's volatile relationship. This information was not disclosed to Mr. Reed's before his trial, let alone in over decades of post-conviction litigation.

180. Mr. Fletcher, a Bastrop County Sheriff's officer at the time of Ms. Stites's murder and a co-worker and close friend of Mr. Fennell, *see* Ex. 23 at 273:5-13, testified that he witnessed Mr. Fennell and Ms. Stites's deteriorating relationship shortly before Ms. Stites's murder. He explained that he personally observed them fighting at a social event, from which he got the impression that they were not in a good place as a couple. *See id.* at 274:19-275:11.

181. Mr. Fletcher also testified that Mr. Fennell knew that Ms. Stites was having an affair. He testified that, at this same social event, Mr. Fennell told him that Mr. Fennell believed Ms. Stites was "fucking a n*****." *Id.* at 276:10-25. Mr. Fletcher remembered Mr. Fennell saying those exact words. *See id.* at 276:19-25.

182. Mr. Fletcher then testified about Mr. Fennell's behavior following Ms. Stites's murder. He recalled going with Mr. Fennell and his parents to Ms. Stites's service and that Mr. Fennell's behavior did not appear right to him, describing it as "sketchy." *Id.* at 278:10-21.

He explained that he came forward to testify at the July 2021 hearing because it was "the right thing to do." *Id.* at 279:24.

183.    Mr. Clampit also testified at the July 2021 evidentiary hearing.  At the time of Ms. Stites's murder, he worked as a deputy at the nearby Lee County Sheriff's Office and was acquainted with Mr. Fennell because their police departments worked together.  *See* Ex. 26 at 10:10-14.   Mr. Clampit testified that he attended Ms. Stites's service, where he witnessed Mr. Fennell say, while standing over Ms. Stites's body, that "[s]he got what she deserved." *Id.* at 13:5-6.  Mr. Clampit never told anyone what Mr. Fennell said until now, but remembers it clearly because "it shocked [him]" and is "burned in my mind." *Id.* at 13:13-19.

184.    This decades-late disclosure of exculpatory evidence in the possession of law enforcement who knew Mr. Fennell at the time of Ms. Stites's murder violates *Brady*'s demands, which apply with equal strength to evidence "known only to police investigators and not to the prosecutor." *Kyles*, 514 U.S. at 438.  As such, a prosecutor "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in [a] case, including the police." *Id.* at 437.

185.     There is no dispute that Mr. Reed never was provided before trial the favorable information possessed by Mr. Fletcher and Mr. Clampit, and testified to in July 2021, regarding Mr. Fennell and Ms. Stites's volatile relationship and Mr. Fennell's inculpatory remarks.  Both former members of law enforcement testified that they had not disclosed this information at the time of Mr. Reed's trial.  *See* Ex. 23 at 279:5-14 (Fletcher); Ex. 26 at 13:13-19 (Clampit).

186.    The suppressed information in Mr. Fletcher and Mr. Clampit's possession was also both favorable to Mr. Reed and material.  For instance, both Mr. Fletcher's and Mr. Clampit's testimony at the July 2021 hearing contradicts Mr. Fennell's trial testimony that he and Ms. Stites

had a good relationship. The defense could have used what Mr. Fletcher knew about Mr. Fennell and Ms. Stites's contentious relationship—having personally seen them fighting shortly before her murder and having personally been told by Mr. Fennell that Ms. Stites was having an affair, *see* Ex. 23 at 274:19-276:25—to impeach Mr. Fennell at trial.

187.    Plus, both Mr. Fletcher and Mr. Clampit witnessed extremely strange behavior from Mr. Fennell at Ms. Stites's service—behavior that does not reflect the typical behavior of a grieving soon-to-be-husband. *See* Ex. 26 at 13:5-6 (Clampit); Ex. 23 at 278:10-21 (Fletcher). Particularly, Mr. Clampit's testimony that Mr. Fennell said, while looking at Ms. Stites's body, that "[s]he got what she deserved," would have suggested to the jury that Mr. Fennell was aware of actions by Ms. Stites that he believed justified her violent death. *See* Ex. 26 at 13:5-6.

188.    In addition to serving as impeachment material, the suppressed information could have been used to **inculpate** Mr. Fennell. Mr. Fletcher's testimony shows that Mr. Fennell knew Ms. Stites was cheating on him with a Black man. *See* Ex. 23 at 276:10-25. This not only substantiated Mr. Reed's consensual relationship defense, it also gives Mr. Fennell motive to kill Ms. Stites. If disclosed, Mr. Fletcher's testimony would have corroborated the defense's theory at trial that Mr. Reed and Ms. Stites were in a consensual relationship, and thus Mr. Fennell knew Ms. Stites was cheating and had motive to kill her.

189.    Furthermore, had this information in Mr. Fletcher's and Mr. Clampit's possession been disclosed to Mr. Reed at the time of his trial, it is unlikely that Mr. Fennell would have waived his Fifth Amendment privilege and testified for the State at all. The State, in turn, would have been left without a star witness, and the only witness able to testify to the alleged timeline of Ms. Stites's murder on her way to work for the early morning shift.

190.     At a minimum, even if Mr. Fennell had still testified, Mr. Reed could have used this information to impeach Mr. Fennell, which would have significantly affected the jury's perception of his character and credibility.

191.     In disposing of this *Brady* claim, the CCA made "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The CCA concluded that Mr. Reed had not met his burden of showing that the State had suppressed the information possessed by Mr. Fletcher and Mr. Clampit. See *Ex parte Reed*, 670 S.W.3d 689, 764-67 (Tex. Crim. App. 2023). This conclusion rested solely on the CCA's unreasonable decision that Mr. Fletcher's and Mr. Clampit's sworn and well-corroborated testimony was not sufficiently credible. *See id.*; *see also id.* at 766 (calling Clampit's "uncorroborated claim . . . dubious at best").

192.     As an initial matter, the CCA unreasonably disposed of this *Brady* claim based solely on a credibility determination. But, as detailed earlier, *see supra* ¶¶ 120-126, the CCA was in no possession to make its own credibility determinations. Without personal observation of witnesses, or even the tools to hear the witnesses' testimony, any witness credibility determination made by the CCA must necessarily be unreasonable. When state court factfinding is predicated on inadequate state procedures, as is the case here for this claim, the factfinding is necessarily unreasonable under 28 U.S.C. § 2254(d)(2).

193.     The CCA also unreasonably determined there was insufficient corroboration of Mr. Fletcher's and Mr. Clampit's testimony. *See Ex parte Reed*, 670 S.W.3d at 764-66. Indeed, the CCA's finding is illogical. On one hand, the CCA determined there was no corroborating evidence. On the other hand, the CCA acknowledged there were numerous other witnesses whose testimony ***did*** corroborate Mr. Fletcher's and Mr. Clampit's testimony. *See id.* at 765 (noting nine witnesses, including three who provided live testimony at the July 2021 hearing, who "all made

statements that, if credited, would tend to increase the likelihood that Fennell harbored this particular suspicion," as testified to by Mr. Fletcher); *id.* at 766 (noting that Cynthia Schmidt's testimony at the hearing that "she overheard Mr. Fennell muttering, 'At least the bitch got to wear the damn dress[,]' . . . might, in theory, corroborate Clampit's claim that Fennell made inappropriate comments at Stacey's funeral").

194. Finally, in choosing to discredit Mr. Fletcher's testimony, the CCA unreasonably credited the state habeas trial court's description of his account as "uncredible." *Id.* at 765. However, the CCA had already, earlier in its opinion, concluded that the state habeas trial court had abdicated its responsibility in failing to make any of its own credibility determinations at the hearing and by merely rubberstamping the State's proposed findings, and thus it refused to accord any deference to its findings. *See supra* ¶¶ 120-121.

195. For these reasons, the CCA's denial of this *Brady* claim in Mr. Reed's tenth state habeas petition does not warrant deference under § 2254(d).

### 3. Suppression of Favorable Evidence from Mr. Fennell and Ms. Stites's Downstairs Neighbor Regarding Their Volatile Relationship

196. Newly discovered evidence at the July 2021 evidentiary hearing demonstrates that the State also suppressed exculpatory information possessed by William Sappington, the downstairs neighbor of Mr. Fennell and Ms. Stites, regarding their strained, even abusive, relationship. Despite the CCA's refusal to adjudicate this claim on the merits and dismissal of it as procedurally barred under state law, this *Brady* violation warrants this court's review. Mr. Reed can overcome the procedural default based on showing "cause" and "actual prejudice," *Davila v. Davis*, 582 U.S. 521, 528 (2017), and/or because failure to consider the actual claim will result in a "fundamental miscarriage of justice," *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986).

197.     At the evidentiary hearing, Brent and Vicki Sappington testified for the first time about the experience of their father and father-in-law, respectively, William Sappington (now deceased), who lived in the apartment below Mr. Fennell and Ms. Stites. *See* Ex. 21 at 189:21-190:5, 191:9-19.   Despite living directly below Ms. Stites and Mr. Fennell at the time of Ms. Stites's murder, William Sappington was never interviewed by police during the investigation. *See id.* at 216:1-4; Ex. 28 at 108:7-21.

198.     Brent Sappington testified that, during a visit to his father's apartment, he heard a "commotion" coming from Mr. Fennell's apartment, which "sounded like a bunch of tables and chairs being turned over with a bunch of screaming and hollering." Ex. 21 at 194:12-19. He testified that, upon hearing the "racket," *id.* at 193:23, his father told him: "That's Jimmy up there . . . yelling at Stacey. It goes on all the time," *id.* at 194:22-23. The yelling and commotion was, according to his father, "a normal thing," and it happened so frequently that his father wanted to move to another apartment in the complex. *Id.* at 195:5-12. Indeed, Brent Sappington testified based on the noise from upstairs, he became "really concerned" for Ms. Stites's safety. *Id.* at 195:21-23.

199.     Vicki Sappington, corroborated her husband's testimony.  She testified that, at the time of Ms. Stites's murder, her father-in-law, William Sappington, recalled "the times that he heard all the noise above, Jimmy screaming at Stacey, and it was very abusive language, and he said Jimmy was very aggressive." *Id.* at 216:6-10. She further testified that William Sappington expressed confusion at why the police had never contacted him for information after Ms. Stites's murder, *id.* at 216:1-4, and that she had never reported this to the police because she was "[s]cared of Jimmy. . . . [I]t's a cop's word against ours," *id.* at 216:16-20.

200.    At the hearing, Brent Sappington explained that William Sappington had reported the frequent fighting he heard upstairs between Mr. Fennell and Ms. Stites after Ms. Stites's murder to Lee County District Attorney Ted ("DA") Weems and Giddings police officer Garnett Danewood. *Id.* at 197:9-198:1. Brent Sappington witnessed his father's conversations with these men, *id.* at 197:14-15, and testified they both told his father "that they already had their suspect, that they didn't need nobody's help . . . to mind your own business, to hush his mouth," *id.* at 198:4-9.

201.    DA Weems himself ***confirmed*** this account.  The State called DA Weems at the July 2021 evidentiary hearing.  He testified that he and Officer Danewood had attended church with the Sappingtons, Ex. 27 at 12:7-11, and that William Sappington had approached him after church one day to let him that he was a neighbor of Mr. Fennell and Ms. Stites and that "he had heard arguing there before, loud arguing many times, *id.* at 12:25-13:4.  DA Weems also testified that the Sappingtons are a "[f]ine family" and a very truthful one. *Id.* at 18:12, 19:4-11.

202.    Although the information that William Sappington shared with DA Weems and Officer Danewood was favorable and highly relevant to Mr. Reed's defense, it was never disclosed to Mr. Reed.  This evidence would have tended to prove Mr. Fennell's violent behavior toward Ms. Stites, implicating him in her murder and exculpating Mr. Reed, while also greatly undermining the rosy picture of their relationship Mr. Fennell painted from the stand. *See Bagley*, 473 U.S. at 676; *e.g.*, Ex. 9 at 62:20-63:23.

203.    And had this evidence been disclosed to Mr. Reed—that a downstairs neighbor of Ms. Stites and Mr. Fennell frequently heard what "sounded like a bunch of tables and chairs being turned over with a bunch of screaming and hollering," Ex. 21 at 194:17-19, and Mr. Fennell yelling at Ms. Stites, *id.* at 194:22-23, so much so that he wanted to move, *id.* at 19:5-11—there is a

reasonable probability that the outcome of the trial would have been different. *See Bagley*, 473 U.S. at 682. Plus, considered individually and cumulatively with the other *Brady* violations detailed in the Petition, this information would have significantly undermined foundational pillars of the prosecution's case-in-chief, namely that Mr. Reed and Ms. Stites were strangers, and that Mr. Fennell and Ms. Stites were a happy couple. *See id*.

204.    Despite the force of this *Brady* violation, the CCA dismissed the claim as procedurally barred under state law, finding that Mr. Reed "has not shown that the factual basis for this claim could not have been ascertained sooner" and never reached the merits of this claim. *Ex parte Reed*, 2023 WL 4234348, at *5 (citing Art. 11.071 § 5(1)(a)).

205.    Mr. Reed can overcome the limitation on federal-court review of this defaulted claim if he can show "cause" to excuse his failure to comply with the state procedural rule and "actual prejudice" resulting from the constitutional violation, *Davila*, 582 U.S. at 528, and/or if he demonstrates that a failure to consider the actual claim will result in a "fundamental miscarriage of justice," *Murray*, 477 U.S. at 495-96.

206.    Here, there is ample reason to find cause, in other words a finding that "some objective factor external to the defense impeded counsel's efforts to comply with the State procedural rule," *id.* at 488, and actual prejudice.

207.    For decades, the State impeded Mr. Reed's efforts to obtain the exculpatory information that William Sappington shared with DA Weems and Officer Danewood. Throughout Mr. Reed's trial, as well as in post-conviction proceedings, the State represented to courts and Mr. Reed that it had always disclosed all relevant, exculpatory information in its possession, including by maintaining an "open file policy." *See, e.g.*, Ex. 16 at 18:4-10 (the State stating at the beginning of Mr. Reed's trial that "we intend to have an open-file policy"); Ex. 34 at 19 (the State

insisting before the evidentiary hearing that it "had more than an open file policy at trial" and that "[t]he open file policy has continued since"). And then at trial, the State made statements which simply did not accord with the information in its possession. For instance, it repeatedly told the jury that nobody had ever contradicted Mr. Fennell's testimony that he and Ms. Stites had a loving, easy relationship. *See, e.g.*, Ex. 1 at 76:11-76:21 ("It's important to note that nobody could ever find anything inconsistent with what [Fennell] told you.").

208. The State's false representations that it both (i) had an open-file policy and (ii) came across no information contradicting Mr. Fennell's testimony about his relationship with Ms. Stites made this "claim . . . not reasonably available to [Mr. Reed's] counsel" and reflected "interference by officials" in discovering this claim. *Murray*, 477 U.S. at 488; *see also Strickler*, 527 U.S. at 283 (explaining that "nondisclosure and the open file policy . . . are both fairly characterized as conduct attributable to the [State] that impeded trial counsel's access to the factual basis for making a *Brady* claim," and extending that logic to state habeas counsel); *Banks v. Dretke*, 540 U.S. 668, 695 (2004) (same).

209. Indeed, the U.S. Supreme Court has twice previously found cause to overcome a lower court's finding of diligence-based procedural default on the ground that a state's misrepresentations make *Brady* violations inherently difficult for defendants to expose. *See Strickler*, 527 U.S. at 285 (observing that the State's misrepresentations made it "especially unlikely that counsel would have suspected that additional [*Brady*] evidence was being withheld"); *Banks*, 540 U.S. at 695-96 (quoting *Strickler* for the same proposition); *see also In re Will*, 970 F.3d 536, 542 (5th Cir. 2020) ("Trial counsel need not assume the prosecution may be withholding information in order to exercise diligence.").

210.    This court should apply the same logic here, as none of the factors that impeded Mr. Reed's discovery of this claim can "fairly be attributed" to him. *Davila*, 582 U.S. at 528. To hold otherwise would require "that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed." *Banks*, 540 U.S. at 695.

211.    This *Brady* violation also caused Mr. Reed "actual prejudice." *Davila*, 582 U.S. at 528. When suppressed evidence is "material" for the purposes of a *Brady* claim, suppression gives rise to sufficient prejudice to overcome procedural default. *See Strickler*, 527 U.S. at 282 (explaining that "unless [suppressed] documents were 'material' for *Brady* purposes, their suppression did not give rise to sufficient prejudice to overcome the procedural default"). And *Brady* evidence is "material" when its inclusion at trial would give rise to the "reasonable probability" of a different result. *Kyles*, 514 U.S. at 433 (citing *Bagley*, 473 U.S. at 682).

212.    That is the case here with this claim. *See supra* ¶ 203. The suppressed exculpatory information that William Sappington shared with Officer Danewood and DA Weems would have seriously undermined the State's trial theory, demonstrating exactly the sort of violent and abusive conduct that would have moved suspicion away from Mr. Reed and onto Mr. Fennell. An apparently harmonious relationship would be replaced by a tumultuous picture, with fighting so loud and frequent that a neighbor desperately wanted to move. Such evidence would give any juror cause for reasonable doubt.

213.    In addition to overcoming the procedural default based on a showing of cause and prejudice, the CCA's failure to consider the merits of this *Brady* violation as one among the State's longstanding practice of withholding evidence in Mr. Reed's case would result in a fundamental miscarriage of justice, as Mr. Reed is actually innocent of the crime. *See Engle v. Isaac*, 456 U.S.

107, 135 (1982); *see also McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013) ("[A] credible showing of actual innocence may allow a prisoner to pursue his constitutional claims . . . on the merits notwithstanding the existence of a procedural bar to relief.").[5]

214.     This Petition details newly discovered evidence of Mr. Reed's innocence, which only builds upon to the previously raised, already sizeable amount of evidence proving Mr. Reed's innocence, that eviscerates the State's case against Mr. Reed at trial.  At the July 2021 evidentiary hearing, over a dozen credible witnesses testified to the intimate relationship between Mr. Reed and Ms. Stites, *see supra* ¶¶ 71-78, information the State either failed to find despite an allegedly extensive investigation, *see supra* ¶¶ 97-98, or had but withheld from Mr. Reed, *see supra* ¶¶ 64-68. Still more witnesses testified that Mr. Fennell was controlling, abusive, and violent towards his fiancé, *see supra* ¶¶ 75, 79-94, and that Mr. Fennell knew of, and was enraged by, Ms. Stites's affair with Mr. Reed, *see supra* ¶¶ 83, 100-101.  Two witnesses even testified that Mr. Fennell had confessed to them that he had killed Ms. Stites. *See supra* ¶¶ 100-101.  The State's own lead investigator now admits that Mr. Fennell was barely investigated.  *See supra* ¶ 98.

215.     On top of this lay witness testimony further establishing Mr. Reed's innocence, the State's own experts now agree with Mr. Reed and his experts that the State presented false and misleading forensic testimony at trial. *See supra* ¶¶ 104-111.

216.     Without this forensic testimony, and particularly without Mr. Fennell as a credible star witness, the State cannot place Mr. Reed with Ms. Stites at or near the time of her death.  As such, Mr. Reed has made more than made a credible showing of actual innocence warranting review of this *Brady* claim.

---

[5] Notably, the "miscarriage of justice exception" standard is *less burdensome* than the § 2244(b) standard, which Mr. Reed must meet for the court to review the claims in this Petition. *See McQuiggin*, 569 U.S. at 396-97.

217. Because there was no merits adjudication in state court, § 2254(d) deference does not apply to the court's review of this *Napue* claim. *See* 28 U.S.C. § 2254(d) (noting that deference only applies to a "claim that was adjudicated on the merits").

## B. THE STATE SOLICITED FALSE TESTIMONY AT MR. REED'S TRIAL

218. The State's solicitation of false factual and forensic evidence at Mr. Reed's trial contributed to his conviction and violated his due process rights. In *Napue v. Illinois*, the U.S. Supreme Court held that "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." 360 U.S. 264, 269 (1959); *see also Miller v. Pate*, 386 U.S. 1, 6 (1967) (upholding a *Napue* claim where "[t]he prosecution deliberately misrepresented the truth" about forensic evidence in its opening and closing statements and cross examination).

219. To establish a *Napue* claim, the defendant must prove that (i) the prosecution made a false representation or allowed false testimony to be placed before the jury; (ii) the prosecution knew or should have known that the testimony or representation was false; and (iii) the false testimony or representation was material, such that when examined holistically with all the evidence presented at trial there is a reasonable likelihood that it would have affected the judgment of the jury. 360 U.S. at 269-71. "[D]eliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice,'" *Giglio v. United States*, 405 U.S. 150, 153 (1972), and therefore grounds for reversal of a conviction, *see Napue*, 360 U.S. at 272.

220. The CCA improperly dismissed Mr. Reed's two *Napue* claims, presented in his eleventh state habeas petition, that the State solicited false factual and forensic testimony at his trial.

221.    The CCA's denial of his first *Napue* claim, based on the solicitation of false factual testimony from two members of law enforcement, "was contrary to, or involved an unreasonable application of, clearly established Federal law" and/or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2).

222.    Regarding his second *Napue* claim, based on the solicitation of false forensic testimony, the CCA dismissed the claim as procedurally barred under state law; however, Mr. Reed can easily overcome that default under both the cause/prejudice, *see Davila*, 582 U.S. at 528, and miscarriage-of-justice exceptions, *Murray*, 477 U.S. at 495.

### 1.    *Solicitation of False Factual Testimony from Law Enforcement*

223.    In light of newly discovered evidence, specifically the State's surprise pre-hearing disclosures on June 25, 2021 and testimony at the July 2021 evidentiary hearing, it is now evident that the State solicited false factual testimony from two law enforcement witnesses at trial regarding the extent and results of the investigation into the connection between Mr. Reed and Ms. Stites.  The CCA's denial of this *Napue* claim, based on its conclusion that Mr. Reed failed to satisfy the materiality prong, was unreasonable under both prongs of § 2254(d).

224.    At Mr. Reed's trial, Bastrop Police Department patrol officer and investigator Paul Alexander testified that his only involvement in the investigation of Ms. Stites's murder was calling to report that a truck was parked at the Bastrop High School early on the morning Ms. Stites was reported missing. *See* Ex. 8 at 119:2-4, 123:4-8.  When asked if he had "any other responsibilities or activities in the investigation of the death of Stacey Stites after that point," Officer Alexander (falsely) responded, "No, I did not." *Id.* at 123:4-8.

225.    Based on new evidence disclosed to Mr. Reed in 2021, Officer Alexander's trial testimony is blatantly untrue—Officer Alexander had actually obtained the wrongfully suppressed

favorable evidence at issue here. The State's June 25, 2021 disclosure letter, as well as testimony from Ms. Hugen at the July 2021 evidentiary hearing, establishes the falsity of Officer Alexander's testimony. In the June 25, 2021 disclosure letter, the State explained that Ms. Hugen, an H-E-B co-worker and friend of Ms. Stites, knew about a connection between Mr. Reed and Ms. Stites because "Stacey Stites introduced [Mr. Reed] to her as a good or close friend and . . . they appeared friendly, giggling, and flirting." Ex. 3. It also noted that Ms. Hugen "believes that she told this information to a man working security named 'Paul,'" who "was possibly Paul Alexander." *Id.* The new evidence, therefore, tends to show that Officer Alexander had a much more significant role in the investigation, having spoken to a critical witness linking Mr. Reed and Ms. Stites. He completely hid that information from the jury, and Mr. Reed could not impeach him.

226. At the July 2021 evidentiary hearing, Ms. Hugen testified, confirming the information in the State's disclosure letter. She further testified that she was certain she had shared what she knew about Mr. Reed and Ms. Stites's relationship, including specifically that the two were "good friends," not strangers, with Officer Alexander in 1997. *See* Ex. 21 at 18:18-20:2.

227. The State also solicited false testimony at trial from another member of law enforcement, Rocky Wardlow, the lead investigator in Ms. Stites's murder investigation, regarding whether the investigation had uncovered "anybody that said [Ms. Stites] had been associat[ed] with [Reed]." Ex. 11 at 112:24-113:11. Mr. Wardlow told the jury that investigators had conducted an exhaustive, year-long search, speaking to "hundreds" of people, including "friends, family, co-workers, associates," as well as "ex-boyfriends," "[c]lassmates from high school," and "[f]ormer co-workers." *Id.* at 112:6-23. And when asked if the police "f[ound] anyone who linked [Ms. Stites] in any way to this defendant" during this investigation, Mr. Wardlow responded, "Not at all." *Id.* at 113:9-11.

228.    Newly discovered evidence, too, establishes that Mr. Wardlow's trial testimony was false.  The State's June 25, 2021 disclosure of "witness interview summaries . . . created by the trial prosecution team in preparation of the underlying 1998 criminal prosecution" indicated that some members of the prosecution and/or investigative team had spoken to several H-E-B employees, including Mr. Haas and Mr. Cardenas, who had reported that they either knew or had heard that Mr. Reed and Ms. Stites were acquainted.  Ex. 4 at 1.  In separate June 25, 2021 disclosure, the State notified Mr. Reed that Ms. Hugen, also a co-worker of Ms. Stites, had informed Officer Alexander that Mr. Reed and Ms. Stites knew each other.  *See* Ex. 3.

229.    Accordingly, and directly contrary to Mr. Wardlow's trial testimony, the investigation into Ms. Stites's murder ***did*** include finding and speaking to individuals who reported that they knew of or had heard about a connection between Mr. Reed and Ms. Stites.

230.    The prosecution knew, or should have known, that the testimony elicited from Officer Alexander and Mr. Wardlow at Mr. Reed's trial was false.  *See Napue*, 360 U.S. at 269-71.  Indeed, the June 25, 2021 disclosure letters make this indisputably clear.  The letter notes that the State—specifically the "trial prosecution team"—possessed at least the witness interview statements "in preparation of" Mr. Reed's trial.  *See* Ex. 4 at 1.  Despite possessing this information before and while Officer Alexander and Mr. Wardlow testified, the State nonetheless elicited their false testimony that nobody in the investigation had linked Mr. Reed and Ms. Stites.  And at least two courts of appeals have held that "knowingly false or misleading testimony by a law enforcement officer is imputed to the prosecution." *Boyd v. French*, 147 F.3d 319, 329 (4th Cir. 1998); *accord Wedra v. Thomas*, 671 F.2d 713, 717 n.1 (2d Cir. 1982).[6]

---

[6] It is irrelevant under *Napue* whether Officer Alexander and Mr. Wardlow intended to give false testimony. The focus of a *Napue* claim is on ***the prosecutor***, who has "the responsibility and duty to correct what he knows to be false."  *Napue*, 360 U.S. at 269-70.  Therefore, so long as the prosecution knew that its own witnesses were testifying falsely (which, here, was the case) and still allowed that testimony to "go

231.    Mr. Wardlow and Officer Alexander's false testimony was material, both individually and when considered cumulative (as clearly established U.S. Supreme Court precedent requires), because there is a reasonable likelihood that it would have affected the judgment of the jury. *See Napue*, 360 U.S. at 269-71.

232.    Mr. Wardlow's false testimony that, despite an exhaustive search, the police spoke to no one who linked Mr. Reed and Ms. Stites significantly undercuts Mr. Reed's defense that he had a consensual, intimate relationship with Ms. Stites.  In turn, it allowed the State to advance its now disproven theory that Mr. Reed was a stranger who kidnapped, assaulted, and murdered Ms. Stites on her way to work.  Mr. Wardlow's testimony was especially damaging to Mr. Reed's defense because he was a member of law enforcement (indeed, the lead investigator on the case), and thus an individual whose testimony was likely to garner significant credence from the jury.

233.    Officer Alexander's testimony that he played no role in the investigation of Ms. Stites's murder other than reporting the truck also improperly hid highly relevant information from the jury.  While he possessed critical information from an important witness who saw Mr. Reed and Ms. Stites together—information that would have greatly supported Mr. Reed's defense and even contradicted Mr. Wardlow's trial testimony—Officer Alexander did not disclose it when asked about what role he played in the investigation, and Mr. Reed could not impeach him.  Thus, as is the case with Mr. Wardlow's testimony, had Officer Alexander testified truthfully, his testimony would have substantially supported Mr. Reed's defense that he had a consensual relationship with Ms. Stites.  Accordingly, there is a reasonable likelihood that these two officers' false testimony affected the judgment of the jury.  *See Napue*, 360 U.S. at 269-71.

---

uncorrected," a due-process violation occurs. *Id.*  In other words, *Napue* requires prosecutors to correct all false statements, not just false statements by a witness who intended to lie.  *See id.* at 269.

234.     The CCA's denial of this *Napue* claim predicated on Mr. Wardlow's and Officer Alexander's testimony resulted in a decision that was "an unreasonable application of clearly established Federal law" and "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" in three different ways.  28 U.S.C. § 2254(d)(1), (2).

235.     The CCA first unreasonably applied the materiality standard established by the U.S. Supreme Court.  In considering materiality under *Napue* (as is the case under *Brady*), courts must make a cumulative—not item-by-item—evaluation of the false evidence presented.  *See United States v. O'Keefe*, 128 F.3d 885, 894 (5th Cir. 1997) (under *Napue*, like under *Brady*, materiality is assessed by "examin[ing] the challenged evidence collectively, not on an item-by-item basis"); *see also Kyles*, 514 U.S. at 441.  Here, the CCA unreasonably applied "established Federal law" when it considered Mr. Reed's false factual testimony claim individually instead of cumulatively with his other *Napue* and *Brady* claims.  *Ex parte Reed*, 2023 WL 4234348, at *6-7.

236.     Next, the CCA made an unreasonable factual determination that Officer Alexander's testimony could not be material when it found "[t]he extent of Alexander's role in the murder investigation was a trivial point in the context of Reed's trial."  *Id.* at *6. This analysis fails to appreciate the significant effect Officer Alexander's testimony could have had on the jury if he had testified truthfully, or if jurors had seen him be impeached.  The most relevant falsity was not Officer Alexander's actual role in the investigation, as the CCA appeared to believe.  *See id*. Rather, it was that Officer Alexander failed to disclose that he spoke with a witness who personally observed Mr. Reed and Ms. Stites together shortly before Ms. Stites's murder.

237.     Contrary to the CCA's unreasonable factual determination, had Officer Alexander been impeached or truthfully testified at Mr. Reed's trial, that he, a member of law enforcement,

spoke to a friend and co-worker of Ms. Stites who had seen Ms. Stites and Mr. Reed together flirting and giggling, there is a "reasonable likelihood" that it would have affected the judgment of the jury. *Napue*, 360 U.S. at 269-71.

238. The defense also may have been able to use Officer Alexander's testimony to impeach Mr. Wardlow when he said that police were unable to find any witness connecting Mr. Reed and Ms. Stites. *See id.* at 269 ("The jury's estimate of the truthfulness and reliability of a given witness" can be "determinative of guilt or innocence.").

239. In addition, the jury would have been even more powerfully impacted because Mr. Reed could have also used Officer Alexander's testimony to bolster the two defense witnesses called to link Mr. Reed and Ms. Stites—individuals the State argued were not credible because they had motive to lie to help Mr. Reed.

240. The CCA also made an unreasonable factual determination when it concluded that Mr. Wardlow's testimony was not material because "[t]he jury already knew that the investigation into Stacey's murder had failed to turn up at least two people who could potentially 'link' Reed and Stacey." *Ex parte Reed*, 2023 WL 4234348, at *7. The CCA unreasonably ignored the impact that Mr. Wardlow's testimony had on the jury when he, the lead investigator, falsely testified that not one person in a year-long search connected Mr. Reed and Ms. Stites. The State was able to use Mr. Wardlow's false testimony to advance its theory that Mr. Reed and Ms. Stites were strangers, and to undermine the testimony of Mr. Reed's two witnesses linking Mr. Reed and Ms. Stites.

## 2. *Solicitation of False Forensic Testimony*

241. In addition to soliciting false factual testimony at Mr. Reed's trial, the State solicited false forensic testimony in support of its theory that Ms. Stites and Mr. Reed were strangers. In erroneously determining that Mr. Reed was not diligent in bringing this claim, the

CCA dismissed the claim as procedurally barred under state law. In doing so, the CCA misunderstood the new evidence supporting this claim, which, in turn, dictates whether Mr. Reed was diligent in bringing this claim. Nonetheless, Mr. Reed can overcome this procedural default under either the cause/prejudice, *see Davila*, 582 U.S. at 528, or the miscarriage-of-justice exception, *Murray*, 477 U.S. at 495.

242. The newly discovered evidence underlying this claim that the State solicited false forensic testimony is that ***the State's own experts admitted*** at the July 2021 evidentiary hearing that critical portions of the forensic testimony presented by the State at trial were false. The State's experts conceded, ***in full agreement with Mr. Reed's experts***, that trial testimony solicited by the State stating that (i) sperm cannot survive intact for more than 24-26 hours, and (ii) Ms. Stites must have been sexually assaulted at the time of her death because she was anally raped and had bruises that could be dated to the time of her murder.

243. Accordingly, the relevant new evidence for this *Napue* claim is that more than two decades after Mr. Reed's conviction, the State now ***agrees*** with Mr. Reed that it presented false evidence to the jury regarding the following three forensic premises relied on to convict him. *See Napue*, 360 U.S. at 269-71 (the first *Napue* prong is that the prosecution allowed false testimony to be placed before the jury).

244. The State relied heavily on its experts' testimony that spermatozoa can survive for only 24-26 hours. DPS criminalist Karen Blakely testified, for instance, that she knew of "published documentation that says that 26 hours is the outside length of time" that sperm will remain intact. Ex. 9 at 16:13-16. This testimony was crucial to the State's case; it allowed the State to link the timing of the alleged sexual assault of Ms. Stites—supposedly when Mr. Reed's DNA was deposited on Ms. Stites—to her murder. By (improperly) narrowing the time when

Mr. Reed's DNA must have been deposited, the State was also (improperly) able to refute, based on forensic evidence, Mr. Reed's defense that he and Ms. Stites had consensual intercourse in the days before her murder, and to (improperly) substantiate the timeline offered only by Mr. Fennell that Ms. Stites was killed on her way to work between 3-5 a.m. Ex. 1 at 38:2-23. And the State repeatedly emphasized to the jury that the small amount of Mr. Reed's spermatozoa present in Ms. Stites's body conclusively proved that he was the murderer because the spermatozoa must have been deposited during the 24-26 hour window, therefore while Ms. Stites was on her way to work. For instance, in its closing, it said:

> [B]ingo, she finds three fully intact spermatozoa. . . . Because we know, from the credible evidence, that that doesn't hang around for days on end. We know from the credible evidence that that tells you that semen got in that girl's body within 24 hours of that eleven o'clock moment. Which is when? On her way to work?

*Id.* at 34:3-12.

245.    At the evidentiary hearing, Mr. Reed's two *pro bono* experts and the State's two highly paid experts **agreed** that the jury was falsely told that spermatozoa can only survive in the vaginal cavity for up to 24-26 hours.

246.    One of the State's experts, Dr. Farley, testified that studies show that sperm can survive much longer than 24 hours—even in deceased victims, Ex. 29 at 279:8-20, and that the State's trial expert had misrepresented a scientific study in claiming that spermatozoa can only survive for 24-26 hours, *id.* at 280:18-21. The State's other expert, Dr. Dana, similarly testified that it was false to say that sperm cannot survive for more than 24 hours. *Id.* at 116:24-117:9. Accordingly, **every expert** to testify at the July 2021 evidentiary hearing agreed that the State solicited false forensic testimony at trial about the lifespan of spermatozoa.

247.    The State also presented false forensic testimony at trial that Ms. Stites suffered a rectal injury. The State's medical examiner, Dr. Bayardo, testified that Ms. Stites's "anus was

dilated" and displayed "lacerations" "consistent with penile penetration." Ex. 19 at 126:6-15. He further testified that "this injury occurred at the time of her death" and that the anal penetration "would not have been consensual." *Id.* at 126:6-127:13.

248. On this point, too, the State's experts at the July 2021 evidentiary hearing ***agreed*** with Mr. Reed's experts that this testimony was false. Dr. Farley testified that anal dilation is a normal postmortem occurrence and does not indicate any kind of sexual activity or assault. Ex. 29 at 283:18-284:6. And both Drs. Dana and Farley ***agreed*** with Mr. Reed's experts that there was no scientific basis to say that the anal dilation meant that Ms. Stites was sexually assaulted at the time of her death. *Id.* at 162:17-163:3 (Dana); *id.* at 283:18-284:6 (Farley).

249. The State, too, presented false forensic testimony, again from Ms. Blakely, that the bruises found on Ms. Stites could be reliably dated to the morning of April 23, 1996, and thus must have been inflicted at the time of her death. *See* Ex. 30 at 120:9-12. At the July 2021 evidentiary hearing, the State's experts—like Mr. Reed's experts—flatly rejected the trial testimony. Like Mr. Reed's experts, *see* Ex. 23 at 148:1-150:23 (Dr. Baker), Ex. 21 at 90:1-25 (Dr. Davis), Dr. Farley testified that bruises cannot be dated with any accuracy, Ex. 29 at 292:2-8, and Dr. Dana testified that it is patently false that the color of bruises has any bearing on their age, *id.* at 128:1-129:1.

250. The State knew, or at a minimum should have known, that the forensic testimony it presented to the jury at Mr. Reed's trial was false. *Napue*, 360 U.S. at 269-71. At the evidentiary hearing, its two highly-paid experts testified that the testimony presented was patently false. Their testimony was not based on new or novel approaches to the forensic evidence that emerged in the decades since Mr. Reed's trial. Rather, their testimony was that the evidence presented at trial was misleading ***then***, and it did not align with published literature ***either in 1998 or today***. For instance,

Dr. Farley testified not only that sperm can survive much longer than 24 hours, Ex. 29 at 279:8-12, but also that Ms. Blakely had misrepresented a scientific study's findings that existed at the time of Mr. Reed's trial when she claimed that spermatozoa can only survive for 24-26 hours, *id.* at 280:18-21. Dr. Dana acknowledged in her testimony that she was unaware of studies stating that "intact sperm would not survive more than 24 to 26 hours"; thus, there was "an important limitation" to the testimony that the jury had heard. *Id.* at 116:24-118:17.

251. There is a reasonable likelihood that the State's false forensic testimony affected the judgment of the jury. *See Napue*, 360 U.S. at 269-71. As a preliminary matter, forensic testimony often has a significant, sometimes even outsized, impact on a jury. *See* Joel D. Lieberman et al., *Gold Versus Platinum: Do Jurors Recognize the Superiority and Limitations of DNA Evidence Compared to Other Types of Forensic Evidence?*, 14 Psych. Pub. Pol'y & L. 27, 52 (2008). Indeed, the record suggests that was likely the case here. The jury gave the State's false forensic testimony at least some weight before issuing a verdict; it asked the trial court to see Dr. Bayardo's testimony and included a question about Dr. Bayardo's opinion on the life expectancy of intact spermatozoa. Ex. 1 at 153:23-154:15.

252. In addition, without the false forensic testimony about the lifespan of spermatozoa, dating of the bruises, and existence of a rectal injury, the State could not have advanced its theory that Ms. Stites necessarily died during a narrow window while on her way to work or that she was sexually assaulted at the time of her murder. The State itself called this evidence its "smoking gun," and said "because [Mr. Reed's] sperm got there at the time it did, that leads you directly to [Ms. Stites's] killer." *Id.* at 37:11-17.

253.     Excluding the forensic evidence, Mr. Fennell, the last individual to see Ms. Stites alive and someone who is now highly implicated in her murder based on new evidence, was the only other person testifying about this alleged timeline.

254.     For all these reasons, there is a reasonable (if not certain) likelihood that the State's presentation of false forensic testimony affected the judgment of the jury. *Napue*, 360 U.S. at 269-71.

255.     The CCA refused to consider this claim on the merits, finding that Mr. Reed was not diligent in bringing this claim and dismissing it as procedurally barred under state law. *See Ex parte Reed*, 2023 WL 4234348, at *7 (citing Art. 11.071, § 5(a)(1)).

256.     As an initial matter, the CCA completely misunderstood the new evidence underlying this *Napue* claim when it found that Mr. Reed was not diligent for failing to point to any "post-trial (let alone post-November 2019) advancements in any of these areas." *Id.* The thrust of Mr. Reed's false forensic testimony claim was not premised on any evidence or information existing before the July 2021 evidentiary hearing, as the CCA unreasonably determined. Rather, Mr. Reed's claim was premised on new evidence discovered at the July 2021 evidentiary hearing, which is that the State ***agreed*** with Mr. Reed and his experts that it had presented false forensic testimony at trial. Prior to the July 2021 evidentiary hearing, the State had never made this critical admission, and thus Mr. Reed could not have raised this false forensic testimony claim at any prior time.

257.     Even so, Mr. Reed can overcome the limitation on federal-court review of this procedural default in two different ways. Mr. Reed can first show "cause" to excuse his failure to comply with the state procedural rule and "actual prejudice" resulting from the constitutional violation. *Davila*, 582 U.S. at 528.

258.     Cause is easily satisfied here.  For more than two decades, the State defended the forensic evidence it presented at Mr. Reed's trial.  Out of nowhere, at the July 2021 evidentiary hearing, its two experts finally conceded that the evidence was false.  Therefore, before the testimony from these two experts at the July 2021 evidentiary hearing, this claim was truly "not reasonably available to [Mr. Reed's] counsel."  *Murray*, 477 U.S. at 489-90.

259.     Actual prejudice, too, is satisfied.   The State's solicitation of false forensic testimony had a highly prejudicial effect on Mr. Reed's trial for the same reasons discussed in the *Napue* materiality analysis above.  *See supra* ¶¶ 251-252.  Most significantly, without the false forensic testimony about the lifespan of spermatozoa, dating of the bruises, and existence of a rectal injury, the State would not have been able to advance its theory that Mr. Reed's DNA was necessarily deposited on Ms. Stites during a narrow window when she was on her way to work, nor that Ms. Stites was sexually assaulted contemporaneously with her murder.

260.     Mr. Reed also overcomes the limitation on federal-court review by making a credible showing of actual innocence to satisfy the miscarriage-of-justice exception.  *See McQuiggin*, 569 U.S. at 392.  Above, Mr. Reed details the reasons he presents more than sufficient new evidence of innocence to meet this exception.  *See supra* ¶¶ 214-216.  He incorporates those facts and analysis here as well.

261.     To be clear, however, the fact that both parties' experts now ***agree*** that the forensic testimony used to convict him—again, the ***only*** evidence that allegedly tied Mr. Reed to Ms. Stites at the time of her death—starkly highlights the powerful nature of Mr. Reed's new evidence of innocence.

262.     Because there was no merits adjudication in state court, § 2254(d) deference does not apply to the court's review of this *Napue* claim.  *See* 28 U.S.C. § 2254(d) (noting that deference only applies to a "claim that was adjudicated on the merits").

## VII.    CONCLUSION AND PRAYER

263.     For these reasons, Mr. Reed respectfully requests that the Court grant his Petition for Writ of Habeas Corpus and vacate his conviction and sentence.

DATED: June 28, 2024

Respectfully submitted,

/s/ *Andrew MacRae*
Andrew F. MacRae
State Bar No. 00784510
MacRae Law Firm PLLC
3267 Bee Cave Rd.,
Suite 107, PMB 276
Austin, TX 78746
(512) 565-7798 (telephone)

Parker Rider-Longmaid*
Skadden, Arps, Slate,
   Meagher & Flom LLP
1440 New York Ave., NW
Washington, DC 20005
(202) 371-7000 (telephone)

George H. Kendall*
Carine M. Williams*
Nicola Cohen*
Squire Patton Boggs (US) LLP
1211 Avenue of the Americas, 26th Floor
New York, NY 10036
(212) 872-9800 (telephone)

Jeremy Patashnik*
Skadden, Arps, Slate,
   Meagher & Flom LLP
One Manhattan West
New York, NY 10001
(212) 735-3000 (telephone)

Barry C. Scheck*
Jane T. Pucher*
The Innocence Project
40 Worth St., Suite 701
New York, NY 10013
(212) 364-5340 (telephone)

* *Pro hac vice* motion forthcoming if Fifth Circuit grants authorization to consider this petition.

*Attorneys for Petitioner Rodney Reed*

# INDEX OF EXHIBITS

Exhibit 1       Trial Transcript Excerpts, Vol. 56

Exhibit 2       Trial Transcript, Vol. 67

Exhibit 3       June 25, 2021 Letter from Matthew Ottoway, Assistant Attorney General, "provid[ing] [Mr. Reed] with notice of statements made by" Suzan Hugen

Exhibit 4       June 25, 2021 Letter from Matthew Ottoway, Assistant Attorney General, "provid[ing] [Mr. Reed] with notice of witness interview summaries"

Exhibit 5       2021 Evidentiary Hearing Excerpts, Vol. 13

Exhibit 6       Trial Transcript Excerpts, Vol. 47

Exhibit 7       Dr. Roberto Bayardo's Report on April 24, 1996 Autopsy

Exhibit 8       Trial Transcript Excerpts, Vol. 43

Exhibit 9       Trial Transcript Excerpts, Vol. 45

Exhibit 10     Police Reports from Investigation of Stacey Stites' Murder

Exhibit 11     Trial Transcript Excerpts, Vol. 46

Exhibit 12     Police Report About Jimmy Fennell's Truck

Exhibit 13     Jimmy Fennell's Bank Records

Exhibit 14     Trial Transcript Excerpts, Vol. 52

Exhibit 15     1996 Failed Polygraphs of Jimmy Fennell

Exhibit 16     Trial Transcript Excerpts, Vol. 3

Exhibit 17     Trial Transcript Excerpts, Vol. 53

Exhibit 18     Trial Transcript Excerpts, Vol. 51

Exhibit 19     Trial Transcript Excerpts, Vol. 48

Exhibit 20     2012 Declaration of Dr. Roberto Bayardo

Exhibit 21     2021 Evidentiary Hearing Excerpts, Vol. 4

Exhibit 22     2021 Evidentiary Hearing Excerpts, Vol. 1

Exhibit 23     2021 Evidentiary Hearing Excerpts, Vol. 2

Exhibit 24     2021 Evidentiary Hearing Excerpts, Vol. 9

Exhibit 25     2021 Evidentiary Hearing Excerpts, Vol. 5

Exhibit 26    2021 Evidentiary Hearing Excerpts, Vol. 3

Exhibit 27    2021 Evidentiary Hearing Excerpts, Vol. 10

Exhibit 28    2021 Evidentiary Hearing Excerpts, Vol. 6

Exhibit 29    2021 Evidentiary Hearing Excerpts, Vol. 8

Exhibit 30    Trial Transcript Excerpts, Vol. 44

Exhibit 31    2021 Evidentiary Hearing Excerpts, Vol. 7

Exhibit 32    State's Proposed Findings of Fact and Conclusions of Law ("FFCL"), filed on October 8, 2021

Exhibit 33    Findings of Fact, Conclusions of Law and Recommendations, *Ex parte Reed*, WR-50,961-10 (21st Jud. Dist. Ct. Oct. 31, 2021)

Exhibit 34    State's Response in Opposition to Mr. Reed's 2021 Motion for Pre-Hearing Discovery, filed on February 5, 2021