# Exhibit 1

1              CAUSE NO. 8701     **73/35**

2

3   THE STATE OF TEXAS   X   IN THE DISTRICT COURT OF
                            X

4   VS.                 X   BASTROP COUNTY, TEXAS
                            X

5   RODNEY REED        X   21ST JUDICIAL DISTRICT

6

7

8

9

10

11   ———————————————————

12            REPORTER'S RECORD
               JURY TRIAL

13   CHARGE OF THE COURT/CLOSING STATEMENTS/VERDICT

14   ———————————————————

15

16             May 18, 1998

17          MORNING SESSION
                AND

18        AFTERNOON SESSION

19

20

21

22

23        VOLUME 56 OF  69

24

25

FILED IN
COURT OF CRIMINAL APPEALS
SEP 9 1998
Troy C. Bennett, Jr., Clerk

ORIGINAL

1        On the 18th day of May, 1998, the

2  above entitled and numbered cause came on for

3  hearing before said Honorable Court, Harold R.

4  Towslee, Judge Presiding, and the following

5  proceedings were had:

6

7

8

9           Volume 56 of **69**

10

11         GUILT/INNOCENCE PHASE

12

13        (PAGES 1 THROUGH 170)

14

15

16

17

18

19

20

21

22

23

24

25

3

APPEARANCES:

For the State

Mr. Charles Penick
District Attorney, Bastrop County
804 Pecan Street
Bastrop, Texas 78602
SBOT #015748500
(512) 321-2244

Mr. Forrest Sanderson
Assistant District Attorney
804 Pecan Street
Bastrop, Texas 78602
SBOT #17610700
(512) 321-2244

Ms. Lisa Tanner
Assistant Attorney General
P. O. Box 12548
Austin, Texas 78711-2548
SBOT #19637700
(512) 463-2170

For the Defendant

Mr. Calvin Garvie
Attorney at Law
22 N. Bell St., P. O. Box 416
Bellville, Texas 77418
SBOT #07714300
(409) 865-9781

Ms. Lydia Clay-Jackson
Attorney at Law
700 N. San Jacinto
Conroe, Texas 77301
SBOT #04332450
(409) 760-2889

# CHRONOLOGICAL INDEX

| WITNESS | PAGE |
|---|---|
| APPEARANCES | 3 |
| MORNING AND AFTERNOON SESSION | 7 |
| | |
| DORAN WILLIAMS (OUTSIDE PRESENCE OF JURY) | |
| DIRECT EXAMINATION BY MR. GARVIE | 9 |
| CROSS-EXAMINATION BY MS. TANNER | 11 |
| | |
| COURT'S CHARGE READ TO JURY | 20 |
| | |
| CLOSING STATEMENT BY MR. PENICK | 20 |
| CLOSING STATEMENT BY MS. TANNER | 23 |
| RECESS | 79 |
| CLOSING STATEMENT BY MS. CLAY-JACKSON | 80 |
| CLOSING STATEMENT BY MR. GARVIE | 103 |
| CLOSING STATEMENT BY MS. TANNER | 128 |
| | |
| JURY BEGINS DELIBERATIONS | 150 |
| | |
| FIRST NOTE RECEIVED FROM JURY | 151 |
| SECOND NOTE RECEIVED FROM JURY | 152 |
| THIRD NOTE RECEIVED FROM JURY | 153 |
| COURT REPORTER'S NOTES READ TO JURY | 157 |
| FOURTH NOTE RECEIVED FROM JURY | 162 |

1   VERDICT READ                              165

2   JURY POLLED                               166

3   COURT ADJOURNED FOR THE DAY               169

4   COURT REPORTER'S CERTIFICATE              170

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT INDEX

## VOLUME 56

| No. | Description | Mrkd | Idnt'd | Ofrd | Admit |
|-----|-------------|------|--------|------|-------|
| S-4 | Photograph | 43/7 | 43/99 | 19 | 19 |
| D-15 | Statement | 8 | 7 | 8 | 8 |
| D-16 | Statement | 8 | 7 | 8 | 8 |

## CLOSING STATEMENT

BY MS. TANNER:  Thank you, Your Honor.

May it please the Court; counsel; good morning ladies and gentlemen.

I came and I talked to you two weeks ago today at opening statements, and at that time I told you as I was closing that the truth in this case was as straight as a desert highway, and it led to only one person, it led to that defendant over there.  And I told you at that time that there were a lot of rabbit trails that went off to the sides of that highway, but that every single one of them was a dead end.

And at that time I made a contract with you on behalf of the State of Texas. See, because opening statements are a contract.  I'm saying to you, here is what we're going to prove to you, here is what the evidence is going to be, and your job was to hold me to the contract.  Your end of the contract, then, it's a give and a take, that if we do that and if we prove every element of the offense to you beyond a reasonable doubt, every single one of them, then your end of the

1   contract is to follow your oaths and find the

2   defendant guilty of capital murder.

3         So the question is, as we finish all

4   this, is did we hold up our end of the deal?

5   And the answer to that is, yes, we did, and I

6   want to talk to you about that specifically,

7   how we held up our end of the deal.  And in

8   doing that, we introduced a number of

9   witnesses to you, and lots of pieces of

10  evidence, and everything that we introduced to

11  you was introduced to prove to you one of four

12  things.  Some of them proved something within

13  each of those four things, but every piece of

14  evidence was tailored to prove to you one of

15  the four things.

16        Number one, on April the 23rd of 1996

17  Stacey Stites was abducted on her way to work,

18  early that morning around three o'clock.

19  Number two, everything was brought to tell you

20  that after she was abducted she was raped and

21  she was sodomized at the time of her death.

22  Number three, everything we brought you was

23  here to tell you that in the course of that

24  rape and sodomy, Stacey was intentionally

25  murdered.  And, number four, and this is just

1    as important as all the others, everything we

2    brought you was brought to you to tell you

3    that he is the one who did it.  Only one

4    person on the face of this earth could have

5    done those three things, and it was this

6    defendant.  That's what all the evidence was

7    brought to you to prove.

8           And before I go into each one of the

9    four of those, I feel the same way I did on

10   opening statement, and I need to apologize to

11   you again.  This time I feel like I need to

12   apologize to you for the nature of what you

13   had to sit here and listen to for two weeks,

14   and I know it wasn't easy, and I want to tell

15   you I'm sorry that we had to expose you to

16   this underbelly of our society, this sort of

17   thing.  I'm sorry that we had to show you the

18   photographs that we had to show you.  I'm

19   sorry that we had to bring in the people to

20   talk about the evidence that was as graphic as

21   it was.  We weren't doing that to try to gross

22   you out, or to shock you, or to upset you.  I

23   know by necessity it's going to upset you, but

24   we were doing that because the only way that

25   you can come to a rational verdict is to

1    The second thing that we endeavored

2 to prove to you through the course of the

3 evidence was that Stacey was raped and

4 sodomized, and we talked so very much about

5 that, and the reason for that is because it's

6 so critically important.  And that evidence of

7 rape revealed itself to Karen Blakley, a

8 seasoned crime scene investigator, right

9 away.  And it revealed itself because, as we

10 talked about, the first thing they noticed is

11 a young lady laying out in the woods without a

12 shirt on.  They noticed her pants wide open,

13 her zipper broken.  Now how critical is that?

14    You remember, Karen came here and she

15 looked at Stacey's pants and it was so broken

16 she had to yank and play with it to get it to

17 come up.  And, I mean, she yanked on it pretty

18 good.  That tells you something, folks.

19    She told you that Stacey's panties

20 were all stretched out.  That tells you

21 something.  So right there, this seasoned

22 crime scene investigator has bells going off

23 in her head.  And thank goodness she did the

24 smart thing, she went and she took the swabs

25 that we talked about.  She took the vaginal

swabs, and what did she find?  At eleven

o'clock that night she goes back to the lab,

she puts them under the microscope and bingo,

she finds three fully intact spermatozoa.  At

that point she knows what she's got here.  We

all know what she's got here.  Because we

know, from the credible evidence, that that

doesn't hang around for days on end.  We know

from the credible evidence that that tells you

that that semen got in that girl's body within

24 hours of that eleven o'clock moment.  Which

is when?  On her way to work.

So Karen tells us that, and then we

know Stacey goes to Dr. Bayardo.  Dr. Bayardo

does the same thing.  He looks at the swabs

and what does he find?  He finds intact

spermatozoa, same thing, and he tells you what

the significance of that is.  And then Dr.

Bayardo goes further, and thank goodness he

does.  Karen told you why she couldn't go

further.  Dr. Bayardo does a full examination

and what does he find?  He finds that evidence

of the anal tearing that we talked so much

about.  And he finds, without any doubt at

all, that that occurred at the time of

1    Stacey's death.  How important is that in the

2    grand scheme of things in this case?

3           He also, if you will recall, looked

4    at the swabs from the rectal swabs and

5    remember what he said.  He said he saw a small

6    amount of what appeared to him to be broken up

7    heads and tails of spermatozoa.  Now that's

8    pretty significant, taking into account what

9    Dr. Johnson said later on, and we'll talk

10   about that in greater detail in a little bit.

11          So that right there tells you just

12   how important this scientific evidence is.

13   So what did Dr. Bayardo tell you when he

14   testified?  He said that in his opinion,

15   looking at everything, looking at all the

16   evidence, whatever happened to this young girl

17   had not happened consensually, based on

18   everything he saw.

19          And it's important to note that we

20   introduced -- the defense introduced this

21   autopsy report.  And you have this, and if you

22   need to see it, you can.  At the very end Dr.

23   Bayardo gives his opinion, and his opinion is,

24   that based on the findings that the decedent,

25   Stacey Stites, came to her death as a result

1   of asphyxia due to ligature strangulation --

2   the last four words are the most important for

3   right now -- associated with sexual assault.

4   Not associated with some sort of a sexual

5   rendezvous, but ligature strangulation

6   associated with sexual assault.  How important

7   is that?

8           Now, we also brought you evidence of

9   the mapping of Stacey's underwear.  Karen

10  Blakley told you about that.  And why is that

11  so important?  That's important because it

12  tells you, it gives you an idea of where the

13  semen was on Stacey's panties.  And what did

14  Karen tell you?  That it wasn't consistent

15  with any kind of drainage like the defense

16  talked about, that there was a very small

17  amount, and that the significance of that is

18  that relative to what they saw on the vaginal

19  swabs, there was very little drainage, and the

20  conclusion that you have to reach is that

21  there wasn't much movement after that

22  happened.  There was not much movement after

23  the sexual act.  What does that tell you once

24  again?  It tells you that it got there at the

25  time of her death.  It tells you again,

1    objective evidence of what happened.

2            So we bring you as well Karen's

3    testimony with regard to the breast swabs, and

4    later testimony that there was saliva on

5    those.  That, too, tells you that this

6    happened that morning at the time of her

7    death, because it's not going to be hanging

8    around there days later, not when normal

9    people take showers and wash things off of

10   them.  It happened that morning.

11           So when I came her and I talked to

12   you and I characterized this part of the

13   evidence as the smoking gun, and I still do,

14   because it is a smoking gun, because it is the

15   thing, because it got there at the time that

16   it did, that leads you directly to Stacey's

17   killer.  Everything that is credible,

18   everything that is objective points to that

19   happening that morning, and that is critically

20   important.

21           So, once again, as we look at the

22   elements that we're required to prove to you,

23   number seven for count one, "while in the

24   course of committing aggravated sexual

25   assault," put a check there, because the

1    credible evidence tells you that.

2         Now, we have to also prove to you

3    that this aggravated sexual assault and this

4    murder go hand in hand, and we have to prove

5    to you that this was an intentional murder.

6    That's one of the elements that we are

7    required to prove, and that's yet another

8    thing that we did.  We know that the sodomy

9    occurred at the time of Stacey's death; and we

10   know that the semen got in her body at the

11   time of her death; and we know that whoever

12   raped Stacey also killed her.  And based on

13   Dr. Bayardo's testimony, we know that whoever

14   killed her did it intentionally.  He told you,

15   remember this, how he said this happened, this

16   belt is broken now, but remember he said this

17   was taken and it was held like this.  For how

18   long?  For three to four minutes, ladies and

19   gentlemen.  Three to four minutes.  How can

20   anyone say this would be anything other than

21   intentional, for that length of time?  His

22   opinion, based on that, was that this was an

23   intentional killing.

24        And you know, it's real easy for us

25   -- we toss around the word "minute" a lot.

1   go the loop, she's not going to make this turn

2   here and go up and go around.  So you can

3   reasonably assume, based on what Andrew told

4   you and based on what Jimmy told you, Stacey

5   went to work this very same way that we've

6   talked about so many times.  And what do we

7   know about that route?  We know that this

8   defendant is out there hanging around all

9   night out there.  Now, if he's out hanging

10  around --

11                  MR. GARVIE:   I'm going to

12  object this, she's stating facts not in

13  evidence.  Obviously, no one has testified to

14  the man being out that night.

15                  THE COURT:  Overruled.  Go

16  ahead.

17                  MS. TANNER:   If he's out

18  hanging around out in here, you know,

19  somewhere up in here in the county in the

20  middle of the night, and some sheriff's

21  deputies tell you that, that's not real

22  compelling.  That doesn't mean a whole lot

23  even if he does hang out all night.  But the

24  fact that he's over here at Long's Star Mart

25  most every night of the week until three,

1    four, five o'clock in the morning, right here

2    on Stacey's route, that tells you something,

3    ladies and gentlemen, that tells you

4    something.  That tells you something in light

5    of all the stops that she had to make along

6    that way.

7         So that's significant.  That ties him

8    to this offense.  Obviously, if he were

9    someone who went to bed at ten o'clock every

10    night and got up at seven o'clock every

11    morning, that would be a little weird.  That

12    would be a little hard to tie him to an

13    offense that occurred at 3 a.m.

14         Another thing that's important is

15    where Stacey's truck was left.  We know from

16    Ms. Felix that the defendant did not have a

17    car.  He didn't have a vehicle so his mode of

18    transportation was walking.  And remember what

19    Lieutenant Campos told you, that that truck

20    was left where it was left for convenience.

21    For convenience.  Now, how convenient is

22    leaving this truck at the high school if

23    you're, say, Jimmy Fennell and you've got to

24    hike back to Giddings?  How convenient is

25    leaving this truck at the high school if

1    you're David Lawhon and you've got to hike

2    back out to the county?  How convenient is it

3    for the defendant, though, to hike six-tenths

4    of a mile back over to his house?  That's

5    significant.  That's very, very significant.

6          We know from Mrs. Estes, the

7    defense's witness, that this defendant

8    frequents a bar out on 1441 that she owns, the

9    Cherokee Bar.  So it's not like he has no

10    knowledge of this area.  A small minor point,

11    but consequential nonetheless.

12          And, finally, I want to talk to you

13    with regard to this issue, the seat, the seat

14    of this truck as it was shown to you, as it

15    was found.  The seat was leaned back and the

16    seatbelt was still engaged.

17          Now, many times, Missy and I, when

18    we're working on cases we've got to rent a

19    car, and we share the car.  One drives and

20    then the other drives --

21               MR. GARVIE:  I'm going to

22    object to personal testimony about items that

23    are not in evidence.

24               THE COURT:  It's overruled.

25    Go ahead.

1          MS. TANNER:    And Missy is

2     about two inches taller than me, an inch

3     taller -- two inches or so taller than me, and

4     every time one of us gets in that car after

5     the other one's driven, what is the first

6     thing we do?

7          MR. GARVIE:    Again, I would

8     object to this line of argument.  She's

9     arguing facts that are not in evidence.

10         THE COURT:    It's overruled.

11    Go ahead.

12         MS. TANNER:    The first thing

13    we do is you've got to readjust the seat and

14    you've got to readjust the mirrors.  Well,

15    that's just common sense.  I mean, that just

16    makes sense.  And isn't it interesting that

17    when Wil Young sat down in that truck with the

18    seat exactly as it was found, he found the

19    rearview mirror to be perfectly adjusted to

20    see out.  Now, if Wil Young were 5'10" or 5'5"

21    or somewhere in there, that wouldn't matter in

22    this case.  But it does matter because you

23    remember seeing over there, when the two of

24    them stood up side by side, they were exactly

25    the same height.  Who would have had a perfect

1    view out that back window if he was driving

2    that truck to the high school?  A person who

3    is 6'2".  Jimmy is not 6'2", and David Lawhon

4    is not 6'2".  Isn't that interesting?  And I

5    would submit to you that that is certainly a

6    person who does not want to be out seen

7    driving Jimmy Fennell's truck around at 3:00

8    or 4:00 in the morning.  So that is a small,

9    circumstantial, yet critically important point

10    in linking this defendant to this case, as if

11    the DNA isn't enough, which I would submit to

12    you that it is.

13           Another interesting point is that

14    Lieutenant Campos told you that, "well, it

15    would take a really big, strong guy to have

16    been able to have committed this offense."

17    You can see him, he's a big strong guy, ladies

18    and gentlemen.

19           The bottom line is, is that the

20    Cinderella slipper in this case fits, and it

21    fits only one person, and they've done

22    everything they can to try and make it fit

23    anyone else, and it doesn't, because the only

24    person in this case who is guilty is that guy

25    sitting right over there, that defendant.  And

1    that's what the truth in this case is.

2            So let's talk for a minute about what

3    the defense said.  Let's talk about the

4    defense's case for just a little while.

5            Opening statement is a contract.  We

6    enter into a contract with you as do they.

7    The contract that they entered into with you

8    was that they told you that they were going to

9    prove to you a secret affair between Stacey

10   Stites and Rodney Reed.  They said that to you

11   straight out at opening statements, and they

12   told you that there was a secret affair

13   between them but somebody else killed her,

14   either David Lawhon killed her, either Jimmy

15   Fennell or I guess some mystery guy killed

16   her, but that they were going to prove to you

17   a secret affair.

18           Well, folks, they made the contract,

19   they said it, and I'm still waiting to hear

20   it.  I am still waiting to hear about this

21   secret affair, because it ain't there.  They

22   haven't brought you one iota of anything to

23   prove to you that.  Nothing.  And don't you

24   know, if there was something out there, you

25   would have heard about it.

1    See, that's kind of the strength of
2    DNA evidence.  DNA evidence is so powerful
3    when you're talking about semen in a dead
4    girl's body, that it is so powerful it's a
5    little hard to go, "It wasn't me, must have
6    been somebody else.  Couldn't have been
7    mine."  So then because of that, this is how
8    you get those claims of, "Well, okay, it was
9    consensual."  What else are they going to
10   say?  What else can they say?
11          That's why, that's why this statement
12   that the defendant made is so important.
13   That's why this is so critically important,
14   because at that point in time when he made
15   this statement he didn't know they had tested
16   that other sample that they already had.  He
17   didn't know that they already had him tied to
18   that semen.  So what's he telling you there
19   when he doesn't know?  Well, I don't know,
20   never met her, never seen her, don't know
21   her.  And then only after he finds out that
22   he's nailed by the semen do we get this secret
23   affair.  That's why this is so important.
24          Now, let's talk about the secret
25   affair.  The angle of the investigation in

1 this case, as all investigators have told you,

2 was we're going to uncover every stone in this

3 girl's life. We're going to talk to everybody

4 who knows her, and everybody who ever knew

5 her, and maybe that will lead us to the

6 killer. Why? Because typically people kill

7 people they know. Not all the time, but that

8 makes sense. So they go and they talk to

9 everybody, every boyfriend, every co-worker,

10 every friend, every family member, everybody.

11 Nobody, nobody connects them. Nobody. Folks,

12 this secret affair was so secret that Stacey

13 Stites didn't even know about it. That's how

14 secret it was because it didn't exist. Don't

15 you know if there was even one grain of truth

16 to it, just one, somebody would have come here

17 and told you about it. A family member, a

18 friend, somebody.

19  So, instead, what we get is we get

20 Ms. Estes. She saw them talking at the HEB.

21 Wow. And I really was not trying to be cute

22 or funny when I asked her the question I asked

23 her. But the point is, i that Stacey Stites

24 worked at the biggest grocery store in town,

25 and how many customers a day do you think she

1    was talking to?  And that does not equate to a

2    secret affair.  It's just that simple.  All it

3    tells you is that he knew her and that he

4    recognized her driving in every morning.  He

5    had his eye on her.  That's all that proves to

6    you.  Maybe it even proves to you she may have

7    know his face well enough to stop if he waved

8    her down that morning, but it does not prove

9    any kind of a secret affair, not by a long

10    shot.

11         So you hear from Ms. Lindley, Iris

12    Lindley.  And usually when I talk to jurors I

13    have to talk to you and say, you know, it's

14    not like it is on TV, you don't usually get to

15    cross-examine people like on TV.  Well, I

16    can't that here because Ms. Lindley is a

17    witness who I must say is utterly devoid of

18    credibility.  Utterly devoid.  And your job is

19    to judge the credibility of the witnesses, and

20    you have the right to believe all, none or

21    some of what they say.  How much of what Ms.

22    Lindley said are you going to believe?  She

23    comes in here and she tells you, "Yeah, I saw

24    a girl come up and talk to Rodney."

25         "What was her name?"

```
 1              "Stephanie."

 2              "Stephanie?"

 3              You saw Ms. Clay-Jackson go, "What

 4     did you say?"  And she said, "Stephanie."  And

 5     then you could kind of see her go, uh-oh, I

 6     got my script wrong.

 7                   MR. GARVIE:   Objection,

 8     striking at the defendant through counsel.

 9     I'm going to object to that, Judge.

10                   THE COURT:   It's overruled.

11     Go ahead.

12                   MS. TANNER:   She got her

13     script wrong, so then she says, "No, no,

14     Stacey, Stacey.  Yeah, that's it, Stacey."

15     Okay, sure.

16              And then she says that this girl

17     drove up in a gray truck.  I saw her in a gray

18     truck.  Well, we know Stacey didn't drive a

19     gray truck.  She got that part of the script

20     wrong, too.  Then this is when it gets

21     classic.  She shows her the driver's license

22     picture.  "Is this the girl?"  "No."  So then

23     we take this picture.  "Is this the girl?"

24     Well, gee, what do you think she's going to

25     say now?  "Yeah, that's her."  Gheez.
```

1        Ms. Lindley is utterly devoid of

2    credibility, and we know how darn reliable

3    that ID is.

4        So that's the evidence of the secret

5    affair.  That's what we've got.  And we've got

6    to look at the circumstances of Stacey's life

7    to tell us whether that's really true.  Let's

8    look at her life back then in April of 1996

9    when she died.  She was 18 days away from her

10   wedding.  She was, by all accounts, even their

11   own witness says, she was extremely excited

12   about the wedding.  The girl took a job where

13   she had to be at work at 3:30 in the morning

14   so she could make 50 cents more an hour to pay

15   for her wedding dress.  Her friends all knew

16   how excited she was.  Her mom told you that

17   the very night before she died she looked like

18   a young girl in love, as did Jimmy.  The last

19   conversation she ever had with her sister was

20   about the shoes for the wedding.  The last

21   conversation she ever had with her mother was

22   about, "I'm going to marry Jimmy."  Remember

23   that?

24        Jimmy told you that Stacey was on the

25   green pill at the time of her death so they

1    weren't engaging in any kind of sexual

2    relations, but they expect you to believe that

3    she would go out and do that with him?

4              Let's look at what was in her truck.

5    State's Exhibit Number 79 is a portrait

6    certificate.  Stacey and Jimmy were scheduled

7    to have their portraits made on the 27th of

8    April, 1996.

9              State's Exhibit Number 78.  On the

10   18th of April, Stacey put down $50 on her

11   wedding dress, a dress that she was getting up

12   at 3:00 in the morning to go to work to pay

13   for.

14             Those things are all circumstantial

15   evidence of her state of mind at the time of

16   her death.  And what was her state of mind?

17   It wasn't what they're saying it is, that's

18   for sure.  What was she planning on doing that

19   day?  Her plan for that day was Jimmy was

20   going to meet her, they were going to get the

21   insurance together, and then they were going

22   to go pick out flowers after she got off

23   work.

24             Now, do you really expect that that

25   girl on the morning of April 23rd of 1996,

1  while she's wearing her HEB uniform, with no

2  makeup on, with a big old knee brace on her

3  knee, is going to stop off on her way to work

4  for a quickie with him? With him? Please.

5  It's ludicrous. And, frankly, in light of

6  everything, it's offensive to think that

7  they'll come here and argue that there was

8  some secret affair between the two of them.

9  It's utterly preposterous. They have

10  completely failed in carrying out their end of

11  any contract as far as that's concerned.

12      So they tell you, I guess, that there

13  is a mystery killer. There is someone else

14  out there that must have killed Stacey. Well,

15  you know, it's kind of a blessing in disguise

16  that it took them a year to focus in on the

17  real killer, because it gave them the

18  opportunity to take blood from everybody else

19  and get them excluded. We know it couldn't

20  have been them. So that was kind of a

21  blessing in disguise. So they say, I guess

22  that there must be someone else out there who

23  did it. And in support of that we hear about

24  this truck out there on 1441, from Ms.

25  Timmons. Well, the problem is, is that Ms.

1    over again, but he didn't do it.

2         So ask yourselves, if you were on the

3    jury here and instead of this defendant, David

4    Lawhon was on trial for Stacey's murder, how

5    fast of an acquittal would that be?  How quick

6    would you be acquitting him, knowing that he

7    was excluded by the DNA, and knowing there is

8    no credible evidence that they knew each

9    other, and knowing that he was at home in bed

10   with his wife?  Five minutes, not guilty, if

11   you're looking at David Lawhon.

12        Let's talk about Jimmy, Jimmy

13   Fennell, Stacey's fiancee.  Again, you judge

14   the credibility.  And you saw Jimmy's demeanor

15   here on the stand when he testified.  Is that

16   the demeanor of a killer?  You saw how he

17   felt, and what it did to him to have to come

18   here.  You saw that.  You judge his

19   credibility.  His reactions were normal,

20   ordinary, grief reactions, the kind of things

21   that you would expect to see from someone

22   who's suffered what he's suffered.  He

23   couldn't stay in that apartment.  He couldn't

24   keep that truck.  He did everything exactly

25   like you would expect a grief-stricken fiancee

1    to do.

2        And I want to you to think, just

3    imagine, would you, please, imagine being in

4    Jimmy's shoes. Think about being Jimmy

5    Fennell through the course of all this. Your

6    fiance is murdered 18 days before your

7    marriage. You were supposed to take her to

8    work and her mom, she talked you out of it.

9    You were supposed to have taken her to work

10    and she wouldn't have been out there. You

11    don't even get to grieve normally because the

12    police are all over you for seven and a half

13    months saying, "Did you kill her? Did you

14    kill her? You killed her. You killed her."

15    You're the first in line to give blood and

16    you're the first in line to give hair and

17    saliva. They're still all over you because

18    you're a cop and because you are the

19    boyfriend. Seven and a half months they're

20    after him.

21        Finally, finally there is an arrest.

22    Finally they find the person who really did

23    it. We come trial and then what happens, if

24    you're Jimmy? You get to hear that your

25    fiancee is off having a secret affair with

1   this guy.  And then you get to come here and

2   have the defense tell the whole world and tell

3   you to your face pretty much that you killed

4   her.  What a nightmare that must be.  God,

5   what a nightmare to be Jimmy Fennell.  The

6   fact is, though, for seven and a half months

7   they looked at Jimmy and the truth is, he

8   couldn't have done it.  It was logistically

9   impossible for Jimmy to have committed this

10  offense, and that's the bottom line.

11          Mrs. Stites told you over and over

12  again that there were two sets of keys to her

13  car and she had them.  And she, on the morning

14  that Stacey disappeared, gave the extra set of

15  keys to Jimmy.  He had no means to use her

16  car.  The police didn't stop there, though,

17  they looked for taxi fares.  None.  They even

18  went so far as to check the mileage logs of

19  all the Giddings police cars to make sure

20  everything jived and everything was where they

21  should have been, and they were.  There was no

22  means by which Jimmy could have even done

23  this.

24          You now how desperate the defense is

25  getting when they ask Lieutenant Campos, "Well

1    is it possible to walk from Bastrop to

2    Giddings and back?"  "Well, I suppose."  Well,

3    let's look at that for just a minute.

4         We know that Stacey's truck was left

5    sometime between 4:30 and 5:23.  So let's give

6    the defense the benefit of the doubt here, and

7    let's say the truck got left at 4:30 in the

8    morning and Jimmy starts hoofing it back to

9    Giddings at 4:30 in the morning.  Now we know

10   that she didn't get killed at midnight the

11   night before or seven o'clock or whenever the

12   night before because Dr. Bayardo tells us

13   that, that Stacey died within an hour of three

14   o'clock.  So we know what our timeframes

15   were.  So let's say 4:30 in the morning the

16   truck is left off and Jimmy is hoofing it back

17   to Giddings.  He's accounted for by Mrs.

18   Stites at 6:45.  That's two hours and 15

19   minutes.  You can do the math.  Thirty miles.

20   He would have to be doing four and a half

21   minute miles to have made it back to Giddings

22   by the time he came downstairs and saw Mrs.

23   Stites.

24        Well, I'm sorry, folks, but Jimmy

25   Fennell does not look to me like a marathoner,

1     and don't you know if somebody would have seen

2     this guy running back to Giddings on foot we'd

3     have known about it.  It's ludicrous.  It's

4     absolutely ludicrous, and it tells you how

5     desperate they were when they said he could

6     have walked.  That doesn't fly at all. The

7     fact is, is that Jimmy could not have done

8     this.  Yes, he was the last one to see Stacey

9     alive, that's true.  But, I mean, yeah, you

10    would expect that.  I mean, they were living

11    together.  They were engaged.  I suspect that

12    at midnight all of you, your spouse is the

13    last person to see you.  That's just common

14    sense.

15          And why would he have possibly done

16    this?  By all accounts, he was, and she was,

17    and they were two young people in love about

18    to start their life together.  That's what the

19    evidence shows you in this case.  So ask

20    yourself, how quick could you find Jimmy

21    Fennell not guilty if he was on trial, snap

22    (snapping of fingers), like that.  He couldn't

23    have done it.  He didn't have the means to do

24    it, he didn't have the motive to do it, and

25    this DNA excludes him.  It's that simple.

1          The fact is, is that there is their

2     case.  There it is.  And there is nothing,

3     nothing, that takes you away from him being

4     the true killer of Stacey Stites.

5          And isn't it interesting that we

6     talked a lot about the fact that Jimmy didn't

7     have an alibi.  Jimmy didn't have an alibi for

8     that night.  Jimmy didn't have anybody

9     accounting for his whereabouts because Stacey

10     was the only one who could have accounted for

11     his whereabouts.  It's important to note that

12     nobody could ever find anything inconsistent

13     with what he told you.  Nobody.  They

14     canvassed his apartment, they looked

15     everywhere, and nobody could find anything

16     inconsistent.  But it's true, Jimmy didn't

17     have an alibi.  But ask yourselves, is there

18     anyone else here who didn't have an alibi?  Is

19     there anyone else who we've heard evidence

20     about that didn't have an alibi?  Yes, there

21     is, the defendant.

22                    MR. GARVIE:   Objection.

23     Again, comment on the defendant's failure to

24     testify.

25                    THE COURT:  It's overruled,

1    go ahead.

2              MS. TANNER:   Don't you know

3    that if somebody, anybody, would have been

4    able to come her and tell you, yeah, he was

5    asleep in bed at my house at three o'clock in

6    the morning the night of April 23rd.   If

7    anyone, family member, friend, girlfriend,

8    anyone on this earth could have come here and

9    told you he was at home in bed with them, and

10   alibied him, you would have heard from them.

11   They have every right to call witnesses just

12   like we do, and you would have heard from

13   them.   And the fact is, is the reason that you

14   didn't is because there isn't one, because he,

15   on April 23rd, 1996, was out roaming the

16   streets like he always does and he either

17   jumped her or flagged her down, but he got in

18   that truck, and there was a struggle inside

19   Stacey's truck, and you know it.   You know it

20   from all of the physical evidence.   And then

21   bent her over the seat, he raped her, he

22   sodomized her, and as he was doing that he put

23   her own belt around her neck and strangled the

24   life out of her.   That's what you know is the

25   end of the road here and is the truth.   And I

1 for you to certify that you are in

2 disagreement as to the statement of a witness,

3 and you should request that part of the

4 witness's statement on the point of dispute

5 and only on that part or point which is in

6 dispute.

7     That would be my proposed response to

8 the jury.

9     Would the State have any objections?

10       MS. TANNER: No, Your Honor.

11       THE COURT: The defense?

12       MR. GARVIE: No objection.

13       THE COURT: And your client

14 has been in the courtroom while we discussed

15 this and put this answer together, right?

16       MR. GARVIE: Yes, sir.

17       THE COURT: Okay. I'm going

18 to send this back in there now

19

20      (Third note received from the

21      jury.)

22

23      THE COURT: This is the next

24 note that we have from the jury. It says:

25 "To the Court, we disagree as to testimony of

1    the medical examiner, regarding, A.  Did he

2    find sperm in the anal cavity as observed by

3    tests or observation?  What was the condition

4    of found sperm?  B. His opinion on the life

5    expectancy of intact sperm in the anal

6    cavity.  C.  Time period associated with anal

7    dilation after death in non-sexual assault

8    victims; and D. What is the evidence that

9    supports the sodomizing of Stacey Stites?"

10   It's signed by the presiding juror.

11           I have had the court reporter go back

12   and research her notes, and I've had the

13   lawyers assist her with that and come to what

14   I believe is an agreement about what needs to

15   be read back to the jury.

16           Is that the correct status of where

17   we are?

18                   MS.  TANNER:   Yes, sir.

19                   MR.  GARVIE:   Yes, sir,

20   Judge.

21                   THE COURT:  And did the

22   defense participate in that?

23                   MR.  GARVIE:   Yes, sir.

24                   THE COURT:  And are there any

25   objections to these two pages being read to

1       THE COURT:  Please be

2  seated.  Thank you very much.

3       Members of the jury, have you reached

4  a verdict?

5       JURY FOREMAN:  Your Honor, we

6  have.

7       THE COURT:  Sir, will you

8  please hand it to the bailiff, he'll bring it

9  to me and I'll read it for you.

10      Mr. Reed, as I read the verdict will

11 you please stand up with counsel.  Thank you.

12      As to count one:  "We the jury find

13 the defendant, Rodney Reed, guilty of the

14 offense of capital murder as charged in the

15 indictment."  And it's signed by the presiding

16 juror.

17      As to count two:  "We the jury find

18 the defendant, Rodney Reed, guilty of the

19 offense of capital murder as charged in the

20 indictment."

21      You may be seated, sir.

22      Members of the jury, this is a

23 two-step process.  The next step is the

24 punishment phase.  You were told that earlier

25 and I think you understand it.  We'll will