# Exhibit 8

1     CAUSE NO. 8701     **73/35**

2

3    THE STATE OF TEXAS     X     IN THE DISTRICT COURT OF
                            X
4    VS.                    X     BASTROP COUNTY, TEXAS
                            X
5    RODNEY REED            X     21ST JUDICIAL DISTRICT

6

7

8

9

10

11     _____

12                  REPORTER'S RECORD
                       JURY TRIAL
13              GUILT/INNOCENCE PHASE
       _____
14

15

16                   MAY 4, 1998

17                 MORNING SESSION

18

19

20

21

22

23          VOLUME 43 OF **69**

24                                      FILED IN
                                        COURT OF CRIMINAL APPEALS
25                                      SEP 9  1998

                ORIGINAL               Troy C. Bennett, Jr., Clerk

1           On the 4th day of May, 1998, the

2    above entitled and numbered cause came on for

3    hearing before said Honorable Court, Harold R.

4    Towslee, Judge Presiding, and the following

5    proceedings were had:

6

7

8

9                   Volume 43 of **69**

10

11               (GUILT/INNOCENCE PHASE)

12

13               (PAGES 1 THROUGH 142)

14

15

16

17

18

19

20

21

22

23

24

25

1    <u>APPEARANCES</u>:

2                    <u>For the State</u>

3              Mr. Charles Penick
                District Attorney, Bastrop County
4              804 Pecan Street
                Bastrop, Texas    78602
5              SBOT #015748500
                (512) 321-2244
6

7              Mr. Forrest Sanderson
                Assistant District Attorney
8              804 Pecan Street
                Bastrop, Texas    78602
9              SBOT #17610700
                (512) 321-2244
10

11             Ms. Lisa Tanner
                Assistant Attorney General
12             P. O. Box 12548
                Austin, Texas    78711-2548
13             SBOT #19637700
                (512) 463-2170
14

15

16                  <u>For the Defendant</u>

17             Mr. Calvin Garvie
                Attorney at Law
18             22 N. Bell St., P. O. Box 416
                Bellville, Texas    77418
19             SBOT #07714300
                (409) 865-9781
20

21             Ms. Lydia Clay-Jackson
                Attorney at Law
22             700 N. San Jacinto
                Conroe, Texas    77301
23             SBOT #04332450
                (409) 760-2889
24

25

1          CHRONOLOGICAL INDEX

2   WITNESS                                    PAGE

3   APPEARANCES                                3

4   MORNING SESSION                            7

5

6   JUROR MICHELLE HAYNIE

7   CONCERNS FOR PERSONAL SAFETY               8

8   RULING                                     12

9

10  MOTION IN LIMINE NO. 33                    13

11  RULING                                     13

12

13  THE RULE INVOKED                           14

14  WITNESS SWORN AND INSTRUCTED               15

15  JURY SWORN AND SEATED                      16

16  THE COURT INSTRUCTS THE JURY               16

17  ANNOUNCEMENTS                              23

18  INDICTMENT READ - COUNT ONE                24

19  DEFENDANT'S PLEA                           25

20  INDICTMENT READ - COUNT TWO                25

21  DEFENDANT'S PLEA                           25

22

23  OPENING STATEMENT BY MS. TANNER            26

24

25  A RECESS WAS TAKEN                         66

1    OPENING STATEMENT BY MS. CLAY-JACKSON                66

2

3    DEBRA RANGEL

4    DIRECT EXAMINATION BY MS. TANNER                     79

5    CROSS-EXAMINATION BY MS. CLAY-JACKSON                85

6    REDIRECT EXAMINATION BY MS. TANNER                   90

7

8    ANDREW CARDENAS

9    DIRECT EXAMINATION BY MR. PENICK                     92

10   CROSS-EXAMINATION BY MS. CLAY-JACKSON               105

11   REDIRECT EXAMINATION BY MR. PENICK                  110

12   RECROSS EXAMINATION BY MS. CLAY-JACKSON             111

13

14   PAUL ALEXANDER

15   DIRECT EXAMINATION BY MR. SANDERSON                 113

16

17   DEFENSE'S FOURTH MOTION FOR PRODUCTION

18       OF EVIDENCE FOR EXPERT EVALUATION               138

19   RULING                                              139

20

21   COURT ADJOURNED FOR A LUNCH BREAK                   141

22   COURT REPORTER'S CERTIFICATE                        142

23

24

25

| No. | Description | Mrkd | Idnt'd | Ofrd | Admit |
|-----|-------------|------|--------|------|-------|
| S-1 | Large Photo | 7 | 82 | 83 | 84 |
| S-1a | Small Photo | 7 | 81 | 82 | 83 |
| S-2 | Map | 7 | 134 | 134 | 134 |
| S-2a | Transparency | 7 | 134 | 134 | 134 |
| S-4 | Large Photo | 7 | 99 | | |
| S-4a | Small Photo | 7 | 98 | 98 | 98 |
| S-5 | Large Photo | 7 | 124 | 124 | 125 |
| S-5a | Small Photo | 7 | 123 | 123 | 124 |
| S-6 | Large Photo | 7 | 124 | 124 | 125 |
| S-6a | Small Photo | 7 | 123 | 123 | 124 |
| S-7 | Large Photo | 7 | 129 | 130 | 131 |
| S-7a | Small Photo | 7 | 129 | 129 | 130 |
| S-8 | Large Photo | 7 | 129 | 130 | 131 |
| S-8a | Small Photo | 7 | 129 | 129 | 130 |
| S-9 | Large Photo | 7 | 129 | 130 | 131 |
| S-9a | Small Photo | 7 | 129 | 129 | 130 |
| S-10 | Large Photo | 7 | 129 | 130 | 131 |
| S-10a | Small Photo | 7 | 129 | 129 | 130 |
| S-11a | Small Photo | 7 | 129 | 129 | 130 |
| S-104 | Piece of Belt | 7 | 137 | 137 | |

EXHIBIT INDEX

1          MS. TANNER:  Yes, Your Honor.

2          THE COURT:  Go ahead.

3

4                    OPENING STATEMENT

5     BY MS. TANNER:

6               May it please the Court, counsel,

7     ladies and gentlemen.

8               Before we start talking about the

9     evidence in this case, I kind of feel like I

10    need to apologize to you.  I know that you all

11    know that this is a process of elimination

12    that we have gone through over the last five

13    weeks to get you here.  We started out with

14    400 people and now we're down to fourteen.

15    And I know that all fourteen of you shared

16    with us the burdens that this will cause in

17    your personal life, and so I do feel like I

18    need to apologize to you for you being here,

19    but I want to thank you too.  I know that the

20    magnitude and the gravity of what we're about

21    to embark on isn't lost on any of you, and I

22    know that you all know the significance of

23    your jobs and I know that you're going to take

24    this seriously.

25               And before I start talking about the

1    genetic profile and these population

2    geneticists develop these data bases.

3         These databases have been used to

4    judge the probability of someone other than

5    the person you're looking at could have left

6    that sample.  So you use the databases to say

7    one in X number of whites could have left this

8    sample, or one in X number of blacks or one in

9    X number of Hispanics.  Because the database

10   is broken down by those three major racial

11   categories.  That is what DNA testing is

12   about.  The evidence will explain that to you

13   a lot better than I did, but at least I wanted

14   to get that ball out.  That is the tool that

15   in this case the police were armed with during

16   their investigation.

17        Well, let's talk about the

18   investigation.  The police went, right after

19   Stacey's death, started trying to figure out

20   who did it.  And they started that by talking

21   to the people she knew.  And the reason for

22   that is pretty simple.  Statistically

23   speaking, most murders are committed by people

24   who knew the victim.  Unfortunately there are

25   way too many random murders out there, but the

majority of murders are not those random murders. So they immediately started talking to people that knew Stacey -- her fiance, Jimmy. They talk to any ex-boyfriends, they talk to her co-workers, they talk to her former co-workers, they talk to her family, they talk to her friends, all to try and find out who might have done this? Who might have killed her? Was she having some secret affair with somebody?

They talked to all these people, and not one of them during the course of the investigation that they talked to ever said she was associated with that defendant. Ever. They weren't dating according to anyone, they weren't friends, they weren't associates. So they talked to all of them trying to find out as much as they could, and then they did exactly what you would expect them to do. When you have an ex-boyfriend or male associate or something, they say, "Hey, would you give us some blood?" "Sure." So they kept getting blood samples from all the suspects, of 25 blood samples they ended up getting from different people.

<u>DIRECT EXAMINATION</u>

<u>QUESTIONS BY MS. TANNER:</u>

Q.   Would you state your name for the jury,
     please.

A.   Debra Rangel.

Q.   Debra, how old are you, and I know it's rude
     to ask?

A.   I'm almost 25.

Q.   And where do you live?

A.   I live in College Station, Texas.

Q.   Where did you grow up?

A.   I grew up in Corpus Christi, Texas.

Q.   And how long have you lived in College
     Station?

               THE COURT:  Will you hold on
     a second?  Our microphone is turned off.  We
     need it on so that we can all hear.  It's fine
     now.  Go ahead.

Q.   (BY MS. TANNER)  And how long have you lived
     in College Station?

A.   Almost a year.

Q.   And you said you grew up in Corpus Christi?

A.   Right.

Q.   Are you married?

A.   Yes, I am.

1   Q.   And what do you do for a living?

2   A.   I'm a school teacher.

3   Q.   And do you teach?

4   A.   Right now I'm teaching 5th grade math, and

5       I'll be teaching 9th grade algebra.

6   Q.   Debra, do you have any brothers and sisters?

7   A.   Yes, I do.

8   Q.   Can you tell us who your brothers and sisters

9       are, starting from the oldest to the youngest?

10   A.   Okay.  Crystal is the oldest, and then my

11       other sister is Brenda, and my brother was in

12       the middle and there was myself and then

13       Stacey was the youngest.

14   Q.   What is Stacey's last name?

15   A.   Stacey Stites.

16   Q.   So Stacey Stites was your baby sister?

17   A.   Yes.

18   Q.   Debbie tell us, are all your other siblings

19       currently alive?

20   A.   No, they are not.

21   Q.   Which ones are not?

22   A.   Stacey is no longer alive, and then my brother

23       passed away last August.

24   Q.   When did Stacey pass away?

25   A.   Stacey died April 23rd, 1996.

1   Q. Campos?

2   A. That's him, yeah.

3   Q. Okay.

4         When -- did you have occasion to see

5       Jimmy Fennell and your sister together?

6   A. The first time we met Jimmy was when Stacey

7       graduated and he was there and that was when

8       we met him and then we came up for

9       Thanksgiving, and he was there for

10      Thanksgiving.

11  Q. Would you classify your sister as a popular

12      young lady when she was in school?

13  A. There were only about a hundred people in the

14      class so it's kind of hard to not know

15      everybody.

16  Q. Well, do you think she was well-liked?

17  A. Yes, all of us siblings are very outgoing and

18      well-liked.

19  Q. Do you recall your mother when you-all were

20      growing up ever talking to you about who you

21      should and should not date?

22  A. Well, yeah -- people we should or should not

23      date. I think every mother does that.

24  Q. But your mother made no references to whether

25      you should or should not date outside your

QUESTIONS BY MR. SANDERSON:

1   Q.  Officer, will you please state your full name
2     and spell your last name?

A.  Paul Alexander, A-L-E-X-A-N-D-E-R.

Q.  Officer Alexander, how are you employed?

A.  Criminal investigator for the City of Bastrop
    Police Department.

Q.  Just by way of history, how long have you been
    in law enforcement?

A.  About 25 years.

Q.  And have you been in an investigator for 25
    years, or have you done different kinds of
    things?

A.  No, sir, patrol and investigation.

Q.  Tell the jury briefly now that you're an
    investigator, what is the difference between
    investigation and patrol?

A.  Well, you pick up after patrol takes reports,
    initial reports, they are turned over to
    investigations and we do all the follow ups.

Q.  Turning your attention -- let me back up and
    ask you one more thing. As a police officer
    for 25 years, do you have to be -- do you have
    to take some sort of certifications in order
    to represent yourself as a peace office in the

```
 1        State of Texas?

 2   A.   Yes, sir.  We have to have a little more

 3        training.

 4   Q.   You are certified as a peace officer in the

 5        State of Texas?

 6   A.   Yes, sir, I have a certificate.

 7   Q.   Let me turn your attention now in general to

 8        April of 1996.  Were you employed here as a

 9        patrol officer in the City of Bastrop?

10   A.   Yes, sir, I was.

11   Q.   Tell the jury a little bit about what your

12        duties were in April of 1996 as a patrol

13        officer rather than an investigator?

14   A.   Patrol the streets.  At nights, beat nights

15        like we were working burglary patrol, keep eye

16        on buildings and traffic and answer calls.

17   Q.   Are there times as a patrol officer where you

18        were directed ahead of time to focus your

19        attention more on a certain area because of

20        crimes having been committed in that area?

21   A.   Yes, sir, we have close patrols.

22   Q.   What are they called?

23   A.   Close patrols.  People ask for close patrols.

24   Q.   And were you involved with a close patrol in

25        April of 1996?
```

1    A.  Yes, sir, I was.

2    Q.  Describe that for us just in brief?

3    A.  It was the HEB store.  Previously some kids

4        from Little Caesar's Pizza had gotten up on

5        the roof and the management got them down and

6        gave them a criminal trespass warning.  And

7        they were scared they would get back up again,

8        and if one fell off it would be a liability

9        for HEB, and also Little Caesar's had been

10       found with the back door open and we were

11       trying to keep a close watch on it -- on the

12       Little Caesar's which was adjacent to the HEB.

13   Q.  Now, were these kids that worked there?

14   A.  Yes, sir, I believe they were employees.

15   Q.  Okay.  So you were engaged in that close

16       activity in April of 1996?

17   A.  Yes, sir, I was.

18   Q.  Other than what you might be focussing on

19       specifically, when you patrol, do you patrol

20       the entire city or is there a certain route

21       that you take?

22   A.  No, sir, the entire city, try not to ever take

23       the same route.

24   Q.  Why not?

25   A.  Just at random.  Just where you don't get in a

1    pattern.

2    Q.   Do you ever patrol around the schools, the

3         high school?

4    A.   Yes, sir.

5    Q.   And the middle school?

6    A.   Yes, sir.

7    Q.   Let me turn your attention now to the night of

8         April the 22nd, 1996, and the early morning

9         hours of April the 23rd, 1996.  Tell the jury,

10        first of all, what was your shift?  When did

11        you come on work and when did you go off work?

12   A.   I started at 9:00 p.m. And got off at 7:00

13        a.m. the next morning.

14   Q.   And how long had you been working that what we

15        might call graveyard shift?

16   A.   I don't know.  We changed every 28 days, and I

17        don't know how far into the shift I was.

18   Q.   But that was the shift that you would work

19        regularly?

20   A.   Yes, sir.

21   Q.   Other than the close patrol there in the HEB

22        area, was there any other thing that you were

23        focusing on that particular night?

24   A.   Just -- I think we had had some burglaries and

25        we were trying to keep a watch on all the

1       businesses and the schools.

2   Q.   Was there ever a time that night when you

3       drove through the parking lot of the high

4       school?

5   A.   Yes, there was.

6   Q.   Do you recall how many times you might have

7       driven through there?

8   A.   I think I went through twice, maybe three

9       times.

10   Q.   Was that just routine patrol, or were you

11       looking for something specific?

12   A.   No, sir, that was just routine.

13   Q.   Do you recall the times you might have driven

14       through there?

15   A.   Just the last time.

16   Q.   The last time would have been at or about what

17       time?

18   A.   5:23 a.m.

19   Q.   Would that be 5:23 a.m. on the 23rd?

20   A.   Yes, sir.

21   Q.   Okay. What, if anything, did you see at 5:23

22       a.m. on the 23rd that you did not see driving

23       through the same parking area at the high

24       school, one of the two other previous times?

25   A.   I observed a red Chevrolet pickup parked, it

1     would be on the west side of the high school

2     in the back by the little, We Bears Daycare

3     Center westbound.

4  Q.  You had to educate me about that this morning.

5     Let's educate the jury.  What is We Bears?

6  A.  It's a daycare center, I believe, for high

7     school kids that have children, and that's

8     where they keep them while they are in school.

9  Q.  And you said that vehicle was not present

10    during the other passes that you went through

11    there?

12  A.  No, sir, I did not see it earlier.

13  Q.  Was that unusual?

14  A.  Well, at that hour.  It was unusual enough

15    that I ran a stolen check on it, and it came

16    back not stolen.

17  Q.  Okay.  And how do you go about doing that,

18    mechanically?  What are we talking about?

19  A.  I pulled up behind the car -- or the truck and

20    I called the license plate in to the dispatch

21    at the county and had them run it for a stolen

22    check.

23  Q.  Now, you mentioned that you pulled in behind

24    the truck.  Do you also get out of your

25    vehicle and come around and take a close look

1        at it, or do you stay inside your truck?

2   A.   I stayed in until they came back with the

3        information that it wasn't stolen, and then I

4        got out and looked at it.

5   Q.   Okay.  When you got out and looked at it,

6        would you simply describe to the jury what it

7        was that you saw?

8   A.   A small Chevrolet extended cab pickup.  The

9        driver's seat was reclined just slightly, and

10       there were some items inside, but I checked --

11       what I was looking for was the window glass

12       wasn't shattered, and the ignition as intact,

13       and the doors locked, and at that time I

14       figured it was some high school kid that had

15       parked going on some kind of school event.

16       After that, I went back in service.

17   Q.   Now, at 5:23 a.m. On April the 23rd, was it

18       light -- was it getting light yet or was it

19       still completely dark?

20   A.   No, sir, it was still dark.

21   Q.   Are there any lights -- parking lights there

22       above where you were at to illuminate?

23   A.   There is indirect lighting, but I don't

24       believe there was any right over me, because I

25       had a flashlight.

1   Q.   You did have a flashlight?

2   A.   Yes, sir, I did.

3   Q.   Did you use your flashlight to shine inside

4       the vehicle?

5   A.   Yes, sir, I did.

6   Q.   Did you see anything unusual when you did

7       shine your light inside the cab of the

8       vehicle?

9   A.   No, sir, that's what I say.  Nothing appeared

10      -- I believe there was some books and

11      clothes, but nothing appeared out of order.

12   Q.   Was the car locked, or did you check?

13   A.   Yes, sir, I checked the door handle, and it

14      was locked.

15   Q.   Both sides?

16   A.   I just checked the driver's side.

17   Q.   In the bed of the pickup, did you flash your

18      light in there to see if there was anything

19      unusual there?

20   A.   I don't remember anything being in the bed.

21   Q.   What about on the ground around the vehicle or

22      at least there on the driver's side where you

23      were?  Did you see anything unusual on the

24      ground?

25   A.   There was a piece of belt with a little buckle

1      on it, and it was just right out from the

2      driver's door.

3  Q.  What were your thoughts when you saw the

4      buckle?

5  A.  I just thought some kid had probably broken

6      their belt and that's where it wound up. I

7      didn't really think much of it in passing.

8  Q.  Is it unusual to find things like that,

9      objects outside the school?

10  A.  Well, yes, sir, on the high school parking lot

11      a lot of times you'll see loose stuff or you

12      will find wallets or shoes or books that they

13      left or something, and I just didn't think

14      much of it in passing.

15  Q.  Now, at 5:23 a.m. in the morning, had you

16      received any report that anybody was missing

17      that you needed to be on the lookout for any

18      young woman who was missing?

19  A.  No, sir, I had not.

20  Q.  So was there any other reason for to you take

21      any more note than what you did of that pickup

22      truck?

23  A.  No, sir, I didn't believe so.

24  Q.  What did you do next, after you investigated

25      the pickup truck?

1   A.   I just went back on patrol.

2   Q.   And you said you got off at what time?

3   A.   At 7:00 a.m.

4   Q.   Did anything else of significance happen

5       between 5:23 and 7:00 a.m.?

6   A.   No, sir, not to my knowledge.

7   Q.   Now, after you got home, after your shift was

8       over, what happened?

9   A.   I received a phone call.  I don't know if it

10      was -- exactly what time it was.  They asked

11      had I run this vehicle's license number, and I

12      told him, "Yes, I had," and I believe they

13      asked me to come down and speak with my boss

14      -- with my chief about that.

15   Q.   By the way, when you first ran the license

16      number at 5:23 a.m., did dispatch tell you who

17      that vehicle was registered to?

18   A.   It just came -- yes, sir, the last name

19      Fennell.

20   Q.   Did you know anybody by that name?

21   A.   Yes, sir, I did, but at that time I didn't put

22      anything to it.

23   Q.   Okay.  So let's move forward then until about

24      9:00 o'clock.  What did you do after you got

25      the phone call to come back on service?

1   A.   I went to the office and told my chief and my

2        sergeant basically what I have told you, and

3        they asked me to do a report on it, and I did.

4   Q.   Okay.  Now, did you have any other

5        responsibilities or activities in the

6        investigation of the death of Stacey Stites

7        after that point?

8   A.   No, I did not.

9                 MR. SANDERSON:   May I

10       approach the witness?

11               THE COURT:  Sure.

12   Q.  (BY MR. SANDERSON)  Investigator Alexander,

13       let me show you a series of photographs, and

14       let's start with these two first, and I'm

15       referring to what has been marked as State's

16       Exhibits 5a and State's Exhibit 6a.  Can you

17       tell us what those are photographs of?

18   A.   Aerial views of the high school and the

19        football field, the school complex.

20   Q.   Okay.  And are these aerial views accurate and

21        correct?

22   A.   Yes, sir, they are.

23               MR. SANDERSON:   The State

24       would offer to admit State's Exhibits 6a and

25       5a.