# Exhibit 9

.CAUSE NO. 8701    *73/35*

| | | |
|---|---|---|
| THE STATE OF TEXAS | X | IN THE DISTRICT COURT OF |
| | X | |
| VS. | X | BASTROP COUNTY, TEXAS |
| | X | |
| RODNEY REED | X | 21ST JUDICIAL DISTRICT |

---

REPORTER'S RECORD
JURY TRIAL
GUILT/INNOCENCE

---

MAY 5, 1998

MORNING SESSION

VOLUME 45 OF **69**

FILED IN
COURT OF CRIMINAL APPEALS

SEP 9  1998

Troy C. Bennett, Jr., Clerk

ORIGINAL

1          On the 5th day of May, 1998, the

2   above entitled and numbered cause came on for

3   hearing before said Honorable Court, Harold R.

4   Towslee, Judge Presiding, and the following

5   proceedings were had:

6

7

8

9              Volume 45 of 6 9

10

11           GUILT-INNOCENCE PHASE

12

13          (PAGES 1 THROUGH 116)

14

15

16

17

18

19

20

21

22

23

24

25

APPEARANCES:

For the State

Mr. Charles Penick
District Attorney, Bastrop County
804 Pecan Street
Bastrop, Texas 78602
SBOT #015748500
(512) 321-2244

Mr. Forrest Sanderson
Assistant District Attorney
804 Pecan Street
Bastrop, Texas 78602
SBOT #17610700
(512) 321-2244

Ms. Lisa Tanner
Assistant Attorney General
P. O. Box 12548
Austin, Texas 78711-2548
SBOT #19637700
(512) 463-2170

For the Defendant

Mr. Calvin Garvie
Attorney at Law
22 N. Bell St., P. O. Box 416
Bellville, Texas 77418
SBOT #07714300
(409) 865-9781

Ms. Lydia Clay-Jackson
Attorney at Law
700 N. San Jacinto
Conroe, Texas 77301
SBOT #04332450
(409) 760-2889

1           CHRONOLOGICAL INDEX

2    WITNESS                                      PAGE

3    APPEARANCES                                  3

4    MORNING SESSION                              6

5

6    KAREN BLAKLEY (CONTINUED)

7    DIRECT EXAMINATION BY MS. TANNER CONTINUED   6

8    CROSS-EXAMINATION BY MR. GARVIE              16

9    REDIRECT EXAMINATION BY MS. TANNER           42

10   RECROSS EXAMINATION BY MR. GARVIE            52

11   FURTHER REDIRECT EXAMINATION BY MS. TANNER   53

12

13   RECESS                                       55

14

15   JIMMY LEWIS FENNELL

16   DIRECT EXAMINATION BY MR. SANDERSON          59

17   RECESS                                       107

18   DIRECT EXAMINATION BY MR. SANDERSON CONTINUED 107

19

20

21   COURT ADJOURNED FOR A LUNCH BREAK            115

22   COURT REPORTER'S CERTIFICATE                 116

23

24

25

```
 1                    EXHIBIT INDEX

 2                     VOLUME 45

 3   * All State's Exhibits marked prior to trialin

 4       Vol. 43, Page 7.    (Volume No./Page No.)

 5   No.   Description        *Mrkd   Idnt'd   Ofrd   Admit

 6   S-75  HEB Shirt          43/7     10       10     11

 7   S-76  Knife              43/7    104

 8

 9

10

11

12

13

14   D-1   Photo               34      34       34     35

15

16

17

18

19

20

21

22

23

24

25
```

1    (Day 22, Morning Session, May 5, 1998; Cause Number

2    8701, the State of Texas versus Rodney Reed.)

3

4                          (Whereupon the Jury returned

5                          to the courtroom and the

6                          following proceedings were

7                          had open Court.)

8

9                    THE COURT:  Please be

10    seated.  Thank you very much.  Go ahead.

11                    MS. TANNER:  Thank you, Your

12    Honor.

13

14         DIRECT EXAMINATION (CONTINUED)

15    QUESTIONS BY MS. TANNER:

16    Q.   Ms. Blakely, I have a few additional questions

17         for you.  Due to the late hour yesterday I

18         forgot about some things.

19              One of the first things I wanted to

20         ask you about was, when you first went out to

21         the crime scene where Stacey Stites's body

22         was, was she covered up with anything or was

23         she still exposed?

24    A.   She was covered with a heavy blanket, a green

25         one.  I couldn't tell if it was a rug or

1  Go ahead.

2 Q. (BY MS. TANNER) What is the whole purpose of

3  refrigerating a body?

4 A. To preserve any evidence and to prevent

5  further deterioration of the body.

6 Q. And when you-all store swabs, over years, how

7  are they stored?

8 A. Generally they are air dried, refrigerated,

9  and after we are finished processing the

10  results, any leftover swabs with biological

11  specimens on it they are then frozen.

12 Q. So that same principle would apply to bodies,

13  correct?

14 A. That's correct.

15 Q. You indicated that in your opinion the fact

16  that you saw three intact sperm on the slides

17  indicated that the sexual activity had to have

18  been quite recent?

19 A. Yes.

20 Q. And you saw them when?

21 A. I saw them about 11:30 -- 11:00 or 11:30 that

22  night.

23 Q. And at the point that you saw the three intact

24  sperms, had the swab that it had been on had

25  it been air dried or had it been refrigerated

1        to stop the deterioration?

2   A.   No.

3   Q.   And based on your training and your knowledge

4        and your experience and any research that you

5        have done, how long of a time frame are we

6        talking about there that you would expect to

7        see that?

8   A.   I'm sorry, I got lost on the first part.

9   Q.   Okay.  Based on your knowledge and your

10       training and experience, how long of a time

11       frame are we talking about that you would

12       expect a sperm to be able to stay intact?

13  A.   I have published documentation that says that

14       26 hours is about the outside length of time

15       that tails will remain on a sperm head inside

16       the vaginal tract of the female.

17                 MS.  TANNER:   No further

18       questions.

19

20                 CROSS EXAMINATION

21  QUESTIONS BY MR.  GARVIE:

22  Q.   The published documentation that you're

23       referring to, would that be an article from

24       1981?

25  A.   Yes, it would.

1          (Whereupon the Jury returned
2          to the courtroom and the
3          following proceedings were
4          had open Court.)

5

6          THE COURT:  Please be
7    seated.  Thank you very much.
8          Is this your next witness?
9          MR. SANDERSON:   Yes, sir.
10         THE COURT:  Sir, will you
11   come up here and let me swear you in before
12   you testify.  Please have a seat right over
13   here.

14

15      JIMMY LEWIS FENNELL, the witness, after
16   having first been duly sworn, assumed the witness
17   stand and testified upon his oath as follows:

18

19              DIRECT EXAMINATION
20   QUESTIONS BY MR. SANDERSON:
21   Q.   Will you please state your full name for the
22        jury and spell your last name?
23   A.   Jimmy Lewis Fennell, Jr., last name spelling,
24        F-E-N-N-E-L-L.
25              THE COURT:  Will you scoot up

1        a little closer to the microphone so that we

2        can all hear you.

3  Q.   (BY MR. SANDERSON)  Mr. Fennell, let me start

4        with some background information.  Where are

5        you currently living?

6  A.   I'm living in Giddings, Texas.

7  Q.   All right.  And are you employed in the City

8        of Giddings?

9  A.   Yes, sir.

10  Q.   And how are you employed, sir?

11  A.   Police officer with the City.

12  Q.   How long have you been a police officer for

13        the City of Giddings?

14  A.   Approximately two and a half years.

15  Q.   And how long have you been certified as a

16        peace officer in the State of Texas?

17  A.   Approximately three years.

18  Q.   For that half year or so that you were not

19        working for Giddings PD, where were you

20        employed?

21  A.   Bastrop County Sheriff's Department.

22  Q.   And what were your functions at the Bastrop

23        SO?

24  A.   Was a corrections officer assigned to the U.S.

25        Marshall's service in Austin, Texas.

1    Q.    And what did you do for them at the time?

2    A.    Prisoner transport and court duty.

3    Q.    And are we talking about federal prisoners?

4    A.    Yes, sir, federal prisoners.

5    Q.    Describe to the jury, if you would, exactly

6          what it is you do as a peace officer for the

7          City of Giddings?

8    A.    Basic patrol duties, narcotics, and kind of

9          special functions dealing with the public, or

10         the basic protect and serve.

11   Q.    Do you have regular hours or do you have hours

12         that fluctuate from month to month?

13   A.    Hours that fluctuate.

14   Q.    Let me turn your attention -- before I do

15         that, are you currently married?

16   A.    No, sir.

17   Q.    Have you ever been married?

18   A.    No, sir.

19   Q.    You have, however, been engaged, have you not?

20   A.    Yes, sir.

21   Q.    And who were you in engaged to?

22   A.    Stacey Lee Stites.

23   Q.    Let me ask you some questions now about your

24         -- the relationship you had with Stacey

25         Stites.  How did you first meet her?

1   A.   I first made her acquaintance in Smithville

2         when I was working at a dance, and then later

3         became acquainted with her at a dance at the

4         Oyster Bar, in Bastrop.

5   Q.   That was the first time you met her; is that

6         correct?

7   A.   Yes, that's correct.

8   Q.   Do you recall about what time it was when you

9         and she first started going out together?

10   A.   Sometime in May of 1995.

11   Q.   Was that shortly after these events that you

12        first met her, or was there a long time in

13        between?

14   A.   It was shortly thereafter.

15   Q.   How long did it take, once you started dating

16        Stacey Stites, for the two of you to become

17        seriously dating?  In other words, exclusively

18        dating one another?

19   A.   Approximately two to three weeks.

20   Q.   Describe a little bit about the relationship

21        you had with her.  How would you put it in

22        your own words?

23   A.   It was a close-knit relationship.

24   Q.   What kinds of things would you like to do

25        together?

1   A.   We participated in family functions, traveling

2         to different places, going hiking and outdoor

3         activities.

4   Q.   Would you describe, especially early on, your

5         relationship with her as being fairly open?

6                 MS. CLAY-JACKSON:

7         Objection, Your Honor, this is leading.

8                 THE COURT: Sustained. Don't

9         lead him.

10  Q.   (BY MR. SANDERSON) With regard to

11        communications about personal matters, how was

12        your relationship with her?

13  A.   We were very open with each other.

14  Q.   Especially early on? If you had been dating

15        somebody else when you first met her, would

16        you have told her about that?

17  A.   Yes, sir.

18  Q.   Vice-versa?

19  A.   Yes.

20  Q.   At what point in time did you and Stacey

21        become engaged?

22  A.   Somewhere around the first of the year, in

23        '96.

24  Q.   Sometime in January would it be?

25  A.   Yes, around January, or little bit before the

1   A.   No, sir.

2   Q.   Who else would wear it?

3   A.   Stacey would wear it.

4   Q.   And I'll also show you State's Exhibit Number

5       75 and ask you whether or not you recognize

6       this shirt?

7   A.   Yes, sir.

8   Q.   From where?

9   A.   That's her work shirt.

10   Q.   And by "her," you mean Stacey, right?

11   A.   Yes, sir.

12   Q.   And, once again, in what order would she wear

13       those?  What would be on top and what would be

14       on the bottom?

15   A.   She would wear the other shirt underneath the

16       red uniform shirt.

17   Q.   Let me shift gears entirely and ask you about

18       a sequence of events that took place once this

19       investigation was in full force.

20             Now, you were an object of this -- or

21       a suspect in this investigation early on, are

22       you aware of that?

23   A.   Yes, sir.

24   Q.   Were there any times that the investigators

25       came to you, personally, and asked you

1    questions or interrogated you?  Whatever word

2    you want to use.

3  A.  Yes, numerous times.

4  Q.  Numerous times?

5  A.  Yes, sir.

6  Q.  Which investigators did that?

7  A.  It was Lieutenant Campos with the Bastrop

8      County Sheriff's Department, Sergeant John

9      Barton with the Bastrop County Sheriff's

10     Department, and also Sergeant Ranger Rocky

11     Wardlow.

12 Q.  Now, you are a police officer yourself.  Are

13     you familiar with the techniques, the

14     mannerisms, the methods by which police

15     officers use whenever they are talking with a

16     suspect?

17 A.  The basic knowledge, yes, sir.

18 Q.  And were those techniques used with you by

19     those officers that you just testified to?

20 A.  Yes, sir.

21 Q.  Do you feel like you were handled with any

22     special privileges while you were a suspect in

23     this case?

24 A.  No, sir.

25 Q.  Were there times when these officers would get

1      pretty rough with you, in a verbal sense?

2  A.  Yes, sir.

3  Q.  Now I'm not asking you to tell the jury what

4      they said, that would be hearsay, as you know,

5      but what kinds of things went during some of

6      these session?

7  A.  A lot of yelling.  A lot of emotional dropping

8      down from high emotion to low emotion, using

9      empathy or sympathy, that sort of thing, and

10     using the bad cop/good cop syndrome, and stuff

11     like that.

12  Q.  Did they ever call you names?

13  A.  Yes, sir.

14  Q.  What other things would they do that might

15     affect your employment?  The fact that you

16     were still a hot suspect in their minds?

17  A.  They continuously tried to get the chief of

18     police to suspend me, in order to get me off

19     the job.

20  Q.  Now, from the time of Stacey's death on April

21     the 23rd, 1996, for how long a period of time,

22     as far as you know, were you an active suspect

23     in their minds?

24  A.  Basically, through the duration of the

25     investigation.