# Exhibit 11

CAUSE NO. 8701    *73135*

| THE STATE OF TEXAS | X | IN THE DISTRICT COURT OF |
|---|---|---|
| | X | |
| VS. | X | BASTROP COUNTY, TEXAS |
| | X | |
| RODNEY REED | X | 21ST JUDICIAL DISTRICT |

---

REPORTER'S RECORD
JURY TRIAL
GUILT/INNOCENCE PHASE

---

MAY 5, 1998

AFTERNOON SESSION

VOLUME 46 OF **69**

FILED IN
COURT OF CRIMINAL APPEALS

SEP 9   1998

Troy C. Bennett, Jr., Clerk

ORIGINAL

1          On the 5th day of May, 1998, the

2   above entitled and numbered cause came on for

3   hearing before said Honorable Court, Harold R.

4   Towslee, Judge Presiding, and the following

5   proceedings were had:

6

7

8

9               Volume 46 of **6 9**

10

11             GUILT/INNOCENCE PHASE

12

13            (PAGES 1 THROUGH 201)

14

15

16

17

18

19

20

21

22

23

24

25

1    APPEARANCES:

2                        For the State

3                        Mr. Charles Penick
                         District Attorney, Bastrop County
4                        804 Pecan Street
                         Bastrop, Texas   78602
5                        SBOT #015748500
                         (512) 321-2244
6

7                        Mr. Forrest Sanderson
                         Assistant District Attorney
8                        804 Pecan Street
                         Bastrop, Texas   78602
9                        SBOT #17610700
                         (512) 321-2244
10

11                       Ms. Lisa Tanner
                         Assistant Attorney General
12                       P. O. Box 12548
                         Austin, Texas   78711-2548
13                       SBOT #19637700
                         (512) 463-2170
14

15

16                       For the Defendant

17                       Mr. Calvin Garvie
                         Attorney at Law
18                       22 N. Bell St., P. O. Box 416
                         Bellville, Texas   77418
19                       SBOT #07714300
                         (409) 865-9781
20

21                       Ms. Lydia Clay-Jackson
                         Attorney at Law
22                       700 N. San Jacinto
                         Conroe, Texas   77301
23                       SBOT #04332450
                         (409) 760-2889
24

25

## CHRONOLOGICAL INDEX

| WITNESS | PAGE |
|---|---|
| APPEARANCES | 4 |
| AFTERNOON SESSION | 8 |
| | |
| JUDGE'S QUESTIONING OF INVESTIGATOR VASQUEZ | |
|     (OUTSIDE PRESENCE OF JURY) | 8 |
| | |
| JIMMY LEWIS FENNELL (CONTINUED) | |
| CROSS-EXAMINATION BY MS. CLAY-JACKSON | 14 |
| REDIRECT EXAMINATION BY MR. SANDERSON | 69 |
| RECROSS EXAMINATION BY MS. CLAY-JACKSON | 77 |
| FURTHER REDIRECT EXAMINATION BY MR. SANDERSON | 77 |
| | |
| RECESS | 78 |
| | |
| L. R. (ROCKY) WARDLOW | |
| DIRECT EXAMINATION BY MS. TANNER | 79 |
| VOIR DIRE EXAMINATION BY MS. CLAY-JACKSON | 97 |
| DIRECT EXAMINATION BY MS. TANNER CONTINUED | 98 |
| A RECESS WAS TAKEN | 131 |
| DIRECT EXAMINATION BY MS. TANNER CONTINUED | 131 |
| VOIR DIRE EXAMINATION BY MS. CLAY-JACKSON | 133 |
| DIRECT EXAMINATION BY MS. TANNER CONTINUED | 133 |
| CROSS-EXAMINATION BY MS. CLAY-JACKSON | 134 |

1   RECESS                                              146

2   CROSS-EXAMINATION BY MS. CLAY-JACKSON CONTINUED 147

3   VOIR DIRE EXAMINATION BY MS. TANNER                 159

4   CROSS-EXAMINATION BY MS. CLAY-JACKSON CONTINUED 160

5   REDIRECT EXAMINATION BY MS. TANNER                  183

6   RECROSS EXAMINATION BY MS. CLAY-JACKSON

7       (OUTSIDE PRESENCE OF JURY)                      195

8

9   COURT ADJOURNED FOR THE DAY                         200

10  COURT REPORTER'S CERTIFICATE                        201

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT INDEX

VOLUME 46

* All State's Exhibits marked prior to trial in
 Vol. 43, Page 7.  (Volume No./Page No.)

| No. | Description | *Mrkd | Idnt'd | Ofrd | Admit |
|---|---|---|---|---|---|
| S-62 | Large Photo | 43/7 | 98 | 98 | 99 |
| S-62a | Small Photo | 43/7 | 97 | 97 | 98 |
| S-63 | Large Photo | 43/7 | 98 | 98 | 99 |
| S-63a | Small Photo | 32/7 | 97 | 97 | 98 |
| S-64 | Large Photo | 43/7 | 98 | 98 | 99 |
| S-64a | Small Photo | 43/7 | 97 | 97 | 98 |
| S-65 | Large Photo | 43/7 | 98 | 98 | 99 |
| S-65a | Small Photo | 43/7 | 97 | 97 | 98 |
| S-66 | Large Photo | 43/7 | 98 | 98 | 99 |
| S-66a | Small Photo | 43/7 | 97 | 97 | 98 |
| S-67 | Large Photo | 43/7 | 98 | 98 | 99 |
| S-67a | Small Photo | 43/7 | 97 | 97 | 98 |
| S-68 | Large Photo | 43/7 | 98 | 98 | 99 |
| S-68a | Small Photo | 43/7 | 97 | 97 | 98 |
| S-69 | Large Photo | 43/7 | 98 | 98 | 99 |
| S-69a | Small Photo | 43/7 | 97 | 97 | 98 |
| S-70 | Large Photo | 43/7 | 98 | 98 | 99 |
| S-70a | Small Photo | 43/7 | 97 | 97 | 98 |
| S-71 | Large Photo | 43/7 | 98 | 98 | 99 |
| S-71a | Small Photo | 43/7 | 97 | 97 | 98 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 | S-105 | Large Photo | 43/7 | 98 | 98 | 99 |
| 2 | S-105a | Small Photo | 43/7 | 97 | 97 | 98 |
| 3 | S-109 | Brown Planner | 43/7 | 132 | 132 | 133 |
| 4 | | | | | | |
| 5 | | | | | | |
| 6 | | | | | | |
| 7 | | | | | | |
| 8 | D-2 | Photo | 52 | 53 | | |
| 9 | D-3 | Photo | 52 | 53 | | |
| 10 | D-4 | Photo | 52 | 53 | | |
| 11 | D-5 | Photo | 52 | 53 | | |
| 12 | D-6 | Photo | 52 | 55 | | |
| 13 | | | | | | |
| 14 | | | | | | |
| 15 | | | | | | |
| 16 | | | | | | |
| 17 | | | | | | |
| 18 | | | | | | |
| 19 | | | | | | |
| 20 | | | | | | |
| 21 | | | | | | |
| 22 | | | | | | |
| 23 | | | | | | |
| 24 | | | | | | |
| 25 | | | | | | |

1          L. R. (ROCKY) WARDLOW, the witness, after

2     having first been duly sworn, assumed the witness

3     stand and testified upon his oath as follows:

4

5               DIRECT EXAMINATION

6     QUESTIONS BY MS. TANNER:

7     Q.   Would you state your name for the jury,

8          please, sir.

9     A.   L. R. Wardlow.

10                    THE COURT:   And will you pull

11         that microphone down so we can all hear you,

12         sir.   Go ahead.

13    Q.   (BY MS. TANNER)   And for the benefit of the

14         court reporter, will you spell your last name?

15    A.   W-A-R-D-L-O-W.

16    Q.   And are you a resident of Bastrop County?

17    A.   Yes, ma'am.

18    Q.   And how are you employed?

19    A.   With the Texas Rangers.

20    Q.   And the Texas Ranger is a portion of what?

21    A.   The Department of Public Safety.

22    Q.   How long have you been employed by the

23         Department of Public Safety?

24    A.   Eighteen years.

25    Q.   And how long have you been a Texas Ranger?

1   A.   Approximately six years.

2   Q.   And how does -- well, let me back up and ask

3       you this.  Where are you stationed as a

4       Ranger?

5   A.   In Bastrop.

6   Q.   Do you cover all of Bastrop County or

7       additional counties?

8   A.   Additional counties.

9   Q.   What counties do you also cover?

10   A.   I'm primarily responsible for Bastrop and Lee

11       County at the present time.

12   Q.   And how does one become a Ranger?

13   A.   A minimum requirement is eight years in law

14       enforcement and the last two years have to be

15       with DPS.

16   Q.   And you indicated that you had been with DPS

17       for 18 years?

18   A.   Yes, that's correct.

19   Q.   Were you in law enforcement before you went to

20       work for DPS?

21   A.   No, ma'am.

22   Q.   And before you became a Ranger, what did you

23       do with DPS?

24   A.   I was a highway patrol sergeant, or

25       supervisor.

1   Q.   And where were you stationed in that regard?

2   A.   In Bastrop.

3   Q.   Has your entire time with the Department of

4        Public Safety been in Bastrop or elsewhere?

5   A.   Elsewhere.

6   Q.   Where else?

7   A.   I was originally stationed in Shamrock, Texas,

8        and then I was transferred to Granbury and

9        promoted to highway patrol sergeant and went

10       to Corpus Christi and then transferred here.

11  Q.   And can you tell the jury your educational

12       background and training in law enforcement?

13  A.   I studied in college some law classes and, of

14       course, we have a basic recruit school.

15       Throughout the 18 years I've been to numerous

16       schools dealing with all aspects of law

17       enforcement.

18  Q.   Okay.  And, generally speaking, what is the

19       duty of a Ranger in a particular county?

20  A.   We do criminal investigation.

21  Q.   And what jurisdiction do you have over

22       criminal investigations in the county?

23  A.   We have a state-wide jurisdiction.

24  Q.   And how do you get involved, or does any

25       Ranger get involved in any particular

```
 1        investigation?
 2   A.   Well, primarily we're called upon by the local
 3        police departments or sheriff's office in
 4        serious felony investigations.  Occasionally
 5        we're assigned investigations from the Colonel
 6        or Senior Ranger Captain.
 7   Q.   Do you do a lot of investigation of public
 8        officials and law enforcement officials that
 9        would be a little too much of a conflict of
10        interest for local law enforcement?
11   A.   Yes.
12                        MS. CLAY-JACKSON:
13        Objection, Your Honor, leading.
14                        THE COURT:  I'll overrule
15        it.
16   Q.   (BY MS. TANNER)  I'm sorry, you can answer the
17        question.
18   A.   Yes, we handle sensitive investigations.
19   Q.   Were you involved in the investigation in the
20        murder of Stacey Stites?
21   A.   Yes, ma'am.
22   Q.   And which agencies were involved in that
23        particular investigation?
24   A.   The Bastrop Police Department and Sheriff's
25        office.
```

| | | |
|---|---|---|
| 1 | Q. | Why were both agencies involved instead of |
| 2 | | just one of them? |
| 3 | A. | Initially the vehicle had been found in the |
| 4 | | City of Bastrop. The Bastrop Police |
| 5 | | Department initiated the investigation of a |
| 6 | | missing person. Later the body was discovered |
| 7 | | outside the city in the county, which is in |
| 8 | | the sheriff's jurisdiction. |
| 9 | Q. | And how did you get involved in that |
| 10 | | particular investigation? |
| 11 | A. | The police department originally called me |
| 12 | | that morning and asked for our assistance. |
| 13 | Q. | Is it common for the Rangers to be involved in |
| 14 | | a multi-jurisdictional case like this? |
| 15 | A. | Yes. |
| 16 | Q. | And when you are involved in a |
| 17 | | multi-jurisdictional case, can you tell us |
| 18 | | whether or not the Rangers kind of run |
| 19 | | interference between the different agencies? |
| 20 | A. | We essentially coordinate the effort between |
| 21 | | the various agencies that may be involved. |
| 22 | Q. | Okay. Now, you indicated you were called by |
| 23 | | the Bastrop Police Department in this |
| 24 | | particular case? |
| 25 | A. | Yes, ma'am. |

| 1 | Q. | And at the time -- do you recall about what |
| 2 | | time it was that you were called? |
| 3 | A. | It seemed like it was around eight o'clock or |
| 4 | | 8:30 when I initially was contacted. |
| 5 | Q. | 8:00 a.m. or p.m.? |
| 6 | A. | A.m. |
| 7 | Q. | And was that on April 23rd of 1996? |
| 8 | A. | Yes, ma'am. |
| 9 | Q. | And at the time you initially became involved |
| 10 | | in the case, was the young lady, Stacey |
| 11 | | Stites, was she already known to be deceased |
| 12 | | or was she only missing? |
| 13 | A. | She was missing at that time. |
| 14 | Q. | Okay. And do you know why it is that you were |
| 15 | | called in? |
| 16 | A. | To assist in the investigation to find her. |
| 17 | Q. | Did you or other officers you were working |
| 18 | | with call in another aspect of the Department |
| 19 | | of Public Safety? |
| 20 | A. | Yes, ma'am, I eventually did. |
| 21 | Q. | And which part of DPS did you call? |
| 22 | A. | Initially I called the aircraft section to |
| 23 | | assist with searching the area by air, |
| 24 | | specifically, one of our helicopters.  And, |
| 25 | | subsequently, after the body was discovered, |

|     |     |                                                      |
| --- | --- | ---------------------------------------------------- |
| 1   |     | between the three agencies?                          |
| 2   | A.  | Yes, ma'am.                                           |
| 3   | Q.  | Okay.  And did you work hand in hand with the        |
| 4   |     | Bastrop County Sheriff's Department and              |
| 5   |     | Bastrop Police Department?                           |
| 6   | A.  | Yes, ma'am.                                           |
| 7   | Q.  | Who were the primary investigators for each of       |
| 8   |     | those agencies?                                      |
| 9   | A.  | With the police department would have been           |
| 10  |     | David Board, at that time, and with the              |
| 11  |     | sheriff's office John Barton and David Campos.       |
| 12  | Q.  | Did Barton and Campos pretty much work side by       |
| 13  |     | side?                                                |
| 14  | A.  | Yes, ma'am.                                           |
| 15  | Q.  | While you were investigating this case, what         |
| 16  |     | was your primary angle?                              |
| 17  | A.  | The primary angle would be focusing on               |
| 18  |     | somebody that knew her.                              |
| 19  | Q.  | Why is that?                                         |
| 20  | A.  | Statistically, most homicides that occur, the        |
| 21  |     | perpetrator is known to the victim.                  |
| 22  | Q.  | Okay.  Not all, however; right?                      |
| 23  | A.  | Not all.                                             |
| 24  | Q.  | And is that a pretty standard way to start a         |
| 25  |     | homicide investigation is to look at the             |

| 1 | | people that the victim knows? |
|---|---|---|
| 2 | A. | Yes, ma'am. |
| 3 | Q. | And what kind of people did you-all talk to |
| 4 | | and interview and run down as a result of this |
| 5 | | angle of your investigation? |
| 6 | A. | We talked to friends, family, co-workers, |
| 7 | | associates, just starting with a small inner |
| 8 | | circle and working our way out. |
| 9 | Q. | Did you talk to ex-boyfriends? |
| 10 | A. | Yes, ma'am. |
| 11 | Q. | Classmates from high school? |
| 12 | A. | Yes, ma'am. |
| 13 | Q. | Former co-workers as well as current |
| 14 | | co-workers? |
| 15 | A. | Yes, ma'am. |
| 16 | Q. | Do you have any idea, numerically, how many |
| 17 | | people associated with Stacey Stites, that |
| 18 | | you, as well as the other investigators, |
| 19 | | together, talked to? |
| 20 | A. | Altogether it would probably be -- I would |
| 21 | | have to say hundreds. |
| 22 | Q. | Hundreds of people? |
| 23 | A. | Yeah. |
| 24 | Q. | Okay. And how long did that continue, where |
| 25 | | you were constantly talking to people that |

|     |     |                                                          |
|-----|-----|----------------------------------------------------------|
| 1   |     | Stacey knew?                                             |
| 2   | A.  | The investigation went on for approximately a           |
| 3   |     | year.                                                   |
| 4   | Q.  | And during that year that this investigation            |
| 5   |     | went on, and through the course of it, did you          |
| 6   |     | find anybody that said she had been                     |
| 7   |     | associating with the defendant?                         |
| 8   | A.  | I'm sorry?                                               |
| 9   | Q.  | Did you find anyone who linked her in any way           |
| 10  |     | to this defendant?                                       |
| 11  | A.  | Not at all.                                              |
| 12  | Q.  | Okay. Now, at some point you learned that               |
| 13  |     | Stacey had been sexually assaulted, correct?            |
| 14  | A.  | Yes, ma'am.                                              |
| 15  | Q.  | Okay. And how soon did you learn that fact?             |
| 16  | A.  | It was around midnight the day we discovered            |
| 17  |     | the body.                                               |
| 18  | Q.  | And who notified you of that particular thing?          |
| 19  | A.  | Karen Blakley called me at home that night.             |
| 20  | Q.  | What was the significance of the presence of            |
| 21  |     | semen in your investigation?                            |
| 22  | A.  | I felt like from what I saw at the crime scene          |
| 23  |     | that it was the "smoking gun," so to speak.             |
| 24  | Q.  | In your mind, why was it the smoking gun?               |
| 25  | A.  | The things that I saw indicated sexual                  |

| | | |
|---|---|---|
| 1 | | jurisdiction at the time of the murder? |
| 2 | A. | That's correct. |
| 3 | Q. | Okay. Now during the course of your |
| 4 | | investigation, it's no secret that Jimmy |
| 5 | | Fennell was a suspect, correct? |
| 6 | A. | Yes, ma'am. |
| 7 | Q. | And you invest -- let me just back up and ask |
| 8 | | you this. Were you at that -- the primary |
| 9 | | investigator looking at Jimmy Fennell? |
| 10 | A. | Yes, ma'am. |
| 11 | Q. | And were you looking to make a case on him if |
| 12 | | you could? |
| 13 | A. | Yes, ma'am. |
| 14 | Q. | Did you treat Jimmy Fennell any better than |
| 15 | | the other suspects, in your opinion, because |
| 16 | | he was a police officer? |
| 17 | A. | Not at all. |
| 18 | Q. | Did you treat him any worse? |
| 19 | A. | Perhaps so. |
| 20 | Q. | And by that you mean what? |
| 21 | A. | Probably was a little harder on him during the |
| 22 | | interviews. |
| 23 | Q. | And tell me about the interviews. I mean, how |
| 24 | | hard were you on him? |
| 25 | A. | I was verbally harsh with him. |

| | | |
|---|---|---|
| 1 | Q. | Did you yell at him? |
| 2 | A. | A little bit. |
| 3 | Q. | Did you call him names? |
| 4 | A. | Yes, ma'am. |
| 5 | Q. | Did you-all use -- and I know you hate to hear |
| 6 | | these kind of terms because laypeople use |
| 7 | | them, did you-all use good cop/bad cop |
| 8 | | techniques and psychology on him and things |
| 9 | | like that? |
| 10 | A. | I tried every technique I could think of. |
| 11 | Q. | And you're pretty well-trained in techniques |
| 12 | | in talking to suspects, I take it? |
| 13 | A. | Yes, ma'am. |
| 14 | Q. | Okay. You, as with the other suspects, did |
| 15 | | you try and make a case on Jimmy independent |
| 16 | | of what the blood came back to exclude him |
| 17 | | with regard to the DNA? |
| 18 | A. | Yes, ma'am. |
| 19 | Q. | Were you able to? |
| 20 | A. | Yes, ma'am. |
| 21 | Q. | Were you able to make a case against Jimmy? |
| 22 | A. | No, ma'am. |
| 23 | Q. | What was the sticking point -- well, let me |
| 24 | | back up and ask you this. Jimmy was by all |
| 25 | | accounts the last person that saw Stacey |