# Exhibit 17

CAUSE NO. 8701       *73/35*

THE STATE OF TEXAS        X     IN THE DISTRICT COURT OF
                          X
VS.                       X     BASTROP COUNTY, TEXAS
                          X
RODNEY REED               X     21ST JUDICIAL DISTRICT

---

REPORTER'S RECORD
JURY TRIAL
GUILT/INNOCENCE

---

MAY 14, 1998

MORNING SESSION

VOLUME 53 of 69

FILED IN
COURT OF CRIMINAL APPEALS
SEP 9  1998
Troy C. Bennett, Jr., Clerk

ORIGINAL

1   On the 14th day of May, 1998, the

2   above entitled and numbered cause came on for

3   hearing before said Honorable Court, Harold R.

4   Towslee, Judge Presiding, and the following

5   proceedings were had:

6

7

8

9           Volume 53 of 69

10

11           GUILT/INNOCENCE PHASE

12

13           (PAGES 1 THROUGH 103)

14

15

16

17

18

19

20

21

22

23

24

25

1    APPEARANCES:

2                        For the State

3                        Mr. Charles Penick
                         District Attorney, Bastrop County
4                        804 Pecan Street
                         Bastrop, Texas    78602
5                        SBOT #015748500
                         (512) 321-2244
6

7                        Mr. Forrest Sanderson
                         Assistant District Attorney
8                        804 Pecan Street
                         Bastrop, Texas    78602
9                        SBOT #17610700
                         (512) 321-2244
10

11                       Ms. Lisa Tanner
                         Assistant Attorney General
12                       P. O. Box 12548
                         Austin, Texas    78711-2548
13                       SBOT #19637700
                         (512) 463-2170
14

15

16                       For the Defendant

17                       Mr. Calvin Garvie
                         Attorney at Law
18                       22 N. Bell St., P. O. Box 416
                         Bellville, Texas    77418
19                       SBOT #07714300
                         (409) 865-9781
20

21                       Ms. Lydia Clay-Jackson
                         Attorney at Law
22                       700 N. San Jacinto
                         Conroe, Texas    77301
23                       SBOT #04332450
                         (409) 760-2889
24

25

1           CHRONOLOGICAL INDEX

2    WITNESS                                          PAGE

3    APPEARANCES                                        3

4    MORNING SESSION                                    6

5

6    BRIAN KENNETH HAYNES

7    COURT'S QUESTIONING OUTSIDE PRESENCE OF JURY    6

8

9    JASON ALLISON (RECALLED)

10   COURT'S QUESTIONING OUTSIDE PRESENCE OF JURY    8

11

12   NEAL HAWKINS (RECALLED)

13   COURT'S QUESTIONING OUTSIDE PRESENCE OF JURY   10

14

15   TAMI HANNATH

16   DIRECT EXAMINATION BY MS. CLAY-JACKSON          13

17   CROSS EXAMINATION BY MS. TANNER                 21

18

19   DAVID CAMPOS

20   DIRECT EXAMINATION BY MS. CLAY-JACKSON          26

21   CROSS EXAMINATION BY MS. TANNER                 55

22   REDIRECT EXAMINATION BY MS. CLAY-JACKSON        69

23   RECROSS EXAMINATION BY MS. TANNER               76

24

25   RECESS                                          79

1    CYNTHIA JONES

2    DIRECT EXAMINATION BY MR. GARVIE                 80

3    CROSS EXAMINATION BY MS. TANNER                  82

4    REDIRECT EXAMINATION BY MR. GARVIE               87

5    RECROSS EXAMINATION BY MS. TANNER                88

6

7    IRIS LINDLEY

8    DIRECT EXAMINATION BY MS. CLAY-JACKSON           90

9    CROSS EXAMINATION BY MS. TANNER                  93

10   REDIRECT EXAMINATION BY MS. CLAY-JACKSON         99

11   RECROSS EXAMINATION BY MS. TANNER                99

12

13   RECESS                                          100

14

15   COURT ADJOURNED FOR A LUNCH BREAK               102

16   COURT REPORTER'S CERTIFICATE                    103

17

18

19

20

21

22

23

24

25

1      <u>DAVID CAMPOS</u>, the witness, after having

2  first been duly sworn, assumed the witness stand

3  and testified upon his oath as follows:

4

5              <u>DIRECT EXAMINATION</u>

6  <u>QUESTIONS BY MS. CLAY-JACKSON</u>:

7  Q.    Would you state your full name, spelling your

8        last, please.

9  A.    My name is David Campos, Jr., last name is

10       spelled C-A-M-P-O-S.

11 Q.    Mr. Campos, are you a resident of Bastrop

12       County?

13 A.    Yes, ma'am, I am.

14 Q.    How long have you been a resident of Bastrop

15       County?

16 A.    Since about 1981, '82, something like that.

17 Q.    What is your present occupation?

18 A.    I'm a contractor for an air conditioning

19       company.

20 Q.    How long have you done that?

21 A.    About a year and a half.

22 Q.    Prior to being a contractor for an air

23       conditioner company, what was your occupation?

24 A.    I was a chief investigator for the sheriff's

25       department here in Bastrop.

1    Q.    What was your rank?

2    A.    I was a lieutenant.

3    Q.    And how long were you with the County of

4          Bastrop?

5    A.    About four years.

6    Q.    Prior to being the chief investigator for the

7          County of Bastrop, where were you employed?

8    A.    I was employed with the New Mexico Department

9          of Prisons.

10   Q.    In Santa Fe or Albuquerque?

11   A.    Santa Fe.

12   Q.    And how long were you there?

13   A.    I was there about a year.

14   Q.    And prior to being with the Department of

15         Corrections in New Mexico, where were you?

16   A.    I was working with the Elgin Police

17         Department.  I was chief of police there.

18   Q.    I'm sorry.

19   A.    I was working with the Elgin Police

20         Department, I was chief of police there.

21   Q.    Okay.  During your tenure with the Bastrop

22         County Sheriff's Department, did you have an

23         occasion to work on the Stacey Stites murder?

24   A.    Yes, I did.

25   Q.    In what position, what capacity, did you work

1    on the murder?

2  A.  I was -- I suppose you could say I was the

3      coordinating officer for the sheriff's

4      department.

5  Q.  And you were coordinating -- what were you

6      coordinating?

7  A.  Coordinating with the other local agencies. I

8      believe Rocky Wardlow was the overall officer

9      in charge of the investigation.

10  Q.  And who was your other counterpart? Rocky

11      Wardlow and who else?

12  A.  The lead officer out of the Bastrop sheriff's

13      office was John Barton.

14  Q.  Of the three of you all, who had the most

15      investigative experience?

16  A.  I would say John Barton did.

17  Q.  Who had the next most after John Barton?

18  A.  I did.

19  Q.  And that would make Rocky Wardlow having the

20      least investigative experience?

21  A.  I believe so, yes.

22  Q.  At what point, Mr. Campos, did you join the

23      investigation in the Stacey Stites murder?

24  A.  It was right -- right at the beginning when

25      the sheriff's department got a call that they

1    both sides of the road to see if there were

2    any other items of the evidence that we could

3    find, on both sides of the road, of what we

4    had cordoned off.

5    Q.    And that was on the 23rd of April, correct?

6    A.    That's correct.

7    Q.    Two days later did you have occasion to sit in

8          on an interview with Jimmy Fennell?

9    A.    Yes, I did.

10   Q.    And would you tell the jury what that

11         interview consisted of?

12   A.    Basically -- well, what happens, in a tragic

13         situation like this, a good part of the time

14         the victim's significant other becomes a

15         primary suspect, and during the course of the

16         investigation that suspect is either

17         eliminated through the investigative process

18         or he's charged with the offense, so that's

19         basically what we did during the interview.

20         He was being treated as a suspect at that

21         particular time.

22   Q.    And being treated as a suspect, does that mean

23         he was what has been known as Mirandized?

24   A.    Yes, he was.

25   Q.    And after he was Mirandized, did he speak with

1    you-all?

2  A.  Yes, he did.

3  Q.  The information concerning Stacey's

4      whereabouts after 7:30 on the 22nd of April,

5      when she left her mother's apartment and went

6      up to hers, all of that information -- where

7      did that information from come from?

8  A.  It came from Jimmy Fennell.

9  Q.  I'm sorry, would you say it again?

10 A.  It came from Jimmy Fennell.

11 Q.  Do you recall whether there was any

12     independent information gathered about

13     Stacey's whereabouts or her actions after --

14     that did not come from Jimmy Fennell?

15 A.  I can't recall.  I can't recall that.

16 Q.  That type -- would that type of detail,

17     independent information from someone who was

18     not a suspect, would that have been

19     information that you would have put in your

20     report?

21 A.  Yes, it would have.

22 Q.  Have you had an opportunity to look at your

23     report?

24 A.  Yes, I have.

25 Q.  And that information was not in your report,

1      correct?

2  A.   No, it's not.

3  Q.   Have you had an opportunity to look at the

4      Bastrop County Sheriff's Department

5      compilation report?

6  A.   No, I haven't had -- I've got a copy of it, I

7      haven't had the opportunity to review it all,

8      no.

9  Q.   Have you reviewed some of it?

10  A.   Yes, I have reviewed the first few pages of

11      it.

12  Q.   Do you recall, Mr. Campos, whether there was

13      any independent investigation conducted -- let

14      me back up a little bit.

15            During the course of this

16      investigation were you and Sergeant Barton and

17      Ranger Wardlow in communication with one

18      another on a regular basis?

19  A.   We communicated.  Keep in mind, when I say

20      "we," the times that I -- I had another case

21      that I was also involved in so I couldn't stay

22      abreast, so to speak, of everything that was

23      going on in the Stacey Stites investigation.

24      Again, there was another case I was dealing

25      with as well.

1    Will you raise your right hand and let me

2    swear you in before you testify.  (Witness

3    sworn.) Please have a seat right over here.

4         Ma'am, would you please speak into

5    that microphone so we can all hear you.

6

7         IRIS LINDLEY, the witness, after having

8    first been duly sworn, assumed the witness stand

9    and testified upon her oath as follows:

10

11              DIRECT EXAMINATION

12   QUESTIONS BY CLAY-JACKSON:

13   Q.   Would you state your full name and spell your

14        last, please.

15   A.   My name is Iris Lindley, and it's spelled --

16        Lindley is spelled L-I-N-D-L-E-Y.

17   Q.   Ms. Lindley, are you a resident of Bastrop

18        County?

19   A.   Yes, I am.

20   Q.   How long have you lived in Bastrop County?

21   A.   All my life.

22   Q.   Are you presently employed?

23   A.   Yes, ma'am, I am.

24   Q.   Where are you employed?

25   A.   Bastrop Nursing Center.

1 Q. And what do you do at the Bastrop Nursing

2   Center?

3 A. I do laundry.  I'm a laundry person.

4 Q. Do you know the young man who is seated to my

5   left?

6 A. Yes, I do.

7 Q. Who do you know him to be?

8 A. Rodney Reed.

9 Q. I want to draw your attention back to -- were

10   you living in Bastrop County back in 1996?

11 A. Yes, I was.

12 Q. And did you know Rodney Reed in 1996?

13 A. Yes, I do.

14 Q. And how do you know him?

15 A. I met him when he was a little kid, and I've

16   been knowing his parents for a long time.

17 Q. Was there an occasion, a specific occasion, in

18   the first part of 1996 where you were visiting

19   in the Reed home?

20 A. Yes, I was.

21 Q. And on this particular occasion do you recall

22   anything -- where were you on this particular

23   occasion?

24 A. I was sitting on Ms. Reed's porch talking to

25   her.

1   Q.   Talking to Ms. Reed?

2   A.   Yes, I was.

3   Q.   Did anyone approach, any non-family member,

4       approach the home when you were sitting there?

5   A.   Yes.

6   Q.   Can you describe the person who approached?

7   A.   Well, she was maybe 5'5", she had dark brown

8       hair, she was kind of heavy, on the heavy

9       side, not too heavy, and when she walked up

10      she asked for Rodney and Ms. Reed told her

11      Rodney wasn't there, and she said would you

12      tell Rodney that Stephanie come by.

13   Q.   Who came by?

14   A.   Stefanie.

15   Q.   Stefanie?

16   A.   Uh-huh.  Stacey or Stephanie.

17   Q.   I'm sorry, Ms. Lindley, what did she say her

18      name was?

19   A.   Stacey.

20   Q.   I show you the contents of State's Exhibit

21      109.  Does this look like the young lady that

22      came by?

23   A.   She was a little heavy-faced.

24   Q.   A little heavy-faced?

25   A.   Uh-huh.

1   Q.   I show you the picture on State's 1, does this

2        look like the young lady?

3   A.   Yes, ma'am.

4   Q.   Okay.

5              MS. CLAY-JACKSON:   Pass the

6        witness.

7

8                  CROSS EXAMINATION

9  QUESTIONS BY MS. TANNER:

10  Q.   Ms. Lindley, did you have the opportunity to

11       give a statement to the defense attorneys or

12       to a defense investigator or anybody?  Did you

13       talk to anyone of that nature?

14  A.   When?

15  Q.   Before you got here today, at some point

16       between April of 1996 and today, have you

17       talked to a defense investigator?

18  A.   Yes, I have.

19  Q.   And you visited with them about what you

20       testified to here?

21  A.   I didn't visit with them, they visited with

22       me.

23  Q.   They visited with you?  Did you talk to them?

24  A.   Yes, I did.

25  Q.   Did you give them a statement?

1    A.   What I seen, yes.

2              MS. TANNER:   Pursuant to

3    Rule 614 we would like a copy of the witness's

4    statement.  We obviously -- since there is no

5    reciprocal discovery we have no right to it

6    until now.

7              MS. CLAY-JACKSON:  We don't

8    have a --

9              THE COURT:  I think what she

10   is asking you is did you give a statement in

11   writing.

12             THE WITNESS:  No.

13   Q.   (BY MS. TANNER)  Did they take notes about

14   what you were telling them as you were saying

15   it?

16   A.   He was writing but I don't know if he took

17   notes or not.

18   Q.   So when you were talking, he was writing kind

19   of like I was doing a minute ago?

20   A.   Yeah.

21             MS. TANNER:   Okay, we would

22   ask for a copy of those notes pursuant to

23   614.

24             THE COURT:  Do you have a

25   copy of the notes?

1          MS. CLAY-JACKSON:    Judge,

2     no, I don't have a copy of the notes.

3          MS. TANNER:    We are

4     certainly entitled to them, Your Honor.    There

5     is no reciprocal discovery until she testifies

6     and we would like to see what she said.    They

7     have gotten everything we have.

8          MS. CLAY-JACKSON:    Judge,

9     that is not the rule.    The rules says if the

10    witness made a written statement they get a

11    copy of that.    Not the notes from our

12    investigator.

13         MS. TANNER:    It says a

14    substantially verbatim recital of oral

15    statement made by witnesses recorded

16    contemporaneously.    That's what I'm asking

17    for.

18         THE COURT:    I'm satisfied

19    they don't have it.

20         Is that what you're telling me?

21         MS. CLAY-JACKSON:    Yes,

22    that's what I'm telling you.    Thank you,

23    Judge.

24         THE COURT:    Go ahead.

25 Q.    (BY MS. TANNER)    Now, this girl that you're

```
 1            telling us about, had you seen her come over

 2            before?

 3    A.      I seen her that day.

 4    Q.      That day?

 5    A.      Uh-huh.

 6    Q.      Had you seen her any other days?

 7    A.      No.

 8    Q.      And when she came over, did she walk up to the

 9            house or did she drive up to the house?

10    A.      She drove.

11    Q.      What did she drive?

12    A.      A gray truck.

13    Q.      A gray truck?

14    A.      Uh-huh.

15    Q.      And you indicated that you know the defendant

16            and have known him for some time?

17    A.      Yes.

18    Q.      And would it be fair to say that he generally

19            dates Caucasian woman?

20    A.      I can't answer that.

21    Q.      Did it appear to you that she was looking for

22            him kind of like a girlfriend looks for a

23            boyfriend?

24    A.      Yeah.

25    Q.      I mean, that's the whole reason you're here,
```

1      right?  To tell this jury that?

2  A.  Yeah.

3  Q.  Okay.  And so I want to make sure I don't

4      understate or overstate the significance of

5      what you're telling this jury, but what you're

6      telling them is what you saw that made you

7      think those two people were dating, right?

8  A.  Yes.

9  Q.  Okay.  And based on what you saw then, what

10     you have testified to before, if there was any

11     sexual activity between them that would have

12     been --

13                    MS. CLAY-JACKSON:

14     Objection, Your Honor, may we approach?

15

16                    (Whereupon a brief discussion

17                    was held off the record.)

18

19                    (Objection outside hearing

20                    of jury.)

21

22                    MS. CLAY-JACKSON:  Judge,

23     it's our contention we are going to object to

24     this line of questioning by the State because

25     it tends to extract it by going into