# Exhibit 21

REPORTER'S RECORD

VOLUME 4 OF 12 VOLUMES

TRIAL COURT CAUSE NO. 8,701

COURT OF CRIMINAL APPEALS NO. WR-50,961-10

| | |
|---|---|
| | ) 21st DISTRICT COURT |
| | ) |
| | ) |
| | ) |
| EX PARTE RODNEY REED | ) OF |
| | ) |
| | ) |
| | ) |
| | ) BASTROP COUNTY, TEXAS |

------------------------------

WRIT OF HABEAS CORPUS

July 21, 2021

------------------------------


   BE IT REMEMBERED THAT on the July 21, 2021, the

following proceedings came on to be heard in the

above-entitled and numbered cause before the Honorable

J.D. Langley, Visiting Judge of the 21st District

Court, held in Bastrop, Bastrop County, Texas.


   Proceedings reported by machine shorthand by

Hayley Stiteler, CSR, RPR.

```
1                    A P P E A R A N C E S

2

3   FOR THE APPLICANT:

4

5        Mr. Andrew F. MacRae
         LEVATINO | PACE LLP
         1101 South Capital of Texas Highway
6        Building K, Suite 125
         Austin, Texas 78746
7        512.6371581
         amacrae@levatinopace.com
8        SBOT NO. 00784510

9
         Barry C. Scheck
10       INNOCENCE PROJECT
         40 Worth Street, Suite 701
11       New York, New York 10013
         212.364.5390
12       bscheck@innocenceproject.org

13
         Mr. George H. Kendall
14       SQUIRE PATTON BOGGS, LLP
         1211 Avenue of the Americas
15       New York, New York 10036
         212.872.9834
16       george.kendall@squirepb.com

17
         Ms. Jane Pucher
18       INNOCENCE PROJECT
         40 Worth Street, Suite 701
19       New York, New York 10013
         646.227.8327
20       jpucher@innocenceproject.org

21
         Ms. Michelle L. Davis
22       SKADDEN, ARPS, SLATE, MEAGHER & FLORM, LLP
         1000 Louisiana, Suite 6800
23       Houston, Texas 77002
         713.655.5100
24       michelle.davis@skadden.com
         SBOT NO. 24038854
25
```

1       Ms. Nicole A. DiSalvo
        SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
2       920 North King Street
        Wilmington, Delaware 19801
3       302.651.3027
        nicole.disalvo@skadden.com
4       Delaware Bar No. 4662

5

6       Ms. Corrine Irish
        SQUIRE PATTON BOGGS
        1211 6th Avenue, 26th Floor
7       New York, New York 10036
        212.872.9823
8       corrine.irish@squirepb.com

9

10      Mr. Quinncy McNeal
        HUSCH BLACKWELL LLP
        600 Travis Street, Suite 2350
11      Houston, Texas 77002
        713.525.6253
12      quinncy.mcneal@huschblackwell.com
        SBOT NO. 24074690

13

14      Ms. Sarah Runnells Martin
        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
15      920 North King street
        Wilmington, Delaware 19801
16      302.651.3000
        sarah.martin@skadden.com

17

18

19  FOR THE STATE:

20

21      Ms. Lisa M. Tanner
        TEXAS OFFICE OF THE ATTORNEY GENERAL
        P.O. Box 12548
22      Austin, Texas 78711
        512.463.2125
23      lisa.tanner@oag.texas.gov
        SBOT NO. 19637700

24

25

Mr. Travis G. Bragg
TEXAS ATTORNEY GENERAL
ASSISTANT ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711
512.936.1400
SBOT NO. 24076286


Ms. Rachel L. Patton
OFFICE OF THE ATTORNEY GENERAL
CRIMINAL APPEALS DIVISION
P.O. Box 12548
Austin, Texas 78711
512.936.1400
rachel.patton@oag.texas.gov
SBOT NO. 24039030


Mr. Garrett Greene
OFFICE OF THE ATTORNEY GENERAL
CRIMINAL APPEALS DIVISION
300 West 15th Street
Austin, Texas 78701
512.936.1400
garrett.greene@oag.texas.gov
SBOT NO. 24096217

# INDEX OF PROCEEDINGS
## VOLUME 4
### (WRIT OF HABEAS CORPUS)

**APPLICANT'S WITNESSES:**

| | DX | CX | VDX | VOL |
|---|---|---|---|---|
| SUZAN HUGEN | 10,39 | 21,41 | | 4 |
| GREGORY J. DAVIS, M.D. | 43,148 | 119,160 | | 4 |
| RICHARD S. SCROGGINS | 164 | 174 | | 4 |
| BRENT SAPPINGTON | 188 | 198 | | 4 |
| VICKI SAPPINGTON | 210 | 217 | | 4 |
| CYNTHIA C. SCHMIDT | 224,265 | 250,267 | 229 | 4 |
| ALICIA SLATER | 271,313 | 295,317 | | 4 |
| CALVIN RAY HORTON | 319,336 | 327 | | 4 |

## BILL OF EXCEPTIONS INDEX

| | Page | Vol |
|---|---|---|
| APPLICANT'S BILL OF EXCEPTIONS BY MS. PUCHER.. | 233 | 4 |
| APPLICANT'S BILL OF EXCEPTIONS CONCLUDED...... | 234 | 4 |
| APPLICANT'S BILL OF EXCEPTIONS BY MS. PUCHER.. | 249 | 4 |
| APPLICANT'S BILL OF EXCEPTIONS CONCLUDED...... | 250 | 4 |

| | Page | Vol |
|---|---|---|
| COURT REPORTER's CERTIFICATE.................. | 338 | 4 |

# ALPHABETICAL INDEX

**APPLICANT'S WITNESSES:**

| | DX | CX | VDX | VOL |
|---|---|---|---|---|
| GREGORY J. DAVIS, M.D. | 43,148 | 119,160 | | 4 |
| CALVIN RAY HORTON | 319,336 | 327 | | 4 |
| SUZAN HUGEN | 10,39 | 21,41 | | 4 |
| BRENT SAPPINGTON | 188 | 198 | | 4 |
| VICKI SAPPINGTON | 210 | 217 | | 4 |
| CYNTHIA C. SCHMIDT | 224,265 | 250,267 | 229 | 4 |
| RICHARD S. SCROGGINS | 164 | 174 | | 4 |
| ALICIA SLATER | 271,313 | 295,317 | | 4 |

# EXHIBIT INDEX

**APPLICANT'S EXHIBITS**

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL |
|---|---|---|---|---|
| 15 | Curriculum Vitae of Gregory J. Davis, M.D. | 54 | 54 | 4 |
| 16 | Peer-Review Report (Bill of Exceptions Exhibit) | 59 | | 4 |
| 17 | Photograph | 77 | 77 | 4 |
| 18 | Declaration of Cynthia Schmidt | 245 | 248 | 4 |
| 19 | Affidavit of Alicia Slater | 272 | 295 | 4 |
| 20 | Letter from Innocence Project to Bastrop P.D. along with Crime/Incident Report, Supplementary Report, Affidavit of Facts, and H-E-B Incident Report | 274 | 295 | 4 |
| 21 | E-mail from Alicia Slater to Gayle Wilhelm | 287 | 295 | 4 |
| 22 | Affidavit of Calvin "Buddy" Horton | 327 | 327 | 4 |

```
STATE'S EXHIBITS
   NO.   DESCRIPTION              OFFERED  ADMITTED  VOL

   19   H-E-B Employee Payroll
        Log                          9        9        4
```

        THE WITNESS:  Hugen, H-U-G-E-N.

        THE COURT:  Okay.  And you may proceed.

        MR. KENDALL:  Thank you, Your Honor.
                      **SUZAN HUGEN**,

having been first duly sworn, testified as follows:

                **DIRECT EXAMINATION**

BY MR. KENDALL:

    Q.  Good morning, Ms. Hugen.  How are you?

    A.  Good morning.

    Q.  For the record, I note that you're in a --

that you entered sitting in a wheelchair, right?

    A.  Yes.

    Q.  Yes, ma'am.

        Where do you live?

    A.  I live in Arkansas.

    Q.  And are you married?

    A.  I am.

    Q.  And who are you married to?

    A.  John Hugen.

    Q.  And how long have you been married to

Mr. Hugen?

    A.  Since 2010.

    Q.  Okay.  Do you have children?

    A.  I have four children.

    Q.  And do you have boys and girls?

1    A.    I have two boys, two girls.

2    Q.    And your boys, what have they done?

3    A.    My two boys -- my oldest boy did three tours

4    in Iraq and Afghanistan -- four tours in Iraq and

5    Afghanistan; and my second son, my youngest son, did

6    three.

7    Q.    And your daughters?

8    A.    My oldest daughter is a teacher.  She teaches

9    autistic children, and my youngest is a nurse.

10    Q.    Thank you.

11          Now, we're going to be talking about some

12    events that occurred in 1996.  Was your last name

13    Hugen then?

14    A.    No.

15    Q.    What was your last name then?

16    A.    Nichols.

17    Q.    Thank you.

18          Tell us a little bit about -- Ms. Hugen, tell

19    us a little bit about your work career.

20    A.    I started working when I was 12, at church in

21    the nursery and in daycare; and then from there I've

22    worked in gas stations and in various retail,

23    painting, mechanics, auto parts stores, many.

24    Q.    You usually work?

25    A.    Since I was 12 until I was disabled.

1    Q.    Thank you.

2          And have you lived in the Bastrop, Texas

3    area?

4    A.    In the area, yes, not in the city.  I've

5    lived outside the city.

6    Q.    And when did you live in the Bastrop area?

7    A.    From 1989 until 2008.

8    Q.    Okay.  And during the time you lived here,

9    did you work at H-E-B in Bastrop?

10   A.    I did.

11   Q.    Okay.  And do you remember which years you

12   worked?

13   A.    From about '92 to '98, something like that.

14   Q.    And tell us what positions you held.

15   A.    My position was always cashier, but I worked

16   all over the store.

17   Q.    Did you work in the floral section?

18   A.    I did.

19   Q.    And did you ever work as an assistant service

20   manager?

21   A.    I did as a part -- as their relief assistant

22   service manager, which means I helped the cashiers,

23   gave change, gave them their breaks or whatever they

24   needed.

25   Q.    And you worked at H-E-B for several years?

1    A.   Yes.

2    Q.   And did you make friends with some of your

3  co-workers?

4    A.   Of course.

5    Q.   And you would take breaks sometimes with your

6  friends?

7    A.   Of course.

8    Q.   Now, during the time that you worked at

9  H-E-B, did you come to know Stacey Stites?

10    A.   Absolutely.

11    Q.   And do you recall when you first met her?

12    A.   The day she came to work.  The very first day

13  she came to work, she came to work as a cashier.

14    Q.   Okay.  Do you remember when that was?

15    A.   I believe it was in late '95.

16    Q.   Okay.  And what was your job then?

17    A.   I was cashier or assistant service manager.

18    Q.   Okay.

19    A.   So I trained other cashiers as well as

20  helping.

21    Q.   Did you see her often?

22    A.   Often.

23    Q.   Okay.  And how would you describe Ms. Stites

24  as a worker?

25    A.   She was a very hard worker.  She was very

pleasant.  She was always pleasant with customers,
with her workers.  She was -- she had this bubbly
personality.  She was a jokester.  She loved to play
pranks.  She was -- she was a good person.

Q.  And did she always work as a cashier?

A.  No, she -- a few months in, she came to me
one day and said there was a position open in produce.
It was different hours, but it made -- it would be
more money, and I think it was like a quarter more an
hour, maybe more.  And she asked if I would be mad if
I -- if she took it.  And I said, "Absolutely not,"
you know, "I think you'll go far in this company and
that's in your line to go.  Go for it."

Q.  So you urged her to take that --

A.  I did.

Q.  Okay.  Now, did you know if Ms. Stites had
plans to marry?

A.  I did.

Q.  And what did you know about that?

A.  Just that I'd been told she was engaged.

Q.  Okay.  Did she ever ask you to do anything in
planning for the -- for the wedding?

A.  Yes.  The weekend before she died, she was
supposed to have a bridal shower or something.  She
asked me to do -- to go shopping with her on that

Sunday or Monday, and I don't remember exactly which day.  But she called me on that Friday and cancelled it.

Q.    And do you remember why?

A.    She told me she wasn't shopping for that wedding.

Q.    So you never went shopping with her?

A.    No.

Q.    Okay.  Did you ever meet her fiancé?

A.    I never met him, no.

Q.    Did you ever see him?

A.    I did.

Q.    And how do you know you saw him?

A.    Stacey and I were leaving work together one day, walking out the door.  We're talking, having a good time, laughing and carrying on, and this guy pulls up in a truck which I knew to be -- I thought it was Stacey's truck.  It was Jimmy's truck, pulled into the crosswalk to pick her up.  And you could see the look on his face that he was mad that she was talking and having fun with me.  Her entire demeanor changed.  She went almost white as a ghost.  She quit laughing.  She just said, "I got to go, I'll see you tomorrow." And then she went and darted into the truck, put her seat belt on, and then left.

Q.   Okay.  Did you ever see anything that caused you to be concerned about her relationship with her fiancé?

A.   I did.

Q.   And what did you see?

A.   I had been in an abusive relationship for a long time, and I often wore long sleeves or I would cover it.  I was very good at covering it so most people wouldn't see it.  But one day I saw what looked like hand marks across her wrist, and I said, "What did you do to your arm?"  And when she did that, she pulled her arm -- her sleeve down.  She goes, "Oh, it's nothing."  And she just changed the subject completely.  That, to me, is what I would have done had my ex done that to me.  I would have hidden it.  I would not have spoken -- "Oh, I bumped into the door, I dropped something."  I would have made an excuse.  I would have just hidden it.  To me, that made -- made that.  And then when I saw her change her demeanor in front of him, that also explained a little bit more about the bruises.

Q.   Now, the marks you saw on her arm, they were --

A.   Looked like fingerprints, like someone had grabbed her -- like fingerprints, like someone had

1    grabbed her and pulled her.

2        Q.    Okay.  Do you know or have you ever met

3    Rodney Reed?

4        A.    I met him.  I didn't know him, no.

5        Q.    Okay.  And when did you meet him?

6        A.    I met him in the store with Stacey.

7        Q.    Okay.  And do you remember where in the

8    store?

9        A.    Yeah.  They were in produce, standing near

10   the bananas and they were talking.  And I came around

11   the corner and she saw me, called me over and

12   introduced me.  Before I got there, I knew they

13   were -- she was standing really close to him without

14   touching him, closer than a normal customer.  She then

15   said -- realized it was me and not someone else.  She

16   goes, "Oh, hey, Suzan, come here."  She put her hand,

17   not around him but like in the middle of his back, and

18   she goes, "Hey, this is my very good friend, Rodney.

19   Rodney, this is Suzan."  And then she introduced me to

20   the other guy, but I don't remember the other guy.

21       Q.    What else did you notice about her demeanor?

22       A.    She was very flirty with him, giggly, happy.

23   It seemed like more than a friendship.

24       Q.    Was there anyone else with Ms. Stites and

25   Mr. Reed at that time when you --

1    A.    There was.  There was another gentleman, a

2  black gentleman, but I don't remember his name.

3    Q.    Okay.  Do you remember when Ms. Stites died?

4    A.    I do remember.

5    Q.    Okay.  Did you go to her service?

6    A.    I did.

7    Q.    Okay.

8         MR. KENDALL:  Todd, can you put up

9  Applicant's Exhibit 8, please.

10    Q.    (BY MR. KENDALL)  And do you remember there

11  being a --

12    A.    It's the next to the bottom, Suzan Nichols.

13    Q.    So you signed the guest book?

14    A.    Yes.

15    Q.    And that's your signature?

16    A.    It is.

17    Q.    Thank you.

18         Do you recall ever speaking to law

19  enforcement about Ms. Stites and Mr. Reed?

20    A.    I did.

21    Q.    And how did that come about?

22    A.    They stated -- before they even found

23  Stacey's body, they -- H-E-B had come in and put

24  security lights in.  They put a buzzer at the door so

25  you wouldn't have to wait and bang on the door if you

got there early.  And they also hired a Bastrop city
police department officer to work, especially the
evening shifts, so that we would not be alone and
could walk us out to our car.

Q.    And who was that?

A.    Paul Alexander.

Q.    Okay.  Did you come to know who
Paul Alexander was?

A.    Yes, I did.

Q.    And did there come a time when you sought him
out about this?

A.    Yeah, I did.  And I don't remember if it was
before Rodney was arrested or after he was arrested,
but when he was a suspect.  It was on the news and
they were talking about they didn't know each other.
And I said -- the next day I went to Paul and I said,
"That's not true."  I said, "Rodney and Stacey were
friends.  She introduced me as a friend."  You know,
as -- she was his friend.

Q.    Okay.

A.    And so I thought that was really weird, so I
told him.

Q.    Okay.  Did he write anything down?

A.    He didn't write anything down at the time.

Q.    Okay.  But he was a police officer?

1     A.   He was a police officer, a uniformed police

2   officer.

3     Q.   Now, after you had that conversation with

4   him, did you -- did anyone else from law enforcement

5   contact you for additional information?

6     A.   No, not until this year.

7     Q.   Okay.  And did anyone from Mr. Reed's defense

8   reach out to you?

9     A.   No.

10     Q.   Okay.  Why did you not reach out to either

11   someone in law enforcement or to Mr. Reed's defense?

12     A.   Well, I reached out to Paul, and I figured

13   that if I told Paul and he told some -- you know, his

14   superiors, then whatever I had to say wasn't

15   important, that they knew each other.  And I didn't

16   come to court.  So I would have stood up in court and

17   said, "That's not true," you know, if they said they

18   didn't know each other.  I would have known better.

19     Q.   Okay.  Now, after you spoke to Mr. Alexander,

20   did you -- you again had an opportunity to speak to

21   somebody from the State, when?

22     A.   It was in June.

23     Q.   June of this year?

24     A.   This year, yes.

25     Q.   And do you remember who you spoke to?

1    A.    Missy Wolfe.

2    Q.    Okay.  Did she come to see you or did she --

3    A.    She called -- well, she had contacted me via

4 Facebook, sent me a picture of her badge and her ID so

5 I would know she was a real officer of the Court, and

6 then she asked to speak with me.  It took a few days

7 for me to get it together where I could talk to her,

8 and I finally got a chance to talk to her, and I did.

9    Q.    Okay.  And you've talked to her once?

10   A.    Twice.  She came in the room and introduced

11 herself, so yes.

12   Q.    Okay.  And when did you first hear from

13 somebody from the defense?

14   A.    It was the day you showed up at my door.

15   Q.    Okay.  Do you remember when that was?

16   A.    It was the end of June.

17   Q.    Okay.  Thank you.

18         MR. KENDALL:  No further questions,

19 Your Honor.

20                   **CROSS-EXAMINATION**

21 BY MR. BRAGG:

22   Q.    Good morning, Ms. Hugen.

23   A.    Good morning.

24   Q.    So I'd like to start off by talking about a

25 sensitive subject.  I apologize --

1    A.   That's okay.

2    Q.   -- but I think it's important.

3         You said that you had worked for most of your

4    life until you became disabled.

5    A.   Yes.

6    Q.   Okay.  When did that happen?

7    A.   I was -- well, I was disabled long before I

8    stopped working.  It just continued to get worse.

9    When I was 43, I believe, is when it got to the point

10   where I could barely walk anymore.  And I've been in a

11   wheelchair now for three years, so...

12   Q.   Do you suffer from multiple sclerosis?

13   A.   I do.

14   Q.   How long have you had that?

15   A.   I was diagnosed about three years ago.

16   Q.   And, again, I apologize for having to ask

17   this question, but --

18   A.   Don't apologize.  Just ask.

19   Q.   Thank you.  Thank you.

20        How advanced would you say that it is?

21   A.   I have a lot of active lesions, but that's --

22   it's not as bad as it could be.  I don't have to take

23   shots or take medications.  It's up and down.  And so

24   when it's really bad, then I take medications.  When

25   it's not, I don't.

1     Q.   And you're aware that multiple sclerosis can

2  affect someone's memory?

3     A.   Short-term memory.

4     Q.   Right.

5     A.   Correct.

6     Q.   Have you noticed any effect on your memory?

7     A.   My short-term memory.  I might watch a movie

8  on, say, Saturday and then on Tuesday, I'll say, "Oh,

9  I've been really wanting to see that," and my husband

10  will say, "We've already seen that."  But my long-term

11  memory is excellent.

12     Q.   Okay.  So you would say that multiple

13  sclerosis has only had an effect on your short-term

14  memory?

15     A.   Yes.

16     Q.   Have you watched any media about this case,

17  any news reports, anything like 10 o'clock news?

18     A.   Recently?

19     Q.   Yes, ma'am.  I'm sorry.  Yes, recently.

20     A.   No, not recently.

21     Q.   Okay.  Have you watched any specials about

22  this case?

23     A.   No.

24     Q.   Have you seen anything in the newspaper about

25  this case?

1    A.   No.  I haven't lived in this area since 2008,
2  so...
3    Q.   Okay.  Have you seen anything on social
4  media?
5    A.   I saw -- a few years ago, I saw a Justice for
6  Stacey website, and then I signed up for it because
7  Stacey was a friend.  But that's been several years
8  ago.  But I don't keep up with it.
9    Q.   Okay.  At the time, did you -- I'm sorry.  By
10  "the time," I mean in 1996/1997.  Did you see any
11  media about the case then?
12    A.   Of course.  It was on every channel.
13    Q.   It was.
14    A.   Yeah, everyone saw it.
15    Q.   Yeah.  Did you see anything in the
16  newspapers?
17    A.   I didn't read the papers, so...
18    Q.   Okay.  Is it also fair to say that not only
19  was it on every channel, as you just said, but that
20  people were pretty consistently talking about it?
21    A.   Pretty consistently, yeah.  Especially at
22  H-E-B where I worked.
23    Q.   Especially at H-E-B.
24    A.   Right.
25    Q.   Y'all were a pretty close family?

front, and they were -- there's a -- it's called "action alley," which means that's where all the action is.  That's where all the produce and stuff is.

Q.  Okay.

A.  So there's an open lane on either end, but that's where the main section is.  And they were in the middle of that main section next to what I believe was bananas and she was standing there with Rodney. So when I walked up on her, she didn't see me coming, and so at first she just kind of jumped.  And then she goes, "Oh, hey, Suzan, come here."  And then she introduced me to him.

Q.  And she -- she was on what you call "action alley"?

A.  She was in the center of action alley.

Q.  Okay.  And what time of day was this?

A.  It was during the day.

Q.  Okay.  So there were customers in the store?

A.  It wasn't a busy day, but there -- yeah, there were customers in the store.

Q.  Yeah, you-all were open for business?

A.  We were open for business.

Q.  And when she introduced him to you, did she whisper?

A.  No.

Q.   She just said it so that you could hear?

A.   So that I could hear, yes.

Because we were friends, she goes, "Oh, hey, Suzan, I want you to meet someone."  And she said, "This is my very good friend, Rodney."  She -- I don't know if she said Rodney Reed, but she said Rodney and she put -- like, she didn't put her arm around or anything, but she put her hand in the middle of his back, like, patting the middle of his back.  And then she said, "and his friend," but I don't remember his friend's name.  And I think it was because I wasn't paying any attention because they were standing so close and talking that -- I caught -- it caught me off guard because -- not because of the color of his skin but because she was engaged, that they were standing so closely and I had never seen Stacey act that way, I mean, with any other customers, with anyone else. They were standing pretty close and he -- she was smiling and having a good time and so was he.

Q.   Right there on action alley?

A.   Yes, right there.

Q.   Yeah.  And in the middle of the day when H-E-B was open?

A.   Yes.

Q.   Okay.  Now, you said earlier that the reason

1      A.    Yes.

2      Q.    You described your conversation with

3  Ms. Wolfe as short?

4      A.    It was short.

5      Q.    You were fully willing to answer any

6  question --

7      A.    Absolutely.

8      Q.    -- she asked you?  And some of the matters

9  that were discussed that you were not asked about; is

10 that correct?

11     A.    I don't believe I was, no.

12     Q.    Okay.  But you would have been willing to

13 answer them --

14     A.    Absolutely.

15     Q.    -- just as you've done here?

16     A.    Yes.

17     Q.    Now, you came to this court from Pine Bluff?

18     A.    Yes.

19     Q.    And it's tiring for you to travel?

20     A.    It is very tiring for me to travel.

21     Q.    And why did you come?

22     A.    Because I wanted to do the right thing for

23 Stacey.

24     Q.    Is there any doubt in your mind about what

25 you saw in the H-E-B?

1    A.    Absolutely not.

2    Q.    Okay.  And that when you first thought that

3  you might have relevant information about this case,

4  you, without delay, approached Mr. Alexander?

5    A.    I did.

6    Q.    And you told him what you've told the Court

7  today?

8    A.    Yes.

9            MR. KENDALL:  Thank you, Your Honor.

10  Nothing further.

11            THE WITNESS:  May I add just one thing,

12  George.

13            MR. KENDALL:  Sure.

14            MR. BRAGG:  Objection, Your Honor.

15  They've passed the witness.

16            THE WITNESS:  It's okay.

17            MR. BRAGG:  After I ask a question, they

18  can certainly ask her again on direct.

19            MR. KENDALL:  Your Honor, may I --

20            THE COURT:  Objection sustained.

21            Go ahead and ask your question.

22            MR. BRAGG:  I appreciate it.

23                    RECROSS-EXAMINATION

24  BY MR. BRAGG:

25    Q.    Do you recall telling Ms. Wolfe that you

needs about ten minutes to get all of the connections

working.  I apologize for asking for an early recess,

but if we could have ten minutes, we will get moving.

                    THE COURT:  That's fine.  We'll go ahead

and take a ten-minute break.

                    MS. PUCHER:  Thank you.

                    THE COURT:  Just let me know when you're

ready.

                    MS. PUCHER:  Will do.

                    (Recess.)

                    (Open court, Applicant present.)

                    THE COURT:  All right.  Be seated,

please.

                    (Witness sworn via Zoom.)

                    You may proceed, Ms. Pucher.

                    MS. PUCHER:  Thank you.

                    **GREGORY J. DAVIS, M.D.,**

having been first duly sworn, testified via Zoom as

follows:

                    **DIRECT EXAMINATION**

BY MS. PUCHER:

     Q.   Good morning, Dr. Davis.

     A.   Good morning.

     Q.   Can you hear me okay right now?

     A.   I can, yes.

Q.    Thank you for being with us here in the
technological sense this morning.

A.    My pleasure.

Q.    If at any point you can't hear me or you
can't hear someone else, please just let us know.  And
I think we're going to try to proceed as slowly as we
can for the record, especially given all of the
technological challenges today.  Okay?

A.    Okay.  I'll be sure and wait until the
question is complete before I start talking.

Q.    Thank you.  Very good.

       What is your occupation?

A.    I am a medical doctor.

Q.    Are you also a forensic pathologist?

A.    Yes.  I am an anatomic pathologist, clinical
pathologist, and forensic pathologist.

Q.    In your description, what does a forensic
pathologist do?

A.    Forensic pathologists are a subspecialty of
pathology, which is the specialty of medicine that
deals with the study of human disease in any form,
whether it's natural or nonnatural.  Forensic
pathology is that subspecialty that deals with the
scientific and medical principles of the investigation
of sudden, unexpected, violent, or unusual death.

        Q.    Where are you presently employed?

        A.    By the University of Kentucky College of
Medicine where I am the director of the Forensic
Consultation Service and associate director of the
hospital autopsy service.

        Q.    And what is the Forensic Consultation
Service?  Can you explain that, please.

        A.    In addition to my work with the state medical
examiner's office, I'm a full-time faculty member at
the University of Kentucky.  And in 2005, my
department chair, my boss, and I were chatting and we
noticed that we were getting a lot of phone calls from
criminal and civil attorneys -- both prosecution and
defense, and plaintiff and defense in the civil
world -- asking for medicolegal consultations.

            So at that time, 16 years ago, my department
chair asked me to formally construct a division within
our department of pathology of forensic consult
services.  I do approximately 250 consults per year of
which about half are civil and about half criminal.

        Q.    And for the half that you say are criminal,
do you have a rough ballpark of how many of those
cases are for prosecutors' offices versus defense
attorneys?

        A.    Approximately 85 percent are for the

conclusions than Dr. Baker, would you feel comfortable
saying that?

    A.    Oh, absolutely.  I mean, folks like Dr. Baker
and others whom I admire are -- take -- we always take
that sort of Jeffersonian platform of we can agree to
disagree, but we don't have to be disagreeable; and
here's what I disagree with you about, here's why.  I
may get you to rethink it, I may not.  And you may do
the same for me.

    Q.    Okay.  Now, you said that you reviewed the
primary materials in this case, meaning the crime
scene reports, the photographs, the video.  And I want
to ask now about some of the conclusions that you
reached regarding your review of those materials,
okay?

         Before we jump into that, just briefly, can
you explain to the Court, how do forensic pathologists
typically estimate or think about, rather, time of
death?

    A.    Well, the first thing most forensic
pathologists will tell you is that it is an inexact
science, that the best we can do is estimate and
ballpark things.  So generally what I do in court or
at the autopsy table with a case officer, lead
detective there asking questions is, you know, I'll

1  say something along the lines of if we're talking time

2  of death, there's no way to do it accurately with

3  precision.  If you have some scenarios that you would

4  like to posit that you're thinking about, I can tell

5  you whether those scenarios are consistent with what

6  I'm seeing at the autopsy table or not consistent

7  with.

8           And I want to be sure to define that term

9  "consistent with."  Consistent with just is not

10 diagnostic of.  "Diagnostic of" means this is exactly

11 how it happened, period, end of discussion.

12 "Consistent with" means, okay, based on what you're

13 telling me, my findings are consistent with that,

14 meaning I can't rule it out but I also can't

15 definitively rule it in for you.  It is consistent

16 with.

17    Q.   Now, you said that these are estimations by

18 the very nature of what we're talking about.

19    A.   Yeah.

20    Q.   If an investigator or lawyer comes to you

21 with a narrow window where they think somebody died,

22 and this is a very narrow, two-hour, two- to

23 three-hour window, what do you think of that

24 typically?  Does that give you concern?

25    A.   It does give me concern.  Most of the time

I'll say, Counselor -- or, "Detective, I can't do that.  Is there a particular reason you're asking me about a particular narrow window?  Maybe that can inform our discussion."  But, no, I mean, we can't, like NCIS or CSI, look at a body or do ancillary testing and say, "It was within this tiny interval that the death occurred."  Our science just isn't that good.

Q.   Okay.  What is rigor mortis?

A.   Rigor mortis is stiffening of the muscles in the body after death.

Q.   Okay.  Now, in temperate climates and sort of average conditions, how long does it take for rigor generally to develop and to dissipate entirely?

A.   Speaking in general terms -- I'm glad you used that qualification.

Q.   Yes.

A.   Generally it will first start to be noticeable within an hour or so, usually in the smaller muscles of the body.  But it does form in all muscles of the body at the same time.  It's just usually more noticeable to the investigator or pathologist early on.

      Over a period of around 12 hours, it will reach its full stiffness in all muscle groups, then it

stays for about 12 hours.  And then over about another
12-hour period, it will slowly begin to disappear.  So
we're talking, you know, somewhere -- again,
ballpark -- of 36-plus hours for rigor mortis to
disappear.

Q.   And is that ballpark in average conditions --
you know, the estimate as we're talking about here, is
that information you're giving the Court from the
forensic literature and from your experience doing
death investigations?

A.   Yes, ma'am, from both.  And, you know, in
temperate climates -- you know, we're not talking
Alaskan winter or the Sonoran Desert in summer.  We're
talking, you know, whether it's Austin, Texas or
Winston-Salem, North Carolina or Lexington, Kentucky.
These are temperate areas.

Q.   Okay.  And just to be clear, you've worked in
Winston-Salem and in Lexington, Kentucky doing death
investigations?

A.   Yes, ma'am.  I've worked all over western
North Carolina, central Kentucky, eastern Kentucky,
and southern Indiana.

Q.   Thank you.

Now, did you review any data related to the
temperature of the -- the ambient temperature on the

day of April 23rd, 1996?

A.   Yes, ma'am.

Q.   Okay.  Do you recall approximately what the
mean temperature was for that day?

A.   According to the weather service, the mean
temperature was 64.2 degrees Fahrenheit.

Q.   Okay.  And do you remember what the all-time
high was from that day?

A.   79 degrees.

Q.   And was there a low that was given?

A.   Yes, ma'am.  The low was 52.9 degrees.

Q.   Okay.

A.   So a range from about 53 to 79 with an
average of 64.

Q.   Okay.  And would you describe those
temperature conditions as temperate?

A.   Yes, ma'am.

Q.   Okay.  And would you describe those
temperature ranges as falling within sort of the
normal conditions where you would expect this rigor to
proceed in the way you described earlier?

A.   I would, yes.

Q.   Okay.  We've talked -- withdrawn.

Is it fair to say that temperature can have
an impact on the progression of rigor?

A.   It can.  Extreme cold can retard the onset
and dissipation of rigor mortis.  Extreme heat can
cause it to come on and disappear more rapidly.

Q.   Okay.  And when you say "extreme heat," would
you describe the temperature range for April 23rd,
1996, in Bastrop, Texas to be extreme?

A.   No, ma'am.  Not in my opinion.

Q.   Okay.  Now, did you review the crime scene
video in this case?

A.   Yes, ma'am.

Q.   Okay.  What evidence of rigor mortis did you
see in the crime scene video?

A.   Very little.  It appeared to be almost gone.
The individuals who were manipulating Ms. Stites' body
seemed to have a fairly easy time of moving her
about -- whether it was her limbs, her head area,
getting her into the disaster pouch.  They all seemed
to be able to do that with relative ease, which to me,
would mean that the rigor mortis was waning at that
point.

Q.   And when you say "disaster pouch," was that
the white bag that her body was transported in?

A.   Right.  I just don't like saying "body bag"
because I sometimes think it's disrespectful.

Q.   Understood.

And did you observe anything about how the people at the scene were manipulating -- or moving, rather, Ms. Stites' head?

A.   Yes, ma'am.  They seemed to move it with relative ease as opposed to somebody who is in full rigor where even I, as a relatively strong-enough kind of person, would have to put a lot of backbone into moving somebody.

Q.   Now, I think you said earlier that you've reviewed the report of Dr. Suzanna Dana, Norma Jean Farley, and Dr. Robert Bux; is that right?

A.   Yes, ma'am.

Q.   And there was some mention in these reports that rigor appeared to be waning.

Would you agree with that?

A.   Yes, ma'am.  I would.

Q.   In your estimation, did the rigor in this crime scene video look like it was just beginning to wane or had been waning for some time?

A.   It looked like it was well on its way to disappearing.  It wasn't -- you know, early on in the waning period, it still is quite stiff and difficult to move around.  And as we've discussed before, it seems as though the onsite investigators were able to manipulate her body quite easily.

1    Q.   Thank you.

2         If Ms. Stites' body had been in full or

3    nearly full rigor or just beginning to wane in rigor,

4    what would you expect to see in the crime scene video?

5    A.   You would expect to see folks having to use a

6    lot of strength in order to move different parts of

7    her body.  For example, I've been at a crime scene or

8    death scene or an autopsy table where I literally had

9    to put all my strength into pulling an arm down so

10   that we could get to the chest area, or manipulating a

11   neck so that we could examine the neck or the head or

12   the brain.  I didn't see evidence of that in this

13   case.

14   Q.   Did you see any signs of decomposition in the

15   crime scene video and the crime scene photographs?

16   A.   Yes, ma'am.

17   Q.   Okay.  And what were those signs?

18   A.   The main things were:  There was some green

19   discoloration of the body; there was black

20   discoloration of the lips -- it's called desiccation

21   or drying that occurs over time; and there was skin

22   slip, which I believe, if I'm saying her name right,

23   Ms. Blakely also described, which is indicative of

24   decomposition.

25        Skin slip is where just even with very light

1   pressure as you touch your gloved finger to a body,

2   the outer layer of the epidermis will separate from a

3   lower layer of skin and it will just peel away.

4       Q.   Now, the fact that you saw these signs of

5   decomposition and this minimal rigor present, what did

6   that lead you to conclude?

7       A.   Well, first and foremost, it leads me to

8   agree with Dr. Baker's assessment of this case in that

9   Ms. Stites' body was decomposing and that that rigor

10  mortis was on the downslope of that 36-hour ballpark

11  time frame that we talked about before.

12      Q.   And did these signs of decomposition combined

13  with the appearance of minimal rigor lead you to any

14  conclusions about whether it's likely Ms. Stites died

15  in that window between 3:00 a.m. and 5:00 a.m.?

16      A.   Yes, ma'am.  To me, based on experience,

17  education, training, I just do not think it is

18  consistent.  And I would tell -- would have told the

19  scene investigator or case detective or any attorney

20  coming to talk to me that those findings are not

21  consistent with her death between 3:00 to 5:00 a.m.

22  It had to have happened sometime previous.

23      Q.   Okay.  I want to ask --

24      A.   But I want to be very -- I want to be very

25  specific.  Again, acknowledging the limitations of our

1    science, I can't give an exact time previous, just

2    that it was previous to that window.

3       Q.   Okay.  The window that is being proposed as

4    3:00 to 5:00 a.m., that's inconsistent with what

5    you're seeing?

6       A.   Right.  The findings here just don't make

7    sense to me in that context, and I would tell the

8    detective, "No, ma'am, I don't think it occurred

9    during that time."

10       Q.   Thank you.

11       Now, what is livor mortis?

12       A.   Livor mortis is pooling of the blood in the

13    dependent portions of the body after death.

14    "Dependent" means gravity side.

15       Q.   Can you explain to the Court the difference

16    between unfixed and fixed lividity.

17       A.   Very early in the postmortem interval and

18    even in some severely ill patients who are lying still

19    in bed with things like congestive heart failure, you

20    can start to see pooling of the blood.  And early on

21    in that scenario, it is unfixed, meaning that you can

22    turn that patient, living or dead, and the blood will

23    then shift from -- let's say that patient was lying on

24    his back.  You turn him on his right side, the blood

25    will start to shift towards the right side of the

abdomen, rib cage, et cetera, as opposed to fixed

livor, which over time becomes congealed within the

blood vessels and sometimes even seeps out of the

blood vessels and gets into the soft supporting tissue

surrounding those vessels.  And it won't move at that

point unless there's some kind of hard pressure placed

on the body in that area, something of that nature.

Q.   Now, I know that you've said repeatedly, in

your line of work everything is about estimates.  But

is there a general estimate for how long it takes for

livor to become fixed?

A.   I think most forensic pathologists, myself

included, would tell you several hours, but then would

demur if you tried to pin us down as to what that

meant.  We can't, you know, get into the conversation

of, "Well, was it three hours, Doctor?  Was it two and

a half?"  I think most of us would just say "several

hours" because, for obvious reasons, there are no

controlled experiments of, you know, killing a person

and then watching this happen.

Q.   Thankfully so.

A.   Exactly.

Q.   Since livor settles in accordance with

gravity, if you observe fixed lividity that's at odds

with gravity, what does that tell you?

1     A.    That tells you that the body was moved

2     sometime after the lividity became fixed.  So it was

3     moved for -- again, several hours after death, after

4     it had become fixed or relatively fixed, and put into

5     a new position.

6          Q.    Thank you.

7                MS. PUCHER:  I would like to show

8     Dr. Davis an image from Slide No. 25 of the PowerPoint

9     that's in evidence, Exhibit 5.

10               Thank you.

11         Q.    (BY MS. PUCHER)  Do you see any evidence of

12    antigravitational livor in this photograph?

13         A.    Yes, ma'am.  So we're looking at Ms. Stites'

14    right shoulder and right arm area, and there are two

15    things here that tell us that there's

16    antigravitational livor.  One is the red discoloration

17    on her arm.  I'm going to define "arm" as from her

18    shoulder to her elbow and "forearm" as from the elbow

19    to the wrist.

20               So first, looking at the arm, you can see

21    this red discoloration that is then intermixed a

22    little bit, almost like a geographic map pattern, with

23    an area of relative pallor.  It kind of looks white in

24    the photograph.

25         Q.    Yep.

A. And that extends down to her forearm. If you look at her wrist area going about halfway up her forearm towards the elbow, it also shows this livor mortis pattern. And then you start to see where the arm is consistent with having been pressed against something while that arm was in a downward position as opposed to this upward position in the picture.

So plainly, the red color near the wrist and the red color between the elbow and the shoulder says to me that this body was moved at some point after livor had fixed.

Q. And that's because the position of her arm relative to her body and the ground she's on doesn't explain the pooling of blood in this fashion; is that right?

A. That is correct.

Q. Okay. I want to talk for a moment more about what you described as pallor on the inside of Ms. Stites' arm. And that's this sort of whiter area that's less red sort of towards the middle of her elbow and extending outward; is that right?

A. That's correct.

Q. Okay. Is that sometimes also known as "blanching" in the literature?

A. Yes. "Blanching" just literally means white,

1  whiting, and it is often seen in livor if a part of

2  the body -- usually, the most common scenario is

3  pressed against the ground or something on a bed or

4  any other physical object that would keep blood from

5  pooling in that area during the early livor period.

6      Q.   Okay.  And so that kind of blanching that we

7  see here, that requires some sort of pressure on the

8  inside of the arm; is that right?

9      A.   That's correct.

10     Q.   Okay.  And do you see anything in this

11 photograph that would explain that blanching pattern

12 as we see it here?

13     A.   No.  The arm is open to the air, open to the

14 sky.  There's nothing on it.  There's no, like, rock

15 or something on it.  The only explanation I would have

16 would be that that arm, during the early postmortem

17 period, was facing downward instead of facing upward,

18 and that arm and forearm.

19     Q.   Okay.  Thank you.

20          MS. PUCHER:  Image 110, please.

21          I'm going to show in a moment, when my

22 colleague gets it on the screen, Applicant's 17, which

23 I've handed to the State before.  This is a photograph

24 collected from the time of Ms. Stites' autopsy, and I

25 would move to admit into evidence.

1           (Applicant's Exhibit 17 marked.)

2           MS. TANNER:  No objection.

3           THE COURT:  It'll be admitted.

4           (Applicant's Exhibit 17 admitted.)

5           MS. PUCHER:  Thank you.

6       Q.   (BY MS. PUCHER)  Okay.  Dr. Davis, do you see

7   this image on your screen?

8       A.   Yes, ma'am.

9       Q.   What does this photograph appear to be of?

10      A.   It's a photograph of Ms. Stites' body lying

11  recumbent.  It's turned 90 degrees to the right.

12      Q.   Can you please describe the lividity pattern

13  that you see here.

14      A.   I see lividity on that right arm as well

15  anteriorly.  If you look at the far left-hand side of

16  the photograph, you can still see some lividity on the

17  anterior arm being the part facing up or to the right

18  in this picture.  You also see some pressure blanching

19  in the right breast in the medial aspect, towards the

20  center of the chest.

21      Q.   Okay.

22      A.   You also see some -- you also see some

23  blanching at the bottom of the breast as well at

24  12 o'clock -- or, sorry, 6 o'clock.

25      Q.   Thank you.

And the pattern of lividity that you see in Ms. Stites' arm here, is this consistent with the lividity pattern that we saw in the previous image?

A. Yes, ma'am.

Q. Okay. Now, I know it's not a perfect picture by any means, but does this image appear to be taken from an autopsy suite?

A. Yes, it does.

Q. Okay. What does it tell you that this lividity pattern remains at autopsy, you know, several hours later after the crime scene has been cleared?

A. That it was fixed at the scene, and it remains fixed here.

Q. Okay. Now, I believe in the reports of Dr. Dana, Farley, and Bux that you may have seen some discussion about potential sunburn on Ms. Stites' body. Do you recall seeing that?

A. Yes, ma'am.

Q. Okay. Do deceased bodies sunburn?

A. No, ma'am, they don't. I was surprised to read that in those reports. I've been doing scene investigations and autopsies for three and a half decades. I've never seen sunburn in a deceased person. Generally what prolonged sun exposure will do is just make the skin harder. The term we usually use

1  is "leather hard," sometimes almost mummified to some

2  degree.  But the skin slip that I saw in those

3  pictures is indicative of decomposition and not

4  sunburn.  Dead people don't get sunburned.

5      Q.  Okay.  And this pattern of lividity --

6  withdrawn.

7          The coloration that you see on Ms. Stites'

8  arm here extending into her flank and on her breast,

9  does that appear to you to be a sunburn?

10     A.  No, ma'am.

11     Q.  Okay.  What does that appear to be?

12     A.  That appears to be pooling of blood.

13     Q.  Okay.

14     A.  I don't see any evidence of sunburn in

15  Ms. Stites' body.  And the other thing that struck me

16  was I believe in Ms. Blakely's report.  She even said

17  the skin slip was in the area that was covered with

18  the clothing.  So, I mean, even in a hypothetical that

19  I don't concede, that sunburn can occur in a deceased

20  person, I would think her documentation would rule

21  that out.

22     Q.  Okay.  Fair enough.

23          MS. PUCHER:  Can we go back to Slide 25,

24  please.

25     Q.  (BY MS. PUCHER)  Just briefly, looking again

1    at the interior -- or the inner area of Ms. Stites'

2    arm, the area that you described as blanching, do --

3    does blanching happen when a person sunburns?

4    A.   No, ma'am.

5    Q.   Okay. That's a phenomenon of lividity; is

6    that right?

7    A.   That's a phenomenon of -- or an epiphenomenon

8    of lividity --

9    Q.   Right.

10    A.   -- where there's been pressure, as we've

11    discussed before, applied to that particular area that

12    precludes the blood from settling there.

13    Q.   Thank you.

14        MS. PUCHER: Slide 26 from the

15    PowerPoint, please. I'm going to go show Dr. Davis

16    Slide 26 from Applicant's 5 in evidence.

17    Q.   (BY MS. PUCHER) Now, you stated, Dr. Davis,

18    that you reviewed upward of 150 pictures of the scene

19    and of the autopsy that I sent to you about two weeks

20    ago; is that right?

21    A.   Yes, ma'am.

22    Q.   And that is in addition to photographs that

23    we sent you months ago when you started your review in

24    this case?

25    A.   Yes, ma'am.

Q.   Okay.  And many of those were duplicates of each other; is that right?

A.   Yes.

Q.   Okay.  But you've now reviewed all of these photographs in their entirety?

A.   Yes.

Q.   Okay.  Now, this is an image -- well, rather -- withdrawn.

Can you please describe what we're looking at on the screen.

A.   We're looking at a photograph taken of Ms. Stites' body at the scene where she was discovered from a different angle than the one we've been looking at before.

Q.   Okay.  More of an aerial view; is that fair?

A.   Yeah, aerial view of a person standing a little bit away and pointing his camera down at her.

Q.   Okay.  Did you see any evidence, in this photograph or any of the photographs we sent you, of Ms. Stites' body being on an incline?

A.   No, ma'am.

Q.   Okay.  Did you see any evidence in any of the crime scene reports that we sent you of any incline being measured in this case?

A.   No, ma'am.

Q.   Okay.  Now, I believe that you reviewed
Ms. Blakely's testimony as well as her crime scene
report; is that right?

A.   Yes, ma'am.

Q.   Okay.  Do you remember seeing her mention
that Ms. Stites was on a small mound of dirt?

A.   I think something to that effect --

Q.   Right.

A.   -- if memory serves, yeah, a small mound.

Q.   Okay.  To you, would that explain -- just
knowing that information and nothing else, would that
explain the antigravitational livor pattern that you
see in Ms. Stites' arm?

A.   No, ma'am.  And even in the hypothetical that
she was on some sort of incline, that still wouldn't
explain the livor mortis that we're seeing in those
photographs.  But I did not see evidence that she was
on an incline.

Q.   And why wouldn't it explain the livor mortis
that we're seeing?

A.   Because you actually have antigravitational
livor mortis that is essentially facing up.  You have
livor that is facing towards the sky instead of facing
toward the ground.  And in the midst of that livor,
you also have that evidence of blanching that we

discussed before.  So even in a hypothetical of a --
of an incline, that's still not explained.

Q.    The blanching wouldn't be explained even if
there was a mound or an incline of some kind?

A.    No, ma'am.  I mean, even if her arm was
hanging over a cliff, it wouldn't explain that.

Q.    Okay.  Now, you also reviewed some
photographs of when Ms. Stites' body was turned over
at the scene and you could see her back; is that
right?

A.    Yes, ma'am.

Q.    Okay.  And did you see lividity on
Ms. Stites' back?

A.    Yes.

Q.    Okay.  How can you explain that lividity on
her back?

A.    Well, lividity, even after it's relatively
fixed, can shift and you can get blanching of
relatively fixed lividity if a person's skin is
pressed up against something hard.  These processes
are -- they're not quantum processes where all of a
sudden it's unfixed and then it becomes permanently
fixed.  So that livor can shift some over time.  We
also don't know at the time of her death how long she
was in a particular place.  We've mentioned before it

takes several hours for it to fix.  But the fact that there's livor on the posterior surface of her back and there's some blanching on the posterior surface of her back does not change my opinion for those reasons.

Q.  Okay.  So the fact that she has -- the livor on her back, is it fair to say, can be explained by the fact that she's on her back for some extended period of time?

A.  For an extended period of time, yes.  Even relatively fixed livor, if you've got enough pressure on it just from body weight over time, can blanch out for some degree.

Q.  Okay.  And it can shift, as you said?

A.  Yes.

Q.  Okay.

A.  Yes.

Q.  Okay.  Now, I want to talk about evidence that was presented in this case of Mr. Reed's trial about the persistence of intact spermatozoa, okay?

Did you review the testimony offered by Karen Blakely and Meghan Clement about the survival times of intact sperm?

A.  Yes, ma'am.

Q.  Okay.  Just briefly, what did they say to the jury was the outside length of time that sperm can

A.   The other study that you mentioned was not only a study but a meta-analysis, meaning it's a study of studies.  The authors reviewed multiple studies in years previous, and that was their conclusion as well, that multiple studies have shown that sperm can survive, you know, week or longer intact in somebody after intercourse.

Q.   Okay.  And in the Willott and Allard study that you're talking about right now, there is mention at one point that those examiners who authored the study found that 26 hours was the outside time that intact sperm could survive; is that right?

A.   Right.  Right.  That's only part of the whole picture because they realize that other individuals who conducted studies found sperm a lot longer after that period.

Q.   Okay.  And so if you were training a death investigator and learned that that person testified quoting that study, that the outside length of time that sperm can survive intact is 26 hours, what would your reaction to that be?

A.   I mean, if they were under my charge, I'd bring them into my office and have a counseling session.

Q.   And why is that?

A.   Because I would tell them they need to read the whole article and then discuss it with me and, you know, to be very careful in just quoting one small thing out of a paper not realizing that the paper also says something very different.

Q.   Okay.  Is it fair to say that's misleading?

A.   I would say, yeah.  Whether we're teaching a class or talking to a jury, you know, I try to presume good faith.  But that is misleading to whoever you are talking to.

Q.   Okay.  I want to talk briefly about some of the conclusions Karen Blakely talked about regarding bruising of Ms. Stites' body.

Do you recall that testimony?

A.   Yes, ma'am.

MS. TANNER:  Objection, Your Honor. That's not in the report.  That's not in this peer-reviewed report that he's talking about; therefore, we'd object.

MS. PUCHER:  Your Honor, if I may, he's talking about his review of these materials, and he did review the issues regarding bruising, and so I'd ask to ask him a few questions about it.

THE COURT:  Objection overruled.

MS. PUCHER:  Thank you.

Q.   (BY MS. PUCHER)  Did you review the testimony
that Karen Blakely gave about the ability to date
bruises on Ms. Stites' body?

A.   Yes, ma'am.

Q.   Okay.  Can bruises be dated?

A.   No, ma'am, they cannot.

Q.   All right.  How do you know that?

A.   Well, both from not only personal experience
but from reviewing the literature.  I think Milroy, in
Canada, wrote a paper back in the early '90s, like
'91, about how bruises can appear any color at any
time.

The old canard that we were always taught
when I was in med school was, you know, they -- first
they're purple, and then they're green, then they're
red, then they're yellow.  That's now known and
generally accepted by forensic pathologists to not be
valid, and the in-joke that you'll hear a lot of
forensic pathologists use -- and I don't mean to be
flip in this very grave process today -- is, Mama told
me never to date a bruise.

Q.   And you said that part of the basis of that
opinion is reviewing studies that were published in
the earlier 1990s; is that right?

A.   Yes, ma'am.

1    Q.   Okay.  So that information was available in

2  1996 and 1997, the time of this case and trial?

3    A.   Absolutely.

4    Q.   Okay.  Now, did you review Dr. Bayardo's

5  testimony regarding the appearance of Ms. Stites' anus

6  at the autopsy in this case?

7    A.   Yes, ma'am.

8    Q.   Okay.  Do you recall what he said about the

9  fact that her anus was dilated?

10    A.   I believe he mistakenly thought that that

11  meant that she had sustained not only anal

12  penetration, but I think he also testified that it was

13  nonconsensual.  I think originally he started out in

14  his report calling some areas abrasions, which means

15  scrape; and then I think he segued later on into

16  calling them laceration, which means tear.

17    Q.   Okay.  Now, just speaking first about the

18  dilation, what does the fact that Ms. Stites' anus was

19  dilated at the time of her autopsy, what does that

20  mean?

21    A.   Absolutely nothing.  It is a nonspecific,

22  common finding especially when someone is beginning to

23  decompose.  The anus is a muscle entity.  It's a

24  sphincter.  Sphincters relax at death.  It's one of

25  the reasons why sometimes, not always like on

television, but sometimes people will lose bowel and
bladder control at the time of death.  It means
absolutely nothing, and it's of no value to the
pathologists other than in saying that this person is
deceased.

Q.  Okay.  And you referred to the fact that
Dr. Bayardo talked about abrasions in his autopsy
report and that changed to lacerations by the time he
was testifying.

Is there anything about normal anal anatomy
that can appear as an injury sometimes to an untrained
eye?

A.  Yes.  The anal anatomy has something called
the pectinate line, P-E-C-T-I-N-A-T-E, that is often
mistaken by folks potentially as an area of abrasion,
meaning scraping, or laceration.  There are also anal
crypts, C-R-Y-P-T-S, which are actually indentations
in the mucosa where anal glands are that help keep
things moving throughout the entirety of the GI tract.
Sometimes those are mistakenly called lacerations or
abrasions.

Q.  Okay.  Now, understanding that there are
features of a normal anal anatomy that can be mistaken
as an injury, did you see any evidence of anal injury
when you reviewed the photographs in this case?

1      A.   No, ma'am, I did not.

2      Q.   Okay.  And that includes both lacerations,

3  abrasions, or tears.  You saw none of that?

4      A.   That is correct, I did not see any of that.

5      Q.   Okay.  Now, you're obviously relying on

6  photographs that were taken by somebody else.  Why do

7  you feel confident relying on those photographs?

8      A.   Well, we get asked that a lot.  And what I

9  always -- the way I answer that is every time you do

10 an autopsy, whether it's of a homicide such as this or

11 even something that you don't think is foul play,

12 because you never know what's going to develop down

13 the road, you always try to dot your I's and cross

14 your T's and take photographs and do the best

15 description that you can because, you know, apropos of

16 our earlier conversation about peer review and quality

17 assurance, that one or more of your peers is going to

18 come behind you and, in good faith, evaluate your

19 observations and your interpretations thereof and

20 potentially critique them.

21      So I always kind of shake my head when folks

22 say, "Well, don't you think it's only the person there

23 that did the case who can testify to it?"  That's just

24 sort of an absurd allegation for the reasons I just

25 mentioned.

1          Q.   Thank you.

2          Now, the statements that Dr. Bayardo gave to

3     the jury about the presence of an injury to

4     Ms. Stites' anus and assuming the presence -- the

5     meaning of that injury, were those accurate

6     statements?

7          A.   They were not.

8          Q.   Okay.

9          A.   They were not, both in the fact that he --

10    and I'm quoting or paraphrasing from memory -- that he

11    said, A, that there were injuries; and B, that

12    building upon that, that it meant there was

13    nonconsensual penetration of her anus.

14         Q.   And I believe Dr. Bayardo also at the end of

15    his testimony goes further to say that he can date the

16    time of those injuries to the moment or approximate

17    moments to when Ms. Stites was dying.  Is there any

18    scientific validity to that statement?

19         A.   Not at all.  The only time you can very

20    crudely, roughly ballpark-date an injury is to take

21    microscopic sections of an abrasion or a laceration

22    before the body is decomposed and evaluate the influx

23    of inflammatory cells, both for quality -- which types

24    of inflammatory cells -- and quantity -- how many are

25    there -- and then you can just crudely say, "Oh, this

happened very recently before death or maybe hours to days before death." But Dr. Bayardo did not take any microscopic sections in this case.

Q. Okay. Thank you.

So after you completed your review of the primary materials in this case and Dr. Baker's report, did we have another conversation about your conclusions?

A. Yes. And you admonished me from the outset, you know, "Be honest with me and give me, you know, your unvarnished thoughts about what you reviewed." And I think my single overriding conversational objective with you was that I agree with Dr. Baker's assessment, both in whole and in part.

Q. Okay. Now, the conclusions that you gave to the Court just now about these findings, are those in line, would you say, entirely with Dr. Baker's conclusions and his report?

A. Yes. And I don't know if the courts are the same way in Texas as it does in Kentucky, but I would say all of my opinions are to a reasonable degree of medical certainty, and I do agree with Dr. Baker.

Q. Okay. Fair enough.

Now, after you informed me that you did agree with these conclusions wholeheartedly, did I ask you

1    THE COURT: Okay. If I could ask you to

2 raise your right hand for me.

3    (Witness sworn.)

4    THE COURT: All right. Just for the

5 sake of assurance, could you spell your last name for

6 the court reporter.

7    THE WITNESS: Yes. It's S as in "Sam,"

8 C-R-O-G-G-I-N-S, as in "Sam."

9    THE COURT: I thought that's the way you

10 would spell it. I just wanted to be sure. Thank you,

11 sir.

12    All right. You may proceed.

13    MS. DISALVO: Thank you, Your Honor.

14    **RICHARD S. SCROGGINS**,

15 having been first duly sworn, testified as follows:

16    **DIRECT EXAMINATION**

17 BY MS. DISALVO:

18    Q.  Mr. Scroggins, what is your occupation?

19    A.  I'm retired.

20    Q.  What did you do for work before you retired?

21    A.  I worked for a FedEx office, formerly

22 Kinko's. I retired there after 30 years.

23    Q.  And, sir, where do you live?

24    A.  I live in Spicewood, Texas.

25    Q.  Is this the first time you have testified in

a court proceeding?

     A.   Yes, ma'am.

     Q.   Do you have any familiarity with court
proceedings?

     A.   I do.  My father was -- my late father was an
attorney and my sister was an assistant DA, and I've
also served as foreman of two civil juries.

     Q.   And so you understand that court proceedings
are serious matters?

     A.   Yes, ma'am.

     Q.   And Judge Langley swore you in, and you
understand that your testimony is under oath today,
correct?

     A.   Yes, ma'am.

     Q.   Mr. Scroggins, do you know a man named
Jimmy Fennell?

     A.   No.

     Q.   Do you know of Jimmy Fennell?

     A.   Yes, ma'am.

     Q.   And under what circumstances did you come to
know of Jimmy Fennell?

     A.   I read an article in the Austin Chronicle in
about 2005, and in the article was a photo, and I
recognized him from the photo.

     Q.   Okay.  Now, is that similar to the photo that

you saw in the Austin Chronicle?

A. Yes, ma'am, similar.

Q. Okay. And that photo was identified in the Austin Chronicle as Jimmy Fennell; is that correct?

A. Yes, ma'am. Not that photo but another photo similar to it.

Q. Okay. Thank you for clarifying that.

Okay. And where did you see Jimmy Fennell?

A. In the parking lot of the H-E-B, which was adjacent to the Whataburger here in Bastrop.

Q. And when did you see Jimmy Fennell in the H-E-B parking lot that was adjacent to the Whataburger?

A. It would have been the week of April 15th, 1996.

Q. And can you tell the Court under what circumstances you saw Jimmy Fennell in the H-E-B parking lot?

A. Yes. I was living in Austin at the time, and I was with two friends of mine -- Clyde Reynolds, who is a former tax assessor/collector and knew a lot about Texas history, and a friend of mine, Michelle Robertson -- and we were doing some genealogical research, actually looking for a cemetery out in the Utley area and had been to various places

in Bastrop County that day and wrapped up I'm thinking
around 12:30, 1:00 o'clock. And we decided we were
all hungry and thirsty and we went to the Whataburger
to get some lunch.

Q.   And were you driving, sir?

A.   I was.  I was driving my truck.

Q.   And where was your truck parked?

A.   In front of the Whataburger with the hood
facing the H-E-B parking lot.

Q.   And once you got to the Whataburger, what
happened?

A.   We went inside, placed our order, and I had
been in a couple of minutes and realized I had left a
binder in the truck and went out to get the binder.
And when I went back outside is when I heard the man
screaming.

Q.   And the man that was screaming, was that, do
you believe, Jimmy Fennell?

A.   That was Jimmy Fennell, yes.

Q.   And where was Jimmy Fennell standing in
relation to you when you heard him screaming?

A.   I'd say 30 feet or so.  Probably as far as
here to maybe -- I'm thinking the blonde lady back in
the back there with the kind of blue and white top --

Q.   Okay.  So I think --

1       A.    -- that just shook her head, yes.

2            MS. DISALVO:  For the record,

3    Your Honor, I think he's pointing to the first row of

4    the gallery.

5       Q.    (BY MS. DISALVO)  Is that accurate?

6       A.    Yes.

7       Q.    Okay.  Thank you.

8            There's a blonde woman in the first row of

9    the gallery.

10           And could you hear from that distance what

11   Jimmy Fennell was screaming?

12      A.    I could.

13      Q.    Okay.  And what do you recall that he was

14   screaming?

15      A.    I want to preface this by saying I'm

16   reluctant to use these words, but these -- this is

17   what I heard, and there was a -- what I call a barrage

18   of invective, just very vicious, obscene language

19   being directed at another individual.  And there

20   was -- it was so fast and so much of it coming, but I

21   recall phrases like "lying fucking bitch," "lying

22   fucking cunt," "fucking bitch twat," just "bitch,"

23   words of that nature.

24      Q.    And I believe you just testified that he was

25   screaming those words that I will not repeat --

1    A.   Yes, ma'am.

2    Q.   -- at someone?

3    A.   Yes, ma'am.

4    Q.   Who was -- you know --

5    A.   A young lady who was leaning against the back

6    of a pickup truck.  I saw her mostly in profile.  She

7    was -- do you want me to describe her?

8    Q.   Yes.  Thank you.

9    A.   I would say between 120, 130 pounds; early

10   20s to my view; tight, curly hair, brown; and holding

11   a purse.  She had on jeans and a white shirt.

12   Q.   Okay.  And you didn't personally know the

13   woman that he was shouting --

14   A.   I did not.

15   Q.   -- at, correct?

16        Okay.  But did you come to know or know who

17   you believe that woman to be?

18   A.   Yes, I believe it to be Stacey Stites.

19   Q.   Was Stacey Stites successful in stopping

20   Jimmy Fennell from shouting at her?

21   A.   He was standing in the parking lot.  She had

22   her head mostly down.  He would go towards her, he'd

23   raise his fist.  He was beet red in the face and

24   literally screaming.  I mean, you, from where I was,

25   could see the -- you know, the veins bulging he was so

angry.  But what I remember was the eyes because they were very laser-like intent.

And the only thing I heard her say, which she said several times because she kind of put her hand up, and she said, "Can we not do this here?  This is where I work.  Can we take this home?"  And that's the only response that I heard.

Q.   And how long did you observe Jimmy Fennell screaming obscenities and vulgar language at Stacey Stites?

A.   I would say it seemed like a long time because I was kind of frozen in place, but probably two -- two to three minutes.

Q.   Okay.  And what happened next?

A.   Like I said, I was kind of paralyzed standing frozen in that spot, and I'd not even gotten into the truck.  And at that point, he turned -- he would go towards her and then he would back up.  And he stopped and he looked directly at me at that point, and said, "What are you fucking looking at, little man?"  And -- which, you know, kind of shocked me, and then he said, "This is none of your fucking business.  Get the fuck out of here."  And at that point, I did.

Q.   Now, when he was walking -- when Jimmy Fennell was walking back and forth, was he

walking towards you and then back or was he --

A.   No.  He was walking towards Stacey.

Q.   And where was that in relation to you?  Was he walking towards you or side to side?  Did he come closer to you when he walked forward?

A.   The truck was parked in the parking lot.  In other words, my vehicle was parked like this way, pointing towards the H-E-B, and that truck was pointed kind of towards the Whataburger --

Q.   Okay.

A.   -- in the parking lot.  And she was kind of half sitting against the back of the truck.

Q.   Okay.

A.   He would go towards her.  So I was seeing him almost full face and I could see her kind of in profile, but she did have her head down most of the time.

Q.   Okay.

So I believe you just testified that after Jimmy Fennell screamed at you and threatened you, you went back inside the Whataburger; is that correct?

A.   Yes, ma'am.

Q.   Okay.

Did you report the incident to anyone at the time?

"Paul," I as in "Ida," N as in "Newman," G as in

"George," T as in "Tom," O as "OSHA," N as in

"Newman," Sappington.

        THE COURT:  All right.

        You may proceed, Mr. McNeal.

        **BRENT SAPPINGTON**,

having been first duly sworn, testified as follows:

        **DIRECT EXAMINATION**

BY MR. MCNEAL:

   Q.  Hi there, Mr. Sappington.

   A.  Hi.

   Q.  I know it can be difficult to come into a

room with everyone looking at you, so let me put you

at ease a little bit.

        My name is Quinncy, as you know.

   A.  Yes.

   Q.  I represent Mr. Reed over here.  These are

State's attorneys.  This is the Honorable J.D.

Langley.

        I've got a few questions for you, after which

the State will have some questions for you.  We'll try

to get you out of here as quickly as we can, okay?

   A.  That's fine.

   Q.  Okay.  So you've stated your name.  Tell us

what you do, Mr. Sappington.

A.    I'm disabled, retired truck driver.

Q.    And did you drive trucks all over?

A.    I did.

Q.    Where do you live now?

A.    Weatherford, Texas.

Q.    And did you drive all the way down from Weatherford to be here today?

A.    I did.

Q.    How long have you lived in Weatherford?

A.    Approximately 16 years.

Q.    And, Mr. Sappington, have you ever lived closer to this area?

A.    I have.

Q.    Tell me where you lived and what times.

A.    Giddings, Texas from '93 to 2000.

Q.    And, Mr. Sappington, with whom did you live?

A.    My wife and two children.

Q.    Okay.  Your wife and two children lived in Giddings, Texas?

A.    Yes.

Q.    What other, if any, family did you have here in Giddings -- or in Giddings?  I'm sorry.

A.    My father, William Frederick Sappington.

Q.    And Mr. Sappington is gone now?

A.    Yes, he is.

1    Q.   And when your father lived in Giddings, where

2 did he live?

3    A.   He lived at Rolling Oaks Apartments.

4    Q.   And with whom did he live?

5    A.   By his self.

6    Q.   Mr. Sappington, how close, if at all, were

7 you with your father?

8    A.   I was very close.

9    Q.   Tell me a little bit more about that.

10   A.   I used to go over there on my last days off.

11 I would take and spend time with him, watching TV,

12 listen to the police scanner, we'd cook.

13   Q.   And you're talking about going over to his

14 place.  You're talking about going over to

15 Rolling Oaks?

16   A.   Yes.

17   Q.   Okay.  And do you recall, Mr. Sappington,

18 which apartment he lived in?

19   A.   Yes, I do.

20   Q.   Which apartment did he live in?

21   A.   He lived at the very front, 501.

22   Q.   501.  And did he live there his entire time?

23   A.   No, he did not.  He lived there a short time,

24 then he moved toward the back.

25   Q.   Okay.  And do you recall that apartment?

1    A.    I do.

2    Q.    Tell me which one.

3    A.    905.

4    Q.    Mr. Sappington, how do you remember the

5    numbers of the apartments so well?

6    A.    Well, whenever you'd go to see your father,

7    you know the apartment numbers.  We had to help him

8    move in and move out.

9    Q.    So he lived in the front of the apartment

10   complex for a short period of time, is your testimony,

11   and then he lived toward the back for a period of time

12   as well?

13   A.    That's correct.

14   Q.    And do you remember which part he lives in in

15   the earlier part of 1996?

16   A.    I do not recall on the years, but I do know

17   that we first moved him in at 501, and it was a very

18   short time that he wanted to get away from there and

19   go to the back.

20   Q.    Okay.  Mr. Sappington, did you -- were you

21   acquainted with any of your father's neighbors?

22   A.    Yes, I was.

23   Q.    And tell me with whom.

24   A.    Jimmy Fennell and Stacey Stites.  And also

25   Carol Stites.

1      Q.   Let's take them one at a time.

2           How were you acquainted with Jimmy Fennell?

3      A.   I used to take and ride with police officers

4  there in Giddings, and he was a Giddings police

5  officer.

6      Q.   Did you kind of follow the police and were

7  you interested in police -- law enforcement?

8      A.   Yes, I was.

9      Q.   So you rode with the police from time to

10 time?

11     A.   Yes.

12     Q.   So you knew him from the apartment complex

13 and also outside of the apartment complex?

14     A.   Yes.

15     Q.   Okay.  The second was Stacey Stites.  Tell me

16 how you knew Stacey.

17     A.   I just knew of her.  I didn't really know

18 her.

19     Q.   Okay.  And Carol Stites?

20     A.   I just knew of her and didn't really know her

21 either.

22     Q.   Okay.  And, Mr. Sappington, where did they

23 live?

24     A.   They lived right above my dad, that's Jimmy

25 and Stacey; and then Carol lived right down below my

dad across the hall there.

Q.   Okay.  So just so that I'm clear and the
Court is clear, Jimmy and Stacey lived right above --

A.   Yes.

Q.   -- 501 where your dad lived?

A.   Exactly.

Q.   And you're saying Carol lived right across
from 501?

A.   Yes.

Q.   Okay.  Now, Mr. Sappington, generally, what
types of things would you do with your father when you
were alone with him?

A.   We would take him -- go over there and watch
TV; we'd listen to the police scanner, as I said; and
then we would cook.

Q.   Okay.  When he lived in the front of the
apartment and Jimmy and Stacey were his neighbors, do
you recall any specific visits?

A.   I do remember one.

Q.   Tell me about the memory that you remember.

A.   I walked in the door.  My dad was standing
there as he opened the door, and all of a sudden, I
started hearing all this racket.  And I asked him, I
said, "What is that?"

     And my dad said, "Well" --

```
 1              MR. GREENE:  Objection, hearsay.

 2              MR. MCNEAL:  Your Honor, I think what

 3    his dad said is a -- is covered and allowed in under a

 4    hearsay exception, Your Honor.  It's his present-sense

 5    impression of the startling event of what he hears

 6    above him.

 7              THE COURT:  Overruled.  I'll allow it.

 8        Q.   (BY MR. MCNEAL)  Let's go a little slower

 9    here.

10         So you go into the apartment?

11        A.   Yes, sir.

12        Q.   Okay.  And take me from there.

13         You go into the apartment.

14        A.   And then I heard this commotion.

15        Q.   Okay.  Let's pause there.

16         Tell me what you heard.

17        A.   It sounded like a bunch of tables and chairs

18    being turned over with a bunch of screaming and

19    hollering.

20        Q.   Okay.  And what was your immediate reaction?

21        A.   I was like, "Dad, what is that?"

22         And he said, "That's Jimmy up there taking --

23    yelling at Stacey.  It goes on all the time."

24        Q.   So that was his explanation of --

25        A.   Yes.
```

1    Q.    -- what you heard?

2          And I cut you off a little bit there.  Go

3    ahead and finish that.

4          What did he say?

5    A.    And then he said that that's just, you know,

6    a normal thing.  He said, "That's why I want to

7    take -- and get away from here and go toward the

8    back."

9    Q.    Were you -- so he basically told you that,

10   from his perspective, this was nothing new.  He heard

11   this often?

12   A.    Yes.

13   Q.    Were you surprised to hear him say it was

14   Jimmy and Stacey?

15   A.    I was because, being a police officer, you

16   don't expect something like that.

17   Q.    Mr. Sappington, were you concerned for

18   Stacey's safety?

19   A.    I was.

20   Q.    And tell me about that.

21   A.    I was really concerned, but I didn't think it

22   would do any good to go to anybody, to law

23   enforcement.

24   Q.    And you're aware -- did any police or sheriff

25   deputies ever come to -- come to you to discuss

Stacey's murder?

A. No, sir.

Q. And you moved from the area --

A. Yes.

Q. -- as I understand; is that right?

A. Yes, sir.

Q. Tell me where you -- so in -- we're talking about when Jimmy and Stacey were in the apartment complex. Where did you move after?

A. We moved to El Campo.

Q. And when did you move to El Campo?

A. In 2000.

Q. Your family and Mr. Sappington?

A. Yes.

Q. And when did you move next?

A. We moved from El Campo to San Antonio, Texas.

Q. And when was that?

A. That was in 2000.

Q. In 2000 you said you moved to El Campo?

A. Right.

Q. When did you move --

A. Oh, okay. From El Campo to San Antonio? Yes, sir. We moved in 2001.

Q. 2001?

A. 2001 from El Campo to -- we weren't there but

a year in El Campo.

Q. Okay. And so then where did you move after? You left San Antonio. Where did you move after San Antonio?

A. To Weatherford, Texas.

Q. Gotcha.

And that's where you've been?

A. Yes, sir.

Q. And let me ask you, Mr. Sappington, do you know if your dad ever came forward to police, to authorities, to anybody?

A. Yes, sir, he did.

Q. How do you know that?

A. Because I was with him whenever we was at the church.

Q. And he was coming forward to someone?

A. He did. He went to the assistant district attorney and also a police officer.

Q. Do you recall the police officer's name?

A. Garnett Danewood.

Q. And who was the assistant DA?

A. Ted Weems.

THE REPORTER: Can you repeat that?

THE WITNESS: Ted Weems.

THE REPORTER: Weems?

1    THE WITNESS:  Weems, W-E-E-M-S.

2    THE REPORTER:  Thank you.

3    THE WITNESS:  You're welcome.

4    Q.  (BY MR. MCNEAL)  And that you're aware of,

5    did anyone ever respond?  Did he get any --

6    A.  They just simply told him that they already

7    had their suspect, that they didn't need nobody's

8    help, that they -- to mind your own business, to hush

9    his mouth.

10   Q.  And, Mr. Sappington, did you ever come

11   forward?

12   A.  No, I did not.

13   Q.  Tell me why you didn't.

14   A.  I didn't think it would do any good.

15   Q.  And why not?

16   A.  Because he's a law enforcement.

17   MR. MCNEAL:  Pass the witness.

18   **CROSS-EXAMINATION**

19   BY MR. GREENE:

20   Q.  Good afternoon, Mr. Sappington.

21   A.  Good afternoon.

22   Q.  My name is Garrett Greene.  I'm an attorney

23   for the State, and I just have a few questions for

24   you, okay?

25   A.  Okay.

as close to that microphone as possible.  You have a

very soft voice.  It would make it easier for them to

hear you if you could talk into that microphone.

(Reporter clarifies spelling.)

**VICKI SAPPINGTON**,

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MR. MCNEAL:

Q.  Hi there, Ms. Sappington.

A.  Hi.

Q.  As you know, my name is Quinncy McNeal.  I

represent Mr. Reed.

A.  Yes, sir.

Q.  Over here are the State's attorneys.  This is

the Honorable J.D. Langley.

I thank you for being here today.  We just

have a few questions for you, both myself and the

State, and we'll get you on your way, okay?

A.  Thank you.

Q.  Okay.  You've said your name.  So we just

spoke to Mr. Sappington.  Is that your husband?

A.  Yes, sir.

Q.  And, Ms. Sappington, where do you live now?

A.  Weatherford, Texas.

Q.  And did you at one time live closer to our

1  area?

2      A.   Yes.

3      Q.   Tell me when you did that.

4      A.   Giddings, we moved there in 1992.

5      Q.   And who did you live with?

6      A.   My husband and our two children.

7      Q.   What are your children's names?

8      A.   Cody and Ashley.

9      Q.   And any other family that you had in

10  Giddings?

11      A.   Yes, sir.  My father-in-law lived there.

12      Q.   Anybody else?

13      A.   No, sir.

14      Q.   And who was your father-in-law?

15      A.   William Sappington.

16      Q.   That is your husband's father?

17      A.   Yes, sir.

18      Q.   We're talking in the past tense, so

19  unfortunately, he's passed away?

20      A.   Yes, sir, he has.

21      Q.   I want to kind of get a sense of

22  Mr. Sappington.  How often would you and the family

23  get together with Mr. Sappington?

24      A.   Almost every day.  We're a big family.

25      Q.   Tell me some of the things you recall the

family doing.

A.   Well, we always went to church together. We'd watch TV, go swimming at the pool there.  The kids were always with their grandpa because they were Papa's kids.

Q.   Did he ever watch the kids?

A.   Oh yes, all the time.

Q.   And how close -- he wasn't your father; he was your father-in-law.

A.   Correct.

Q.   How close, if at all, were you with your father-in-law?

A.   We were very close.  He was more of a father than a father-in-law to me.

Q.   Did you have close conversations with him?

A.   Yes, sir.

Q.   Did you spend time at his apartment?

A.   Yes, sir.

Q.   Now, your husband -- well --

Tell me where his apartment was.

A.   At the Rolling Oaks Apartments there in Giddings.

Q.   And, Mrs. Sappington, do you recall the apartment that he lived at in Rolling Oaks?

A.   Yes, sir.  He actually lived in two different

apartments.  When he first moved in, he was in
Apartment 501, and that was at the front of the
complex.  And then after a while, he moved to the back
side which was 905, where he remained until he moved.

Q.   And do you have any recollections -- and if
you don't, that's okay.  Do you have any recollection
of how long he was in 501 or maybe what year that was?

A.   It was '96, I know that.

Q.   Okay.  And at some point, it sounds like your
testimony is, once he left 501, he went to 905?

A.   Yes, sir.

Q.   Okay.  And it sounds like -- well, so because
you and your family were around Rolling Oaks in 1996,
I wonder if you have any recollection of the
Stacey Stites murder?

A.   Yes, sir.

Q.   And what kind of impression did that make on
you?

A.   For such a young life to be taken so young,
it just really was very disturbing for me and our
whole community.

Q.   Did you know Stacey?

A.   I didn't know her personally.

Q.   Did you know of Stacey?

A.   Yes.

1      Q.   You obviously knew of Stacey.

2      A.   Yes.

3      Q.   Well, let me ask you about Jimmy.  Did you

4  know Jimmy?

5      A.   I didn't know him personally.  I've seen him.

6  I knew he was one of the Weatherford -- Giddings PD.

7      Q.   And where did they live?

8      A.   Jimmy lived above my father-in-law in 502,

9  and Stacey and her mom lived across -- right across

10 from my father-in-law.

11     Q.   Just to make sure I understand,

12 Mr. Sappington lived in 501, Jimmy lived in 502, you

13 said --

14     A.   Correct.  Correct.  And then they lived in

15 503 right across from them.

16     Q.   Gotcha.  And how do you know that?

17     A.   He told -- he told us.

18     Q.   Do you recall Dad ever expressing any

19 intentions or plans regarding getting involved in the

20 case?

21     A.   Yes.

22     Q.   What did he say?

23     A.   He said that he was worried --

24               MR. GREENE:  Objection, hearsay.

25               MR. MCNEAL:  Your Honor, the question

has been, does she recall any plans or intentions that

he might have expressed about this case given that

they lived in the apartment complex.  I think that

comes in under 803(3).

THE COURT:  I'm going to go ahead and

allow it.

MR. MCNEAL:  Thank you, Your Honor.

THE COURT:  The objection will be

overruled for the purposes of this hearing.

MR. MCNEAL:  I'm sorry, Your Honor.  I

missed that.

THE COURT:  For the purposes of this

hearing.

MR. MCNEAL:  Okay.

THE COURT:  I don't think it's going to

make it into a trial before a jury, though.

MR. MCNEAL:  Thank you, Your Honor.

Q.  (BY MR. MCNEAL)  Let's take it one step back.

And I'll try to project a little bit more because I'm

told that I'm not talking very clearly.

Do you recall Dad ever expressing any

intentions or plans about getting involved in the

Stacey Stites murder investigation?

A.  Yes.

Q.  And what did he say?

A.   He wanted -- he was just more or less
wondering why he was never questioned.  He lived below
Jimmy, and Stacey and her mom lived right across.  He
was never contacted, anything.

Q.   Did he express that he knew something?

A.   Well, he said that he could -- you know, the
times that he heard all the noise above, Jimmy
screaming at Stacey, and it was very abusive language
and he said Jimmy was very aggressive.  All he could
hear was Jimmy.  He never heard Stacey.

Q.   Now, Ms. Sappington, were you in favor of his
getting involved in this or were you not in favor of
his getting involved?

A.   I was not in favor at first because --

Q.   And why not?

A.   Scared of Jimmy.

Q.   Jimmy's law enforcement.  Can you explain a
little bit about why you would be scared of Jimmy.

A.   Well, when you -- it's a cop's word against
ours.

Q.   Do you regret --

A.   Absolutely.  Every day.

Q.   Let me finish the question.

     Do you regret not having Mr. Sappington get
involved?

1    A.   Yes, I do, every day.

2    Q.   And why do you regret that?

3    A.   Because there's an innocent man sitting on

4  death row, and there's a monster out there that he's

5  the one that they should be looking at.

6    Q.   Ms. Sappington, have you ever gone to the

7  police about this?

8    A.   I have not.

9    Q.   And why not?

10    A.   I'm one little person.

11    Q.   I understand your family left the area

12  shortly after?

13    A.   Yes, sir.

14    Q.   And so just to be clear, police never came to

15  you about this?

16    A.   No, sir.

17         MR. MCNEAL:  Okay.  I pass the witness.

18              **CROSS-EXAMINATION**

19  BY MR. GREENE:

20    Q.   Good afternoon, Mrs. Sappington.  My name is

21  Garrett Greene.  I'm an attorney for the State.  I'm

22  just going to ask you a few questions.

23    A.   Yes, sir.

24    Q.   Thank you, ma'am.

25         Now, you prepared a declaration for this

**CYNTHIA C. SCHMIDT,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MS. PUCHER:

Q.   Good afternoon, Ms. Schmidt.  How are you?

A.   I'm fine.

Q.   Good.

Where do you live right now?

A.   In Muldoon, Texas.

Q.   Muldoon.  Okay.  And you are sort of in the country; is that fair to say?

A.   Oh, yes.

Q.   Okay.  Off the beaten path?

A.   Uh-huh.

Q.   All right.  Are you currently employed?

A.   No.

Q.   Why not?

A.   I'm retired, my back.

Q.   Okay.  I see you came in today in a wheelchair; is that right?

A.   Yeah.

Q.   Okay.  And so you aren't able to work right now?

A.   No, ma'am.

Q.   Okay.  Thank you for being here.

1     A.   Thank you.

2     Q.   Did you previously work as a dispatcher at

3  the Giddings Police Department?

4     A.   Yes.

5     Q.   Okay.  Did you enjoy your work there?

6     A.   Oh, loved it.

7     Q.   Why?

8     A.   I just loved it.

9     Q.   Interesting?

10    A.   Oh, yeah.  Never a dull moment.

11    Q.   I can imagine.  When did you begin working

12 there?

13    A.   '92.  I don't know exactly what month.

14    Q.   Okay.  And about when did you leave?

15    A.   Right in the middle of '98.

16    Q.   And what was your job when you were at the

17 Giddings Police Department?

18    A.   Secretary to the chief and dispatcher.

19    Q.   Secretary to the chief and dispatcher?

20    A.   Uh-huh.

21    Q.   Okay.  What were your responsibilities as a

22 dispatcher?

23    A.   Take all the calls that came from the

24 officers, calls from the phones, 911.

25    Q.   Okay.  Now, can you describe the Giddings

1    Police Department back in, let's say, 1996 or so?

2    About how many folks worked in the police department?

3        A.    Around 20, maybe a little less.

4        Q.    Okay.  And was the whole police department

5    housed in one central building?

6        A.    Yes.

7        Q.    Okay.  So is it fair to say you interacted a

8    lot with your colleagues?

9        A.    Yes.

10        Q.    Okay.  Did you work with a man named

11    Jimmy Fennell while you were a dispatcher in Giddings?

12        A.    Yes.

13        Q.    About when would you say you started working

14    with Jimmy?

15        A.    I honestly couldn't tell you, just whenever

16    he started.  I don't even know exactly when he

17    started.

18        Q.    Okay.  All told, how long do you think you

19    worked with Jimmy Fennell as a colleague?

20        A.    The whole time he was there.

21        Q.    Yeah.  Okay.  So a couple of years?

22        A.    Yeah, yeah.

23        Q.    Okay.  Over the course of those years, did

24    you come to observe his behavior around the police

25    department?

**BILL OF EXCEPTIONS**

**EXAMINATION**

BY MS. PUCHER:

Q.   Moving on, Ms. Schmidt, can you tell me, did you attend Ms. Stites' funeral services?

A.   Yes.  Well, the viewing.

Q.   The viewing.  Okay.  Why did you attend the viewing?

A.   The chief -- we did it out of respect for a fellow officer.

Q.   Okay.  Were you given time off to go and -- to that viewing?

A.   Just for an hour or so.

Q.   For an hour, okay.

     Did you know Ms. Stites personally?

A.   No.

Q.   Okay.  But you said you went out of respect?

A.   Uh-huh.

Q.   Did you have any interactions with Jimmy Fennell while you were at that viewing?

A.   Interactions with him?

Q.   Yes.

A.   No.

Q.   Okay.  Did you see him at the viewing?

A.   Yes.

```
 1      Q.   All right.  Did you hear him say --
 2            THE COURT:  All right.  We're off of the
 3  bill now.  We're back to personal knowledge.  Okay?
 4            (Bill of exceptions concluded.)
 5            MS. PUCHER:  Thank you, Your Honor.
 6            THE COURT:  Just for the clarity of the
 7  record.
 8            MS. PUCHER:  Thank you.
 9      Q.   (BY MS. PUCHER)  Did you hear him say
10  anything?
11      A.   Yes.
12      Q.   Okay.
13            MS. PATTON:  Objection, hearsay.
14            THE COURT:  Overruled.
15            MS. PUCHER:  Thank you.
16      Q.   (BY MS. PUCHER)  Did you hear Mr. Fennell say
17  anything at the funeral home?
18      A.   Yes.
19      Q.   Okay.  What did you hear him say?
20      A.   We were standing back here viewing Stacey,
21  and he's over about as far as maybe the corner of that
22  desk over there, and I heard him pop up and say,
23  "Well, at least the bitch got to wear the damn dress."
24      Q.   Okay.  You heard him say, "At least the bitch
25  got to wear the damn dress"?
```

1       A.    Uh-huh.

2       Q.    All right.  And I want to just go back for a

3  moment.

4             So when you heard this statement, can you

5  tell me what part of the viewing room that you were

6  in?

7       A.    It wasn't a very big room, maybe a quarter of

8  the size of this area right here and he was over to

9  that -- like I said, about the corner of that desk,

10 and I'm standing right about here.  And Stacey's right

11 over there at the corner where y'all are.

12      Q.    Okay.  So he's standing -- from where you're

13 sitting at the witness stand, he's standing about

14 where --

15      A.    Right there.

16      Q.    -- Ms. Loucks, is it --

17      A.    Yeah, right there at the corner of her desk.

18      Q.    -- is sitting at the edge of the Judge's desk

19 area at the front of the courtroom --

20      A.    Yeah.

21      Q.    -- is that right?

22            Okay.  And were you closer to Ms. Stites'

23 body than Mr. Fennell was at that point?

24      A.    About the same distance.

25      Q.    Okay.  Was he -- in regards to the entryway

1            MS. PATTON:  Objection, Your Honor.

2  That's hearsay.

3            I'm sorry.  This is the bill.  I

4  apologize.

5            MS. PUCHER:  Thank you.

6     Q.  (BY MS. PUCHER)  Are you aware from Officer

7  Gary Joe Bryant of any threats that Jimmy Fennell made

8  to harm Stacy Stites?

9     A.  Yes.

10     Q.  Okay.  Can you please tell the Court what

11  that threat was.

12     A.  Joe was working, and I was working.

13     Q.  Yeah.

14     A.  And if it was just us in the office, then we

15  would talk.  And he said that Jimmy had stated right

16  there in front of him that -- excuse me -- but he

17  said, "If I ever catch her fucking a nigger, I'll kill

18  her."

19            (Bill of exceptions concluded.)

20            MS. PUCHER:  Thank you.  Pass the

21  witness.

22                  **CROSS-EXAMINATION**

23  BY MS. PATTON:

24     Q.  Ms. Schmidt, I'm going to try to be

25  relatively quick.  We've been in here a long time this

A.    Yes.

Q.    And it was the Bastrop Police Department?

A.    Yes.

Q.    All right.  And just briefly, can you give the Court just a short summary of the incident that you reported at that time?

A.    Sure.  I was the bagger and cart girl at the H-E-B, and so I spent a lot of time outside.  A man had approached me and asked for my phone number in the parking lot, And I refused to give it to him.  I went around another round, did some more carts, came back around, and he was still there.  And he asked me again, and I said, "Don't you think I'm a little too old for you?"  And I proceeded to start walking away, and he grabbed me by my right arm and started pulling me towards the open car of his -- I'm sorry, open door of his Chevy Suburban at the time.

Q.    And do you know whether the man that grabbed you was ever apprehended?

A.    He was not.

Q.    There were no suspects, to your knowledge?

A.    No.

Q.    And so let's go back to work at H-E-B.  Was Stacey Stites a coworker of yours?

A.    Yes, she was.

Q.   Okay.  And do you recall how close in age the two of you were?

A.   She was about a year older than me.

Q.   And did you interact with her at the grocery store?

A.   We did, during our lunch breaks or in the break room.

Q.   Okay.  And do you recall what shifts she normally worked?

A.   I do not.  We weren't in the same department, so...

Q.   Okay.  And can you describe your interactions with Ms. Stites.

A.   Just very casual, girl talk, normal with people around in the break room, talking about high school things.  She wasn't in high school anymore.  I was 18 and she was 19 or so, but just normal girl talk.

Q.   And did you and Ms. Stites socialize together outside of work?

A.   No.

Q.   So you were -- would you describe yourselves as coworkers, work acquaintances?

A.   Just work acquaintances.

Q.   Okay.  So you've come a long way.

1          Is there a specific encounter with Ms. Stites

2   that you would like to tell the Court about?

3      A.   Yes.

4      Q.   And tell me where this encounter occurred.

5      A.   It happened at the H-E-B in the break room

6   upstairs.

7      Q.   And was anybody with you?

8      A.   No.  It was at a time where we were just the

9   two of us left alone in the break room.

10     Q.   And is that something that typically happened

11  at H-E-B?

12     A.   All the time.  People come and go.

13     Q.   And give us a little explanation of -- were

14  you are talking, were you chatting?  Were you eating

15  lunch?

16     A.   I believe we were finishing our lunch, and we

17  were just chatting and -- and the -- we were talking

18  about her engagement ring, and I asked if she was so

19  excited to get -- so excited to get married.  And she

20  proceeded to tell me that she was not so excited to

21  get married and quickly followed that with "because I

22  am sleeping with a black man named Rodney."

23     Q.   Okay.  Do you recall anything else about that

24  conversation?

25     A.   I remember I was pretty shocked.  For one, I

didn't know her that well for her to just tell me
this. And besides being shocked, she -- I knew she
was engaged to -- she was engaged to a police officer
and you're sleeping with any man, but you're sleeping
with a black man and --

Q. How did you know that Stacey was engaged to a
police officer?

A. Well, her engagement ring. She talked about
her wedding. It was just common knowledge around the
store that she was engaged and common knowledge that
he was a police officer.

Q. And when Ms. Stites relayed this information
to you, did you respond to her?

A. I did. She -- she had said she didn't know
what her fiancé would do if he ever found out and that
she had to be careful. And I agreed with her, "Wow,
Stacey, you do need to be careful." And that's what I
recall.

Q. Now, this was a long time ago.

A. Yes.

Q. So I'm going to be honest here and ask you,
are you sure that she said a black male?

A. Yes.

Q. Okay. And are you sure that she said his
name was Rodney?

1     A.   Yes.

2     Q.   Have you given any specific thought as to why

3 you would remember something so specific for so long?

4     A.   Because for one, it was very shocking in that

5 I didn't know her that well, so for her to confide in

6 me out of the blue like this and then to tell me the

7 actual fact that she's not only, you know, having an

8 affair, that she's about to be married in -- maybe it

9 was weeks or months, I'm not sure -- but that she was

10 sleeping with a black man named Rodney just really

11 stuck out in my mind and was burned in my brain.

12     Q.   Do you have any recollection of when this

13 conversation occurred in relation to when Ms. Stites

14 was murdered?

15     A.   It could have been a few weeks.  It could

16 have been a month, could have been a few months, but

17 very -- pretty close to it.

18     Q.   And now I want to step back a moment.  We

19 talked a little bit earlier about the incident that

20 you'd had in August of 1995.

21     Did anyone in law enforcement ever contact

22 you again about what you had reported to the police?

23     A.   Yes, they did.

24     Q.   Okay.  And do you recall when that was?

25     A.   It was a few weeks after Stacey's murder and

1   time for one more, Your Honor.

2                   THE COURT:  Very well.

3                   MS. MARTIN:  The Applicant would call

4   Calvin Horton.

5                   THE COURT:  Good afternoon, Mr. Horton.

6                   THE WITNESS:  How are you doing, sir?

7                   THE COURT:  Please be seated.

8                   And if you could raise your right hand

9   for me, please.

10                  (Witness sworn.)

11                  THE COURT:  All right.  You may proceed.

12                     **CALVIN RAY HORTON**,

13  having been first duly sworn, testified as follows:

14                     **DIRECT EXAMINATION**

15  BY MS. MARTIN:

16      Q.   Good afternoon, Mr. Horton.

17      A.   Hey.

18      Q.   What is your full name?

19      A.   Calvin Ray Horton.

20      Q.   And do you go by any nicknames?

21      A.   Buddy.

22      Q.   Are you related to Stacey Stites?

23      A.   Yes.

24      Q.   How are you related to her?

25      A.   She's my cousin.

Q.   And I mean how long had you known Stacey, her whole life or --

A.   Well, pretty much.  I mean, my dad and her mom's brother and sister.

Q.   And at some point in time, did Stacey live with your family?

A.   She lived with my mom and dad, her and her mom.

Q.   And where was that?

A.   On Farris Lane in Rosanky.

Q.   And how close was that to where you lived at the time?

A.   Just down the road.

Q.   And how long would you say that Stacey and her mother lived with your parents?

A.   A couple of months.

Q.   And at some point after a couple of months, they moved out?

A.   Yes.

Q.   And to your knowledge, why did they move out?

        MS. TANNER:  Objection, calls for speculation.

        THE COURT:  Overruled.

Q.   (BY MS. MARTIN)  You may answer.

A.   There were some issues that came up with them

staying there.

Q.   And what would those issues have been, to your knowledge?

A.   Some behavioral problems with Stacey.

Q.   And when Stacey and Carol moved out, did you help them move?

A.   Yes.

Q.   And where did you help them move to?

A.   Smithville.

Q.   And once Stacey and her mother moved out, did you see them around town at all?

A.   Occasionally.  I saw Carol more than I saw Stacey.

Q.   But you saw Stacey every now and then?

A.   Yeah, here in town.

Q.   And where are the types of places that you would see her?

A.   Well, I saw her at H-E-B.  The one particular time I saw her at Dairy Queen here in Bastrop.

Q.   And when do you think that you saw her? Around, you know, what year, what time of year would it have been that you saw her at Dairy Queen in Bastrop?

A.   I'm thinking in fall, October, along that time.  It was probably around '95, 1995.

1    Q.   And what makes you -- you know, what

2    generally do you remember that it was around October

3    of 1995?

4    A.   Well, the weather was changing, stuff like

5    that.

6    Q.   And do you remember around what time of day

7    that was when you saw her at Dairy Queen?

8    A.   Well, it was later in the afternoon.  I mean,

9    at that time I worked most Saturdays.  Sundays was

10   really my only day off.  And it was in the afternoon.

11   I took two of the kids to Dairy Queen to get them some

12   ice cream.

13   Q.   And when you saw Stacey at the Dairy Queen,

14   how far away from her were you?

15   A.   It really wasn't that far.  I mean, I was

16   pulling in as she was coming out of the Dairy Queen

17   there.

18   Q.   And was Stacey with anyone when you saw her?

19   A.   She was with a black gentleman, yes.

20   Q.   And at the time, did you know who that black

21   gentleman was?

22   A.   No, I didn't.

23   Q.   And what did you do when you saw Stacey?

24   A.   Well, I mean, just seeing Stacey, you know, I

25   was going to give her a holler, you know, just say hey

or whatever.

Q. And what was her reaction to seeing you?

A. Well, I guess it startled her at first, and then she didn't seem excited to see me at the moment.

Q. And do you remember, you know, what happened after that?

A. Yeah. Her and this gentleman got in the car, and they were driving off. She didn't want to have anything to do with talking to me.

Q. Did it surprise you to see Stacey with a black man?

A. No.

Q. And why not?

A. In the family, there was talk of problems.

MS. TANNER: I'm going to object to family talk of problems as obviously being hearsay.

THE COURT: If it doesn't go any further than that, I'll overrule the objection. Getting into what that talk was would get into pretty rank hearsay.

Q. (BY MS. MARTIN) Did you tell anyone about this incident at the time?

A. Well, at the time, I mentioned it to my dad.

Q. And what was his reaction?

A. Well, he wasn't surprised.

MS. TANNER: Objection, hearsay.

          MS. MARTIN:  Your Honor, the State has
repeatedly said and suggested that witnesses have
memory issues in this case.  I'm not asking him for
the truth of the matter asserted.  I'm asking him to
demonstrate that not only does he remember the
incident, he remembers what his father said about the
incident.

          THE COURT:  I'm going to go ahead and
allow it.

     Q.   (BY MS. MARTIN)  What was your father's
reaction?

     A.   Well, he wasn't surprised.  He told me --

          MS. TANNER:  Objection, hearsay.

          THE COURT:  Noted.

          Go ahead.

          THE WITNESS:  Sir?

          THE COURT:  Go ahead.

     A.   He told me he wasn't a bit surprised.  He --
he'd seen a black boy at Carol's before when he took
them her mail and some other things that she had left
at my parents' house.

     Q.   (BY MS. MARTIN)  Okay.  And you said, at that
time, you didn't know who the black gentleman was that
you saw with Stacey?

     A.   No.

1      A.    No, it was a --

2      Q.    That's the destination?

3      A.    No, it was a trip to go to Dairy Queen.  I

4  didn't get to spend much time with them.  It was a

5  slow Sunday afternoon.  Took them into town.  I

6  didn't -- Bastrop really wasn't open a whole lot on

7  Sundays then.

8      Q.    Okay.  So y'all made the trip into Dairy

9  Queen on a Sunday afternoon from out of town to get

10  the ice cream, and that's when you come across Stacey?

11     A.    Yes.

12     Q.    Okay.  And you've told us that when you

13  hollered her name -- let me make sure I get your words

14  right -- you startled her at first and "she didn't

15  seem to be excited to see me and she got in the car."

16     A.    Uh-huh.

17     Q.    Right?

18           Okay.  I'm looking at your affidavit and I'm

19  on the second page.  Do you have it in front of you?

20           At the -- you with me?

21     A.    Uh-huh.

22     Q.    Okay.  On the second page at the very top,

23  the continuation of paragraph 6, the first full

24  sentence, you said, "I hollered her name to get her

25  attention as I drove in, but she did not respond,"

1  right?

2      A.   Uh-huh.

3      Q.   Okay.  And that's accurate, right?

4           And you've mentioned in your affidavit that

5  you have a big voice, and we all can tell that.

6      A.   Yeah.

7      Q.   And so you drive up, you go "Hey, Stacey" or

8  something along those lines, right?

9      A.   Well, I told her, I said, "Hey, girl."

10     Q.   Okay.  And did you use her name?

11     A.   Well, I called her name after that, yeah.

12     Q.   Okay.  And she didn't respond?

13     A.   Well, she -- both of them looked at me.

14     Q.   Okay.  But she didn't reply?

15     A.   No, she did not answer or anything.

16     Q.   Okay.  And so she didn't answer to her name,

17  fair?

18     A.   Well, I don't know, answering by verbal or

19  looking at me.  She answered.  She -- I got her

20  attention.

21     Q.   She didn't acknowledge your, "Hey, Stacey,"

22  or whatever words they were, right?

23     A.   I got her attention.

24     Q.   Okay.  And you did not -- she didn't

25  acknowledge you?

1    A.   No.

2    Q.   Okay.  And, of course, you know human nature

3    just like everyone in this courtroom does, right?

4    A.   Uh-huh.

5    Q.   And if I'm in a place or if any person's in a

6    place and somebody yells out your name, what's your

7    first reaction?  You look, right?

8    A.   Well, sure.

9    Q.   Okay.  And she didn't respond to you?

10   A.   Not verbally.

11   Q.   Okay.  Well, I mean, that's what you have in

12   your affidavit, "she did not respond," right?

13        Correct?

14   A.   Not so much.

15   Q.   Okay.  And then 19 and a half years later,

16   you executed the affidavit that you're certain that

17   it's not only her but it's also Rodney Reed, right?

18   A.   Well, I mean, people get older as time goes

19   on, but he still looks the same.

20   Q.   Okay.  And so 19 and a half years later,

21   you're certain from seeing on the news that this is

22   the person that you saw --

23   A.   I was certain then.

24   Q.   Okay.

25   A.   Pretty certain now.

1     Q.  And that's your eyewitness identification?

2     A.  Yes, ma'am.

3     Q.  Okay.  Now, you've told us why Carol and

4 Stacey moved out of your parents' house, to your

5 understanding.

6        Do you think Carol may have a little

7 different of a recollection of those events?

8     A.  I would think so, maybe.

9     Q.  Okay.  And you've made a point, both in your

10 affidavit and in your testimony, that -- about how

11 Stacey dated black men.  And there's absolutely

12 nothing wrong with that, but I'm curious about -- you

13 have this broad statement.

14        Does it just come from what you're telling us

15 from your father or do you have some other knowledge

16 that you haven't shared with us?

17     A.  Well, it was some knowledge that even Carol

18 had mentioned with my mom and my wife.

19     Q.  I see.  Okay.

20        Let me ask you this:  When was the last time

21 you spoke to Stacey before her death?

22     A.  Probably at H-E-B.

23     Q.  Okay.  Do you have any idea how long before?

24     A.  No.

25     Q.  Had you ever met -- did you ever meet her

fiancé?

A.   Not as a fiancé.

Q.   Okay.  Well --

A.   I knew him -- I knew Jimmy from being a police officer in Smithville.  When I say I know him, I knew who he was.

Q.   Okay.  So he was a police officer in Smithville?

A.   Yeah.

Q.   Okay.  And Smithville is actually the closest town to Rosanky, isn't it?  That direction?

A.   Yeah.

Q.   Okay.  But you never saw Jimmy or Stacey -- and Stacey together?

A.   No.

Q.   Okay.  Now, when was the last time you talked to Stacey's sister Debra?

A.   Oh, it's been many years.

Q.   Okay.  What about her sister Brenda?

A.   Brenda, Crystal --

Q.   Yeah.

A.   -- Clifford, it's been a long time since I've talked to any of them.

Q.   Okay.  And other than this chance meeting that you've recounted to us, you have no other

personal knowledge about what may or may not have happened to your cousin, correct? You have no other personal knowledge about any of the evidence in this case, right?

A. No.

MS. TANNER: No further questions.

MS. MARTIN: I just have one question for you.

### REDIRECT EXAMINATION

BY MS. MARTIN:

Q. If you look back at your affidavit, the same paragraph that Ms. Tanner was asking about on the very top of page 6 -- or I'm sorry, the top of page 2, the end of paragraph 6, you say, "I hollered her name to get her attention as I drove in, but she did not respond. I know they heard me because both Stacey and the black man looked directly at me."

A. Uh-huh.

Q. Is that accurate?

A. Yes.

MS. MARTIN: No further questions.

MS. TANNER: No further questions.

THE COURT: I sustained a couple of the -- or a few of the State's objections. Do you want to make a bill on anything that I sustained?