# Exhibit 22

REPORTER'S RECORD

VOLUME 1 OF 1 VOLUMES

TRIAL COURT CAUSE NO. 8701

COURT OF CRIMINAL APPEALS NO. WR-50961-10

|  |  |
|---|---|
| | ) 21st JUDICIAL COURT |
| | ) |
| | ) |
| | ) |
| EX PARTE RODNEY REED | ) OF |
| | ) |
| | ) |
| | ) |
| | ) BASTROP COUNTY, TEXAS |

------------------------------

PRETRIAL HEARING

July 6, 2021

------------------------------

BE IT REMEMBERED THAT on the July 6, 2021, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable J. D. Langley, Visiting Judge of the 21st District Court, held in Bastrop, Bastrop County, Texas.


Proceedings reported by machine shorthand.

```
1                A P P E A R A N C E S

2
    FOR THE STATE:
3

4        Mr. Matthew D. Ottoway
         TEXAS ATTORNEY GENERAL
5        ASSISTANT ATTORNEY GENERAL
         P.O. BOX 12548
6        Austin, Texas 78711
         512.936.1400
7        SBOT NO. 24047707

8

9        Mr. Bryan C. Goertz
         BASTROP COUNTY DISTRICT ATTORNEY
10       804 Pecan Street
         Bastrop, Texas 78602
11       512.581.7125
         bryan.goertz@co.bastrop.tx.us
12       SOBT NO. 00784138

13

14       Mr. Travis G. Bragg
         TEXAS ATTORNEY GENERAL
15       ASSISTANT ATTORNEY GENERAL
         P.O. Box 12548
16       Austin, Texas 78711
         512.936.1400
17       SBOT NO. 24076286

18

19       Ms. Rachel L. Patton
         OFFICE OF THE ATTORNEY GENERAL
20       CRIMINAL APPEALS DIVISION
         P.O. Box 12548
21       Austin, Texas 78711
         512.936.1400
22       rachel.patton@oag.texas.gov
         SOBT NO. 24039030
23

24

25
```

```
 1          Mr. Edward L. Marshall
            OFFICE OF THE ATTORNEY GENERAL
 2          CRIMINAL APPEALS DIVISION
            P.O. Box 12548
 3          Austin, Texas 78711
            512.936.1400
 4          edward.marshall@oag.texas.gov
            SOBT NO. 00797004
 5

 6          Mr. Garrett Greene
            OFFICE OF THE ATTORNEY GENERAL
 7          CRIMINAL APPEALS DIVISION
            300 West 15th Street
 8          Austin, Texas 78701
            512.936.1400
 9          garrett.greene@oag.texas.gov
            SOBT NO. 24096217
10


11   FOR THE APPLICANT:

12

13          Mr. Andrew F. MacRae
            LEVATINO | PACE LLP
14          1101 South Capital of Texas Highway
            Building K, Suite 125
15          Austin, Texas 78746
            512.6371581
16          amacrae@levatinopace.com
            SOBT NO. 00784510
17


18          Barry C. Scheck
19          INNOCENCE PROJECT
            40 Worth Street, Suite 701
20          New York, New York 10013
            212.364.5390
21          bscheck@innocenceproject.org

22          Mr. George H. Kendall
23          SQUIRE PATTON BOGGS, LLP
            1211 Avenue of the Americas
24          New York, New York 10036
            212.872.9834
25          george.kendall@squirepb.com
```

Ms. Jane Pucher
INNOCENCE PROJECT
40 Worth Street, Suite 701
New York, New York 10013
646.227.8327
jpucher@innocenceproject.org




Ms. Michelle L. Davis
SKADDEN, ARPS, SLATE, MEAGHER & FLORM, LLP
1000 Louisiana, Suite 6800
Houston, Texas 77002
512.322.2606
michelle.davis@skadden.com
SOBT NO. 24038854

preliminary motions that we could take up on short?

MR. OTTOWAY:  No, Your Honor.

THE COURT:  All right.  Then,
Mr. MacRae, what do you want to do first?

MR. MACRAE:  The first thing I want to
do, Your Honor, is call your attention to what we
believe are continued Brady violations on the part of
the State, which was a motion that we included with
our response on Friday, based on some recent
disclosures by the State.

And if I could approach, Your Honor?

THE COURT:  Yes, sir.

(Defendant's Exhibit 1 marked.)

MR. MACRAE:  Your Honor, I've marked as
Exhibit No. 1, essentially the detail that I want to
call to your attention today.  It's rather low-tech.
I have handwritten some numbers in the bottom
right-hand corner of each page.  I've handed the
exhibit to Ms. Stiteler, and I've handed you a copy
with highlights, and Mr. Ottoway's copy has highlights
as well.

The gist of our motion, Your Honor, is
that on June 25th, 2021, 11 days ago, we were provided
with two letters by the State that they call their
16th and their 17th disclosure letters.  One of them,

the 16th disclosure letter, disclosed for the first
time two witness summaries confirming -- or at least
consistent with our position that Mr. Reed and
Ms. Stites knew each other well before the trial and
that they knew each other way back when, long before
Mr. Reed was tried.

And that was a pretty big part of the
defense team's trial strategy, Your Honor, was that
Mr. Reed and Ms. Stites knew each other.  And the
reason that was important is because Mr. Reed was
accused of kidnapping Ms. Stites and also sexually
assaulting her.  So a big part of the defense team's
strategy at trial was that they knew each other.
There wasn't a sexual assault.  They had a
relationship.

The State took the opposite position,
obviously, that they did not know each other and they
hammered that home at trial, Your Honor.  And what
I've handed you is a list of, essentially, documents
documenting what the State said and did, bringing you
up towards today.

And the very first page, Your Honor, is
out of the State's answer in this case, filed just
last year, that I've highlighted at the bottom the
State's position, that multiple law enforcement

agencies searched for Ms. Stites's killer.  They
interviewed hundreds of witnesses.  And they say in
the answer, none mentioned Mr. Reed associating with
Ms. Stites.

That is actually consistent with the
trial testimony, which is the next two pages of the
exhibit.  That trial testimony is Mr. Rocky Wardlow,
who is the lead investigator for the State.  He
confirmed that they had an investigation of over a
year.  They spoke with hundreds of witnesses.  And in
answer to the question "Did you find anyone who linked
her..." -- Ms. Stites -- "...in any way to this
defendant," Mr. Wardlow said, "Not at all."

So the lead investigator said there was
no relationship between them.  Well, the prosecutor
hammered that home in closing argument.  Absolutely
hammered it home, Your Honor.  And that's the next few
pages of the exhibit, pages 4, 5, and 6.  I won't read
every word of it to you, but it was hammered home that
Mr. Reed and Ms. Stites did not know each other.

We now know the State knew they did, and
they suppressed that information.  So Mr. Reed was
convicted of both the kidnapping and murder and the
sexual assault and murder charges.  He has maintained
and we have maintained since then there was a

consensual relationship. And, over time, we have developed that record and we have provided witnesses who have maintained and proven that there was indeed a consensual -- a relationship -- at least a friendship between Ms. Stites and Mr. Reed.

In this case, Your Honor, you'll remember, we filed a motion for discovery back in January and the State responded in February, and we had a hearing in front of you in February. In February, at that hearing -- excuse me -- in the response, the State says -- and this is page 7 of the exhibit on front of you.

The State says it had more than an open-file policy at trial, and it copied its file for defense counsel. And it says further, when new evidence has come into the possession of the State, that information has been shared with the applicant. And the State takes the position that our requests for additional information were duplicative and abusive.

At the hearing, I argued that part of our issue -- and we have a Brady claim in this litigation. My argument was -- and part of our issue is we don't have the full file from the State. We are sure, Your Honor, we don't have the full file.

It was represented to you, Your Honor,

on page 10 of this exhibit, by Mr. Ottoway, "What I
can say is that, with respect to the investigatory
product of the agencies involved in this case, we have
turned that over." That was the State's position back
in February, Your Honor; and based on that, you denied
our motion.

On June 25th, Mr. Ottoway sent me two
letters, which I alluded to a moment ago. Redacted
versions of them are attached to our response that we
filed on Friday. But if you fast-forward a little
bit, Judge, past Exhibits A and B in this exhibit,
you'll see at page 16, the complete letter Mr. Ottoway
sent to me.

In that letter, Mr. Ottoway says, "This
letter is to provide you with notice of witness
interview summaries, which I've attached, created by
the trial prosecution team in preparation for the
underlying 1998 criminal prosecution," 23 years ago.
Mr. Ottoway included those -- a summary of the
summaries. And then the summaries themselves are
behind that letter, Your Honor, beginning at page 17
of this Exhibit.

One of the people identified is Mr. Ron
Haas, who was a store director at HEB. He confirmed
to someone on the prosecution team that he had heard

rumors that Mr. Reed and Ms. Stites had a
relationship. Mr. Andrew Cardenas said essentially
the same thing, that he had heard rumors as well.

These documents, Your Honor, were not
disclosed to the trial team, and we've confirmed that
with the trial team. These documents were not
disclosed. This, Your Honor, is a gold mine for
competent counsel, which is a Brady element.
Competent counsel takes these summaries and says,
"Aha," and they go and investigate everybody and they
talk to everybody at HEB. And they find the witnesses
that we have found over the last 23 years. They find
them before trial. And those witnesses testify at
trial, "Yes, there was a relationship. They knew each
other." That guts the kidnapping claim. It guts the
sexual assault claim.

The other letter we received, Your
Honor, on June 25th, is at page 22 of this exhibit,
and it references a lady named Suzan Hugen, H-U-G-E-N.
But this is not a 1998 summary, but it certainly gives
us some indication there's something back there in
1998 regarding Ms. Hugen. She was identified by the
State as a witness at trial. Wasn't called at trial.

But, recently, she spoke, apparently,
with a State investigator and confirmed to that

investigator that she saw Mr. Reed and Ms. Stites, and she said "they appeared friendly, giggling, and flirting."  Ms. Hugen knew back in 1998 or sooner there was a relationship.

The State must have something in its file that caused her to call this lady, who now lives in Pine Bluff, Arkansas, in 2021, to call her and ask her questions.  There's something in their file they haven't disclosed about Ms. Hugen.

The letters arrived on late Friday afternoon, June 25th.  Our defense team looked at them over the weekend and were horrified.  And on Monday the 28th, I sent Mr. Ottoway an e-mail.  And that's at page 23 of this exhibit.  And the reason I bring that up, Your Honor, is we tried, really, all we know to do to remedy this situation.  And I told him, This is a Brady violation.  This is a problem.

Mr. Ottoway responded -- and that's on same wheel, on page 23 -- No, it's not a Brady violation.

We spoke on the phone later that day.  I said, "Why? Why is this not a Brady violation, to provide witness summaries 23 years later establishing a relationship?"

He didn't have an answer or at least

1    didn't give me an answer.  He just said he wasn't

2    going to respond to that until we got to court.

3             I sent him a more formal letter, Your

4    Honor, which is at page 20 -- excuse me -- page 24 of

5    this exhibit -- on June 29th, saying we need to know

6    more about this.  We need to know where this came

7    from; who prepared these summaries; what did they

8    prepare them from; and what else do you have.  What

9    else do you have that you have not given us?  That was

10   June 29th, Your Honor.  I got no response.

11            At 5:01, on Friday afternoon, we filed

12   our omnibus response and our motion, and our motions

13   for sanctions and to reopen discovery, to compel

14   discovery.  At 5:01, I had no response whatsoever.

15            At 7:12 p.m. that night, Mr. Ottoway

16   writes me a letter.  And I don't mean to pick on him,

17   but he is the State for purposes of today.  On page 27

18   of that exhibit, Your Honor, Mr. Ottoway says

19   essentially nothing.

20            On June 25th, he provided me summaries

21   he should have given me 23 years previously.  I have

22   been jumping up and down for a week, begging him,

23   "Tell me what you have. Tell me why you haven't given

24   me this before."  Crickets.

25            So here we are, Your Honor, 11 days now

after they've disclosed this information for the first
time.  Still -- we still have absolutely no indication
whatsoever of why this stuff was not produced before,
where it's been, who did it, who prepared these
summaries.  In the summaries, there is reference to
"you."  "I've prepared this from 'your' notes."

There is something more out there, Your
Honor, and we need it.  Mr. Reed needs it.  We've been
asking for it for years.  We now have evidence it
exists.  So what we're asking, Your Honor, is you
require the State to disclose its entire file.  Not
just drips and drabs, not just what it wants us to
see, not just what it feels like we might want to see.
We want to see it all, the entire file.  We need
someone to verify that's the entire file.  A sworn
affidavit saying, "This is everything. I've talked to
everybody. This is it."  And then we want to start
taking depositions of the people who have hidden this
information for 23 years.

And, Your Honor, I offer Exhibit No. 1
in its entirety and page by page as well.

THE COURT:  Any objection to the
exhibit?

MR. OTTOWAY:  No objection, Your Honor.

THE COURT:  All right.  It will be

1   admitted as Exhibit 1 to this hearing.

2              (Defendant's Exhibit 1 admitted.)

3              MR. MACRAE:  That's all I wanted to say,

4   Your Honor.  Thank you.

5              THE COURT:  Mr. Ottoway?

6              MR. OTTOWAY:  Yes, Your Honor.  With

7   respect to the memoranda that were produced, as I

8   explained in the letter, it was the first time I had

9   seen those.  They are work product.  They were not

10  created by the investigatory agencies in the case.

11             Again, as soon as I found them, I turned

12  them over.  And basically what opposing counsel is

13  alleging is a new claim that is not in front of this

14  Court.  If they want to file an application to raise

15  that claim, that is what they can do.  But that cannot

16  be litigated in this Court.  It is not part of their

17  application.

18             And, also, if you look at those

19  memoranda, this is not a Brady violation.  The

20  individuals were talked to.  They denied any sort of

21  rumors.  Rumors are not admissible in a court of law.

22  It's not as if the defense did not know that there

23  were individuals who were saying that they saw Stacey

24  and Rodney Reed at the HEB.  They called a witness who

25  said that they saw them at the HEB, so they knew to

1  investigate her work there.

2          Again, these are not material.  They are

3  rumors.  And when those rumors were run down, the

4  individuals denied them.  Again, with respect to the

5  open-file policy, we do have an open-file policy; but

6  with respect to work product, that is not provided,

7  and the defense -- the post-conviction defense has

8  known that.  They have reviewed the file on multiple

9  occasions and were told that when requesting certain

10  material, that they would not be provided it because

11  it is work product.

12          With respect to the post-conviction work

13  product of Suzan Hugen, again, with respect to that

14  type of work product, there is no legal obligation to

15  turn over post-conviction work product.  And what we

16  have done is, when we have discovered this material,

17  we had written them letters and provided them the

18  underlying information.  We have far exceeded our

19  legal and ethical duties with respect to

20  post-conviction investigation and provided that

21  material.

22          And I think at this point, Your Honor,

23  I'll stand on that.

24          THE COURT:  Mr. MacRae?

25          MR. MACRAE:  Your Honor, if it's work

product and they don't turn that over, why did they
turn it over?  And how do we know it's work product?
There's no evidence before you that this is work
product.  It's a summary, and it's provided,
apparently, based on notes.  That's not work product.

And, frankly, I think representations by
the State at this point in the litigation should be
taken with a grain of salt as to whether something is
work product or not.  That's what we're getting after.
We want to know what there is in this file, and they
won't tell us.

And as far as litigating it in a
separate application, I think that is preposterous.
Because what they'll do, Your Honor, is exactly what
they've been doing for 23 years, drip it out page by
page, and say, "Oh, sorry, king's "X." Go file another
application."  That's a waste of your time, my time,
Mr. Reed's time, everybody's time.  This needs to be
litigated here and now.

THE COURT:  The Court of Criminal
Appeals has instructed this Court to make findings in
what issues?

MR. MACRAE:  Three issues, Your Honor.
The one that pertains to today is Brady.  We have
filed an application for a Brady review based on the

affidavits of a number of witnesses.  This is a

continuation of Brady.  It's just more Brady.

And I should mention, Your Honor, which

I forgot to mention earlier, Ms. Hugen in her

summary -- or excuse me -- her conversation recently

says that she told someone named "Paul," possibly Paul

Alexander, about the relationship between Mr. Reed and

Ms. Stites.

Guess what?  Mr. Alexander is a cop.

Another Brady violation.  I can't keep track of them

at this point, Your Honor.  But the way to keep track

of them is to see that file and get what we're

entitled to, what we've been entitled to for 23 years.

THE COURT:  Well, you have the

unredacted letter identifying who these people were

that made these statements; do you not?

MR. MACRAE:  Yes, Your Honor, as of a

week ago.

THE COURT:  And so what is preventing

you from talking to them before the hearing?

MR. MACRAE:  We can go and talk to them,

Your Honor.  But we should have been able to talk to

them 23 years ago.

THE COURT:  Well, that's --

MR. MACRAE:  And I didn't introduce this

gentleman behind us.  His name is Titus Levi.  He's an
investigator and a future law student.  Someone like
him takes these summaries and makes them into gold,
goes and talks to Mr. Haas and says, "Tell me about
this rumor. Where did you hear this rumor?"

"I heard it from Fred." He goes and
talks to Fred.  Fred heard it from Janet.

Rumors aren't admissible, but they sure
are part of a file, and they sure are something a good
lawyer and a good investigator can take.

THE COURT:  So what more do you believe
is in the file about the disclosures that were made in
this letter?

MR. MACRAE:  Well, what I know is in
there, Your Honor.

THE COURT:  That you don't have.

MR. MACRAE:  At page 19, the summary of
Mr. Cardenas, at the top of the page, in parentheses.
"(Some of this is from your notes and is somewhat
sketchy -- I wasn't in your office at that time.)"

I don't know who "I" is there, I don't
know who "you" is there, but I'm entitled to know
both.

The one by Mr. Coronado, page 21:
"During our previous conversations with some HEB

1    employees, information was obtained."  I'm entitled to

2    those conversations.  I have been for 23 years.

3                    On Ms. Hugen, how did the investigator

4    know in June of 2021, to call a lady in Pine Bluff,

5    Arkansas and ask them about a relationship out of the

6    blue?  That lady is not on our witness list.  Never

7    has been.  They've provided us no information about

8    her whatsoever, but they know enough to call her and

9    ask her about a relationship that they know existed.

10                   They represented to the jury there was

11   nothing, not one thing.  Their chief investigator

12   represented that.  He may not have known.  The

13   prosecutors sure knew, and they hid it.  Conceal and

14   ambush, that's what they do.  Conceal what might help,

15   and ambush what doesn't.

16                   Your Honor, there is no question this

17   meets the Brady criteria.  Absolutely no question.

18                   THE COURT:  And what, Mr. Ottoway, would

19   be the problem in disclosing the source of these

20   summaries?

21                   MR. OTTOWAY:  With respect to work

22   product, Your Honor, even 3914 doesn't require the

23   State to provide work product.  I will say that these

24   were prepared prior to trial by the prosecution team,

25   not by law enforcement in the sense of the

investigatory agencies. This was witness preparation for individuals who were scheduled to testify.

And, again, with respect to the disclosure, as we noted on our letter, we were providing anything possible, even if we don't believe that this is disclosable material.

Again, these are rumors. Rumors are not admissible. And for purposes of Brady in Texas, evidence that is admissible must be disclosed for purposes of a Brady claim.

And, again, with respect to the assertion that this Court could even hear that claim, that is not true. You don't get to just say "Brady" and then litigate every alleged Brady claim all at once. The Court of Criminal Appeals has to authorize the claims that this Court is going to hear. And with respect to that claim, they have three particular witnesses; and that's Richard Derleth, Jim Clampit, and Wayne Fletcher. Those are the claims that are before the Court, not this allegation that they are making now.

MR. MACRAE: Your Honor, that is an engineered motion for continuance, that's what you just heard. Two weeks before the hearing -- three weeks before the hearing, they give us new information

1  and say "Sorry, we're not going to talk about that. Go

2  fish. Go to the Court of Criminal Appeals yet again.

3  Go for an 11th time."

4          And if this is work product, why are

5  they producing it?  And if Mr. Ottoway is so

6  unworried, why does he say in his letter "I just found

7  this."

8          And what's this based on?  What's this

9  work product based on?  Notes.  That's not work

10  product.  That's investigative notes, which is not

11  work product.  These documents might be work product,

12  but there's no evidence before you that they are.  And

13  even if they are, they've waived it.  And even if they

14  haven't waived it, the underlying information, Your

15  Honor, is what we're entitled to at a minimum.  And we

16  were entitled to it, Your Honor, 23 years ago, which

17  you're probably tired of me saying it, but I'm not

18  tired of saying it.  23 years ago, Your Honor, we

19  should have received this information.  It's

20  outrageous.

21          THE COURT:  So what is it that you're

22  asking the Court to do at this point?

23          MR. MACRAE:  We're asking for the entire

24  file to be turned over whether they consider it work

25  product or not.  If they consider it to be work

1  product, we need a privilege log.  We need the entire

2  file, including, at a minimum, the notes that these

3  summaries are based on.  We need someone to verify

4  this is the entire file, and they need to verify what

5  they've done to ensure it's the entire file.  And then

6  we need to start taking the depositions of the people

7  who have had access to the file.  We need to know why

8  this stuff is coming out 23 years later.  Why did

9  Rocky Wardlow testify there was no connection

10  whatsoever 23 years ago when they knew darn well there

11  was?

12            We are not asking for a continuance.

13  We're asking for that information to be disclosed by

14  the end of the day tomorrow.  And we want to take

15  depositions of the prosecutor, the investigator,

16  anybody who we might identify in that file, and

17  Mr. Ottoway, next week.

18            MR. OTTOWAY:  Your Honor, there's no

19  possible way --

20            THE COURT:  Is there nothing you can do

21  to narrow that request?

22            MR. MACRAE:  I wish I could.  Your

23  Honor, I really wish I could.  I'm not being facetious

24  about that.  I'm here 23 years later; I don't know

25  what's out there.  All I know --

1          THE COURT:  You're not going to believe

2     anything they say anyway, are you?

3          MR. MACRAE:  Well, I shouldn't.  I

4     certainly shouldn't, but I have up until now.  And I

5     believed Mr. Ottoway when he said "You've got

6     everything."  And you believed them as well, Your

7     Honor.  You believed him as well and said it's a

8     fishing expedition.  And at this point, Your Honor,

9     it's not.  This is basic constitutional fairness.

10          If you recall at the last hearing, Your

11     Honor, I had said "We're doing discovery because we

12     want to streamline things and make things as efficient

13     as possible."  We've got two weeks, that's all we

14     have.  And here we are, 12 days before the hearing

15     begins, begging for the information we should have had

16     23 years ago.

17          MR. OTTOWAY:  Your Honor, the requests

18     that they are making, there's no possible way that we

19     could be able to be prepare for a hearing and then

20     also deal with the requests that they are currently

21     making.

22          And, again, I would point out that those

23     memoranda that were provided were provided in an

24     abundance of caution, and they are not Brady material.

25     We did not have an obligation to disclose them, but we

did anyway.  And with respect to anybody that we have

talked to since, we have provided them notice when

anything that has been favorable to them has been

disclosed to us and we provided that to them.

                 And since I have been on this case, I

believe I have provided now 17 disclosure letters.

And most of that is post-conviction developments.

                 MR. MACRAE:  Most of it.  Not this.

This is preconviction.  It's pretrial.

                 THE COURT:  Let me understand that this

page 13, redacted letter, in Exhibit 1 -- you have the

unredacted letter --

                 MR. MACRAE:  Yes, judge.

                 THE COURT:  -- that identifies the

individuals to which are referred in this letter?

                 MR. MACRAE:  I'm sorry, Your Honor, I

couldn't hear you.

                 THE COURT:  You have an unredacted

letter that identifies these individuals?

                 MR. MACRAE:  Yes, Judge.  It's page 16

of the same exhibit.  We redacted in the public

filing, but I wanted you to see the names.

                 THE COURT:  And so what is preventing

you from contacting these individuals?

                 MR. MACRAE:  Well, there's nothing

preventing me from contacting them, Your Honor.  The

trouble is it's 23 years too late.  This should have

been disclosed in April, 1998, when the trial

attorneys were buried by a 300-person witness list.

THE COURT:  Are you now asking to add

these individuals to your Brady motion issues?

MR. MACRAE:  Well, I think we may have

to.

THE COURT:  Well, I don't know -- we're

two weeks away from the hearing.  If we're going to do

anything, we need to do it today.

MR. MACRAE:  I agree.

THE COURT:  The Court of Criminal

Appeals has specified the issues.  I have the ability

to allow evidence in and allow your request for that

issue to be considered by them and give them the

record with which to do that.  But I need to know, is

that what you're wanting, or are you just wanting to

go back and relitigate my ruling on the discovery

motion, which is far -- that's what you're asking for.

You're not asking for the narrow access to the

information underlined, this information.  You're

asking for the whole file to be opened up and

depositions taken two weeks before trial.

MR. MACRAE:  Yes, Judge.

1    THE COURT:  I'm going to deny that

2 request.

3    MR. MACRAE:  That's part of what I'm

4 asking.  I'm asking for a lot of things today.  One of

5 them is that.  Another is that, yes, we be allowed to

6 litigate this information in our hearing.  But somehow

7 we're going to have to squeeze it into a two-week

8 hearing we already had scheduled, and we're going to

9 have to scramble because we didn't get this until two

10 weeks before the hearing.

11    So that's my problem, Your Honor, is I

12 need to add this, but I'm not sure how good of a job

13 we can do.  That's why we need the entire file so that

14 I can see what these summaries are based on and see

15 what else there is.

16    THE COURT:  Okay.  Your request is

17 denied.  We're just going to take up the issues that

18 the Court of Criminal Appeals has raised.  And if you

19 want to make a request for additional time to the

20 Court of Criminal Appeals and an amendment to their

21 designation between now and when we begin the hearing,

22 you're certainly well able to do so, are you not?

23    MR. MACRAE:  Are you telling me, Your

24 Honor, I need to do that in order to bring this

25 information into our hearing?

THE COURT: You're insisting on doing far more than what you have raised a question on by your request. I'm not going to do that. I'm not going to blow this whole thing wide open two weeks before the scheduled hearing that the Court of Criminal Appeals has said, We're not giving you any more time.

I've already pushed this case so far into the time limit that they have allowed that I don't have any more time to do this. Okay? And they have said they're the only ones that can grant more time, clearly.

MR. MACRAE: I understand that, Your Honor. And I'm not trying to put you in a jam. I feel like you're in a jam and I'm in a jam because they failed to give us this information 23 years ago. That's my point. We'll squeeze everything we can into this hearing, but I wanted you to see that we still don't have everything we're entitled to. It's plain as day.

So my concern is, Your Honor, we will be back.

THE COURT: Well, I'm not entirely certain it's plain as day because this is rumors and innuendos. It's not evidence.

MR. MACRAE: I didn't say it was, Your Honor. It's not evidence. It's what lawyers and investigators take and produce evidence from.

THE COURT: I understand that. The motion is denied.

All right. Your next motion?

MR. MACRAE: Your Honor, the next motion I'm going to argue is the motion to strike the witness list, which is kind of a continuation of what we were just talking about in my theme of the State conceals and then ambushes.

On the 18th of June, pursuant to your scheduling order, we provided a witness list to the State and we identified rough numbers, about 20 witnesses we intend to call and another few witnesses we thought we may call. We thought that's what was required, to give the State notice of who we were calling and who we might.

The State's response -- or excuse me -- the witness list they filed the same day was 103 people. It wasn't alphabetized. There was no indication given of who's going to say what. There was no indication of who they intend to call versus who they may call. It's 103 people.

So in a continuation of what we were