# Exhibit 23

REPORTER'S RECORD

VOLUME 2 OF 12 VOLUMES

TRIAL COURT CAUSE NO. 8,701

COURT OF CRIMINAL APPEALS NO. WR-50,961-10

|  |  |
|---|---|
| | ) 21st DISTRICT COURT |
| | ) |
| | ) |
| | ) |
| EX PARTE RODNEY REED | ) OF |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) BASTROP COUNTY, TEXAS |

-------------------------------

WRIT OF HABEAS CORPUS

July 19, 2021

-------------------------------

BE IT REMEMBERED THAT on the July 19, 2021, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable J.D. Langley, Visiting Judge of the 21st District Court, held in Bastrop, Bastrop County, Texas.

Proceedings reported by machine shorthand by Hayley Stiteler, CSR, RPR.

```
 1                    A P P E A R A N C E S

 2


 3
     FOR THE APPLICANT:
 4

 5       Mr. Andrew F. MacRae
         LEVATINO | PACE LLP
 6       1101 South Capital of Texas Highway
         Building K, Suite 125
 7       Austin, Texas 78746
         512.6371581
 8       amacrae@levatinopace.com
         SBOT NO. 00784510
 9

10       Barry C. Scheck
         INNOCENCE PROJECT
11       40 Worth Street, Suite 701
         New York, New York 10013
12       212.364.5390
         bscheck@innocenceproject.org
13

14       Mr. George H. Kendall
         SQUIRE PATTON BOGGS, LLP
15       1211 Avenue of the Americas
         New York, New York 10036
16       212.872.9834
         george.kendall@squirepb.com
17

18       Ms. Jane Pucher
         INNOCENCE PROJECT
19       40 Worth Street, Suite 701
         New York, New York 10013
20       646.227.8327
         jpucher@innocenceproject.org
21


22       Ms. Michelle L. Davis
         SKADDEN, ARPS, SLATE, MEAGHER & FLORM, LLP
23       1000 Louisiana, Suite 6800
         Houston, Texas 77002
24       713.655.5100
         michelle.davis@skadden.com
25       SBOT NO. 24038854
```

```
 1        Ms. Nicole A. DiSalvo
          SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
 2        920 North King Street
          Wilmington, Delaware 19801
 3        302.651.3027
          nicole.disalvo@skadden.com
 4        Delaware Bar No. 4662

 5
          Ms. Corrine Irish
 6        SQUIRE PATTON BOGGS
          1211 6th Avenue, 26th Floor
 7        New York, New York 10036
          212.872.9823
 8        corrine.irish@squirepb.com

 9
          Mr. Quinncy McNeal
10        HUSCH BLACKWELL LLP
          600 Travis Street, Suite 2350
11        Houston, Texas 77002
          713.525.6253
12        quinncy.mcneal@huschblackwell.com
          SBOT NO. 24074690
13

14        Ms. Sarah Runnells Martin
          SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
15        920 North King street
          Wilmington, Delaware 19801
16        302.651.3000
          sarah.martin@skadden.com
17

18
          FOR THE STATE:
19

20        Ms. Lisa M. Tanner
          TEXAS OFFICE OF THE ATTORNEY GENERAL
21        P.O. Box 12548
          Austin, Texas 78711
22        512.463.2125
          lisa.tanner@oag.texas.gov
23        SBOT NO. 19637700

24

25
```

1      Mr. Travis G. Bragg
      TEXAS ATTORNEY GENERAL
2      ASSISTANT ATTORNEY GENERAL
      P.O. Box 12548
3      Austin, Texas 78711
      512.936.1400
4      SBOT NO. 24076286

5

6      Ms. Rachel L. Patton
      OFFICE OF THE ATTORNEY GENERAL
7      CRIMINAL APPEALS DIVISION
      P.O. Box 12548
8      Austin, Texas 78711
      512.936.1400
9      rachel.patton@oag.texas.gov
      SBOT NO. 24039030
10

11

12     Mr. Edward L. Marshall
      OFFICE OF THE ATTORNEY GENERAL
12     CRIMINAL APPEALS DIVISION
      P.O. Box 12548
13     Austin, Texas 78711
      512.936.1400
14     edward.marshall@oag.texas.gov
      SBOT NO. 00797004
15

16

17     Mr. Garrett Greene
      OFFICE OF THE ATTORNEY GENERAL
18     CRIMINAL APPEALS DIVISION
      300 West 15th Street
19     Austin, Texas 78701
      512.936.1400
20     garrett.greene@oag.texas.gov
      SBOT NO. 24096217

21

22

23

24

25

# INDEX OF PROCEEDINGS
## VOLUME 2
### (WRIT OF HABEAS CORPUS)

|                                                      | Page | Vol |
|------------------------------------------------------|------|-----|
| ANNOUNCEMENTS....................................    | 8    | 2   |
| RULE INVOKED....................................     | 11   | 2   |
| MOTION TO QUASH................................      | 12   | 2   |
| COURT'S RULING ON MOTION TO QUASH.............       | 15   | 2   |
| MOTION TO PRESERVE THE STATUS QUO.............       | 18   | 2   |
| OPENING STATEMENT BY MR. MACRAE...............       | 22   | 2   |
| OPENING STATEMENT BY MS. TANNER...............       | 46   | 2   |

**APPLICANT'S WITNESSES:**

|                        | DX        | CX        | VDX | VOL |
|------------------------|-----------|-----------|-----|-----|
| ANDREW M. BAKER, M.D.  | 63,260    | 172,270   |     | 2   |
| CHARLES W. FLETCHER    | 272,296   | 280,300   |     | 2   |
|                        | ,298      |           |     |     |
| RUBIE VOLEK            | 304,321   | 312       |     | 2   |

|                                               | Page | Vol |
|-----------------------------------------------|------|-----|
| COURT REPORTER'S CERTIFICATE.................  | 328  | 2   |

## ALPHABETICAL INDEX

**APPLICANT'S WITNESSES:**

|                        | DX        | CX        | VDX | VOL |
|------------------------|-----------|-----------|-----|-----|
| ANDREW M. BAKER, M.D.  | 63,260    | 172,270   |     | 2   |
| CHARLES W. FLETCHER    | 272,296   | 280,300   |     | 2   |
|                        | ,298      |           |     |     |
| RUBIE VOLEK            | 304,321   | 312       |     | 2   |

# EXHIBIT INDEX

**APPLICANT'S EXHIBITS**

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL |
|---|---|---|---|---|
| 1 | Curriculum Vitae of Andrew M. Baker, M. D. | 74 | 74 | 2 |
| 2 | March 12, 2020, Report by Dr. Baker | 82 | 83 | 2 |
| 3 | Spermatozoa- their Persistence After Sexual Intercourse, by Willott and Allard | 136 | 139 | 2 |
| 4 | Persistence of Spermatozoa in the Lower Genital Tracts of Women, by Silverman and Silverman | 146 | 146 | 2 |
| 5 | PowerPoint, by Dr. Baker | 171 | 172 | 2 |
| 6 | Affidavit of Charles Wayne Fletcher | 297 | 298 | 2 |
| 7 | Affidavit of Rubie Volek | 322 | 324 | 2 |

| STATE'S EXHIBITS NO. | DESCRIPTION | OFFERED | ADMITTED | VOL |
|---|---|---|---|---|
| 1 | Photographs | 208 | 208 | 2 |
| 2 | Photographs | 208 | 208 | 2 |
| 3 | Photographs | 208 | 208 | 2 |
| 4 | Photographs | 208 | 208 | 2 |
| 5 | Photographs | 208 | 208 | 2 |
| 6 | Photographs | 219 | 220 | 2 |
| 7 | Photographs | 219 | 220 | 2 |
| 8 | Photographs | 219 | 220 | 2 |
| 9 | Photographs | 230 | 230 | 2 |
| 10 | Photographs | 230 | 230 | 2 |
| 11 | Photographs | 230 | 230 | 2 |
| 12 | Photographs | 230 | 230 | 2 |
| 13 | Photographs | 235 | 236 | 2 |
| 14 | Photographs | 235 | 236 | 2 |
| 15 | Dr. Roberto Bayardo's Medical Examiner's Report | 232 | 233 | 2 |

1          Thank you.

2          THE COURT:  First witness?

3          MS. PUCHER:  Thank you.  Good morning,

4    Your Honor.  Applicant calls Dr. Andrew Baker, who is

5    in the witness conference room.

6          THE COURT:  Dr. Baker, go ahead and be

7    seated.  Good morning.

8          THE WITNESS:  Good morning, Your Honor.

9          MS. TANNER:  Your Honor, before

10   Dr. Baker begins, we would ask the Court to allow our

11   expert, Dr. Dana, to be present to hear his testimony.

12         THE COURT:  Where is he?

13         MS. TANNER:  She is right here.

14         THE COURT:  She?  Okay.  You can just go

15   ahead and have a seat, ma'am.

16         Dr. Baker, if you could please raise

17   your right hand for me.

18         (Witness sworn.)

19         THE COURT:  All right.  You may proceed.

20         MS. PUCHER:  Thank you.

21              **ANDREW M. BAKER, M.D.,**

22   having been first duly sworn, testified as follows:

23              **DIRECT EXAMINATION**

24   BY MS. PUCHER:

25      Q.   Good morning, Dr. Baker.

A.    Good morning.

Q.    Dr. Baker, what is your occupation?

A.    I am a forensic pathologist and a medical examiner.

Q.    What does a forensic pathologist do?

A.    Forensic pathology is a subspecialty in the field of medicine in which our primary concern is figuring out who people were and how those people died.  Our main tool is performing autopsies, although there are many other aspects of a death investigation besides an autopsy.

Q.    And are forensic pathologists sometimes also referred to as medical examiners?

A.    Yes.  Forensic pathology is a medical specialty.  "Medical examiner" is typically the title conferred upon you by the municipality that hires you.

Q.    Where are you presently employed?

A.    I am the chief medical examiner for Hennepin, Dakota, and Scott Counties in the state of Minnesota.

Q.    And how long have you worked as a forensic pathologist generally?

A.    I finished my formal education in 1998, and so I guess that means I've been doing this for about 23 years.

Q.    And how long have you been the chief medical

1  of death.

2     Q.   And you mentioned before when first talking

3  about estimation and the importance of that word that

4  the -- a narrow time-of-death window is a red flag for

5  you.  Can you just explain that a little bit more.

6     A.   Well, there's so much variability that goes

7  into all three of these things that very narrow

8  time-of-death windows become increasingly difficult to

9  support because of all the caveats that go into these

10 things.

11         Let me just give you rigor mortis as an

12 example, the stiffening of the muscles.  That's going

13 to vary depending on the outside temperature.  That's

14 going to vary depending on the temperature of the

15 decedent's body at the moment that individual died.

16 It's going to vary depending on how muscular that

17 individual is because more muscular people will appear

18 to have more rigor mortis than people who don't have

19 as much muscle.

20         There is a subjective assessment involved:

21 How much experience does the person have in the

22 observation of the rigor; how much experience do they

23 have; is that person relatively not muscular compared

24 to the muscular body they're examining.  So all of

25 these things come into play, and there's just as many

caveats for livor mortis and algor mortis.  So when you start talking about very narrow time-of-death estimates and all you have to go on is this, to me, that's a red flag.

I normally don't give time-of-death estimates in my jurisdiction because there's so many caveats that go into them.  However, I will speak up on a time-of-death issue if you make an observation that's so at odds with the theory being proposed that you have to go back and relook at that theory and say, I can't square this finding with what you're saying.

Q.   And we'll discuss that more in just a moment. But let's first explain to the Court what is rigor mortis, if you can go to the next slide.

A.   So rigor mortis, as I mentioned earlier, that's just a fancy Latin term for stiffening of the muscles after death occurs.  It is a chemical reaction that takes place in the muscles.  And under normal conditions, you'll find numbers like this in most forensic pathology textbooks.  And I put "normal" here in quotes because I'm referring to typical comfortable outdoor temperatures or typical indoor temperatures that you might keep your house or residence at.

Under those relatively normal conditions, rigor mortis starts to set in at about the six-hour

body?

A. I have.

Q. Okay. Please proceed to the next slide.

A. So here you can see someone manipulating Ms. Stites' left arm. She doesn't seem to be having much trouble moving that arm. And you'll notice the rest of Ms. Stites' body does not move when she picks that arm up. That, to me, does not look like a body that's in full-blown rigor mortis. Again, I will tell you in my own experience, just to straighten out an arm or even the fingertips on somebody who's in rigor mortis is extremely difficult to do.

Q. Now, if we could just go back to the very beginning of the video. Play again.

(Video played.)

Q. (BY MS. PUCHER) So is it fair to say that the woman who is manipulating Ms. Stites' arm is at some point doing it with just one hand; is that right?

A. Yeah, and really just using the strength of her fingers and wrists. I mean, it's not like she's having to torque on that arm or those joints to get them to move.

Q. Okay. And based on your experience, if Ms. Stites were in full or even nearly full rigor mortis, would that be so simple to do?

A.   No, it would be much more difficult to
manipulate joints like that.

Q.   Okay.  And do you believe you'd be able to
see the difficulty of that manipulation in this video?

A.   Yes.

Q.   Okay.  All right.  I believe you have a
second video to show the Court.  We can proceed to
that.

A.   I do.

Q.   Go ahead and go to the next video.

A.   Yep.  Here we go.

Q.   Thank you.

A.   We skipped over one.  Sorry.

     I'll let you cue this up.

Q.   Thank you.

          (Video played.)

A.   So here you can see that somebody just turned
Ms. Stites' head with one hand, the hand that was
applied to her forehead.  And when those hands are
released for whatever reason, you're going to see that
head flop back down into the position it started in;
and you're going to, I believe, see that hand come in
again and rotate that head with very little
difficulty.

          And, again, in my experience, this is not at

1 all what full-blown rigor mortis looks like.  This is

2 either rigor mortis that is not yet very well

3 developed or is on the wane, meaning it's going away.

4     Q.  (BY MS. PUCHER)  Thank you.

5        And I believe there's one more clip that you

6 pulled for the Court, so if you can please play that.

7     A.  Yeah, so I have one more clip, and this will

8 be very -- this is will be late in the sequence

9 because you're going to see a couple of gentlemen put

10 Ms. Stites' body in a body bag.  And you'll notice

11 that there's a little bit of rigor in her arms, but

12 each of them with one hand really has no difficulty

13 placing her arms in the body bag.  Those arms then

14 pretty much stay in place and they are able to zip the

15 bag.  Those are not joints that are in full rigor

16 mortis.

17        I will tell you in my experience, and this is

18 from having done thousands of autopsies, if my

19 investigators go to a scene and the body is in full

20 rigor mortis with the arms above the head, that body

21 usually comes back to the office in the bag with the

22 arms still over the head because it's so difficult to

23 get those to go into a bag as easily as you see here.

24 So, again, to me, this is evidence of rigor mortis

25 that is either not yet developed very much or has

1    already moved to the phase where it's largely going

2    away.

3        Q.   Okay.  And we'll talk in a moment about how

4    you can determine whether this is developing or

5    waning, as you said.  But first, I want to have you

6    move to the next slide, please.

7             Now, did you review Dr. Bayardo's trial

8    testimony in this case as well as his autopsy report?

9        A.   I did.

10       Q.   Okay.  Based on the testimony you reviewed

11   from his testimony and the related reports in this

12   case, what were the relevant points in the State's

13   timeline as to when Ms. Stites was killed?

14       A.   So the key data points that I would use to

15   say this is the portrayal of the time line is that

16   Ms. Stites was purportedly killed between 3 o'clock

17   and 5 o'clock in the morning on April 23rd, 1996.  We

18   know that she was found dead at or about 3:10 p.m. on

19   April 23rd, 1996.

20            As I believe I just showed the Court, the

21   video taken sometime shortly after 6:17 p.m. does not

22   show fully developed rigor mortis.  And then there was

23   the testimony that Dr. Bayardo gave about these

24   findings.  And his testimony was, quote:  Based on the

25   changes that occur after death in the body, I make an

1   estimation of the time of death being around 3:00 a.m.

2   on April 23rd, 1996, give or take one or two hours.

3       Q.   Thank you.

4            MS. PUCHER:   And for the record, it's

5   pre-printed on the slide.   That's from trial

6   transcript date May 6th, 1998, afternoon session,

7   pages 113 and 114, 23:11.

8       Q.   (BY MS. PUCHER)   Now, from your review of

9   Dr. Bayardo's testimony and his autopsy report, what

10  was Dr. Bayardo's estimate that this death had to have

11  occurred around 3 o'clock in the morning, what was

12  that based on?

13      A.   What was his estimate based on?

14      Q.   Correct.

15      A.   As near as I can tell, nothing.   I had no

16  evidence that he had ever gone to the death scene.   I

17  had no evidence that he examined Ms. Stites' body at

18  the death scene.   If he ever saw the videos, today

19  would be the first time I was made aware of that.

20  Nothing was asked in his original testimony about how

21  did you come up with this estimate, what features did

22  you use.   It just hung out there.   And I'm not sure he

23  was even crossed about this.   So I have no idea what

24  his dataset was for making an estimate that's that

25  narrow.

1      Q.   So it's fair to say, in Dr. Bayardo's

2  testimony there is no discussion of rigor mortis, as

3  you've just explained to the Court?

4      A.   I certainly don't recall any discussion of

5  rigor mortis, and there certainly was -- there was no

6  nuance to this.  There was no caveats, there was no

7  more likely, less likely, probable, not probable.  It

8  just was, "This is my estimate."

9      Q.   Now, you mentioned that Dr. Bayardo did not

10 appear to go to the death scene of the scene where

11 Ms. Stites' body was found.  Can you please explain to

12 the Court the importance of going to the death scene

13 in complicated homicides.

14     A.   Well, if time of death is going to be an

15 issue in a homicide case, then somebody who is

16 qualified to make the observations of rigor and algor

17 and livor should be at the death scene.  To my

18 knowledge, no one at Ms. Stites' death scene was

19 qualified to do that.

20          In my office, for example, all of my death

21 investigators, who work only for me, not for law

22 enforcement, they go to every death scene and they

23 make those assessments on every single case.  And

24 those individuals are trained to do so and they are

25 accredited by their own professional body to do that.

1    A much younger version of me used to go to

2  homicide scenes all the time.  When I was a fellow in

3  training, I was on call almost every single night of

4  the month, and I went to 45 death scenes in one year

5  and learned to make these various observations.  Up

6  until a couple of years ago, my office still sent a

7  physician to every homicide death scene that took

8  place outside of a hospital.

9    To be fair, 99 percent of the time, time of

10  death is not an issue in a homicide case.  But in a

11  case like this where it clearly did become an issue,

12  this is what jumped out at me, this unjustifiably

13  precise narrow window of time given by someone who

14  provided no dataset to even make that estimate.

15  Q.   And is it fair to say, I think based on your

16  description, that making observations about rigor

17  mortis and lividity, which we'll discuss next, are --

18  requires specific medical training and knowledge to be

19  able to make those accurately?

20  A.   It doesn't necessarily have to be medical

21  training, but it needs to be a qualified forensic

22  pathologist or a trained medicolegal death

23  investigator making those observations.  And even

24  under the best of circumstances where you have those

25  individuals doing it, you still have to put in all the

1    caveats when you make an estimate like this because

2    there is subjectivity involved and there's variability

3    from person to person.

4         Q.   Thank you.

5              Next slide, please.

6              Okay.  Now, if Ms. Stites was in fact killed

7    between 3 o'clock in the morning and 5 o'clock in the

8    morning, as the State theorized, what would the

9    postmortem interval be in this case?

10         A.   So if we simply do the math based on the

11   State's time line, to me that comes out to about 15 to

12   17 hours between when the State alleges Ms. Stites was

13   killed and when the videotape is running and shows her

14   relative lack of rigor.  The hypothesis here is that

15   you have an approximately 15- to 17-hour of window of

16   time since she died.

17         Q.   Okay.  And just for clarity's sake, what does

18   "postmortem interval" mean exactly?

19         A.   It just means the time from when the person

20   died to when their body was found and somebody made an

21   observation about that body.

22         Q.   Thank you.

23              Next slide, please.

24              Now, how does rigor mortis develop and

25   dissipate over time?

1    A.   As I mentioned earlier, typically the onset

2    is around six hours.  Again, these are all fuzzy

3    numbers.  But it's typically around six hours,

4    crescendos to about the 12-hour mark, persists for

5    about 12 hours, and then dissipates over the next 12

6    hours.

7              THE WITNESS:  And if it would help the

8    Court, I would happily walk up to the monitor and

9    point out what I just said to explain this chart a

10   little better.

11             THE COURT:  No, I think I can read it.

12   Q.   (BY MS. PUCHER)  Okay.  Thank you.

13             MS. PUCHER:  The pointer, unfortunately,

14   does not work on the screen, so there will be a point

15   where I would ask the Court's permission for Dr. Baker

16   to approach.

17   A.   And, Counsel, I would just point out that I

18   did not make up this particular chart.  This is

19   adopted from a relatively well-known textbook of

20   forensic pathology that was just published last year.

21   This happens to be out of the UK, I believe, but

22   this -- you know, this chart is consonant with what I

23   testified to earlier, which is most forensic pathology

24   textbooks are going to give you numbers in this

25   ballpark for how long does it take rigor to come on,

how long will it persist, how long does it take before
it goes away.

Q.   (BY MS. PUCHER)   Thank you.

Based on the State's postmortem interval at
trial as developed by Dr. Bayardo, where on this rigor
curve would you expect Ms. Stites' body to be in the
video clips that you just showed us.

A.   So we're going to set time zero at what
Dr. Bayardo testified to.  So he testified that she
died at 3 o'clock in the morning, give or take one or
two hours.  So we'll give the two-hour window on
either side.  That's between 1:00 and 5:00 in the
morning; he's saying that's when she died.  If you put
6:17 p.m. when that video starts on this chart, she
should be in full-on rigor mortis in that video.

Q.   So if she was, in fact, on that part of the
curve right at the very top, how would you expect --
or what would you expect to see in her body in the
video in terms of rigor mortis?

A.   Well, it would be so stiff, you would have --
you would see people having difficulty extending her
limbs or opening up her joints.  You would see people
having difficulty turning her head.  You would see the
funeral directors having difficulty getting her arms
into the body bag, laying across her abdomen the way

they did.  Because her rigor mortis is fairly minimal
in those videos.  It's not the full-on rigor mortis
that you would expect if Dr. Bayardo were correct.

Q.   And is it fair to say that the rigor would
appear something approximate to the image you showed
us before of the individual on the two sawhorses in
the autopsy suite?

A.   Yes.

Q.   Thank you.

Okay.  Now, Dr. Baker, how does temperature,
outside temperature, ambient temperature, impact the
progression of this curve?

A.   So rigor mortis is a chemical reaction, and
like most chemical reactions, it will speed up if it's
heated and it will slow down in a cool environment.
So in a very, very hot environment, a body can go into
rigor mortis and out of rigor mortis much more quickly
than is illustrated here.  Conversely, in a very cold
environment, the onset and the dissipation of rigor
mortis can be retarded for days and days because of
the cool temperature.

Now, we're talking about relatively extreme
temperature changes here to completely blow up this
chart.

Q.   So at what temperatures would you expect to

see a significantly accelerated curve in terms of this

onset and dissipation of rigor?

A.    Well, there's never an exact answer to that

because, obviously, you know, these studies would be

very difficult to do.  But when I talk about extreme

temperatures, I'm talking about a body that's, you

know, in the mid to high 80s, 90s outdoors, you know,

all day for hours exposed to that heat.  Now, I'm

certainly aware that my colleagues in the South have

seen cases in that extreme temperature where bodies go

into and out of rigor mortis very quickly.

Q.    So -- and I believe you testified earlier

that the data you looked at in this case showed a mean

temperature of about 64.2 degrees and an all-day high

of 79 degrees.  Would you expect those temperatures to

accelerate the curve in a significant way?

A.    No, I would not.  I mean, I can certainly

imagine temperatures like that tweaking this curve a

little bit.  But completely blowing this curve up to

put Ms. Stites in what is essentially waning rigor

mortis way more quickly than you'd expect, no.  I

don't think those temperatures are extreme enough to

do that.

Q.    Now, you testified that you reviewed Karen

Blakely's testimony as part of your review in this

case.  Did she discuss putting -- or excuse me.

Withdrawn.

Did she discuss a blanket having been placed

at some point over Ms. Stites' body?

A.   I think she did, yes.

Q.   Okay.  What impact would the placement of a

blanket on a body have on the progression and

dissipation of rigor?

A.   In my opinion, placing a blanket on a body

wouldn't have anything to do with the onset or

dissipation of rigor.

Q.   And why is that?

A.   Well, the reason that you put a blanket on

yourself when you're alive is because you create body

heat and the blanket is the insulation around you that

traps your body heat and keeps you warm.  Once you're

deceased, particularly if you'd been deceased for many

hours like Ms. Stites had, she's obviously not

generating body heat.  And so putting a blanket on her

is not going to trap her own body heat around her,

causing her to be warmer, causing this curve to

suddenly go haywire.

Q.   Thank you.

Next slide, please.

Now, you said that the minimal rigor that you

observed in Ms. Stites' body, in the three videos we

showed to the Court and then the crime scene video,

generally means that she's either going into rigor on

that upside of the slope or going out of rigor on the

downside.

How do you know what side of the curve this

body was on?

A.   So there's other features you can look at

that tell you the condition of her body to help you

know if she's only been out there for a few hours or

if she's been deceased for many hours, features that

are not dependent on the rigor but are dependant on

other things.

Q.   And did you see any of those features present

in any of the images in this case?

A.   I saw some and I also saw some described.

Q.   Okay.  So let's start with what was

described.  What was described that would indicate to

you there was decomposition present?

A.   So this is an observation that was made by

"KHB," which I take to be Karen Blakely based on the

initials, where she recorded, quote:  The victim's

face exhibited a green-colored tint or discoloration

along the jawline and into the hair on the left side

of the face.  The victim's lips were nearly black in

1  find people dead in one position all the time, and my

2  investigators put them in a different position to put

3  them in a bag and bring them in.

4  Q.  Thank you.

5  Next slide, please.

6  Okay.  Would you please describe the lividity

7  pattern you see here in Ms. Stites' body.

8  A.  So the lividity that got my attention in this

9  photograph was the lividity that is on her right arm

10  and her right forearm and her right wrist and her

11  right hand.  And you can actually see the lividity on

12  her right shoulder as well.  You can see how much more

13  pink those appear to be than her left arm and her left

14  hand.  And to my eye, that looks like lividity that is

15  not consistent with the position that her body is in.

16  Q.  And if I may just have you approach again,

17  Dr. Baker.  I apologize for not asking before.  If you

18  could please just show the Court again those areas

19  that you're referring to where you see

20  antigravitational livor in Ms. Stites' arm and

21  shoulder.

22  A.  So I'm talking about the red coloration right

23  here (indicating), which should be on the back of her

24  arm, not the top of her arm.  The red coloration that

25  you see here on the wrist, which should be on the

back, the downside, not the upside, and the same

comment here with her hand.

       This arm should look more like her left arm,

where you can see the lividity is on the bottom half,

the half that's touching the ground, as opposed to the

half that's not touching the ground (indicating).

   Q.   And if I could just have you stay there for

one second.  Can you please explain to the Court, on

her right inner forearm, the white pattern that you

see.  What is that?

   A.   So this white pattern -- so depending on what

position she really was in when she died, as far as

however many hours before her body may have been

moved, something could have been pressing against her

body right there to prevent the lividity from forming

in that area.

       Human skin is exquisitely sensitive to

changes in pressure.  Just the pressure from a bra

strap or the elastic band of underwear can prevent

lividity from forming on that specific part of the

body just by compressing the little capillaries shut.

So it doesn't take much pressure to have areas like

that.  We call that "sparing lividity" in forensic

pathology.  It just means that part of the body was

spared because there was something up against it.

Q.   Okay.  Thank you.  Please be seated.

And -- I'll let you sit.  Sorry.

Dr. Baker, based on the appearance or the position of Ms. Stites' body in this image, is there anything that you can see as she's positioned here that would cause this blanching pattern on the inside of her arm?

A.   Not that I can see, no.  I mean, as near as I can tell, her upper body is relatively flat, meaning it doesn't look to me like her right arm is lower than her left arm.

Q.   And there's nothing here in this image pressing on the inside of her arm; is that fair to say?

A.   Correct.

Q.   Okay.  Next image, please.

Now, in this image here, which is an aerial view of where Ms. Stites' body was found, can you please describe how Ms. Stites' body position appears to you.

A.   She appears to be on her back with her legs twisted to her right at her hip.  Her left arm is above her head, and her right arm is extended outward.  To me, this looks relatively flat.

Q.   Do you see anything about the way that her

body is positioned here in relation to the ground and

what's around her that would cause the lividity

pattern that you just described and showed to the

Court in her right arm?

A.   I don't.

Q.   Now, you reviewed Karen Blakely's notes from

the crime scene.  I believe that's right?

A.   Yes.

Q.   Okay.  Now, how did Ms. Blakely describe the

body's position at the crime scene?

A.   I'm going to be paraphrasing, but I believe

there was a small mound of dirt under the body --

Q.   Right.

A.   -- causing her to lean a little bit.  But I

don't know that that was ever qualified in terms of

what the small mound of dirt is nor even which

direction she was leaning.

Q.   Okay.  And do you see any elevation or small

mound of dirt here that would cause the

antigravitational livor to form in the way that you've

just showed to the Court?

A.   I don't see that illustrated, no.

Q.   Thank you.

Next image, please.

What is this image?

1    A.   This is a photograph taken at the autopsy

2  table.  The autopsy was performed the following

3  afternoon, April 24th, after Ms. Stites was found

4  deceased.

5         The reason I inserted this particular autopsy

6  photo is you can see the persistence of that lividity

7  on her right shoulder and right arm.  It still has not

8  moved to her back and settled.  That's just further

9  evidence that this lividity is fixed in place in that

10 area.

11   Q.   Dr. Baker, if you could please get up and

12 show the Court, just with your hand again, the

13 lividity pattern you are saying is remaining the next

14 day in the autopsy suite.

15   A.   I'm talking about this lividity right here

16 (indicating), which is on the front of her body even

17 though she was found deceased on her back.  This is

18 just evidence that that lividity persisted through the

19 night of the 24th and into the next day, the 24th,

20 when that autopsy was being performed.

21   Q.   Thank you.

22        MS. PUCHER:  And Dr. Baker was referring

23 to the area of Ms. Stites' right arm, right upper

24 breast, and right neck area in that image, for the

25 record.

Q.   (BY MS. PUCHER)  Now, Dr. Baker, by seeing
this fixed lividity pattern in the body inconsistent
with the position in which Ms. Stites was laying at
the death scene remaining the next day, what
conclusions can you draw?

A.   Well, the first conclusion I would draw is
the fact that you have that fixed lividity is further
support that she's on the downslope of the rigor
curve, because you wouldn't expect that degree of
fixation if she'd only been dead for a few hours.

The second interpretation would be that this
is good evidence that this body was moved at some
period of time after she had been dead for at least
several hours, long enough for that lividity to become
fixed in that area.

Q.   Next image, please.

Dr. Baker, what does this image represent?

A.   This is a photograph of Ms. Stites taken at
the scene where her body was found.  It has obviously
been rolled over from the original position in which
she was found.  You can see that she has developed
some lividity on her back, which is the very light
pink coloration you see on her left flank and left
lower back.

If you look at her left upper back, you can

Dr. Dana and I agree on that point, that she's waning,

as do the other expert opinions that I've read.  This

would indicate that she died many hours before the

purported time of 3:00 to 5:00 a.m. to explain why her

rigor mortis would have dissipated so much.

And then the livor mortis is evidence that

her body was in some other position for hours longer

than the two hours allotted by time of death between

approximately 3:00 a.m. and 5:00 a.m.  So that's

basically a nutshell of my opinions regarding the

time-of-death testimony in this case.

Q.  And did you make these opinions within a

reasonable degree of medical certainty?

A.  I did.

Q.  Thank you.

Next slide, please.

Okay.  Let's move on now to talking about the

testimony featured in multiple witnesses in this case

about the persistence of sperm.

Just to overview the Court, did you form an

opinion about the State's trial testimony regarding

persistence of spermatozoa in the vagina?

A.  I did.

Q.  Okay.  And what is that opinion?

A.  My opinion is that the State's testimony was

incorrect about how long sperm, intact or otherwise, can persist in the vagina.

Q.   Next slide, please.

Now, I believe you reviewed the testimony of Ms. Blakely in this case?

A.   I did.

Q.   Can you please just summarize for the jury what she -- for the Court what she told the jury about the persistence of intact sperm.

A.   I can.  I will quote Ms. Blakely as to --

Q.   Thank you.

A.   -- what she told the jury.

She said, quote:  I have published documentation that says that 26 hours is about the outside length of time that tails will remain on a sperm head inside the vaginal tract of the female.  End quote.

This was not qualified.  There were no caveats.  There were no more likelies or more probables.  This was just put out there as though 26 hours is some sort of hard-and-fast cutoff.  Now, she also cited a reference for this, which I know we will come back to.

Q.   Yes.  Thank you.

And you also reviewed the testimony of Meghan

1  tails can be found in the vagina was dramatically

2  incorrect based on literature that was known at the

3  time.  In my opinion, Ms. Blakely cited a key

4  reference but then misstated what the reference

5  actually said, because there was no reference to the

6  table in that reference that showed that sperm with

7  tails can persist much longer than the 26 hours that

8  she testified to.

9  And I would just point out that the length of

10  time that visible sperm without tails can be found was

11  already known from studies that were published and

12  available in 1996.  This is not some new science that

13  goes back and contradicts a mistake that was made in

14  the past.  This was known data at the time.

15  Q.  And did you make these opinions summarized

16  here within a reasonable degree of medical certainty?

17  A.  Yes.

18  Q.  Thank you.

19  Next slide, please.

20  Okay.  I believe you also formed an opinion

21  about the testimony Ms. Blakely offered about bruises

22  found on Ms. Stites' body.  Can you please just

23  preview that for the Court?

24  A.  Yes.

25  So this is what Ms. Blakely testified about

when she was dating or aging the various injuries
found on Ms. Stites' body.  Ms. Blakely testified,
quote:  Oftentimes, one can tell if a bruise is recent
just by the color.  If it is still red, that means the
blow is really recent as it would be if you received a
blow.  If a certain time has passed, they tend to turn
a purple color.  And then if it's been days, it's
often a green color.  That is the normal progression
of a bruise in anybody.  However, that stops at the
time of death, and I did see some bruises that looked
like they had been there for days and some that looked
like they were relatively fresh.

     Now, that's my emphasis added because she is
now dating the bruises on Ms. Stites' body.

     Q.  Next slide, please.

     Now, was that testimony that Ms. Blakely gave
and that you just read to the Court correct?

     A.  It is incorrect, and we knew it was incorrect
long before 1996 based on published data in the
forensic science literature.

     Q.  Okay.  Now, what do the relevant studies in
the forensic scientific literature show about the
ability to date bruises?

     A.  So I'll give you two examples of that.  The
first one is from Langlois and Gresham.  This was a

study looking at scores, if not hundreds, of bruises that occurred in patients who came to the hospital emergency room with a bruise of a known cause or hospital staff who came to sick-call with a bruise of a known cause. And so these doctors decided we will photograph these bruises every day, same conditions, for as often as we can and see what we can actually learn about the progression of bruises.

Because prior to this study, the conventional wisdom was, well, all of us have gotten bruises on ourselves at some point and we've seen the progression, and so we assume that that's predictable. So what did the data actually say when they did the study?

Well, it turns out that red, blue, purple, and black can appear at any time in the evolution of a bruise. It turns out red has no bearing on the age of a bruise. And even in the same person, bruises of identical age and cause can appear to evolve differently depending on the part of the body they're on.

So, again, nobody would go into court testifying that they can date bruises as being days old or being fresh, or they shouldn't be doing that, because the literature already said it turns out you

can't do that.

Q. Thank you.

Next slide, please.

A. So that slide is a different study. This is by Stephenson and Bialas. This happens to involve children, although that's not really relevant here. It's just that bruises come up a lot more in child abuse cases than in other types of cases. But what they did is they took photographs of bruises of known date and known cause, and they showed 44 instances of these to a person who was purported to be an expert in dating bruises.

And they showed this expert these photographs of known accidental bruises, and all the expert had to do was tell you whether the bruise was fresh, meaning it looked like it was less than two days old; whether it was intermediate, meaning two days to seven days old; and whether it was old, meaning it was older than a week. Now, those are pretty broad parameters. You'd think that if there were any science behind this, you would get all these right. And in fact, this expert was correct in only 24 of 44 cases, which is barely 50 percent.

So, again, I point this out because this existed in the literature prior to this testimony

being given at trial.  If you're going to testify about bruises, you should know what the literature says.

Q.    And I believe have a cite at the bottom of this slide, which is the Stephenson and Bialas study, which is dated 1996.

A.    Correct.

Q.    Okay.  Thank you.

Next slide, please.

So just to summarize this opinion, was Ms. Blakely qualified to give such an opinion about the age or meaning of bruises on Ms. Stites' body?

A.    So in my opinion, she was not.  In my opinion, only physicians or other qualified health care practitioners should be testifying about the nature of injuries.  As far as I know, Ms. Blakely was not a physician and she had no qualifications to testify about the nature of the injuries.

My second opinion is that she portrayed an expertise in dating injuries where that expertise doesn't even exist, and there's no scientific data that allows you to date bruises with any level of precision based on their color changes.

Q.    Thank you.

Moving to your last or your fourth opinion

1    tearing.

2        Q.   Thank you.

3             Next slide, please.

4             Okay.  Now, as a medical examiner, can you

5    infer whether a sexual act was consensual based on the

6    presence or absence of an injury?

7        A.   No.

8        Q.   Okay.  Why not?

9        A.   So a sexual assault is a legal term.  It's

10   not something you can diagnose based on an autopsy

11   finding.  There is no autopsy finding that's

12   diagnostic of a sexual assault.

13       Q.   Now, I want to draw your attention to a

14   longer quote from the trial testimony of Dr. Bayardo.

15   It's cited at the bottom.  From May 6, 1998, afternoon

16   session, 126:16 to 25 to 127:1 to 13.  I'm going to

17   read part of his testimony and then ask your opinion

18   about it.

19            "QUESTION:  Dr. Bayardo, we've talked already

20   about the fact of being able to determine when

21   injuries occur in relation to death, either after

22   death, before death, or at the time of death.

23            "Did you look at this injury, the lacerations

24   on the young lady's anus, to make a determination to

25   whether this occurred before death, at the time of

1  death, or after death?

2        "ANSWER:  It's my opinion that this injury

3  occurred at the time of her death, around the time of

4  her death.

5        "QUESTION:  As a result of that fact,

6  Dr. Bayardo, would you have an opinion as to whether

7  or not any penile penetration in that regard would

8  have been consensual?

9        "ANSWER:  Yes.

10        "QUESTION:  What would that be?

11        "ANSWER:  Yes, I would say this would not

12  have been consensual.

13        "QUESTION:  Is that due to the fact of the

14  injury and that it was at the time of death?

15        "ANSWER:  That's correct."

16        Now, Dr. Baker, is this testimony something

17  that a medical examiner is able to give properly to a

18  court?

19     A.   In my opinion, no.

20     Q.   And why is that?

21     A.   Well, this is wrong on multiple levels.  The

22  first level is there weren't lacerations around the

23  anus, which is what he's basing this testimony on.

24  The second is, even if there had been a laceration

25  there, you can't time that laceration with any level

of precision that would allow you to know that it

occurred, quote, around the time of her death or,

quote, at the time of her death, unquote.

          And even if the laceration were real, sexual

assault and sexual consent are not pathological

diagnoses.  That is something that other people would

have to infer from a legal point of view.  It's not an

autopsy finding.

          Q.  Thank you.

          Next slide, please.

          Okay.  Just one more short section of the

testimony.  And I'm going to draw your attention to

this section, Dr. Baker.  This is from the trial

testimony May 6th, 1998, afternoon session, 138:15 to

25 to 139:1 to 4.

          "QUESTION:  According to your previous

testimony, you indicated that the rectal tear was

postmortem, therefore" -- I'm sorry -- "premortem.

Therefore, what would have had to have been occurring

when that happened?

          "ANSWER:  At that time she would have been at

least unconscious if not already dead.

          "QUESTION:  But right in that area?

          "ANSWER:  Yes, ma'am, definitely.

          "QUESTION:  Consequently, would it have been

occurring hand in hand with being strangled to death
with State's Exhibit 56?

          "ANSWER:  Well, I believe it occurred just
after the strangulation."

          And then:  "No further questions."

          Dr. Baker, was this a medically sound
statement for Dr. Bayardo to give to the jury?

     A.   No.

     Q.   And why is that?

     A.   You can't possibly time this injury -- which,
as I'm going to point out shortly, I don't think even
existed -- with that level of precision.  To say that
it occurred just after the strangulation or to be
asked if it occurred hand in hand with being strangled
and to provide any kind of meaningful answer to that,
there's simply no way you can do that on an autopsy
finding.

     Q.   Is there any basis that you know in
scientific literature for that kind of timing of an
injury?

     A.   None.

     Q.   Thank you.

          Next slide, please.

          Okay.  Now, what does -- there was testimony
offered by Dr. Bayardo that Ms. Stites' anus was

1    dilated at the time of her autopsy.

2         What does "anal dilation" mean in the context

3    of a deceased individual?

4        A.    So anal dilation actually means nothing in a

5    deceased individual.  The anus is a sphincter -- it's

6    actually a couple of sphincters -- and like all

7    sphincters in the body, it is very likely to relax at

8    the moment of death or shortly after you die.  Every

9    forensic pathologist has done many autopsies where

10   people have urine in their underwear, feces in their

11   underwear because their urethral sphincter, their anal

12   sphincter is relaxed after death.

13        We see the same thing with the esophagus.

14   Dead people will have vomit and stomach contents

15   coming out of their mouth, getting into their trachea

16   because the sphincter at the bottom of your esophagus

17   will dilate, not unlike an anus.

18        Anal dilatation means nothing postmortem.

19   You certainly cannot look at a dilated anus and infer

20   that someone has been sexually assaulted.

21       Q.    How long does it take for an anus to dilate

22   after somebody dies?

23       A.    I don't know that anybody's ever done that

24   specific study.  But having done plenty of autopsies

25   where it clearly has taken place, it's nowhere near

the four to five days that Dr. Bayardo is claiming.
Given how many people have fecal contents in their
underwear, it clearly does not take very long.

Q.   Next slide, please.

A.   Yeah, this is my other comment with regard to
the reality of the anal findings in this case.  The
autopsy photos don't show any anal lacerations, and I
believe Dr. Bayardo mistook what is actually normal
anal anatomy for lacerations.

Q.   And do you have an image of normal anal
anatomy that might help the Court in understanding
this point?

A.   I do.

THE WITNESS:  And if the Court wouldn't
mind, I'm pretty sure I'm going to need to come to the
screen for this.

THE COURT:  Go ahead.

MS. PUCHER:  Thank you.

A.   So this is a very complicated diagram from an
anatomy textbook of the colon, rectum, and anus.  So
the primary things you need to recognize in this
photograph is this is the rectum right here.  This is
the anus right here.  And your anus is lined with skin
that's not unlike the skin on the rest of your body,
and there's muscles around the anus known as the

sphincter, and so they keep that shut when you're

alive.

       Where the skin at the anus meets the mucosa,

or the lining of the rectum, is this undulating line

right here, and this can undulate pretty dramatically.

So these are known as the columns of Morgagni right

here.  And in a living person, there's very few

circumstances where you would ever be able to see

those.  Except under anesthesia or some kind of

medical scope, you wouldn't see these in a living

person.  But in a dead person, when the anal sphincter

is relaxed and that anus starts to splay open, you can

actually see these columns of Morgagni; and if you

don't know what you're looking for, you can

misinterpret those as abrasions and lacerations.

       Q.   Thank you.

       Now, how can normal anal anatomy, as you're

showing to the Court through this image, be mistaken

for lacerations or injury?

       A.   Well, again, once these sphincters open up

and that anus dilates, this part of the body gets

much, much closer to the opening of the anus and so

you can see it where you wouldn't normally see it in a

living person.  These columns of Morgagni become

visible and they're mistaken for lacerations.  I know

this happens because I've seen other physicians do it.

Q. Okay. Do you have some images to illustrate that?

A. I do.

Q. Okay. Next slide, please.

A. So this image was supplied to me courtesy of a colleague, who happens to be a pediatrician who does a lot of sexual abuse exams, alleged or real, sexual abuse in children. This is a photograph of a normal anus that would be used for teaching purposes. All you're going to see in a living person is the outside skin all wrinkled up. These, of course, the sphincters are intact.

Q. Yes. Next slide, please.

A. So I mentioned this area earlier, these columns of Morgagni. If you have a case where the person's anus is markedly dilated for any reason, what you're going to see -- I don't want to be in Your Honor's way, but I've got to get over here to point -- what you're going to see is anuses that look like this or anuses that look like this. Now, these are normal anal exams by a qualified practitioner. These anuses happen to be dilated. But notice when you start to see those columns, those get kind of scary looking and you might think that's an injury,

but you're actually seeing these sway open

(indicating).

Q.   Can you just circle with your hand again

which columns you're talking about that might be

mistaken for an injury.

A.   On the photographs?

Q.   Yes, on the photographs, please.

A.   Oh.  On the photographs, it would be these

undulating scalloped margins right here; this

scalloped margin right here (indicating).  Again, if

an anus is dilated enough, you can mistake that normal

anatomy for a laceration.  Now, if these were really

lacerations, they would obviously bleed a lot, right,

because this is skin that has blood vessels in it

that's been torn.

Q.   Right.  Understood.  Yeah.

MS. PUCHER:  And for the record,

Your Honor, Dr. Baker has circled on two top-to-bottom

images on the left-hand side of this slide some areas

around the top portion of the anus that are scalloped

and around the bottom right-hand side of the anus in

those images.

Q.   (BY MS. PUCHER)  Okay.  Dr. Baker, were there

any images in this case of Ms. Stites' anal-rectal

area that suggested to you that injuries -- or there

1  were -- the alleged injuries were actually this

2  phenomenon being mistaken?

3      A.   Yes.

4      Q.   Would you please switch to the next slide.

5      A.   And I think I may want to come back to the

6  screen for this.

7      Q.   Sure.  That's fine.

8      A.   This is, as near as I can tell, the

9  best-quality existing photograph of Ms. Stites' anus

10 in existence today that was supplied to me.  This is

11 obviously being taken in the autopsy suite.  It's got

12 the autopsy identifiers right here.  You'll notice

13 there is a finding right here that appears to be

14 coming off of her anus (indicating).

15     Q.   Uh-huh.

16     A.   Notice how much it looks just like the

17 mistake in anatomy that I showed you earlier.

18     Q.   So on her body, for the record, you're

19 pointing to 12 o'clock at the top of her anus the

20 divotted area; you're comparing that to the images on

21 the left-hand side?

22     A.   Correct.  And I would even use the word

23 "scalloped" because you can actually make out three

24 more scallops if you come really close.  And they're

25 all more or less in continuity with this one right

here, not unlike what you see on a known photograph in a normal individual. And, of course, if this were really a laceration and it occurred right before you died, that should be bleeding.

Q. Now, do you see any evidence, looking at this image of Ms. Stites' anus, of a laceration or an abrasion?

A. I don't. What I see is most likely a column of Morgagni that's been mistaken for a laceration.

Q. Thank you.

Okay, I think you can go to the last slides that we have.

So in summary, just on this opinion specifically, what is your opinion about the medical evidence offered at trial about the presence and meaning of alleged anal injuries?

A. So my first opinion would be that anal dilatation is a normal postmortem occurrence and you cannot infer any sexual activity, consensual or otherwise, from it.

I do not believe the autopsy photos document any actual anal lacerations, which again, by the way, Dr. Bayardo didn't call them "lacerations" in his report; he called them "abrasions." They only became lacerations when he testified.

1          (Witness sworn.)

2          THE COURT:  And if you could state your

3  full name for the court reporter.

4          THE WITNESS:  Charles Wayne Fletcher.

5          THE COURT:  All right.

6          And, Ms. Martin, you may proceed

7  whenever you're ready.

8          MS. MARTIN:  Thank you.

9              **CHARLES W. FLETCHER**,

10  having been first duly sworn, testified as follows:

11              **DIRECT EXAMINATION**

12  BY MS. MARTIN:

13      Q.  Mr. Fletcher, at some point were you employed

14  by the Bastrop County Sheriff's Office?

15      A.  Yes, I was.

16      Q.  And when would that have been?

17      A.  '92 -- I think I left sometime in '96.

18      Q.  And what were your duties while you were

19  employed by the sheriff's office?

20      A.  A corrections officer, and I was reserve

21  officer, and I was a transport officer.  I would

22  transport inmates to court and medical appointments.

23      Q.  Did you also serve as a jailer?

24      A.  Yes.

25      Q.  And are you familiar with Jimmy Fennell?

A.   Yes.

Q.   And how did you know Jimmy Fennell?

A.   He started in the jail.  I think we kind of trained him around a little bit.

Q.   Did you frequently work with Mr. Fennell?

A.   Yes, uh-huh.  A lot.

Q.   And how often would you say, on a daily basis, you spent time at work with Mr. Fennell?

A.   Oh, 12, 13 hours.

Q.   And generally how would you describe your relationship with Mr. Fennell?

A.   You know, kind of a coworker/friend relationship.

Q.   Did you have a social relationship?

A.   Yes.

Q.   And are you also familiar with Stacey Stites?

A.   Yes.

Q.   And how did you know her?

A.   Stacey and Jimmy -- he introduced me as her fiancé [sic].

Q.   And do you recall at one point helping Jimmy move Stacey and her mother into an apartment?

A.   Yes.

Q.   And did you ever see Stacey and Jimmy socially?

A.   A couple of times, not -- not a lot, but a
few times.

Q.   And can you generally describe for me, you
know, what you would do socially with them.

A.   Oh, we'd, you know, get food, eat, we'd
barbecue, you know.

Q.   Is there any particular social interaction
with Jimmy and Stacey that stands out in your mind?

A.   Just when they moved to Giddings.  I didn't
see him a whole lot, but I went over there for a
barbecue and what he said was pretty alarming at the
time.

Q.   This barbecue you're referring to, when do
you think approximately that would have been?

A.   Early April, maybe late March, I think.

Q.   And can you just generally describe for me,
you know, the scene of the barbecue.  When you
arrived, what was going on?

A.   Well, they were getting stuff and -- getting
stuff ready.  And then Stacey said, "I'm just going to
the pool," and you know, "You do it yourself."

        And he said, "Why, you're not going to help
me?"

        She said, "No," and then she just stomped off
and went around to the pool.

Q.   So was your impression that that was --

A.   Yeah.

Q.   -- somewhat intense --

A.   Yeah.

Q.   -- interaction?

A.   They were -- voices was raised and they were just real short answers.

Q.   Was it your impression that they were in a good place in their relationship at that point in time?

A.   Not at that time, no.

Q.   And I'll just ask you to give me a little chance so the court reporter has some time to get down your answer --

A.   Okay.

Q.   -- before I ask my question.

     And was there anything specific that you remember Jimmy just saying to you --

A.   Yes.

Q.   -- at that time?

A.   Yes.

          MS. TANNER:  Objection, Your Honor, hearsay.

          MS. MARTIN:  Your Honor, first of all, she doesn't know what he's going to say yet.  Second

of all, it's not hearsay.  This is a Brady witness.
We're offering it for purposes of showing that the
prosecution had this information and it's a Brady
violation not to disclose it.

Second, you know, once the information
is out, I can explain to you about three reasons why
it falls under hearsay exceptions, or I can preview
the testimony and give you that information now.

THE COURT:  Objection overruled.

Q.   (BY MS. MARTIN)  Mr. Fletcher, what do you
recall Mr. Fennell saying to you?

A.   That he thinks that she was fucking a nigger.

Q.   And when you say "she," who was he referring
to?

A.   Stacey said -- said Stacey was.

Q.   So Mr. Jimmy Fennell said that he believed
that Stacey --

A.   Yeah, that Stacey was fucking a nigger.

Q.   And you remember him saying those --

A.   Yes.

Q.   -- exact words?

A.   Yes.

Q.   And why do you remember?

A.   Just how he said it to me and using that tone
and that word, the N-word and...

1        Q.    And do you remember where you were when Jimmy

2   said this?

3        A.    Yeah, we were right outside the front of the

4   apartments around the barbecue pit.

5        Q.    And did you follow up or ask him questions

6   about it?

7        A.    No, not really.  I kind of just left it

8   alone, and I think I left even before the food was

9   ready.

10       Q.    And this was a long time ago.  Why do you

11  still remember this?

12       A.    Well, just because he hardly ever said that

13  word.  You know, I never heard him say it, so it just

14  stood out to me.  And Curtis Davis was there too.  He

15  heard it too as well.

16       Q.    And at some point after this, Ms. Stites was

17  murdered, correct?

18       A.    Yes.

19       Q.    And did you attend Stacey's viewing and

20  funeral services?

21       A.    Yes.

22       Q.    What was your impression of Jimmy's behavior

23  before and at the service?

24       A.    He was just, you know, not saying anything.

25  He just looked real lethargic to me.  Just didn't say

hardly anything, movement was real slow.

Q. And did you -- after the service, did you then attend Stacey's burial?

A. Yes.

Q. How did you get there?

A. I went down with Jimmy and his parents in their car.

Q. And what was his behavior like in the car ride?

A. He didn't say a whole lot, maybe three or four words the whole ride down to Corpus.

Q. And did his behavior raise any questions in your mind?

A. Well, it did just in my mind, but, you know...

Q. And what was the impression that his behavior left on you?

A. That, you know, I don't know, something sketchy. I don't know. I felt kind of -- in my gut. I didn't have no proof, but just, you know, my gut feeling.

Q. And did Jimmy's behavior affect your relationship with him going forward?

A. Yes. Yes.

Q. And how was that?

A.    I just never -- never seen him again.  I
think he came to the jail one time and was going down
the hall and I said hello and he just walked right
past me.  He was with Chris Walker, investigator.

Q.    And at the time Stacey's murder was being
investigated, did you ever tell anyone about the
statements that Jimmy made to you at that barbecue?

A.    No.

Q.    And why didn't you say anything at the time?

A.    Well, I was getting ready to quit and I
didn't want -- you know, I still had family here and I
was moving away.  And I just -- you know, I didn't
feel like I should go against local law enforcement at
the time.

Q.    Since the time, have you -- you know, outside
of interactions with counsel, have you ever told
anyone about what Jimmy said to you about Stacey or
his behavior at the funeral?

A.    Not really.

Q.    Did you ever talk to your family about it?

A.    No.  I told my wife, but...

Q.    And why are you coming forward with this
information now?

A.    Just the right thing to do, and then the more
stuff that's come up about him has kind of fallen in

line.

          MS. MARTIN:  No further questions.  I reserve the right to redirect.

### CROSS-EXAMINATION

BY MS. TANNER:

    Q.   Mr. Fletcher, I just have a few questions for you.

    A.   Yes, ma'am.

    Q.   First of all, you have provided an affidavit to the defense counsel telling basically the same thing you've testified to, and it's dated October 11th of 2019, right?

    A.   Yes.

    Q.   Do you have any disagreement with that?  I'm looking at it --

    A.   No.

    Q.   -- and it was sworn to on October 11th, 2019, right?

    A.   Right.

    Q.   Okay.  So we know that Stacey Stites was murdered in April of 1996, right?

    A.   Right.

    Q.   So this affidavit is 23-plus years after she was murdered?

    A.   Correct.

1    Q.   Okay.  And you say that Jimmy tells you this

2  disturbing thing in March of '96, thereabouts, and

3  then Stacey's murdered around April of '96, correct?

4    A.   Right.

5    Q.   Okay.  And at the time she was murdered, you

6  were also a Bastrop County law enforcement officer,

7  correct?

8    A.   Yes.

9    Q.   Okay.  You worked for the Bastrop County SO?

10   A.   Yes.

11   Q.   And you know that the Bastrop County SO was

12  one of the agencies that was investigating Stacey's

13  murder?

14   A.   Yes.

15   Q.   Right?

16        For the record, did you work on that

17  investigation in any capacity?

18   A.   No.

19   Q.   Okay.  You were not involved in it in any

20  way, shape, or form?

21   A.   No.  I was never asked a question about it.

22   Q.   Never asked -- never asked you to do anything

23  on it?

24   A.   No.

25   Q.   Never -- you never volunteered to do anything

1  on it?

2      A.   I did ask Chris Walker to help on the

3  investigation.  He told me no; I was too close to it.

4      Q.   You were too close, so you were kept out of

5  the investigation of Stacey's murder because of your

6  relationship with Jimmy?

7      A.   Right.

8      Q.   Okay.  And so, therefore, you had no

9  involvement whatsoever in the investigation.

10     A.   None.

11     Q.   All right.  Now, after Stacey's murder, you

12 knew enough just from being at the Bastrop County

13 SO --

14     A.   Uh-huh.

15     Q.   -- and working at the SO to know that the

16 Rangers and other law enforcement officers were taking

17 a pretty hard look at Jimmy --

18     A.   Uh-huh.

19     Q.   -- right?

20     A.   Yes.

21     Q.   I mean, they were -- they came down on him

22 pretty hard in the first, I don't know, six months or

23 so of this investigation, didn't they?

24     A.   I don't know how hard they came down on him.

25     Q.   But you knew he was a suspect?

1       A.   Yes.

2       Q.   Okay.  And you knew that the Rangers were

3   looking at him as a possible person to have caused

4   Stacey's death, right?

5       A.   Correct.

6       Q.   Okay.  And would you agree with me that the

7   information you now say that you have, back then,

8   would have been something an investigator might have

9   been interested in?

10      A.   Maybe.

11      Q.   Maybe?  Okay.

12      A.   But I didn't want to get too much involved.

13      Q.   You didn't want to get involved?

14      A.   No.

15      Q.   Okay.  And you are -- by the way, you're not

16  a law enforcement officer anymore, are you?

17      A.   No.

18      Q.   You are, of course, familiar with the Texas

19  Rangers?

20      A.   Yes.

21      Q.   Okay.  Do you respect the Texas Rangers?

22      A.   Yes.

23      Q.   Yes?

24      A.   Yes.

25      Q.   Okay.  By the same token, the detectives

1    THE COURT:  All right.  And could you
2  state your full name for the court reporter, please.
3    THE WITNESS:  Rubie Volek.
4    THE COURT:  Can you spell that last name
5  for us.
6    THE WITNESS:  V-O-L-E-K.
7    THE COURT:  Okay.  Proceed.
8    **RUBIE VOLEK**,
9  having been first duly sworn, testified as follows:
10    **DIRECT EXAMINATION**
11  BY MR. MCNEAL:
12    Q.  Hi there, Ms. Volek.  How are you?
13    A.  I'm fine, thank you.
14    Q.  As you know, my name is Quinncy McNeal,
15  counsel for Mr. Reed.  This is the State's counsel
16  here.  This is the Honorable J.D. Langley.
17    I just have a few questions for you.
18    A.  Okay.
19    Q.  I hope to get you out of here pretty quickly,
20  okay?
21    A.  Okay.
22    Q.  You said your name is Rubie Volek.  Do you
23  mind if I call you "Ms. Volek"?
24    A.  Not at all.
25    Q.  Ms. Volek, where are you from?

          A.    Round Rock, Texas.

          Q.    I'm going to try to project my voice so that
you can hear me.  I have a tendency of mumbling.

                And what line of work are you in?

          A.    The insurance business.  Life insurance.

          Q.    Life insurance.  I'm sorry.

                And, Ms. Volek, how long have you been doing
that?

          A.    Probably close to 45 years.

          Q.    And tell us which insurance company you're
associated with.

          A.    Currently with the SPJST.

          Q.    What is the SPJST?

          A.    It's a fraternal life insurance company.

          Q.    Okay.  And have you always been with the
SPJST?

          A.    No, sir.

          Q.    And who did you work with before that?

          A.    BlueCross BlueShield.

          Q.    Rubie, what is the difference between an
SPJST type of insurance company and BlueCross
BlueShield?

          A.    SPJST is a fraternal; it's family oriented,
and it is concerned about its members and tries to
create harmony and concerns for its members.

Q.   Okay.  Which company were you with in 1996?

A.   SPJST.

Q.   Okay.  Tell me just a little bit more about SPJST.  Are there -- do you have events and such outside of just insurance -- the insurance business?

A.   Being a family-oriented organization, it creates lodges.  We have about a little over 200 lodges over the state of Texas, and the purpose of that is to create -- to create socializing amongst its members.  It has monthly meetings.  Each lodge is separate, and they elect their own officers and directors.  They -- at the meetings, they, like I say, promote socialism in the fact that covered -- maybe covered dish, they play dominoes.  For the children, they have camps, they give scholarships and donations to various organizations.  And the ones -- the lodges that have halls -- not all of them have halls, but the ones that do also have dances.

Q.   Dances.  Let's talk about the dances a little bit.  Were you ever in charge of these dances or had a supervisory role over the dances?

A.   Yes, sir.  I was an officer.  So the officers and directors took turns being in charge of the different dances that we had.  And so yes, I was.

Q.   And so you were an officer; is that what you

said?

A.    Yeah.  I was secretary at that time.

Q.    As secretary of SPJST in these --

A.    In that lodge.

Q.    In that lodge as secretary, were you in
charge of staff or security at the dances?

A.    Yes.  Each -- I was in charge of the entire
dance for that night.  I had to get the workers for
the ticket sales, the kitchen sales, the bar sales,
and I had to be sure that the money was there in -- in
each department and also make sure that the security
was -- was there.

Q.    Let's talk about security for a second.  Did
Jimmy Fennell work as part of your security?

A.    Yes, he did.

Q.    And what role did he generally have in doing
that?

A.    Well, he was -- along with two or three
others that were usually in charge of -- or working at
the same time that he was, they would make sure that
there wasn't any minors drinking, that no fights were
taking place, and just acting as security.

Q.    Basic security?

A.    Yes.

Q.    Okay.  And so you knew Jimmy through his work

1  as security; is that your testimony?

2  A.  Yes, sir.

3  Q.  And did you ever have occasion to meet

4  Stacey Stites?

5  A.  I did.

6  Q.  And tell me, Ms. Volek, where did you meet

7  her?

8  A.  He brought her -- occasionally he would bring

9  her over to the hall when he was working security.

10  This -- this one particular time I was in charge and

11  he introduced me to her as -- as his girlfriend.

12  Q.  Okay.  And tell me what happened next after

13  the introduction.

14  A.  Well, we visited, and being in the life

15  insurance business, I approached her about buying a

16  life insurance policy.

17  Q.  Okay.  And what happened next, Ms. Volek?

18  A.  And she agreed to do that.  And so I ran out

19  to the car and I got an application, brought it back

20  in, and she proceeded to fill it out.

21  Q.  What happened next?

22  A.  And as she was filling it out, she made the

23  comment that she doesn't know why she really needs

24  life insurance, that she's so young.

25  Q.  Okay.  And what happened next?

A.    And as soon as she said that, Jimmy immediately said, "If I ever catch you messing around on me, I will kill you and nobody'll know that I was the one that did it."

Q.    And, Ms. Volek, did he appear to be joking to you?

A.    Not at all.

Q.    Why do you say that?

A.    Well, it just -- he was very stern when he said it, and it really concerned me, not only because I was in the life insurance business but because he was threatening her life.

Q.    How long was the exchange altogether?

A.    Well, it wasn't very long.  She proceeded to fill out the application.  Made no comment.

Q.    Ms. Volek, what happened next that you recall?

A.    Well, I submitted the application to my home office for approval.

Q.    And around what time was this?  Do you know that?

A.    It was in November of 1995.

Q.    And how do you recall that so well?

A.    Because I got a confirmation back from the home office that they had received her application.