# Exhibit 25

REPORTER'S RECORD

VOLUME 5 OF 12 VOLUMES

TRIAL COURT CAUSE NO. 8,701

COURT OF CRIMINAL APPEALS NO. WR-50,961-10

|  |  |
|---|---|
| | ) 21st DISTRICT COURT |
| | ) |
| | ) |
| | ) |
| EX PARTE RODNEY REED | ) OF |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) BASTROP COUNTY, TEXAS |

------------------------------

WRIT OF HABEAS CORPUS

July 22, 2021

------------------------------

BE IT REMEMBERED THAT on the July 22, 2021, the
following proceedings came on to be heard in the
above-entitled and numbered cause before the Honorable
J.D. Langley, Visiting Judge of the 21st District
Court, held in Bastrop, Bastrop County, Texas.

Proceedings reported by machine shorthand by
Hayley Stiteler, CSR, RPR.

```
 1              A P P E A R A N C E S

 2
      FOR THE APPLICANT:
 3

 4          Mr. Andrew F. MacRae
            LEVATINO | PACE LLP
 5          1101 South Capital of Texas Highway
            Building K, Suite 125
 6          Austin, Texas 78746
            512.6371581
 7          amacrae@levatinopace.com
            SBOT NO. 00784510
 8

 9          Ms. Jane Pucher
            INNOCENCE PROJECT
10          40 Worth Street, Suite 701
            New York, New York 10013
11          646.227.8327
            jpucher@innocenceproject.org
12

13          Barry C. Scheck
            INNOCENCE PROJECT
14          40 Worth Street, Suite 701
            New York, New York 10013
15          212.364.5390
            bscheck@innocenceproject.org
16

17          Mr. George H. Kendall
            SQUIRE PATTON BOGGS, LLP
18          1211 Avenue of the Americas
            New York, New York 10036
19          212.872.9834
            george.kendall@squirepb.com
20

21
            Ms. Michelle L. Davis
22          SKADDEN, ARPS, SLATE, MEAGHER & FLORM, LLP
            1000 Louisiana, Suite 6800
23          Houston, Texas 77002
            713.655.5100
24          michelle.davis@skadden.com
            SBOT NO. 24038854
25
```

       Ms. Nicole A. DiSalvo
       SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
       920 North King Street
       Wilmington, Delaware 19801
       302.651.3027
       nicole.disalvo@skadden.com
       Delaware Bar No. 4662


       Ms. Corrine Irish
       SQUIRE PATTON BOGGS
       1211 6th Avenue, 26th Floor
       New York, New York 10036
       212.872.9823
       corrine.irish@squirepb.com


       Mr. Quinncy McNeal
       HUSCH BLACKWELL LLP
       600 Travis Street, Suite 2350
       Houston, Texas 77002
       713.525.6253
       quinncy.mcneal@huschblackwell.com
       SBOT NO. 24074690


       Ms. Sarah Runnells Martin
       SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
       920 North King street
       Wilmington, Delaware 19801
       302.651.3000
       sarah.martin@skadden.com


FOR THE STATE:

       Ms. Lisa M. Tanner
       TEXAS OFFICE OF THE ATTORNEY GENERAL
       P.O. Box 12548
       Austin, Texas 78711
       512.463.2125
       lisa.tanner@oag.texas.gov
       SBOT NO. 19637700

Mr. Travis G. Bragg
TEXAS ATTORNEY GENERAL
ASSISTANT ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711
512.936.1400
SBOT NO. 24076286


Ms. Rachel L. Patton
OFFICE OF THE ATTORNEY GENERAL
CRIMINAL APPEALS DIVISION
P.O. Box 12548
Austin, Texas 78711
512.936.1400
rachel.patton@oag.texas.gov
SBOT NO. 24039030


Mr. Edward L. Marshall
OFFICE OF THE ATTORNEY GENERAL
CRIMINAL APPEALS DIVISION
P.O. Box 12548
Austin, Texas 78711
512.936.1400
edward.marshall@oag.texas.gov
SBOT NO. 00797004


Mr. Garrett Greene
OFFICE OF THE ATTORNEY GENERAL
CRIMINAL APPEALS DIVISION
300 West 15th Street
Austin, Texas 78701
512.936.1400
garrett.greene@oag.texas.gov
SBOT NO. 24096217

# INDEX OF PROCEEDINGS
## VOLUME 5
### (WRIT OF HABEAS CORPUS)

July 22, 2021                                          Page  Vol

PROCEEDINGS.................................  7   5


APPLICANT'S WITNESSES:

| | DX | CX | VDX | VOL |
|---|---|---|---|---|
| BRENDA J. DICKINSON | 8 | 15 | | 5 |
| JIMMY FENNELL, JR. | 33,36, 223 | 160,290 | | 5 |

## BILL OF EXCEPTIONS INDEX

Page  Vol

APPLICANT'S BILL OF EXCEPTIONS BY MR. MACRAE..  35   5

APPLICANT'S BILL OF EXCEPTIONS CONCLUDED......  36   5



Page  Vol

COURT REPORTER'S CERTIFICATE.................. 300   5

## ALPHABETICAL INDEX

APPLICANT'S WITNESSES:

| | DX | CX | VDX | VOL |
|---|---|---|---|---|
| BRENDA J. DICKINSON | 8 | 15 | | 5 |
| JIMMY FENNELL, JR. | 33,36, 223 | 160,290 | | 5 |

# EXHIBIT INDEX

## APPLICANT'S EXHIBITS

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL |
|-----|-------------|---------|----------|-----|
| 23 | Letter to Mr. MacRae from Mr. Ottoway | 80 | 85 | 5 |
| 24 | Jimmy Fennell's Subpoena | 89 | 90 | 5 |
| 25 | Jimmy Fennell's Polygraph Results | 113 | 113 | 5 |
| 26 | December 1996 Polygraph Report of Jimmy L. Fennell, Jr. | 113 | 114 | 5 |
| 27 | Bastrop Police Department Supplemental Report | 120 | 158 | 5 |
| 28 | TDCJ Additional Information memo | 241 | | 5 |
| 29 | Texas Department of Criminal Justice Business Records Affidavit | 242 | 242 | 5 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL |
|-----|-------------|---------|----------|-----|
| 20 | Texas Commission on Law Enforcement Officer Standards and Education Application for License/Employment Report, Jimmy Lewis Fennell, Jr. | 164 | 166 | 5 |
| 21 | Text Messages | 222 | 222 | 5 |

```
 1              P R O C E E D I N G S
 2  July 22, 2021
 3              (Open court, Applicant present.)
 4              THE COURT:  Good morning.  Please be
 5  seated.
 6              All right.  We're reconvened in the Ex
 7  Parte Rodney Reed case.
 8              Mr. MacRae, your next witness?
 9              MR. KENDALL:  Good morning, Your Honor.
10  The Applicant calls Brenda Dickinson.
11              THE COURT:  Good morning, ma'am.
12              THE WITNESS:  Morning.
13              THE COURT:  If I could ask you to raise
14  your right hand for me, please.
15              (Witness sworn.)
16              THE COURT:  All right.  Could you state
17  your full name for the court reporter, please.
18              THE WITNESS:  Brenda Jean Dickinson.
19              THE COURT:  Okay.  Do you need a
20  spelling on it?
21              THE REPORTER:  Your last name, please.
22              THE WITNESS:  D-I-C-K-I-N-S-O-N.
23              THE COURT:  All right.  Proceed.
24              MR. KENDALL:  Thank you, Your Honor.
25              ***NO TESTIMONY OMITTED***
```

**BRENDA J. DICKINSON**,

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MR. KENDALL:

Q.   Good morning, Ms. Dickinson.  Good morning.

A.   Good morning.

Q.   How are you?

A.   Okay.

Q.   Where do you live?

A.   In Bastrop.

Q.   In Bastrop.

And how long have you lived in Bastrop?

A.   Almost 24 years.

Q.   Okay.  And, Ms. Dickinson, are you married?

A.   Yes, sir.

Q.   And do you have children?

A.   Yes, sir.

Q.   And do you have boys?

A.   Yes, two of them.

Q.   And is one of your sons a special needs son?

A.   Yes, sir, he is.

Q.   And caring for him is -- takes a lot of time?

A.   Yeah, it does.

Q.   Are you currently employed now?

A.   Yes, sir, I am.  Self-employed.

1    Q.   And what do you do?

2    A.   I am self-employed.  I work in the private

3    sector, and I have -- I work for a client full time

4    and then I have other clients on other days.

5    Q.   Okay.  And in your working career, have you

6    had -- did you work at the Bastrop in -- or the H-E-B

7    in Bastrop?

8    A.   Yes, sir.

9    Q.   And do you remember what years you worked

10   there?

11   A.   1994 to 2003 -- or 2004, sorry.

12   Q.   And what positions -- what kind of tasks did

13   you do there?

14   A.   I was a cashier, and then from a cashier, I

15   worked scanning prices and making sure all our ad

16   prices were okay.  I worked in produce and then I

17   became the floor manager, and that's where I ended my

18   career.

19   Q.   Okay.  And during your years that you worked

20   at H-E-B, you forged friendships with some of your

21   coworkers?

22   A.   Yes, sir.

23   Q.   And during your time there, did you come to

24   know Stacey Stites?

25   A.   Yes, sir.

Q.   Okay.  And did you form a friendship with
her?

A.   Yes, sir.

Q.   And how would you describe Stacey?

A.   She was very friendly.  She was outgoing.
The customers liked her, and all of us liked her.  She
was kind of chatty and full of energy.

Q.   Okay.  Now, were there occasions when you
were on the same -- when you were working the same
shift that you would take breaks with Stacey?

A.   Yes, sir.

Q.   Okay.  And you would -- you would talk some?

A.   Oh, yes, we all -- yeah, always.

Q.   Okay.  Did -- sometime did your chats with
her take -- focus on personal issues?

A.   Yes.

Q.   And did she ever tell you about her
relationship with her fiancé?

A.   Yes, sir.

Q.   And what did you learn?  What did she tell
you?

A.   At first she was excited about getting
married, and then she started seeing him in a whole
new light.  He became very jealous and very
controlling and threatening, you know, her.  So she

1   became very, very scared.

2     Q.  Of --

3     A.  Of him.

4     Q.  Of her fiancé?

5     A.  Yes.

6     Q.  And did you attend a -- did H-E-B have a

7   Christmas party in 1995?

8     A.  Yes, they did.

9     Q.  And did you attend that party?

10     A.  Yes.

11     Q.  Okay.  And did Ms. Stites attend that party?

12     A.  Yes.  We both got off at the same time, so we

13   both drove our cars over to the VFW, is where it was.

14     Q.  Okay.  And did Mr. Fennell, or her fiancé,

15   come that night?

16     A.  No, she didn't want him to come.

17     Q.  And why didn't she want him to come?

18           MS. TANNER:  Objection, calls for

19   speculation.

20           THE COURT:  Overruled.

21     Q.  (BY MR. KENDALL) You can answer.

22        Why did you --

23     A.  Because he'd make a scene.

24     Q.  Okay.

25     A.  He thought he was better than everybody.

Q.   Okay.  Did she use -- did you get a sense
that she needed to be home by a certain time?

A.   Yeah, because she got -- she looked up at the
clock and said, "Oh, no, it's way past my curfew."

Q.   Okay.  Did she ever express to you doubts
about whether she should marry her fiancé?

A.   Yeah.  She said she wasn't quite sure that
she really wanted to go through with it.

Q.   And did she tell you why?

A.   Because of the jealousy and the controlling
issue and because, you know, just statements that he
made to her.

Q.   Okay.  Do you know whether Ms. Stites liked
to see her fiancé come to the store?

A.   Did she like him to come to the store?  No.

Q.   And why was that?

A.   Because he always caused a scene.  He would
get her upset and stuff, yell at her.

Q.   Okay.  Did you -- if you saw him coming in
the store, would you -- would you do anything?

A.   We tried to alert her and let her know that
he's in the store.

Q.   Okay.  Now, did you ever notice Ms. Stites
talking to an African American man in the store?

A.   Yes.

1     Q.   And did you ever ask Ms. Stites about that

2 man?

3     A.   Yes, I teased her about it.

4     Q.   What did you -- what did you say to her?

5     A.   I said, "Who's that secret admirer of yours?"

6     Q.   And what did she say?

7     A.   She said -- she just kind of goes kind of

8 giddy and she says, "He's just a friend."  That's

9 about it.

10     Q.   Okay.  Did she say a name?

11     A.   Yeah.  She said his name was Rodney.

12     Q.   Okay.  And did she tell you anything more

13 about Rodney?

14     A.   No, and I didn't ask.

15     Q.   Okay.  Now, you became a real friend of

16 Ms. Stites, right?

17     A.   Yes, sir.

18     Q.   And would it be fair to say that you were

19 upset by her death?

20     A.   I was more than upset.

21     Q.   Okay.  How did you feel?

22     A.   Devastated.  I -- just overwhelmed and

23 everything.  I almost fainted at work because I didn't

24 know anything until I got to work, so...

25     Q.   Okay.  And did you attend the viewing

1   underneath her uniform as well, would it?

2       A.   Huh-uh.  It wouldn't.

3       Q.   Okay.  I mean, that kind of goes along with

4   the territory of what the job was?

5       A.   Yes.

6       Q.   Okay.  Fair enough.  Thank you.

7            Now, I want to talk with you about what

8   you've told us of your conversations with Stacey,

9   okay?

10           You were -- and I will not ask you your age

11  or date of birth, but I will ask you -- you were about

12  16 years older than Stacey --

13      A.   Uh-huh.

14      Q.   -- right?

15           Okay.  Give me a "yes" or a "no."

16      A.   Yes.  Sorry.

17      Q.   I'm sorry.  I'm sorry.

18           And so y'all weren't contemporaries by any

19  stretch of the imagination?

20      A.   I'm not sure what you're implying -- what

21  that means.

22      Q.   I mean, y'all were not -- she was 19 years

23  old at the time.  You were more than 19 -- 16 years

24  more than 19, and so the point is -- see, I'm trying

25  here.  My point is is that it wasn't like y'all were a

1  couple of teenage girls talking.

2     A.   Right.

3     Q.   Okay.  And -- but you're saying that she

4  was -- were you a confidante, then, to her?

5     A.   Sort of, yes.

6     Q.   Okay.

7     A.   But we were friends.  We liked the same

8  things, so...

9     Q.   Did y'all socialize outside of -- out of

10  H-E-B?

11     A.   No, she -- she could not do that.

12     Q.   Okay.  Now, the story you tell us about her

13  relationship with her fiancé is -- it's sad, isn't it?

14     A.   It's very sad.

15     Q.   And it's harrowing, isn't it?  And it's

16  troubling, isn't it?

17     A.   Yes, and it hurts my heart.

18     Q.   And when she ended up dead while she was

19  engaged to her fiancé, it made it very, very

20  disturbing, didn't it?

21     A.   Uh-huh.  Yes.

22     Q.   Yet you didn't say anything, did you?

23     A.   Who was I supposed to say it to?

24     Q.   Well, the police were in and out of the

25  H-E-B, right?

A.    And they took it -- all the people they
wanted to talk to, they -- they centered on all men.

Q.    Okay.  They centered on the men?

Okay.  Well, but they centered on the men as
it relates --

A.    As in produce.  In produce, the ones that
were close -- to work with her.

Q.    And who was the produce manager, if you
recall?

A.    Robert Amaya.

Q.    Okay.  Did you ever say anything to Robert
Amaya like, "Man, the cops need to talk to me.  I've
got some stuff here"?

A.    No, because it -- that -- the stuff that
Stacey told me, it was just stuff between two girls,
you know.

Q.    Okay.  And Ron Haas was your store manager,
right?

A.    That's in the beginning.  He wasn't my -- our
store manager --

Q.    At the --

A.    Well, yeah, in '96 he was.

Q.    At the time Stacey was murdered --

A.    Yes, Ron Haas was our manager.

Q.    Okay.  And Ron Haas made it very clear to the

1  employees that, you know, you guys need to cooperate

2  with law enforcement, give them what you got if you've

3  got anything, stuff like that?

4      A.   Uh-huh.

5      Q.   Okay.  Now, you also tell us that you knew of

6  some level of a relationship between Stacey and the

7  defendant, Rodney Reed?

8      A.   Yes.

9      Q.   And, again, that's another thing that --

10  information you say that you had that you did not

11  provide to management or law enforcement or anything

12  like that, right?

13      A.   No one ever asked me.

14      Q.   Okay.  Now, you said in your declaration that

15  Stacey told you that he had gone -- she had gone out

16  to lunch with Rodney, right?

17      A.   Yes.

18      Q.   Okay.  And I want to make sure that I get the

19  words exactly right, and I'm going to reference in

20  your declaration -- hold on.

21          It's in paragraph 10, and I'm going to quote

22  you:  "On another occasion she told me about going out

23  to have lunch with Rodney," right?

24      A.   Uh-huh.

25      Q.   Okay.  Now, you've told us also that she was

1  scared of her fiancé.

2    **A.**  Yes.

3    **Q.**  Okay.  If she was scared of her fiancé on the

4  one hand and he was all of these things that you've

5  shared with us, on the other hand, does it make a lot

6  of sense to be going out publicly having lunch with

7  another man?

8        Those two things don't really jive, do they?

9    **A.**  It depends.  A lot of women have problems at

10 home that they don't -- and are afraid of their

11 husbands or afraid of their fiancés that don't say

12 anything to anyone.

13   **Q.**  Sure.  I completely agree with you, ma'am.

14 But what I'm getting at is that if you're scared of a

15 man in your life for a potential for violence, you

16 probably wouldn't be publicly going out and displaying

17 a relationship with another man, would you?

18   **A.**  Well, I can't speak for Stacey.

19   **Q.**  Okay.  But it's just common -- I mean,

20 would -- you wouldn't do that, would you?

21   **A.**  It depends if it was just a friend.

22   **Q.**  Okay.  And you made a comment that -- I asked

23 you if you socialized with Stacey outside of work, and

24 you said, well, she -- you couldn't, right?

25   **A.**  Uh-huh.

```
 1      Q.    And I assume that was in relation to the idea
 2    that her fiancé wouldn't let her?
 3      A.    Exactly.
 4      Q.    But she was able to go out to lunch with
 5    another man without any apparent problems, right,
 6    according to your testimony?
 7      A.    Right.  But I'm talking about days -- I
 8    was -- when you said socializing, I'm thinking, like,
 9    on her days off or after work.
10      Q.    Okay.
11      A.    And that wasn't allowed.  He had her timed on
12    what time she'd get home.
13      Q.    Okay.  And you said that you've lived in
14    Bastrop for 24 years.
15      A.    Uh-huh.
16      Q.    And I was doing the math.  Did you move to
17    Bastrop to -- and start the H-E-B job
18    contemporaneously?  I mean, did you -- did --
19      A.    I started at H-E-B in 1994 when I came out
20    here to Texas.
21      Q.    Okay.  And -- so you came to Texas in '94.
22            And where did you live when you first came to
23    Texas?
24      A.    Cedar Creek, Bastrop.
25      Q.    Cedar -- so it's just outside of Bastrop?
```

1  out, I stated earlier that I'm a belt and suspenders

2  type of a guy.

3            Would you mind terribly, Mr. Reed,

4  moving to the middle of counsel table?

5            MR. KENDALL:  Is this okay here?

6            THE COURT:  I'd prefer if you were

7  seated where Ms. Pucher was.

8            MS. PUCHER:  Right.  Okay.

9            THE COURT:  Thank you.

10           All right.  Mr. Fennell, good morning.

11           THE WITNESS:  Good morning, sir.

12           THE COURT:  Could you raise your right

13  hand for me, please?

14           (Witness sworn.)

15           THE COURT:  All right.

16           You may proceed whenever you're ready.

17           MR. MACRAE:  All right.

18                 JIMMY FENNELL, JR.,

19  having been first duly sworn, testified as follows:

20                 DIRECT EXAMINATION

21  BY MR. MACRAE:

22      Q.  Mr. Fennell, have you ever testified before?

23      A.  Yes, sir, I have.

24      Q.  And you have taken other oaths before, have

25  you not?

Q. So you can't say that she wasn't having a consensual affair with Mr. Reed, can you?

A. No, sir.

Q. And, in fact, you found out she was?

A. No, sir.

Q. Yes, you did, sir.

A. No.

Q. All right. But you told Wayne Fletcher that she was.

Do you remember that?

A. No, I do not remember that.

Q. Okay. Mr. Fletcher came in. He was nice enough to come in and testify. He was nice enough to sign an affidavit saying that you told him that Stacey Stites was "F", blank, blank, blank, a "N," blank, blank, blank.

Do I have to tell you what those words mean?

A. No, sir.

Q. You understand what those words are, don't you?

A. Yes, sir.

Q. You used them, didn't you?

A. No, sir.

Q. Yes, you did, sir.

You told Wayne Fletcher that Stacey Stites

1   was fucking a nigger, didn't you?

2      A.   No.

3      Q.   Mr. Fletcher's lying?

4      A.   Yes.

5      Q.   Is he lying or mistaken?

6      A.   He's lying.

7      Q.   Okay.  Okay.  Is Ms. Slater lying or

8   mistaken?

9      A.   Lying.

10     Q.   Okay.  Ms. Hugen?

11     A.   As far as I'm concerned, they're all lying.

12     Q.   They're all lying.

13     A.   Yes.

14     Q.   All of them.  Even Buddy Horton's lying?

15     A.   Yes.

16     Q.   Good gracious.  So that's four liars in a

17  row.  Let's see about the fifth one.

18          Paul Espinoza worked at H-E-B, and he

19  testified that you came in and you stood right next to

20  Ms. Stites and you spoke in a threatening manner in

21  her ear and she was scared and embarrassed and went to

22  the back room and cried.

23          Do you know about that?

24     A.   No, sir.

25     Q.   Is he lying?

1    A.    He's lying too.

2    Q.    Wow, that's incredible.  So that's five.

3            MR. MACRAE:  Would someone keep track,

4    please, of how many liars there are?

5            MR. BRAGG:  Objection, Your Honor,

6    sidebar.

7    Q.    (BY MR. MACRAE)  Let's go to the sixth one.

8            THE COURT:  Sustained.

9    Q.    (BY MR. MACRAE)  Richard Scroggins came in

10   yesterday and he testified that he saw you screaming

11   at Stacey Stites.  And, again, I've put asterisks in

12   there -- lying "F," asterisk, asterisk, asterisk,

13   bitch.  Lying "C," asterisk, asterisk, asterisk.

14           Do I need to translate those for you?

15   A.    No, sir.

16   Q.    Okay.  Do you know what they mean?

17   A.    Yes, sir.

18   Q.    What are those words?

19   A.    They're not words that I said.

20   Q.    What are those words?  You know what I'm

21   saying.

22   A.    You want me to say the words?

23   Q.    I do.  You said them once.  Say them again.

24   A.    I didn't say them once, and I'm not going to

25   say them again.

     Q.   You just told me you understand what those
asterisks mean.

          What do they mean?

               MR. BRAGG:  Objection, Your Honor, asked
and answered at this point.

               MR. MACRAE:  It's asked, Your Honor.  It
is not answered.

               MR. BRAGG:  He has said that he's not
going to say them, Your Honor.

               THE COURT:  I'm not going to make him
say it.  I think he's stated that he understands, and
we don't need it repeated by the witness.  So your
objection is sustained.

     Q.   (BY MR. MACRAE)  All right.  So Mr. Scroggins
said those words, and he said you said those words,
and you understand what those asterisks mean, correct?

     A.   Correct.

     Q.   All right.  And he's lying too?

     A.   Yes, sir.

     Q.   Six, by my count.

          All right.  Gary Joe Bryant.  Jimmy Fennell
said, "If I ever catch her 'F' blank an 'N' blank,
I'll kill her."

          And, again, I don't have to translate that
for you, do I?

1   A.   No, sir.

2   Q.   Do you want to say those words again or not?

3   A.   No, sir.

4   Q.   Okay.  So when Mr. Bryant said that about

5   what you said about if you catch Ms. Stites having an

6   affair with a black man, was he lying?

7   A.   Yes, sir.

8   Q.   Okay.  So that's seven liars.

9        Rubie Volek.  Do you remember her?

10  A.   No, sir, I don't remember her.

11  Q.   She remembers you very well.  She came in,

12  and she's an insurance salesperson.  She used to

13  retain you to go to do security at dances.  Do you

14  remember that?

15  A.   Depends on where it was at because I

16  worked --

17  Q.   Somewhere in Round Rock.  The SPJST

18  organization.

19  A.   Okay.

20  Q.   Do you remember now?

21  A.   Yes, sir.

22  Q.   Nice, kind, petite lady?

23  A.   Well, I don't remember her, no.

24  Q.   Okay.  She remembers you, sir.  She remembers

25  you coming in and introducing her to Stacey Stites,

and she remembers Stacey saying something to the effect of, "Why do I need life insurance?"

Ms. Volek was a life insurance salesperson.

And Stacey said this and she was -- she said, "I'm so young?"

And you said -- this is what Ms. Volek said. "If I ever catch you cheating on me, I'll kill you and no one will ever find out I did it."

You said that, didn't you?

A. No, I did not.

Q. And Ms. Volek's lying?

A. She's lying too.

Q. Okay. She's not mistaken. She's lying.

A. She's lying.

Q. Okay. She came in, took the same oath you did, and lied?

A. Yes, sir.

Q. Okay. Do you know why she would lie?

MR. BRAGG: Objection, calls for speculation.

MR. MACRAE: I'm just asking if he knows why.

THE COURT: He can answer the question if he knows.

A. No, sir, I don't know.

Q.   (BY MR. MACRAE)   Do you know why Gary Joe
Bryant would lie?

A.   No, sir.

Q.   Any idea why Charles Wayne Fletcher would
lie?

A.   No, sir.

Q.   Any idea why Suzan Hugen would come all the
way from Pine Bluff, Arkansas just to lie?

A.   No, sir.

Q.   Any idea why Alicia Slater would come in from
California on her own dime and lie about you?

A.   No, sir.

Q.   Can you think of any benefit any of those
people would get from lying about you?

A.   Other than attention, no.

Q.   What do you stand to gain from your testimony
today?

A.   Nothing.

Q.   You stand to remain a free man, don't you?

A.   Yes.

Q.   Yeah.   And you stand to lose a lot, don't
you?

A.   No.

Q.   If Mr. Reed is released and the State's
decide -- State decides to try you and you're

convicted, I'd call that a big loss, wouldn't you?

A.   Because I know it won't happen.

Q.   That's not my question.

Do you remember the question?

A.   No.  Repeat it.

Q.   I asked you if you have anything to lose, and you said no.  And I said, well, maybe if you go to jail, that counts as a loss.

You would agree with me, wouldn't you?

A.   Yes.

Q.   Okay.  So you still have something to gain, you may be a free man; and you have something to lose, being an unfree man.

Are you with me?

A.   Yes.

Q.   None of these people have any such thing to lose, do they?

A.   Not that I know of.

Q.   Right.

Okay.  Arthur Snow.  You remember Mr. Snow?

A.   No, sir, I do not.

Q.   He testified that when you were in prison together, you -- you knew him as a member of the Aryan Brotherhood and you approached the Aryan Brotherhood for protection.  Does that sound

1   familiar?

2     **A.**   No, sir.

3     **Q.**   You never did that?

4     **A.**   Never.

5     **Q.**   Wow.

6         Okay.  So Mr. Snow's lying?

7     **A.**   Yes, sir.

8     **Q.**   Okay.  Well, Mr. Snow said that -- and he

9   said it a lot more graphically than this, and I don't

10   want to read it to you.  But if you want to see his

11   affidavit, you can.

12         He said in this court -- he took the same

13   oath you did, and he said, "Jimmy Fennell told me he

14   killed his "N"-loving fiancée."

15         Are you telling us that didn't happen either?

16     **A.**   It did not happen.

17     **Q.**   And you know what I mean by the N-word,

18   right?

19     **A.**   Yes, sir.

20     **Q.**   And you used to use the N-word an awful lot,

21   did you not?

22     **A.**   No, sir.

23     **Q.**   Okay.  Numerous people have come in here and

24   testified that you used that N-word.

25         Are you saying they're all lying about that

1   as well?

2      A.   Yes, sir.

3      Q.   Okay.  So I think that's eight.

4          Do you remember Michael Bordelon from prison?

5      A.   Yes, sir.

6      Q.   He was your friend?

7      A.   No, he was not a friend.

8      Q.   Well, he testified that you were friends.

9          He's lying too?

10     A.   Yes, sir.

11     Q.   Okay.  Did you have any friends in prison?

12     A.   Yes, sir, I did.

13     Q.   Okay.  Once they found out you were a cop,

14  did you have any friends in prison?

15     A.   Yes, sir.

16     Q.   Okay.  Good.

17         So Michael Bordelon came in -- he came in

18  from Beaumont, Texas -- and he said that "Jimmy

19  Fennell told me he got rid of her" -- "her," being

20  Ms. Stites -- and he made this motion (indicating),

21  which he agreed was consistent with strangulation.

22        Do you agree with that?

23     A.   Yes, sir, I agree with it.

24     Q.   That's how Ms. Stites died, isn't it?

25     A.   Yes, sir.

Q.  She was strangled?

A.  Yes, sir.

Q.  And is Mr. Bordelon telling the truth?

A.  No, he's lying.

Q.  All right.  So we've got nine.

I'm going to challenge you to tell us if this witness is lying, Mr. Fennell.  I'll represent to you Dr. Andrew Baker came in and testified, and he's a forensic pathologist, and he testified that Ms. Stites died hours before 3:00 a.m.

MR. BRAGG:  Objection, Your Honor.  This is going to go well beyond his personal knowledge.  He is neither a scientific expert to testify about all the things that Dr. Baker testified about.  Further, the record is clear that he does not know the time that Stacey died.

THE COURT:  I'm just going to sustain this as improper impeachment.

Q.  (BY MR. MACRAE)  Well, let me do it this way, Mr. Fennell.  Dr. Andrew Baker came in and testified that the time of death was hours before 3:00 a.m.

You testified at trial that Stacey Stites was with you until 3:00 a.m.

Do you remember that testimony?

A.  I don't remember much about my testimony, but

 1  if I testified that, yes, it was correct.

 2      Q.   Okay.  So if Dr. Baker is correct, Ms. Stites

 3  died while she was with you?

 4      A.   No, she did not.

 5      Q.   I didn't ask you if you killed her.  I'll ask

 6  you that later.

 7           If Dr. Baker is correct that she died hours

 8  before 3:00 a.m., if she died during that time period,

 9  she was with you?

10      A.   Correct.

11      Q.   Okay.  Because she was with you, by your

12  testimony, from 9:00 a.m. to 3:00 p.m. -- excuse me,

13  9:00 p.m. to 3:00 a.m. from April 22nd to April 23rd,

14  that's your testimony.

15      A.   Okay.

16      Q.   Okay.  Do you remember that?

17      A.   Yes -- I don't remember it, but yes.

18      Q.   Okay.  Sounds familiar?

19      A.   Yes, sir.

20      Q.   Okay.  So if Dr. Baker testified that she

21  died hours before 3:00 a.m. -- we know from your

22  testimony at trial, when you took the same oath you

23  took today and told the truth, that Ms. Stites was

24  with you from 9:00 p.m. to 3:00 a.m., and that's when

25  Dr. Baker says she died.

1       And that's while you were with her, right?

2   A.   Yes, sir.

3   Q.   Okay. And then another doctor, another

4 forensic pathologist from Kentucky, he came in and

5 testified to the same thing. The time of death was

6 somewhere hours before 3:00 a.m.

7       Again, if that is correct, that is when you

8 were with Ms. Stites?

9   A.   Yes, sir.

10   Q.   Okay. Do you want to say whether Dr. Baker

11 or Dr. Davis is lying?

12   A.   Both of them are lying.

13   Q.   Okay. So by my account, that's -- 11, 12? --

14 12 people lying and you telling the truth?

15   A.   Yes, sir.

16   Q.   Twelve people with nothing to gain, all

17 lying; one person with everything to gain who's

18 telling the truth?

19   A.   That's correct.

20   Q.   Mr. Fennell, you were subpoenaed to be here;

21 is that correct?

22   A.   Yes, sir.

23   Q.   And you were here on Monday morning pursuant

24 to that subpoena?

25   A.   Yes, sir.

those allegations with the State?

A.   Yes, sir.

Q.   And what did you tell the State?

A.   That that was wrong, that that didn't happen.

Q.   That Mr. Fletcher was lying?

A.   Yes, sir.

Q.   Okay.  Did you talk to the State about a gentleman named Jim Clampit?

A.   Yes, sir.

Q.   Okay.  You remember talking to the State about that?

A.   Yes, sir.

Q.   What do you remember about that conversation?

A.   They said that he made a statement that -- I made a statement at the funeral or something of that sort.

Q.   Do you remember what the statement was that --

A.   No, sir, I don't remember what -- exactly what the statement was.

Q.   Mr. Clampit testified that you were at the viewing and you said something to the effect of, "She got what she deserved."

Is he lying?

A.   Yes, sir.

1      Q.   Is it your position, Mr. Fennell, that any
2 witness called by Mr. Reed's legal team must be lying?
3      A.   Yes, sir.
4      Q.   Okay.  I kind of suspected that, but I wanted
5 to make sure.
6           Mr. Fennell, have any of the topics that
7 we've just discussed changed your mind about invoking
8 your rights under the Fifth Amendment?
9      A.   No, sir.
10     Q.   Okay.
11          THE COURT:  Would this be a good time to
12 take a break?
13          MR. MACRAE:  Yes, Judge, of course.
14          THE COURT:  All right.  We'll take a
15 15-minute break.
16          (Recess.)
17          (Open court, Applicant present.)
18          THE COURT:  Go ahead and be seated.
19          Thank you.
20          All right.  You may resume your direct
21 examination of the witness.
22          MR. MACRAE:  Thank you, Your Honor.
23     Q.   (BY MR. MACRAE)  Mr. Fennell, just to go back
24 over a couple of things to make sure I didn't miss
25 anything.

         Am I correct that after you were served with a
subpoena, you texted Ms. Wolfe?

    A.   Correct.

    Q.   And you did not communicate with anybody else
at all about that, correct?

    A.   Not that I remember.

    Q.   Okay.  And we asked you to bring your phone
in when you came back in.

         Did you bring it?

    A.   No, I forgot it again.

    Q.   Well, at the next break, I'll ask you.

    A.   Okay.

    Q.   I didn't want to shortchange you with the
number of witnesses that we've brought, but I wanted
to also mention we brought a gentleman named Victor
Juarez to testify.

         And I assume your position is he is lying as
well?

              MR. BRAGG:  Objection, speculation.  He
doesn't know what Mr. Juarez said.

              THE COURT:  Sustained.

    Q.   (BY MR. MACRAE)  Mr. Juarez testified that he
knew Mr. Reed and had since he was a kid and that he
saw Mr. Reed with Ms. Stites.

         Is he lying?

1   A.   Yes, sir.

2   Q.   And then we also brought a lady named Rebecca

3   Randall.

4        Do you know Ms. Randall?

5   A.   No, sir.

6   Q.   And a gentlemen named Brent Sappington.  Do

7   you know him?

8   A.   No, sir.

9   Q.   He testified that his father lived below you

10  and Stacey at the Rolling Oaks Apartments.

11       Do you remember Mr. Sappington?

12  A.   No, sir.

13  Q.   Okay.  Mr. Sappington, Brent Sappington, told

14  us that his father would hear you and Stacey fighting

15  above him.

16       Is he lying?

17  A.   Yes, sir.

18  Q.   And then Vicki Sappington also came in.

19  She's Brent Sappington's wife and Mr. Sappington's

20  daughter-in-law, and she testified similarly.

21       Is she lying?

22  A.   Yes, sir.

23  Q.   Mr. Fennell, I want to be clear.  Is it your

24  position that every word out of every witness's mouth

25  is a lie?

1    A.   Not necessarily.

2    Q.   Okay.  So they are telling the truth until

3 they say something that you don't like?

4    A.   No, that's not -- they're not necessarily

5 telling the truth.

6    Q.   Okay.  You have no idea if they're telling

7 the truth, but you know they're lying about you?

8    A.   Well, I know what they've said are lies --

9    Q.   Okay.

10    A.   -- correct.

11    Q.   And by the same token, if the State calls a

12 witness, that witness is telling the truth, right?

13    A.   Not necessarily.

14    Q.   Mr. Fennell, I want to take you back now to

15 soon after Ms. Stites' death.  In fact, it was the

16 morning that she went missing, April 23rd, 1996.

17         Do you remember that morning?

18    A.   Yes, sir.

19    Q.   And you know that her body was not found

20 until the afternoon of that day, April 23rd, 1996?

21    A.   Yes, sir.

22    Q.   Okay.  But on April 23rd, in the morning

23 before Stacey's body was even found, you cleaned out

24 your bank accounts, didn't you?

25    A.   No, sir.

1          "Evaluation of this subject's polygrams did

2    reveal to this examiner significant criteria that

3    would indicate deception at questions pertaining to

4    knowledge of and/or participation in this offense."

5          Did I read that correctly?

6      A.   Yes, sir.

7      Q.   It goes on to say, "Subsequent to the

8    polygraph examination, after deception was indicated,

9    the subject" -- you -- "requested to talk with an

10   attorney."

11         Did I read that correctly?

12     A.   Yes, sir.

13     Q.   So you're the prime suspect, you had no

14   alibi, you failed two polygraphs, and then you asked

15   for an attorney and you invoked your Fifth Amendment

16   rights, did you not?

17     A.   Yes, sir.

18     Q.   And then you waived your Fifth Amendment

19   rights after Mr. Reed was arrested?

20     A.   I believe so, yes.

21     Q.   Because at that point, you thought, "What I

22   told Rubie Volek is true," right?  "I'm going to kill

23   her and get away with it;" isn't that correct?

24     A.   No, sir.

25              MR. MACRAE:  May I approach?

1      THE COURT:  Yes, sir.

2      (Applicant's Exhibit 25 marked.)

3   Q.   (BY MR. MACRAE)  Mr. Fennell, I've handed you

4  what's been marked as Exhibit No. 25.  Is that a copy

5  of the October 1996 polygraph that we were just

6  discussing?

7   A.   Yes, sir.

8   Q.   And is that the polygraph in which you were

9  found to be deceptive in answering the question, "Did

10  you strangle Stacey Stites on April 23rd, 1996?"

11  A.   That's what he has on here, yes.

12      MR. MACRAE:  I'll offer No. 25, Judge.

13      MR. BRAGG:  Your Honor, we would object

14  as, obviously, polygraphs are not admissible evidence

15  for -- it's been well documented that they're just not

16  credible evidence.

17      THE COURT:  I didn't hear you object

18  when he was asking him the questions about it.

19      Objection's overruled.  Applicant's

20  Exhibit 25 will be admitted.

21      (Applicant's Exhibit 25 admitted.)

22      (Applicant's Exhibit 26 marked.)

23  Q.   (BY MR. MACRAE)  Mr. Fennell, I'm handing you

24  Exhibit No. 26, which is the December 1996 polygraph

25  examination we were just discussing; is that correct?

1    A.   Yes.

2    Q.   And if you turn towards the second-to-last

3    page, that's the paragraph that we were discussing

4    about your deception, the one that's up on the screen?

5    A.   Yes, sir.

6    Q.   Okay.

7              MR. MACRAE:   And I'll offer 26,

8    Your Honor.

9              MR. BRAGG:   Same objection, Your Honor.

10             THE COURT:   Overruled.   Applicant's

11   Exhibit 26 is admitted.

12             (Applicant's Exhibit 26 admitted.)

13   Q.   (BY MR. MACRAE)   Mr. Fennell, if you had

14   complied with the subpoena, you could have your trial

15   testimony in front of you, but instead I'll put it up

16   on the screen for you.

17        Do you recall that you testified at trial,

18   Mr. Reed's trial, on April the 5th, 1996 [sic], that

19   you had never heard of Rodney Reed until he was

20   charged with killing Stacey Stites?

21   A.   That is correct.

22   Q.   And the question asked of you was, "Did

23   Stacey ever mention to you ever even knowing a person

24   named Rodney Reed?"

25        And your answer was, "No, sir."

1      Correct?

2      A.   That's correct.

3      Q.   And then you were asked, "Prior to any of

4   this happening, did you ever know a person named

5   Rodney Reed?"

6           And you said, "No, sir."

7      A.   That's correct.

8      Q.   Isn't it true, Mr. Fennell, you learned that

9   Ms. Stites and Mr. Reed were having a consensual

10  affair and you confronted Mr. Reed about it?

11     A.   That is untrue.

12     Q.   Okay.  And so when Mr. Fletcher talks about

13  you telling him you had found out that Ms. Stites was

14  having an affair with a black man, that's a lie?

15     A.   Yes, sir.

16     Q.   So is it your position in your trial

17  testimony there that you did not know Rodney Reed is,

18  in fact, true?

19     A.   That is true.

20     Q.   Then you also testified at trial that you and

21  Ms. Stites were together in your apartment on

22  April 22nd, 1996, from around 8:00 p.m. until she left

23  for work early in the morning the next day?

24     A.   Yes, sir.

25     Q.   And in reality, Mr. Fennell, you also

      "QUESTION:  You said that your relationship
with Stacey was good?

      "ANSWER:  Yes.

      "QUESTION:  You would not in any description
call it a controlling relationship, would you?

      "ANSWER:  No ma'am.

      "QUESTION:  You would call it an equal
partnership; is that right?

      "ANSWER:  Yes, ma'am."

      Is that your testimony?

**A.**   Yes.

**Q.**   So when Mr. Scroggins came in and testified
that you were screaming and yelling at Stacey and she
said, "Can we not do this here, this is where I work,"
he was lying?

**A.**   Yes.

**Q.**   And when Paul Espinoza testified that you
came up behind Ms. Stites at her place of work and got
in her ear and made her kind of quiver, he was lying?

**A.**   Yes.

**Q.**   And you testified that you argued, just like
anybody, but that you never fought in public, right?

**A.**   That's correct.

**Q.**   You said, "All right" --

      The question was:  "All right.  During the

1  year that you and Stacey were going together and

2  engaged, did you ever quarrel?

3          "ANSWER:  We argued just like anybody.

4          "QUESTION:  And sometimes did those arguments

5  ever become public?

6          "ANSWER:  No.

7          "QUESTION:  So they were never public

8  arguments?

9          "ANSWER:  No, ma'am."

10          Did I read that correctly?

11   A.  Yes.

12   Q.  Mr. Scroggins came in and testified that you

13  were screaming at Stacey Stites in a parking lot.

14          I'd call that a public argument, wouldn't

15  you?

16   A.  I was never in that parking lot.  So how

17  could it have happened?

18   Q.  If you were screaming at Stacey Stites --

19  let's say for a moment that Richard Scroggins, who has

20  no axe to grind, was being truthful.  Just go with me.

21  Let's say he was being truthful.

22          That's a public argument, isn't it?

23   A.  Yes.

24   Q.  So when you testified that you didn't have

25  any public arguments, that was false, wasn't it?

1    A.   No, it was true.  We never had public

2  arguments.

3    Q.   Maybe I'm misdefining "argument."

4       If you're screaming and yelling at your

5  fiancée and she is saying, "Can we do this somewhere

6  else," and putting her hands up like this

7  (indicating), I'd call that an argument, wouldn't you?

8    A.   Never happened.

9    Q.   Wouldn't you call that an argument if it did?

10    A.   Yes.

11    Q.   Just so you know the exact area I'm talking

12  about, it wasn't just the H-E-B parking lot, it was

13  outside Whataburger.  Apparently the H-E-B and the

14  Whataburger shared a parking lot, and Mr. Scroggins

15  testified you were closer to Whataburger than H-E-B.

16       Does that refresh your recollection better?

17    A.   No.

18    Q.   Okay.  Were you friends with Mr. Fletcher?

19    A.   We had worked together.  We weren't really

20  friends outside of work.

21    Q.   All you did was work together?

22    A.   Yes, sir.

23    Q.   You never, ever spent any time together

24  outside of work?

25    A.   No, sir.

Q.   Okay.  So when Mr. Fletcher testified that he and his wife went to visit you and Stacey at the Rolling Oaks Apartments for a barbecue, that was a lie?

A.   I believe so because I never remember it happening.

Q.   And when he testified that Ms. Stites and you were angry with each other and she stormed off to go to the pool, that was a lie?

A.   Yes.

Q.   Okay.  And, in fact, the idea that there was a pool was a lie, right?

A.   Well, like I told the counsel over here that I didn't remember there being a pool, and that the whole time that we lived there, it was during the wintertime, so nobody would have been going to the pool.

Q.   Is April winter?

A.   Well, it's -- no, but it's right at the end of winter.

Q.   Isn't it true, Mr. Fennell, that although you call Mr. Fletcher only a work friend and someone you never saw socially, that you put him down as a reference when you went to work at Giddings Police Department?

1   A.   I might have because I worked with him, yes.

2   Q.   But he's a liar?

3   A.   Evidently.

4   Q.   And Curtis Davis is a liar?

5   A.   Yes, sir.

6   Q.   Are all your friends and acquaintances liars?

7   A.   No.

8   Q.   Only the ones who testify?

9   A.   No, not necessarily.

10  Q.   Well, those are the only two we've discussed

11  so far and they're both liars, right?

12  A.   Correct.

13  Q.   Okay.  So any friend of yours who comes in

14  and testifies, he then becomes a liar?

15  A.   No.

16  Q.   If he testifies against you, he's lying.  You

17  said that, right?

18  A.   If they testify the untruth, then they're

19  lying.

20  Q.   If somebody came in and became the 19th

21  person who was otherwise a friend and that person

22  testified to something you didn't like, that person's

23  a liar, right?

24  A.   No.  They have to be telling the truth not to

25  be a liar.

Q.   I agree with you, sir, but you said the previous 17, 18, whatever it is, they're all liars.

A.   Yes.

Q.   And I'm suggesting to you that if you have another police officer friend who you otherwise know and trust, if he came in and testified, he'd be lying?

A.   If he said a lie, yes.

Q.   Well, you said Curtis Davis is a liar, and you said Wayne Fletcher is a liar, right?

A.   Correct.

Q.   Doesn't it stand to reason that the next person who comes in who is a police officer or a friend of yours or both must be lying?

A.   I just can't make that assumption until their testimony's been heard.

Q.   Well, you've made a lot of assumptions so far, sir.  You've called a bunch of people liars without even looking at their affidavits.  Right?

          MR. BRAGG:  Objection, Your Honor.  He's been asking him to do that.  He has been -- and that's what we've objected to as speculation.

          THE COURT:  Objection sustained.

Q.   (BY MR. MACRAE)  Mr. Fennell, you were asked at trial, "Did you kill Stacey Stites?"

          Do you remember that question?

1  **A.** Yes.

2  **Q.** And it was almost asked of you

3 apologetically, wasn't it?

4  **A.** I don't recall.

5  **Q.** "QUESTION:  Jimmy, I do have to ask you this,

6 did you kill Stacey Stites?

7    "ANSWER:  No, sir."

8    Right?

9  **A.** Correct.

10  **Q.** You have told two different people in prison

11 that you did kill her, haven't you?

12  **A.** No, I have not.

13  **Q.** Two different people that you were in prison

14 with have come in and testified that you told them

15 that you killed Ms. Stites?

16  **A.** No, I did not tell anybody that.

17  **Q.** Well, let me know show you their affidavits

18 because Mr. Bragg just brought that up, and maybe that

19 will refresh your recollection more and we can talk

20 more about the exact words you used.

21    MR. BRAGG:  Objection, Your Honor.

22 Again, improper impeachment -- well, improper

23 refreshing of recollection.  He can't use someone

24 else's affidavit to refresh this man's recollection of

25 something he didn't create.

THE COURT:  From a technical standpoint, I agree that the manner of the impeachment is improper.  To speed things along, I'm going to allow it, all right, because he's just going to turn around and read the affidavit to him.

MR. BRAGG:  I understand, Your Honor.

Q.  (BY MR. MACRAE)  Mr. Fennell, this is Exhibit No. 10.  It's the affidavit of Arthur Snow, who testified at some length and quite graphically about what you told him about how you killed Ms. Stites.  I don't know if you've seen that before.  I know the State has not shown it to you, even though perhaps it would have been helpful.

Take as long as you need to look at that affidavit, or do you even need to look at it at all because you know he's lying?

A.  I don't need to look at it because I know it's the -- not the truth.

Q.  So Mr. Snow testified in his affidavit that you came to the Aryan Brotherhood seeking protection. Is that incorrect?

A.  That's incorrect.

Q.  And it is a lie?

A.  Yes.

Q.  Okay.  And he also testified in his affidavit

1  that you told him that you killed your N-word-loving

2  fiancée.

3       Is that also a lie?

4       A.  Yes.

5       Q.  Do you have any idea why Mr. Snow would make

6  that up?

7       A.  I have no idea.

8       Q.  Do you have any idea what Mr. Snow might gain

9  from making such a statement?

10      A.  No, sir.

11      Q.  Are you familiar with something called the

12  Aryan Brotherhood?

13      A.  Yes, sir.

14      Q.  Is it a whites-only prison gang?

15      A.  Yes, sir.

16      Q.  Can you think of any circumstance under which

17  any Aryan Brotherhood member would do anything to help

18  a black man?

19      A.  No, sir.

20      Q.  Can you think of any circumstance under which

21  a member of the Aryan Brotherhood would do anything

22  that he even thought might help a black man?

23      A.  Not that I know of.

24      Q.  I mean, they never would, would they?

25      A.  Unless he's trying to help himself.

Q. Well, I'm glad you brought that up because Mr. Snow testified about all the benefits he got from all of this. He testified he's been divorced. He's testified his wife was so angry she hit him with a hammer. He testified that he's unemployed, and he testified that he has been hassled day in, day out by his wife, who has a protective order against her, and by the media.

Can you think of a way in which that's a benefit to Mr. Snow?

MR. BRAGG: Objection, calls for speculation.

THE COURT: Sustained.

Q. (BY MR. MACRAE) Are you aware of any benefit that Mr. Snow got from testifying that you killed Stacey Stites?

A. No, sir.

Q. Now, Mr. Snow also frankly testified that he was nervous or even scared about being here but testified. That's certainly not a benefit, is it?

A. No.

Q. Now, although you don't remember Mr. Snow, you do remember Mr. Bordelon, do you not?

A. Yes.

Q. And he testified that you were friends in

prison, but I think you said that's a lie.

A. Correct.

Q. He also testified that you told him something about how your fianceé died and he expressed some concern and asked to talk to you about it.

Is that a lie?

A. Yes.

MR. BRAGG: Objection, Your Honor, asked and answered. At this point we're just covering the same grounds that we've already covered, going through the various witnesses and what they've said.

THE COURT: Overruled.

Q. (BY MR. MACRAE) Your answer was that was a lie?

A. Yes.

Q. And then Mr. Bordelon testified that he went into your cell, asked your cellmate to leave so you can talk.

Is that a lie?

A. Yes, sir.

Q. Then he testified further that you sat across from each other on the two bunks talking about you killing Ms. Stites.

Is that a lie?

A. Yes, sir.

 1      Q.   And you told him -- or he testified that you
 2   told him you got rid of her.
 3           That's a lie?
 4      A.   Yes, sir.
 5      Q.   And when he put his hands together to
 6   indicate a strangulation motion and agreed that's what
 7   you were showing, that's a lie?
 8      A.   Yes, sir.
 9      Q.   Mr. Fennell, you testified at trial that when
10   you -- the morning that Ms. Stites disappeared, you
11   went into the Bastrop County Sheriff's Office because
12   you had friends there.
13           Do you recall that testimony?
14      A.   Yes, sir.
15      Q.   Okay.  And you had worked there for about a
16   year and half, had you not?
17      A.   Yes, sir.
18      Q.   And you knew people there and trusted people
19   there?
20      A.   Correct.
21      Q.   Among them Curtis Davis and Wayne Fletcher?
22      A.   Yes, sir.
23      Q.   Okay.  And if any of those other people come
24   and testify at trial -- or at this hearing, is it your
25   position that they are lying?

```
 1      A.   I don't know what their testimony is.

 2      Q.   You don't know what anybody's testimony is,

 3   sir, and you've said they're lying.

 4      A.   Because you've presented their testimony to

 5   me.

 6      Q.   And so, therefore, if I present testimony to

 7   you that -- then they -- those people are lying?

 8      A.   If it's not the -- not the truth, yes, that's

 9   correct.

10      Q.   Mr. Snow testified that you paid protection

11   to the Aryan Brotherhood.

12           Is that a lie?

13      A.   Yes, sir.

14           MR. MACRAE:  Todd, can you go back to

15   that first slide summarizing the testimony.

16      Q.   (BY MR. MACRAE)  Mr. Fennell, I want to ask

17   you a hypothetical question.

18           Suppose, hypothetically, that these witnesses

19   who are up on the screen are truthful.  I know you

20   disagree with that, but suppose for purposes of this

21   question they are being truthful.

22           Are you with me?

23      A.   Yes.

24      Q.   Okay.

25           MR. MACRAE:  Can you go to the first
```

medication before?

   A.   No.  I had never taken it in my life until then.

   Q.   How did it make you feel?

   A.   Like I was numb.  It just took a little bit off of all the pain.

   Q.   From what you can remember, can you describe what Stacey's funeral was like?

   A.   I can't remember anything about it.

   Q.   Blurry?

   A.   Yes, sir.

   Q.   Would you have said at the funeral -- would you have said to anyone there that Stacey got what she deserved?

          MR. MACRAE:  Your Honor, objection. Calls for speculation.  He just testified he doesn't remember anything.

          THE COURT:  Overruled.

   Q.   (BY MR. BRAGG)  So I'll ask this again.

         Did -- would you have said at the funeral to anybody there or just to yourself that Stacey got what she deserved?

   A.   No, sir.

   Q.   Did Stacey get what she deserved?

   A.   No, she did not.

1    Q.   Would you have ever told anyone at the
2    Stevenson Unit, and I quote, "I had to kill my
3    N-word-loving fiancée"?
4    A.   No, sir.
5    Q.   Would you have ever said to anyone, "You
6    wouldn't believe how easy a man's belt would break
7    when you strangle a N-word-loving whore"?
8    A.   No, sir.
9    Q.   Jimmy, was Stacey a whore?
10    A.   No, sir.
11    Q.   How does it make you feel that someone would
12    claim that she is or that you used these words to
13    describe her?
14    A.   For 25 years, they've made him the victim and
15    her the demon.
16    Q.   And how does that make you feel?
17              MR. MACRAE:  Relevance, Your Honor.
18              THE COURT:  Overruled.
19    A.   It rips out your gut.
20    Q.   (BY MR. BRAGG)  I'd like to go forward a
21    little bit in time to 2012, 2014.
22         Were you on the Estes Unit around that time?
23    A.   Yes, sir.
24    Q.   I believe you said that you at least knew the
25    name Michael Bordelon.

1    A.   Yes, sir.

2    Q.   Did you know him?

3    A.   He worked in the maintenance department where

4    I worked.  He just worked on a different crew.

5    Q.   So did -- you knew of him, you knew he worked

6    there, but you didn't know him at all?

7    A.   No, sir.

8    Q.   Would you have ever had an occasion to tell

9    him that Stacey was screwing an N-word?

10   A.   No, sir.

11   Q.   Would you say that to anyone?

12   A.   No, sir.

13   Q.   Would you have told anyone that you got rid

14   of her?

15   A.   No, sir.

16   Q.   Because that's not true, is it?

17   A.   Correct.

18   Q.   Did you ever tell anyone there at the Estes

19   Unit that you confronted a black man about sleeping

20   with Stacey?

21   A.   No, sir.

22   Q.   Did you ever say the words, "I took care of

23   her, and that damn N-word is going to do the time"?

24   A.   No, sir.

25   Q.   And you're sure about that?

ready, Mr. MacRae.

## FURTHER REDIRECT EXAMINATION

BY MR. MACRAE:

Q. Mr. Fennell, at the very end of your direct examination [sic] a moment ago, you said that your relationship with Ms. Stites, even though it was short, it was wonderful.

Do you recall that testimony?

A. Yes, sir.

Q. I neglected to tell you this morning about two more witnesses who have testified. One being Brenda Dickinson who testified that there was an alert system at H-E-B whenever you came into the store so Stacey could hide and that Stacey was expressing being worried about being married to you, which is contrary, really, to your story of short and wonderful, is it not?

A. Yes.

Q. And so Ms. Dickinson is lying, I assume?

A. Yes, sir.

Q. And then Ms. Cindy Schmidt, do you remember her as a dispatcher in Giddings?

A. No, sir.

Q. She remembers you quite well. And she testified that the viewing of Ms. Stites, that she was

in the wedding dress and that you said, in her

vicinity, "At least she got to wear that damn dress,"

referring to Ms. Stites.

     Do you remember saying that?

A.  No, sir.

Q.  Are you denying saying that?

A.  Yes.  I did not say that.

Q.  So Ms. Schmidt is also lying?

A.  Yes, sir.

Q.  And both of those ladies have testified

contrary to your suggestion that your life with

Ms. Stites was short and wonderful.

     Do you agree with that?

A.  Yes, sir.

Q.  You testified extremely confidently on direct

that Ms. Stites was not having an affair with

Mr. Reed.

     Do you remember that testimony?

A.  Yes, sir.

Q.  How do you know?

A.  I just know.  Because every time she wasn't

at work, she was with me or with her mother.

Q.  So she couldn't possibly have been having an

affair with Mr. Reed?

A.  No.

Q.    Is that the basis for your opinion, just that
when she wasn't at work, she was with you?

A.    Yes, sir.

Q.    So if somebody were to come in and testify
that she saw -- well, he saw -- Mr. Reed and
Ms. Stites together outside of Ms. Stites' workplace,
that would be a lie as well?

A.    Yes, sir.

Q.    Is there any other way you know that Mr. Reed
and Ms. Stites were not having an affair?

A.    There was no possible way.  She was always
with me or her mother, so...

Q.    Do you have any training in forensic
pathology?

A.    No, sir.

Q.    If Dr. Bayardo has testified -- and I'll
represent to you that he has -- that the semen that
was found in Ms. Stites was deposited there
consensually, then Ms. Stites and Mr. Reed were having
a consensual affair, correct?

        MR. BRAGG:  Objection.  That's going to
call for a scientific conclusion that he does not have
the expertise on.

        THE COURT:  Sustained.

Q.    (BY MR. MACRAE)   You're aware, are you not,

1   Is that what you just said?

2      A.   Yes.   They would have been hearing the wrong

3   apartment.

4      Q.   Okay.   Cindy Schmidt testified that there was

5   a 911 call to your apartment for domestic disturbance.

6   Do you remember that?

7      A.   There was never one.

8      Q.   She testified a police officer was dispatched

9   but that nothing ever happened.   Do you recall a

10  police officer coming --

11     A.   There was never a police officer --

12     Q.   -- in response to a domestic disturbance

13  call?

14     A.   No, sir, never one.

15     Q.   Ms. Schmidt is lying?

16     A.   There's no record.   I mean, that --

17     Q.   Oh, how do you know there's no record?

18     A.   There was never a call made.

19     Q.   How do you know there's no record?

20     A.   There was never a call, there was never --

21     Q.   You just testified there was no record.   How

22  do you know that?

23     A.   I just assumed there's not a record.

24     Q.   Someone told you that, didn't they?

25     A.   No, sir.   If it never happened, there would

1  be no record.

2      Q.  How do you know there's no record?

3      A.  Because it never happened.

4      Q.  You started that exchange with "there was no

5  record," meaning someone told you there was no record.

6      A.  No, sir.

7      Q.  Who was it?

8      A.  No one told me there was no record.

9      Q.  How do you know there was no record?

10     A.  Because it never happened.

11     Q.  Did you ever go look at the records to see if

12 there was a record?

13     A.  No, sir.

14     Q.  You're just making stuff up as we go along,

15 aren't you?

16     A.  No.

17     Q.  Who told you there was no record?

18     A.  I know there's no record.  There was no --

19     Q.  How do you know that, sir?

20     A.  Because it never happened.  How can it happen

21 and there not be a record?

22     Q.  And you're saying -- you're saying nobody has

23 told you there's no record of that at all?

24     A.  Nobody's told me that there was any kind of

25 record or no record or anything.

1  A.  Yes, sir.

2  Q.  Okay.  Numerous people have said you were

3  prejudiced.  You're denying that?

4  A.  I'm definitely denying that.

5  Q.  Anyone who said that is of course lying?

6  A.  Yes, sir.

7  Q.  "Before we started dating, I used to get my

8  hair cut by a black woman.  After we started dating,

9  he wouldn't let me go to her anymore because her salon

10  was, quote, across the tracks, closed quote, and, open

11  quote, white women don't go there," closed quote.

12      Did I read that correctly?

13  A.  Yes, sir.

14  Q.  Ms. Duncan is lying of course?

15  A.  Yes, sir.

16  Q.  "At one point I was considering hiring a

17  black woman to work at the store and Jimmy got really

18  angry.  He told me everything he thought about black

19  people.  (He didn't say, quote, black people, close

20  quote.  He used the N-word)."

21      Did I read that correctly?

22  A.  Yes.

23  Q.  It goes on to say that you said, "They were

24  all bad, all on drugs, all crooks, and why I shouldn't

25  hire her."

1          Did I read that correctly?

2    A.   Yes, sir.

3    Q.   Another lie?

4    A.   Yes, sir.

5    Q.   "I ended up hiring her, and that was a big

6  problem between us for a couple of months."

7          Did I read that correctly?

8    A.   Yes, sir.

9    Q.   Mr. Fennell, do you have any idea why all

10 these people are coming forward and lying about you?

11   A.   No, sir.

12   Q.   No idea whatsoever?

13   A.   No.

14   Q.   I mean, it's weird, isn't it?

15         Isn't it?

16   A.   Yes.

17   Q.   I mean, we've talked about 20 different

18 people or more today who have come forward with

19 nothing to gain and have accused you of some pretty

20 horrible things, and we really just have no

21 explanation, right?

22   A.   Correct.

23   Q.   I mean, they're all lying, of course, but we

24 have no explanation for why they would come forward.

25 Have you thought about that?

A.   I've thought about it for a long time, why
they would say that stuff.

Q.   Yeah.  Do you have any explanation for why --

A.   No, sir.

Q.   -- 20 people or more would come forward over
25 years saying things about you for no gain?

A.   No, sir.

Q.   I mean, it's almost unexplainable, isn't it?

A.   Yes, sir.

Q.   I mean, here you are the only truthful
person, the only person with something to lose, the
only person with something to gain.  You're telling
the truth and nobody else is.  It's weird, isn't it?

MR. BRAGG:  Objection, Your Honor, asked
and answered at this point I think four --

THE COURT:  Sustained.

Q.   (BY MR. MACRAE)  So, Mr. Fennell, with respect
to your communications with the State, did you ask
them if you should consult with a lawyer?

A.   I might have.  I just don't remember if I did
or not.

Q.   And if you had asked them that, do you
remember what they would have answered?

A.   They would have said that's up to me.

Q.   They would have said that or they did say it?

1  you say are lying you've known about for a long time,

2  have you not?

3     A.   Some of them, yes.

4     Q.   Okay.  And you wait till you get in here and

5  you waive the Fifth Amendment to talk to them about

6  it.  Have you talked to any of them about it,

7  challenged them and said, "You're lying"?

8     A.   No, sir.

9     Q.   Did the State or any of the people you met

10  with say or do anything to make you think that if

11  Mr. Reed prevails and there's a new trial, that you

12  wouldn't be tried?

13     A.   No, sir.

14     Q.   No intimations, no implications, no

15  inferences, no nothing?

16     A.   No, sir.

17          MR. BRAGG:  Objection, Your Honor, asked

18  and answered.  We're covering the same ground at this

19  point.

20          THE COURT:  Sustained.

21     Q.   (BY MR. MACRAE)  Look, please, Mr. Fennell, at

22  that exhibit with the text messages again, and it's

23  several pages in.  It looks like it's Thursday,

24  June 17th, and I'm looking at the right-hand side.

25          Tell me when you're there.

1    A.  Okay.

2    Q.  This is an exchange, again, with Ms. Wolfe,

3  and I think you testified earlier you had one or two

4  text messages with Ms. Wolfe.  In reality, you had

5  closer to 100, would you agree?

6    A.  Yes, sir.

7    Q.  And on June the 17th, it looks like, you're

8  talking about someone named Lorenzo Torres.  Do you

9  know who that is?

10    A.  Yes, sir.

11    Q.  Who is that?

12    A.  That is a gentleman who I was incarcerated

13  with.

14    Q.  And it looks like you're talking about

15  witnesses.  What does he know that would be relevant

16  to this case?

17    A.  He was just a character witness who was

18  around me during -- when I was incarcerated.

19    Q.  Did you confess to him that you killed

20  Stacey Stites also?

21    A.  No, sir.

22    Q.  And then you also go on to say, "If you need

23  more witnesses, let me know."  Do you see that?

24    A.  Yes.

25    Q.  And to what are you referring there?