# Exhibit 26

REPORTER'S RECORD

VOLUME 3 OF 12 VOLUMES

TRIAL COURT CAUSE NO. 8,701

COURT OF CRIMINAL APPEALS NO. WR-50,961-10

|  |  |
|---|---|
| | ) 21st DISTRICT COURT |
| | ) |
| | ) |
| | ) |
| EX PARTE RODNEY REED | ) OF |
| | ) |
| | ) |
| | ) |
| | ) BASTROP COUNTY, TEXAS |

------------------------------

WRIT OF HABEAS CORPUS

July 20, 2021

------------------------------

BE IT REMEMBERED THAT on the July 20, 2021, the
following proceedings came on to be heard in the
above-entitled and numbered cause before the Honorable
J.D. Langley, Visiting Judge of the 21st District
Court, held in Bastrop, Bastrop County, Texas.

Proceedings reported by machine shorthand by
Hayley Stiteler, CSR, RPR.

```
 1                    A P P E A R A N C E S

 2

 3   FOR THE APPLICANT:

 4

 5       Mr. Andrew F. MacRae
         LEVATINO | PACE LLP
 6       1101 South Capital of Texas Highway
         Building K, Suite 125
 7       Austin, Texas 78746
         512.6371581
 8       amacrae@levatinopace.com
         SBOT NO. 00784510

 9

10       Barry C. Scheck
         INNOCENCE PROJECT
11       40 Worth Street, Suite 701
         New York, New York 10013
12       212.364.5390
         bscheck@innocenceproject.org

13

14       Mr. George H. Kendall
         SQUIRE PATTON BOGGS, LLP
15       1211 Avenue of the Americas
         New York, New York 10036
16       212.872.9834
         george.kendall@squirepb.com

17

18       Ms. Jane Pucher
         INNOCENCE PROJECT
19       40 Worth Street, Suite 701
         New York, New York 10013
20       646.227.8327
         jpucher@innocenceproject.org

21

22       Ms. Michelle L. Davis
         SKADDEN, ARPS, SLATE, MEAGHER & FLORM, LLP
23       1000 Louisiana, Suite 6800
         Houston, Texas 77002
24       713.655.5100
         michelle.davis@skadden.com
25       SBOT NO. 24038854
```

1   Ms. Nicole A. DiSalvo
   SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
2   920 North King Street
   Wilmington, Delaware 19801
3   302.651.3027
   nicole.disalvo@skadden.com
4   Delaware Bar No. 4662

5

6   Ms. Corrine Irish
   SQUIRE PATTON BOGGS
   1211 6th Avenue, 26th Floor
7   New York, New York 10036
   212.872.9823
8   corrine.irish@squirepb.com

9

10   Mr. Quinncy McNeal
   HUSCH BLACKWELL LLP
   600 Travis Street, Suite 2350
11   Houston, Texas 77002
   713.525.6253
12   quinncy.mcneal@huschblackwell.com
   SBOT NO. 24074690

13

14   Ms. Sarah Runnells Martin
   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
15   920 North King street
   Wilmington, Delaware 19801
16   302.651.3000
   sarah.martin@skadden.com

17

18

19   FOR THE STATE:

20

   Ms. Lisa M. Tanner
21   TEXAS OFFICE OF THE ATTORNEY GENERAL
   P.O. Box 12548
22   Austin, Texas 78711
   512.463.2125
23   lisa.tanner@oag.texas.gov
   SBOT NO. 19637700

24

25

Mr. Travis G. Bragg
TEXAS ATTORNEY GENERAL
ASSISTANT ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711
512.936.1400
SBOT NO. 24076286


Ms. Rachel L. Patton
OFFICE OF THE ATTORNEY GENERAL
CRIMINAL APPEALS DIVISION
P.O. Box 12548
Austin, Texas 78711
512.936.1400
rachel.patton@oag.texas.gov
SBOT NO. 24039030


Mr. Edward L. Marshall
OFFICE OF THE ATTORNEY GENERAL
CRIMINAL APPEALS DIVISION
P.O. Box 12548
Austin, Texas 78711
512.936.1400
edward.marshall@oag.texas.gov
SBOT NO. 00797004


Mr. Garrett Greene
OFFICE OF THE ATTORNEY GENERAL
CRIMINAL APPEALS DIVISION
300 West 15th Street
Austin, Texas 78701
512.936.1400
garrett.greene@oag.texas.gov
SBOT NO. 24096217

# INDEX OF PROCEEDINGS
## VOLUME 3
### (WRIT OF HABEAS CORPUS)

**APPLICANT'S WITNESSES:**

| | DX | CX | VDX | VOL |
|---|---|---|---|---|
| JAMES CLAMPIT | 8,33,37 | 14,35 | | 3 |
| ARTHUR J. SNOW, JR. | 38,91 | 52,99 | | 3 |
| MICHAEL LYNN BORDELON | 105 | 123 | | 3 |
| VICTOR JUAREZ | 135,154 | 140,154 | | 3 |
| REBECCA RANDALL | 156 | 161 | | 3 |
| PAUL ESPINOZA | 174,200 | 187 | | 3 |

| | Page | Vol |
|---|---|---|
| COURT REPORTER'S CERTIFICATE.................. | 213 | 3 |

## ALPHABETICAL INDEX

**APPLICANT'S WITNESSES:**

| | DX | CX | VDX | VOL |
|---|---|---|---|---|
| MICHAEL LYNN BORDELON | 105 | 123 | | 3 |
| JAMES CLAMPIT | 8,33,37 | 14,35 | | 3 |
| PAUL ESPINOZA | 174,200 | 187 | | 3 |
| VICTOR JUAREZ | 135,154 | 140,154 | | 3 |
| REBECCA RANDALL | 156 | 161 | | 3 |
| ARTHUR J. SNOW, JR. | 38,91 | 52,99 | | 3 |

## EXHIBIT INDEX

**APPLICANT'S EXHIBITS**

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL |
|---|---|---|---|---|
| 8 | Funeral Register Book | 10 | 11 | 3 |
| 9 | Affidavit of Jim Clampit | 33 | 34 | 3 |
| 10 | Affidavit of Arthur Snow | 39 | 96 | 3 |

| | NO. | DESCRIPTION | OFFERED | ADMITTED | VOL |
|---|---|---|---|---|---|
| | 11 | Agreed Final Decree of Divorce of Tamesha Matthews and Arthur Snow | 44 | 96 | 3 |
| | 12 | October 29, 2019 Letter from Innocence Project to Hays County Jail | 98 | 99 | 3 |
| | 13 | October 29, 2019- Incident Report involving Arthur Snow | 98 | 99 | 3 |
| | 14 | Affidavit of Michael Lynn Bordelon | 106 | 133 | 3 |

**STATE'S EXHIBITS**

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL |
|---|---|---|---|---|
| 16 | Texas Parks and Wildlife Business Records Affidavit | 26 | 26 | 3 |
| 17 | Business Records Affidavit- Contact History for Arthur Snow | 72 | 76 | 3 |
| 18 | H-E-B Employee Roster, Special Report for Bernie D. Bastrop Partners with Term Dates Greater than 3-16-96 as of June 1, 1996 | 144 | 173 | 3 |
| 19 | H-E-B Employee Payroll | 144 | | 3 |

court reporter, please.

THE WITNESS:  James Clampit.

THE COURT:  Okay.  How do you spell your last name, Mr. Clampit?

THE WITNESS:  C-L-A-M-P-I-T.

THE COURT:  P-I-T?

THE WITNESS:  Yes, sir.

THE COURT:  You may proceed, ma'am.

**JAMES CLAMPIT,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MS. MARTIN:

Q.  Good morning, Mr. Clampit.

A.  Good morning.

Q.  Could you please tell me about your professional history.

A.  I was in the Air Force for eight years.  When I got out of the Air Force, I moved back to East Texas, Lufkin, where I was originally from, and I was accepted and hired with the Lufkin Police Department. And I was with them for one year.  Then I was accepted to the Texas Parks and Wildlife Department game warden school at Texas A&M University.

Q.  And after graduation from the Texas A&M University, where did you -- what was your next

position?

A.   I was a game warden stationed in Lee County -- Giddings in Lee County.

Q.   And after that position, what was the next job you held?

A.   I was with them for 15 years, and then I resigned -- that was back in the early '80s when the oil field hit Lee County -- and I went to work with Santa Fe Minerals.

Q.   And then at some point in time, did you come to work for the Lee County Sheriff's Office?

A.   Yes.  When the oil field crunch hit in the late '80s, I was laid off.  And I knew the sheriff and he knew I had prior law enforcement experience, so he hired me as a deputy.

Q.   And around what year would that have been?

A.   '67, '68, somewhere along in there.

Q.   And then what would your responsibilities have been as the deputy in the Lee County Sheriff's Office?

A.   I was a deputy enforcing state and county laws in Lee County.

Q.   And in 1996, were you a deputy at the Lee County Sheriff's Office?

A.   Yes, I was active.

Q. Were you aware of the murder of Stacey Stites in 1996?

A. Yes.

Q. Were you personally acquainted with Ms. Stites?

A. No.

Q. Did you know her fiancé, Jimmy Fennel?

A. Yes.

Q. And how did you know him?

A. He was a member of the Giddings Police Department and we had a working -- closely with the sheriff's department and the police department right there in Giddings. We backed each other on calls because of small departments.

Q. And do you recall if you attended Ms. Stites' viewing services?

A. Yes, I did.

MS. MARTIN: I would introduce, Your Honor, Applicant's Exhibit 8 which is the funeral registry for Ms. Stites' viewing services.

(Applicant's Exhibit 8 marked.)

MS. PATTON: Is that the complete registry?

MS. MARTIN: I will give you a complete copy. I believe it is.

1    May I approach, Your Honor?

2    THE COURT:  Yes, ma'am.

3    Q.   (BY MS. MARTIN)  And, Mr. Clampit, if you can

4    turn to -- it's about the fifth page --

5    THE COURT:  Any objection to this

6    exhibit?

7    MS. PATTON:  No objection, Your Honor.

8    THE COURT:  All right.  Applicant's

9    Exhibit 8 is admitted.

10    (Applicant's Exhibit 8 admitted.)

11    Q.   (BY MS. MARTIN)  It's around the fifth page.

12    I put a little flag on your version.

13    Is this your signature at the bottom of the

14    page?

15    A.   Yes, ma'am, it is.

16    Q.   What do you recall about the viewing

17    services?

18    A.   I remember there was quite a few law

19    enforcement people there.  There was a good crowd of

20    people there.  And it was at Phillips & Luckey Funeral

21    Home in Giddings.  I was standing in the hallway

22    looking in a little room where her casket was against

23    the back wall.  And she was a pretty woman.  And she

24    was dressed in all white, a white dress.  And Jimmy

25    walked up right beside me and he said, "She's being

1 buried in her wedding dress."

2     **Q.**   And did Jimmy say anything else to you?

3     **A.**   Yes, he said something to me.  I can't

4 remember his exact words, but it floored me.  It --

5         MS. PATTON:  Your Honor, I'm going to

6 object to hearsay at this point.

7         MS. MARTIN:  Your Honor, what

8 Mr. Clampit is about to testify to is not hearsay

9 because we're not offering it for the truth of the

10 matter asserted.

11         Frankly, it would be offensive if we

12 offered it for the truth of the matter asserted.  It's

13 being offered for Brady purposes and to show what

14 Mr. Fennell said.

15         MS. PATTON:  They have not demonstrated

16 that this witness had anything to do with the

17 investigation or even that the department had anything

18 to do with the investigation.  It cannot be Brady.

19         THE COURT:  Objection overruled.

20     **Q.**  (BY MS. MARTIN)  Mr. Clampit, you can go ahead

21 and continue what you were saying.

22     **A.**   What he said, I can't remember word for word.

23 But it shocked me so much.  I've never been shocked

24 that bad in my life.  My mind just went totally blank.

25     **Q.**   And to the best of your --

    A.   And he turned and walked away from it.  I
just stared at him as he walked away.

    Q.   To the best of your recollection, what did
Mr. Fennell say?

    A.   Near's I can figure it, it was, "She got what
she deserved," and that's kind of...

    Q.   And to whom was that statement directed?

    A.   Well, he was standing right beside me.  It
was to me.

    Q.   And you believed he was talking about his
fiancée?

    A.   Yes.

    Q.   It's been a long time since Ms. Stites'
services.  Why do you remember this so well?

    A.   Well, because the way -- it shocked me.  It's
burned in my mind.  It's been there forever.

    Q.   Did you ever tell anyone about what
Mr. Fennell said to Ms. Stites at the service?

    A.   At the time, no.

    Q.   And why are you here today?

    A.   Well, when the publicity on Rodney Reed's
case started coming out, I was thinking about all this
the whole time; and I said, "I need to tell somebody
about this."  So I found a phone number -- I don't
know, in the paper or somewheres -- and I called that

phone number, and it was an attorney representing

Reed.  And I explained to him and he sent someone to

my house in Giddings to interview me.

Q.  And in connection with that, did you end up

signing an affidavit?

A.  Yes.

Q.  Has the media ever contacted you regarding

this?

A.  Yes, several times, I've been contacted by

media.  60 Minutes called me one time and wanted me

to -- when this --

Q.  And have you ever spoken to the media?

A.  No, I refused.

MS. MARTIN:  No further questions at

this time.

### CROSS-EXAMINATION

BY MS. PATTON:

Q.  Good morning, Mr. Clampit.

A.  Good morning, ma'am.

Q.  Let's go back to 1996 real quick.

You testified that you were a deputy with the

Lee County sheriff's department; is that correct?

A.  Yes, ma'am.

Q.  How old were you back then?

A.  How old was I?

```
1              THE WITNESS:  Good morning.
2              (Witness sworn.)
3              THE COURT:  You may proceed.
4                  ARTHUR J. SNOW, JR.,
5    having been first duly sworn, testified as follows:
6                  DIRECT EXAMINATION
7    BY MR. MACRAE:
8        Q.   Good morning, Mr. Snow.
9        A.   Good morning.
10       Q.   You're here by a subpoena, are you not?
11       A.   Yes, sir.
12       Q.   Are you nervous about being here?
13       A.   Yes, sir.
14       Q.   Forgive me.  I don't mean to intrude or be
15   offensive.  Are you scared?
16       A.   Yes, sir.  I've been threatened.
17       Q.   Okay.  By what?  Who or what?
18       A.   My ex-wife, with the Aryan Brotherhood --
19              MR. BRAGG:  Objection, Your Honor,
20   hearsay.
21              THE COURT:  Overruled.
22       Q.   (BY MR. MACRAE)  Who is your ex-wife?
23       A.   Tamesha Matthews.
24       Q.   When you say you've been threatened by her,
25   has she called you?
```

         Q.    Do you recognize Mr. Reed?

         A.    Just from the news.

         Q.    Mr. Snow, this is Mr. Reed.  Mr. Reed is on
death row for the murder of a lady named
Stacey Stites, who was the fiancée of a guy named
Jimmy Fennell.

               Do you know Jimmy Fennell?

         A.    Yes, I do.

         Q.    Did he tell you anything contrary to the idea
that Mr. Reed --

               MR. BRAGG:  Objection.  Calls for
hearsay.

               THE COURT:  Overruled.

               THE REPORTER:  Can you repeat the
question, please.

         Q.    (BY MR. MACRAE)  Mr. Snow, did Mr. Fennell
tell you something that is contrary to the idea that
Mr. Reed killed Ms. Stites?

         A.    He said in my presence that you wouldn't
believe how easy a man's belt would break when you
strangle a nigger-loving whore.

         Q.    The previous witness testified about
something that Mr. Fennell said to him, and he said it
floored him.  Did that floor you?

         A.    No.  I was in prison and you hear so many war

stories.  The only reason I remember Jimmy Fennell is
because he turned out to be a cop.  That's the only
reason.

Q.   Mr. Snow, I handed you your affidavit.  In
case you need to refresh your recollection at any
time, feel free to look at it.  I'm not going to take
too long on it.

But you said a moment ago that you hear a lot
of stories in prison, and I'm guessing that the dope
dealer on the corner is actually a drug kingpin by the
time he gets in there?

A.   Yes, sir.

Q.   But this story stuck with you --
Mr. Fennell's confession to you stuck with you, in
part, because it turned out he was a cop?

A.   That, and when he told the story, it was the
only time he had a pair of balls.  You know, any other
time, he would walk with his head down.  He was
scared.  He wanted protection.

Q.   Is that how you first met him, he came to you
for protection while you were in prison together?

A.   Yes.

Q.   And did you provide that protection?

A.   Yes.

Q.   And in your affidavit, I think you testified

that you weren't really friends with him, but you would converse on occasion?

A.   Well, he would bring us the payment, you know.

Q.   And then in paragraph 6 of your affidavit, you talk about the circumstances -- excuse me, paragraph 7 -- the circumstances under which he told you this and that you were walking on the track in the rec yard; is that right?

A.   Yes, sir.

Q.   And I'm assuming you don't know whether anyone else heard that or not?

A.   There were other people present.  You know, I can't speak for them.

Q.   Did you tell your wife about Mr. Fennell's statement to you?

A.   Ex-wife.

Q.   Excuse me, ex-wife?

A.   Yes.

Q.   Was she your wife at the time you told her?

A.   Yes.

Q.   Did you tell her when she came to visit you in prison sometime pretty soon after --

A.   I told her why I got shipped from one unit to another about -- I didn't know nothing about the Reed

case at the time. I just -- Jimmy Fennell turned

out -- somebody came to the unit and said that he was

on PC and he was a cop from Georgetown.

Q. Okay. And once you find out that someone's a

cop in prison, I'm guessing there's not a whole lot

else you can do for them?

A. No.

Q. What made you come forward, Mr. Snow?

A. It was the right thing to do.

Q. Have you gained anything from coming forward?

A. No.

Q. Would the inverse be true?

A. Yes.

Q. You lost your marriage?

A. Yes.

Q. Ms. Matthews, you've mentioned, she's Aryan

Brotherhood?

A. Yes.

Q. I take it she wasn't terribly happy that you

came forward with an affidavit that potentially helps

a black man get off death row.

A. No. And I have a bunch of texts, if the

Court would like to read them, about that.

Q. I'm guessing Judge Langley would not like to

read them, but I'll let him speak for himself.

Have you been paid anything for your affidavit or your testimony?

A.   No, sir.

Q.   Have you been offered anything?

A.   No, sir.

Q.   Have you asked for anything?

A.   No, sir.

Q.   The State's position appears, from their papers, to be that you are a jailhouse snitch.

A.   No.  I ain't ever cooperated with law enforcement in my life.

Q.   What's a jailhouse snitch?

A.   I don't know, but I ain't one.  I told the truth.

Q.   Tell me if -- my understanding of a jailhouse snitch is someone in jail who tells a story and gets something in return.

Assuming that's generally true, have you gotten anything in return for what you've done?

A.   A bunch of heartache.

Q.   That's all, sir.  Thank you very much for your time.

MR. MACRAE:  I pass the witness.

***NO TESTIMONY OMITTED***

**CROSS-EXAMINATION**

BY MR. BRAGG:

    Q.   Good afternoon -- or excuse me, good morning, Mr. Snow.

    A.   Good morning.

    Q.   My name is Travis Bragg, and I represent the State. I'd like to start with your affidavits and the things you said there.

        So to be clear, you are a member of the Aryan Brotherhood, or you were?

    A.   I was. I'm not anymore.

    Q.   Okay. But you were a member of the Aryan Brotherhood?

    A.   Yes, sir.

    Q.   And "AB," is that short for Aryan Brotherhood?

    A.   Yes, sir.

    Q.   When did you become a member?

    A.   1987.

    Q.   About how long did you stay a member of the Aryan Brotherhood?

    A.   Twenty years.

    Q.   Twenty years?

    A.   Yes, sir.

    Q.   Did you become a member while you were in

1  prison or before?

2      A.   In prison.  State of Texas don't give you no

3  choice.

4      Q.   The State of Texas don't give you no choice?

5      A.   No.  They promote racism.

6      Q.   Okay.  So the State of Texas forced you to

7  become AB?

8      A.   Pretty much.  To stay alive.

9      Q.   You said in your affidavit that you achieved

10  some leadership status while you were in the Aryan

11  Brotherhood.

12     A.   Yes, sir.

13     Q.   Is that correct?

14     A.   If you -- yes.

15     Q.   Okay.  Can you describe what that leadership

16  would be?  Did you have a title, a rank?

17     A.   No.

18     Q.   Okay.  Part of my naïveté, but I hear on TV

19  shows the term "shot caller" thrown around.  Were you

20  a person who could call shots?  Were you a person who

21  could make things happen?

22     A.   Yes.

23     Q.   About how long did you have this leadership

24  status in the Aryan Brotherhood?

25     A.   A few years.

1    Q.   And you said in your affidavit that other
2  inmates knew this, that you were a part of the AB,
3  correct?
4    A.   Yes, sir.
5    Q.   And other inmates knew that you were a leader
6  in the AB, correct?
7    A.   If you could read my tattoos, you can read
8  them.  I don't know what other people knew or didn't
9  know.  It's not something that had to be told.  You
10  just knew.
11    Q.   Okay.  You recall executing an affidavit for
12  this case, correct?
13    A.   Yes, I do.
14    Q.   Okay.  I want to show you here.  I apologize.
15  That's upside down.
16         I'm going to show you what's marked here as
17  paragraph 5.  And you see here in paragraph 5, the
18  second sentence, you said, "Eventually I became a
19  respected member of the gang and was seen by other
20  inmates as a sort of leader."
21         Is that what it says there?
22    A.   Yes, sir.
23    Q.   Okay.  And this is the affidavit that you
24  signed?
25    A.   Yes, sir.

Q.   Did the guards there -- and I believe this is
while you were in the Stevenson Unit; is that correct?

A.   Yes, sir.

Q.   And did the guards there at the Stevenson
unit know that you were AB?

A.   I don't --

          MR. MACRAE:  Objection, speculation.

          MR. BRAGG:  It's actually not,
Your Honor.  He says in his affidavit they did.

A.   TDC knows I'm Aryan Brotherhood.

Q.   (BY MR. BRAGG)  Okay.  TDC --

A.   I'm on gang file in the State of Texas.

Q.   You are?  And you've seen the gang file?

A.   Every time I go to a jail or anything, I'm
thrown with the gang members.

Q.   Okay.  So the guards at the Stevenson Unit --

A.   I don't know what the guards knew.

Q.   Let me ask my question, sir.

     The guards at the Stevenson Unit, during the
time you were talking about in your affidavit, they
knew you were AB, correct?

A.   I don't know what they -- which guards?
There's a bunch of guards that work for TDC.

Q.   Let me show you your affidavit again.  This
is paragraph 9.  I'm going to start here with the

1    Is that what your affidavit says?

2    A.   Yes, sir.  I'm pretty sure that's why I got

3    sent there.  With other reasons, you know.  You know,

4    they was building a file on me.

5    Q.   Okay.  And building a file on you in part

6    because of your association with the Aryan

7    Brotherhood?

8    A.   Yes, sir.

9    Q.   I would like to ask you about the statement

10   that you made earlier.  You said that -- I'm sorry.

11   It's the statement that you said that Jimmy made to

12   you.  You said, and I'm quoting here, that Jimmy said

13   to you, "You wouldn't believe how easy a man's belt

14   can break when you strangle an N-word-loving whore."

15        That's what Jimmy said to you?

16   A.   He said it in a conversation where there was

17   probably five or six people standing -- walking

18   around.

19   Q.   Okay.  Do you recall who any of the other

20   people were?

21   A.   I'm not giving out none of their names.

22   Q.   Fair enough.

23        But you recall hearing Jimmy say those words?

24   A.   Yes, sir.

25   Q.   Okay.  Why does that not appear in your

```
 1              THE COURT:  You can go ahead and be
 2   seated, sir.
 3              All right.  Good afternoon -- or good
 4   morning, sir.  If you could raise your right hand for
 5   me.
 6              (Witness sworn.)
 7              THE COURT:  And if you could state your
 8   full name for the court reporter, please.
 9              THE WITNESS:  Michael Lynn Bordelon.
10              THE COURT:  And could you spell the last
11   name.
12              THE WITNESS:  B-O-R-D-E-L-O-N.
13              THE COURT:  Okay.  You may proceed.
14              MR. MACRAE:  Thank you, Judge.
15                 MICHAEL LYNN BORDELON,
16   having been first duly sworn, testified as follows:
17                    DIRECT EXAMINATION
18   BY MR. MACRAE:
19       Q.   Mr. Bordelon, are you appearing here by a
20   subpoena today?
21       A.   I'm a little hard of hearing.
22       Q.   Are you appearing here pursuant to a
23   subpoena?
24       A.   Yes, sir.
25       Q.   Where do you live?
```

1   A.   Beaumont, Texas.

2   Q.   How far is that from here?

3   A.   Three hours, three and a half hours.

4   Q.   So I take it you came in last night?

5   A.   Yes, sir.

6   Q.   You signed an affidavit, did you not, back in

7   early 2020 with respect to Mr. Reed's case?

8   A.   Yes.

9           (Applicant's Exhibit 14 marked.)

10  Q.   (BY MR. MACRAE)  Mr. Bordelon, I handed you

11  something marked Applicant's Exhibit 14.  Is that a

12  copy of your affidavit?

13  A.   Yes.

14  Q.   This is not a memory contest, sir.  If you

15  need to refer to that at any time to refresh your

16  recollection, please feel free to do so.

17  A.   Yes, sir.

18  Q.   Mr. Bordelon, you said you live in Beaumont.

19  What do you do there?

20  A.   Currently, I sell boats.  Boat salesman for a

21  boating company.

22  Q.   How long have you been doing that?

23  A.   A little over a year.

24  Q.   And what else do you do?

25  A.   I own a construction company.  Bordelon

Construction.

Q.   What kind of construction?  Commercial or residential?

A.   Residential, slight commercial.

Q.   How long have you been doing that?

A.   Well, I had a brief period where I had to stop, but on and off for about 30 years.

Q.   Okay.  A brief period, was that a prison sentence?

A.   Yes.

Q.   Where were you in prison?

A.   Each time?

Q.   Well, let me ask a better question.

    Do you know Mr. Jimmy Fennell?

A.   Yes.

Q.   Did you meet him in prison?

A.   Yes.

Q.   And what unit were you in at that time?

A.   Sanders Estes.

Q.   Mr. Bordelon, when did you get out of prison?

A.   November the 24th, 2014.

Q.   And have you been charged with any crimes since then?

A.   No.  I'm not charged with a crime.  I'm accused of a slight civil case.

1    Q.   A civil case, not a criminal case?

2    A.   No.  No, sir.

3    Q.   Let me ask a better question because that may

4    not be clear for the record.

5         The case you just mentioned is a civil case,

6    correct?

7    A.   Well, no, sir, that's not correct.  It is a

8    criminal case.

9    Q.   Okay.

10   A.   I had to stop and think.

11   Q.   All right.  Tell me a bit more about that.

12   A.   I hired a fencing contractor to put up some

13   fence work.  It was -- he claimed to be over $10,000.

14   So long story short, theft of services is what he's

15   claiming, and I was arrested for it.

16   Q.   And what's the status of that?

17   A.   We're supposed to go to court August --

18   sometime in August.  I can't recollect the date right

19   now.

20   Q.   And you're defending yourself with a lawyer

21   and you've denied the charges?

22   A.   Oh, yes.

23   Q.   Let me go back to Mr. Fennell, then.

24        Back between 2012 and 2014, you were in the

25   Sanders Estes Unit; is that right?

1    A.   Correct.

2    Q.   And that's where you met Mr. Fennell?

3    A.   Correct.

4    Q.   Did you become friends with him?

5    A.   Yeah.

6    Q.   As I understand your affidavit, you were a
plumber and he was an electrician and you were on the
same crew?

9    A.   Correct.

10    Q.   Describe for the court what that means.  What
crew?  Where?

12    A.   They had a program there, a maintenance
program, and I was in the maintenance program.  And
there was different sections of it.  I was in the
plumbing section, and they had some carpenteries and
electricians, different sections like that.

17    Q.   So maintaining the buildings on the unit?

18    A.   Yes.

19    Q.   And that's how you got to know Mr. Fennell
and I assume spend a fair amount of time with him?

21    A.   Yes.

22    Q.   Both working and eating out?

23    A.   Yes.

24    Q.   And would you say you became friends with
him?

1   A.   Yes.

2   Q.   And looking at your affidavit, Mr. Bordelon,

3   you mentioned in paragraph number four that, "although

4   Mr. Fennell claimed not to be a racist person, you

5   could tell that he was."

6        Could you explain what you mean by that?

7   A.   Just the way we would talk about things and

8   how we felt about things, and some of the stuff he

9   told me about what groups he was in on different units

10  before he got to Sanders Estes.

11  Q.   And did he claim to be part of the Aryan

12  Brotherhood?

13  A.   Yes.

14  Q.   And when he referred to a black person, did

15  he use a pejorative term that starts with "N"?

16  A.   Not always.

17  Q.   Sometimes?

18  A.   Yes.

19  Q.   Have you ever met Rodney Reed?

20  A.   No, I have not.

21  Q.   I assume you probably recognize him from

22  media coverage or what have you.

23  A.   Well --

24  Q.   If you don't, you don't.

25  A.   I don't watch TV much.  I can't deny it.

1   I've seen his picture somewhere.

2       Q.   Okay.  I want to look at paragraph 6 of your

3   affidavit.  And if you need to refresh your

4   recollection by looking at it real quick, please do

5   and let me know when you're finished.

6       A.   Yeah, I remember that.

7       Q.   What do you remember?

8       A.   I remember our conversation that we had about

9   different things and some of the stuff that it led to

10  that he told me went on in his life also.

11      Q.   Okay.  What did he tell you that went on in

12  his life that we're talking about right now?

13               MR. BRAGG:  Objection.  Calls for

14  hearsay.

15               THE COURT:  Overruled.

16      Q.   (BY MR. MACRAE)  Go ahead, sir.

17      A.   I'm sorry?

18      Q.   What did he talk to you about that went on in

19  his life?

20      A.   Why he was there.  Things that he did.  He

21  told me that he was actually incarcerated for -- he

22  was a policeman and he had taken a girl, kidnapped a

23  girl, accused of that -- what he was accused of, of

24  kidnapping her and raping her, got accused of it.  And

25  we just talked more about it, exactly why and what.

1    Q.   Did you find out that's why he was in prison?

2    A.   Yes.

3    Q.   Did you ever talk to him about the death of

4  his previous fiancée?

5    A.   We had conversations -- a conversation about

6  it after that.

7    Q.   And as I understand it, according to

8  paragraph 6 of your affidavit, you talked to him about

9  his fiancée and he told you that --

10             MR. BRAGG:  Objection, hearsay,

11  Your Honor.

12             THE COURT:  Well, I'll sustain the

13  question on the grounds of leading.  On the grounds of

14  hearsay, overruled.

15    Q.   (BY MR. MACRAE)  Mr. Bordelon, in

16  paragraph 6 -- let me just read it to you:  "He" --

17  and you're talking about --

18             MR. BRAGG:  Objection, Your Honor.

19  Again, he needs to ask it as a question, not be

20  reading the affidavit.

21             THE COURT:  He can call his attention to

22  a portion of the affidavit and then ask him a question

23  about it.

24    Q.   (BY MR. MACRAE)  Mr. Bordelon, in paragraph 6,

25  you say, "He told me that he was married and that he

had been engaged before to a different woman."

Did I read that correctly?

A.   Are you asking me what that --

Q.   Did I read it correctly?  That's all.

A.   Yes.

Q.   And in the following sentence, you say --

MR. BRAGG:  Objection.  Leading, Your Honor.

THE COURT:  Overruled.

Q.   (BY MR. MACRAE)  -- "He told me that a," quote, "damn nigger killed," close quote, "his fiancée and that the killer was on death row."

Did I read that correctly?

A.   Yes, sir.

Q.   And what you say then is -- I guess that obviously got your attention and you wanted to talk to him more about that, did you not?

A.   Correct.

Q.   Okay.  And then you go on in paragraph 7 of your affidavit to talk about that.

Do you remember still that day, Mr. Bordelon, when you went to talk to Mr. Fennell about the death of his fiancée?

A.   Yes.

Q.   And tell me what you remember about that.

A.   I was curious and -- it was three or four guys, we were talking, and later I wanted to know.  I was curious what he actually meant.  So I went to his cell and his cellmate was in there, and he asked the cellmate to leave.  And he started telling us what he meant by that.

Q.   So one of you asked his cellmate to leave. Was that kind of a common thing that would happen?

A.   We always did that.  I mean, if we wanted to talk separate, you know -- I mean, it was a common courtesy thing, "Would you give us some time."

Q.   And then did the cellmate leave?

A.   Yeah, no questions asked.

Q.   What happened after that?

A.   We started talking about exactly what he meant.

Q.   Okay.  And what did he tell you he meant?

A.   I asked him, I said, "What did you mean by that?"

         And he told me, "I took care of the problem."

Q.   He said, "I took care of the problem"?

A.   "Of the problem."

Q.   Did you ask more questions about that?

A.   I said, "What do you mean, Jimmy?"

         Do you want me to repeat exactly what he

said?

Q.   Yes, please, sir.

A.   "I took care of her" -- and I hate saying it.
I don't want to say the N-word -- "and that damn 'N'
is going to do the time.  The problem's been taken
care of."

Q.   Did he indicate to you why he was so mad at
that black man?

A.   No.

Q.   Look at paragraph 7 of your affidavit,
please, and maybe I didn't ask my question very well.
And look in the third line, and see if that refreshes
your recollection.

A.   Yeah, that was all part of the conversation.

Q.   He told you that his fiancée was screwing a
N-word; is that right?

A.   Yes, sir.

Q.   So he told you that he had learned that his
fiancée was having an affair with a black man, and he
also told you that he took care of it and that he got
rid of her; is that right?

A.   Yeah.

Q.   Okay.  Did he indicate how he got rid of her?

A.   No.

Q.   Did he make any gestures with his hands?

A.    Yeah.  We were sitting across from each
other, and he just -- when I asked him, "What do you
mean," he just -- "I took care of her.  I took care of
her." [Gesturing.]

Q.    So you're gesturing with your hands -- and
the court reporter is taking down what we're saying
because there's no video, so let's try to describe it.

He had his hands out in front of him as
though they were around something; is that right?

A.    Yes.

Q.    And do you know that his fiancée died by
being strangled?

A.    I had no idea.

Q.    Do you know that now?

A.    Yeah.

Q.    Whether you knew that back then or not, his
gesture of having two hands around something is
consistent with strangulation; would you agree?

A.    At the time --

        MR. BRAGG:  Objection, speculation,
Your Honor.

        THE COURT:  Overruled.

Q.    (BY MR. MACRAE)  Let me ask my question
better.

I'm not asking you about whether you knew how

he killed his fiancée or anything like that.  But what
I'm saying is, he told you he got rid of her and he
made a gesture where his hands were out as though they
were around something?

A.  "I got rid of her."

Q.  Okay.

A.  That's just -- you know, "I got rid of her."

Q.  Okay.  And he's gesturing with his hands?

A.  Yeah.

Q.  Okay.  And do you know now that his fiancée
was killed by strangulation?

A.  Yes.

Q.  My question is, is the gesture that he made
with his hands, like this, consistent with
strangulation?

A.  Yes.

Q.  Mr. Bordelon, this must have happened
sometime in 2012; is that right?

A.  Correct.

Q.  Here we are in 2021 and you signed your
affidavit in February of 2020?

A.  Correct.

Q.  Help me understand why you came forward and
when, please.

A.  Exactly?

1     MR. KENDALL:  Mr. Reed calls

2  Victor Juarez, please.

3     THE COURT:  It sounds like you can take

4  your time.

5     Good afternoon, sir.

6     THE WITNESS:  Hi, how are you?

7     (Witness sworn.)

8     THE COURT:  And if you could just state

9  your full name for the court reporter, please.

10     THE WITNESS:  Victor Juarez.

11     THE COURT:  Okay.  Mr. Juarez.

12     You may proceed.

13     MR. KENDALL:  Thank you, Your Honor.

14                    **VICTOR JUAREZ**,

15  having been first duly sworn, testified as follows:

16                 **DIRECT EXAMINATION**

17  BY MR. KENDALL:

18     Q.   Good afternoon, Mr. Juarez.  How are you?

19     A.   Fine, sir.

20     Q.   Where do you live, sir?

21     A.   203 Maynard.

22     Q.   And where is that?

23     A.   Here in Bastrop.

24     Q.   And are you married?

25     A.   Yes, sir.

1    Q.   How long have you been married?

2    A.   Fifty-five years.

3    Q.   Same person?

4    A.   Yes, sir.

5    Q.   Do you have children?

6    A.   Yes, sir, two.

7    Q.   And do they live near you?

8    A.   Yes, sir.

9    Q.   And are you a member of a church?

10   A.   Yes, sir.

11   Q.   Which church is that?

12   A.   Primera Baptist.

13   Q.   And is that in Bastrop?

14   A.   Yes, sir.

15             (Reporter clarification.)

16   Q.   (BY MR. KENDALL)  Sir, how long have you been

17   a member of that church?

18   A.   I've been going there since I was one year

19   old.  I became a member when I was 12 years old when I

20   accepted Christ.

21   Q.   And do you hold any leadership positions --

22   A.   Yes, Sunday school teacher at one time and

23   then I'm a deacon there.

24   Q.   And let me direct you to your time back in

25   the 1980s.  Were you active in a church program that

taught Bible courses to young persons in the

community?

    A.   Yes, sir.

    Q.   And do you remember how long you did that?

    A.   Probably about five or six years.

    Q.   Okay.  And in the course of those activities,

was there also a sports component with that?

    A.   Yes, sir.

    Q.   And what was that?

    A.   Basketball and track.

    Q.   And through that program, did you have

occasion to meet Rodney Reed?

    A.   Yes, sir.

    Q.   And he attended the Bible classes?

    A.   Yes, sir.

    Q.   And he plays basketball?

    A.   Yes, sir, the younger group.

    Q.   So you had a younger group and older group?

    A.   Yes, sir.

    Q.   Okay.  And how would you describe him?

    A.   Quiet, kind of on his own.  You know, didn't

bother anybody, didn't start anything.

    Q.   And how was he as a basketball player?

    A.   Mediocre.

    Q.   After Mr. Reed left that the program, did you

1   have occasion ever to see him in the community again?

2        A.   Well, yes, sir.  And I worked for H-E-B.  I

3   would see him come in maybe with his brother and I

4   would say hi to him.

5        Q.   And were you working at H-E-B in 1996?

6        A.   Yes, sir.

7        Q.   Okay.  And do you remember what your position

8   was in 1996?

9        A.   I was a market manager -- assistant market

10  manager for a while; but then we were having problems

11  with the deli and I started working at night trying to

12  take care of that deli, the lunch meat and stuff.

13       Q.   Okay.  And did you meet a co-employee there

14  named Stacey Stites?

15       A.   Yes, sir.

16       Q.   And tell us about her.

17       A.   She was an outgoing person.  Beautiful girl.

18  She would come in, like, 10:00 till 4:00 in the

19  morning to open the produce and she would come by and

20  say hello.  And I liked to fish; she liked to fish.

21  And she would tell me about her fishing -- going out

22  fishing.  She would show me the wedding dress, her

23  gown, and stuff like that.

24       Q.   Now, during that same period of time, do you

25  recall ever seeing Mr. Reed and Ms. Stites together?

1      A.    Outside of the store?

2      Q.    Yes.

3      A.    Yes.

4      Q.    Tell us about that.

5      A.    Well, just driving home, next to the Dairy

6   Queen -- it was either the Dairy Queen or Walmart, I

7   saw them together.

8      Q.    And where did you see them?

9      A.    I can't remember.  Either Dairy Queen or

10  Walmart.

11     Q.    Okay.  Were they in a car?  Were they in a

12  parking lot?  Where were they?

13     A.    In the car.  In a parking lot.

14     Q.    Okay.  That was a long time ago.  Are you

15  sure you saw them?

16     A.    Yes.  Yes.

17     Q.    Okay.  After Ms. Stites' death, were you ever

18  interviewed by any law enforcement?

19     A.    Yes, sir.

20     Q.    And do you recall when that was?

21     A.    I guess a few days afterwards -- or I don't

22  recall really, but maybe a week afterwards.

23     Q.    And after that interview, were you ever

24  interviewed again by law enforcement?

25     A.    No, sir.

1      (Witness sworn.)

2      THE COURT:  All right.  You can put your

3  hand down.

4      And do you spell your name

5  R-A-N-D-A-L-L?

6      MS. RANDALL:  Yes, sir.

7      THE COURT:  Proceed.

8      **REBECCA RANDALL**,

9  having been first duly sworn, testified as follows:

10      **DIRECT EXAMINATION**

11  BY MS. DAVIS:

12      Q.   Good afternoon, Ms. Randall.  How are you

13  this afternoon?

14      A.   I'm good.

15      Q.   Was there a time that you worked at the H-E-B

16  grocery story here in Bastrop?

17      A.   Yes.

18      Q.   Do you recall generally what that time frame

19  was?

20      A.   Yes.  From November of '94 until May of 2000.

21      Q.   So you were working at the H-E-B in 1996?

22      A.   Yes.

23      Q.   And did you work full time?

24      A.   Yes.

25      Q.   And were you married?

1    A.   I was.

2    Q.   Did you have any children?

3    A.   I did, three:  4, 12, and 14.

4    Q.   I would think that Bastrop has changed a

5    little bit since 1996.

6    A.   Substantially, yes.

7    Q.   Was the town a little bit smaller back then?

8    A.   Quite a bit.

9    Q.   And in 1996, what were your job duties at

10   H-E-B?

11   A.   I worked on the front end.  I was a cashier,

12   an assistant service manager, and I worked behind the

13   counter as -- in customer service as well.

14   Q.   What is an assistant service manager?

15   A.   Well, we keep things rolling on the front.

16   So when someone would come on shift, they would check

17   in with us and then we would assign them which

18   cashier -- which cash register to go to and where they

19   were going to be put or to relieve someone for a break

20   or whatever.

21   Q.   You kept the store rolling, kept things

22   going?

23   A.   Pretty much.

24   Q.   And was Stacey Stites a coworker of yours?

25   A.   Yes, she was.

1    Q.    And do you recall what kind of work she did

2    at the H-E-B?

3    A.    She started as a cashier, I believe.

4    Q.    And did she continue in that role?

5    A.    No, she actually transferred to the produce

6    department.

7    Q.    And how often -- if you recall, how often did

8    you interact with Ms. Stites?

9    A.    Well, that depended on if we were working the

10   same shift or not.  If we were working the same shift

11   and she was a cashier, we would interact for service

12   calls or if she needed a customer service call or

13   whatever.  But once they went to their stations, they

14   were pretty much there their whole shift.

15   Q.    Okay.  So passing work interactions?

16   A.    Right.

17   Q.    And how would you describe Stacey's

18   personality?

19   A.    She was very personable.

20   Q.    Did you ever see Ms. Stites and Rodney Reed

21   together at the H-E-B grocery store?

22   A.    Yes, I did.

23   Q.    And did you know at the time it was

24   Rodney Reed?

25   A.    By first name, no.  I knew he was one of the

Reed boys.

Q. And how did you know that he was one of the Reed boys?

A. Well, I knew Mr. Reed. He shopped at the store regularly. And I had coworkers that had lived in the area much longer than I had and knew many of the customers personally and so -- through a coworker, you know, and chitchatting with Mr. Reed when he would come in.

Q. And did you see any interactions between Mr. Reed and Ms. Stites that appeared to you to be more than chitchatting across the apples?

A. Yes, a couple of times.

Q. And can you describe those for the Court, please.

A. Well, I would just see them, if he would come in, and them chitchatting. But there was one instance one day when I was off the clock and doing some shopping on my own, and I came around the corner on an aisle and they were -- I saw Stacey and a guy standing there in very close proximity, standing very close together, having a very quiet conversation; and then Stacey looked at me and acknowledged me, and then Rodney turned and I recognized him and seeing him speaking with her before. And then I went on my way.

Q.   And did you ever say anything to Ms. Stites about seeing her and Mr. Reed at the H-E-B?

A.   No.  It was neither here nor there to me.

Q.   Did you ever see Ms. Stites and Mr. Reed together outside of the H-E-B?

A.   I don't think so.  Possibly.  I saw Stacey at Fisherman's Park playing basketball with several guys on the basketball court there one day, and from a distance, I think one of the guys was Rodney.  But I'm not sure.

Q.   Did it look like one of the Reed brothers or one of the Reed family?

A.   It did, yes.

Q.   And did you ever say anything to Ms. Stites after seeing her playing basketball at -- I think you said Fisherman's Park?

A.   Yes, I did.  I asked her where she learned how to play basketball that good.  She was pretty impressive.

Q.   And did you attend Stacey's funeral?

A.   I did.

Q.   During the police investigation surrounding Ms. Stites' death, were you ever interviewed by anyone in law enforcement?

A.   No.

1    THE COURT:  Okay.  Next witness?

2    MS. PUCHER:  Mr. Reed calls

3    Paul Espinoza, and he's in the witness room.  Thank

4    you.

5    THE COURT:  Go ahead and be seated,

6    Mr. Espinoza.

7    (Witness sworn.)

8    THE COURT:  Can you spell your last name

9    for the court reporter, please.

10   THE WITNESS:  E-S-P-I-N-O-Z-A.

11   THE COURT:  All right.  Proceed.

12   MS. PUCHER:  Thank you.

13                    **PAUL ESPINOZA,**

14   having been first duly sworn, testified as follows:

15                  **DIRECT EXAMINATION**

16   BY MS. PUCHER:

17   Q.   Good afternoon, Mr. Espinoza.

18   A.   Hello.

19   Q.   Hi.  Is that mic working for you, do you

20   think?

21   A.   I think it is.

22   Q.   Okay.  Where did you grow up, Mr. Espinoza?

23   A.   I grew up in Smithville, Texas.

24   Q.   Has your family been there a long time?

25   A.   Yes.  The house that I live in, my sons are

the fourth generation in that home.

Q.   Okay, so you have sons.  How old are they?

A.   16 and 13.

Q.   And do you still live in that same house that you grew up in?

A.   Yes, ma'am.

Q.   Okay.  Where do you work currently?

A.   Right now I work for the City of Smithville. I'm the foreman of the water and wastewater site.

Q.   Foreman of a wastewater site?

A.   Yes.

Q.   And in that position, do you hold any managerial roles?

A.   I do, yes.

Q.   What does that involve?

A.   Basically making sure that the wastewater site, that all my tests are taken care of for the State; all our drinking water is in good, perfect condition and people are able to drink it.

Q.   We appreciate that.  Thank you.

     And do you oversee other people doing that too?

A.   Yes, ma'am, I do.

Q.   And do you do any volunteer work as well?

A.   I do.

Q.   What is that?

A.   I'm a volunteer fireman for the City of Smithville.  I also volunteer a lot with my church.  I also volunteer -- have volunteered with Feed the Need here in Bastrop County.

Q.   Thank you.

Did you know Stacey Stites?

A.   Yes, ma'am, I did.

Q.   When -- approximately when -- or where, rather, did you meet Ms. Stites initially?

A.   Initially in high school.

Q.   What high school was that?

A.   Smithville High School.

Q.   And when you were in high school and saw Stacey Stites, were you in the same grade?

A.   She was probably a little bit younger than I was.

Q.   Were you close friends?

A.   Not really close but we were acquainted since -- I mean, the community is small, so, I mean, everybody does know everyone.

Q.   Okay.  So you were acquaintances in high school.  And, then, when was the next time that you interacted with Ms. Stites?

A.   When we worked together at H-E-B.

1    Q.   Okay.  And in the H-E-B, what department did

2 you work in?

3    A.   I worked in the produce department.

4    Q.   Did you start working at H-E-B

5 before Ms. Stites joined?

6    A.   If I'm correct, I think I was there before

7 her, yes, ma'am.

8    Q.   And then at some point, she started working

9 there too?

10    A.   Yes, ma'am.

11    Q.   And so she worked in the produce department

12 and you worked in that department as well?

13    A.   Yes, ma'am.

14    Q.   Now, when you were working at the H-E-B in

15 the produce department, did you work the same shift as

16 Ms. Stites?

17    A.   Occasionally.

18    Q.   Occasionally.  But most of the time, were you

19 working different shifts?

20    A.   I'm sorry, what was that?

21    Q.   Sorry.  Most of the time, were you working

22 different shifts?

23    A.   Yes.

24    Q.   Okay.  Did you work at H-E-B a lot; fair to

25 say?

A.   Yes.  I was there quite a bit from '91 to '96.

Q.   So when you started in 1991, you were still in high school?

A.   Yes, ma'am.

Q.   Okay.  And did you work a lot of shifts, you know, pick up a lot of work when you were at H-E-B?

A.   As much as I could, I guess.

Q.   Now, when you were working at H-E-B in your shifts, did you ever run into Ms. Stites around the store when she was on a different shift?

A.   Occasionally, yes, ma'am.

Q.   But most days you wouldn't necessarily interact with her?

A.   Not too much.  Again, I knew who she was. And, again, we worked in the same department, so there were times where we had to interact at times.

Q.   Okay.  Did you ever see Mr. Reed in the store?

A.   Right now -- he didn't look familiar, no, ma'am.

Q.   Okay.  So you don't remember seeing him in there?

A.   No, ma'am.

Q.   Now, was there a day when you observed

Jimmy Fennell come into the store to speak with
Ms. Stites?

    A.   Yes, ma'am, I did.

    Q.   And on that day, were you working the same
shift or at the same time as Ms. Stites?

    A.   Yes.

    Q.   What department was that in?

    A.   The produce department.

    Q.   What did Mr. Fennell look like, if you
remember at all?

    A.   I guess more business type.  He didn't come
in as -- dressed as some of these officers here.  To
me he looked more like a detective, I guess.  You
know, slacks and a shirt and things like that.

    Q.   Nice plain clothes?

    A.   Yes, ma'am.

    Q.   And when you saw Mr. Fennell come into the
store, what were you doing at that time, if you
remember?

    A.   I was putting product out in my department.

    Q.   Putting product out?

    A.   Yes, ma'am.

    Q.   Is that fruits and vegetables?

    A.   Yes, ma'am.

    Q.   Okay.  And what was Ms. Stites doing?

A.    She was doing the same thing.

Q.    About how far away from you was Ms. Stites putting product out while you were doing the same?

A.    Several feet.

Q.    Several feet?

A.    Yes, ma'am.

Q.    Can you describe what happened when Mr. Fennell came into the store?

A.    Well, as I was putting my product out -- and, you know, I'm observing everything going on around the department, watching people go by -- and I see him walk up to her, in my opinion, in an aggressive manner, he walks up to her and starts talking to her -- and not loud, you know, more like he's whispering something to her.  And to me it almost seemed like a -- when he was talking to her, like a child being scolded in a way.

Q.    Like a child being scolded by a parent or something?

A.    Yes, ma'am.

Q.    And can you describe her body position in relation to Mr. Fennell who was talking to her in this scolding way?

A.    Well, if I remember correct, the front door was here.  He walked into the produce department and

1   she was putting product out this way, and she

2   basically kept looking at the product.  She never

3   turned around, looked at him.  I mean, she already

4   knew who was speaking to her, you know.  She never

5   looked at him.

6        Q.   So just for the record to be clear, because I

7   know you were gesturing with your hands --

8        A.   Yeah.

9        Q.   She's facing forward --

10       A.   Facing forward at the product she was putting

11  out.

12       Q.   -- and Mr. Fennell is sort of talking at her

13  from the side?

14       A.   About right here.

15       Q.   About how close was he to her when he was

16  talking to her?

17       A.   Like, whispering.  Like, telling her a secret

18  or something, you know.  Just very close, but still I

19  couldn't hear anything.

20       Q.   Okay.  So you couldn't hear what he was

21  saying, but you could see his body language and her

22  body language?

23       A.   Yes, ma'am.

24       Q.   Okay.  And how did she appear?

25       A.   I would think scared.  I would say scared.

1     Q.   Okay.  How long did that --

2     A.   Or embarrassed.  Embarrassed, maybe...I

3  guess.

4          MS. TANNER:  I'm sorry, could you repeat

5  that.  I couldn't hear what you said.

6     A.   Like she was scared or embarrassed about what

7  was happening.

8     Q.   How long did that interaction between

9  Mr. Fennell and Ms. Stites take?

10    A.   Maybe five minutes or so.

11    Q.   Okay.

12    A.   Or more than that.

13    Q.   Okay.  And what were you doing while they

14  were having this interaction?

15    A.   Really trying to mind my own business and put

16  out my product.  You know, I just didn't want to be

17  involved at the time.

18    Q.   Did there come a point when Mr. Fennell left

19  the store?

20    A.   He left the department.  I don't know if he

21  left the store.

22    Q.   He left your line of sight?

23    A.   Yes, ma'am.

24    Q.   And what did Ms. Stites do at that point?

25    A.   She stayed putting her product out for a few

minutes.  Then she turned around and went to our

cooler, our storage area, and passed me.

Q.   Okay.  So she passed you as she was walking

towards the cooler area?

A.   Yes, ma'am.

Q.   And was that sort of a break room area for

you-all when you needed to take a break?

A.   Kind of, yes, ma'am.  Like a prep area for

certain things.

Q.   And what did you do when she walked past you

to that prep area?

A.   I stayed doing what I had to do for a few

minutes.  I kind of just watched the produce area.  We

were still watching people go by, just making sure

nobody was going to come back.  And then I pretty much

proceeded to go back there to ask her if she was okay.

Q.   Now, when you say "making sure nobody came

back," who were you looking for?

A.   I would assume it was Mr. Fennell because I

didn't want him to take -- I guess get the wrong idea

of me going back and trying to -- I don't know.  I

guess get a weird feeling about me going back to talk

to Stacey about -- trying to be nosey, I guess, about

what happened, asking her what happened.

Q.   Right.  And to be clear, at the time, did you

1  know that that person who had come in to talk to

2  Stacey, that his name was Jimmy Fennell?  Did you know

3  that name?

4      A.  I've heard it.  She had said it a couple of

5  times, but, you know, it never was like, her fiancé.

6  It was more like, oh, okay, that's who it is, you

7  know.

8      Q.  I see.

9          When did you piece that together, that that

10 was him?

11     A.  After everything happened.

12     Q.  After she died?

13     A.  Yes, ma'am.

14     Q.  Okay.  If you remember, how did you make that

15 connection, that that man that was in the store was

16 Jimmy Fennell?

17     A.  Through newspapers and the media.

18     Q.  And were those newspapers shortly after she

19 died?

20     A.  Yes, ma'am.

21     Q.  Okay.  So after Ms. Stites walked to the

22 break room area and you made sure that Jimmy Fennell

23 wasn't still hanging around, what did you do?

24     A.  I went to the back and I asked her if she was

25 okay.  She was crying.  She was cleaning her face.

And she said, "I'm fine, I'm fine."  And I said,
"Okay," and I went back out and did my job.

     Q.    Okay.  So she was sort of wiping off her face
when you walked in there?

     A.    Yes, ma'am.

     Q.    So you could tell she had been crying?

     A.    Yes, ma'am.

     Q.    Again, were you and Ms. Stites particularly
close that you felt you could ask her more about what
had happened?

     A.    No.  I've always been a person to myself.  So
I didn't want to feel like I was, you know, digging
into somebody's private, you know, business.

     Q.    Why does that interaction that you saw
between Mr. Fennell and Ms. Stites, why does that
stick out in your mind today?

     A.    That was the last thing that -- you know,
pretty much our interaction.  That was it.  That was
the last thing I remember, me and Stacey really
talking.

     Q.    Before she was killed?

     A.    Yes, ma'am.

     Q.    Okay.  So that was sometime shortly before
she was killed?

     A.    Yes, ma'am.