# Exhibit 27

REPORTER'S RECORD

VOLUME 10 OF 12 VOLUMES

TRIAL COURT CAUSE NO. 8,701

COURT OF CRIMINAL APPEALS NO. WR-50,961-10

|  |  |
|---|---|
| EX PARTE RODNEY REED | ) 21st DISTRICT COURT ) ) ) ) ) OF ) ) ) ) ) BASTROP COUNTY, TEXAS |

-------------------------------

WRIT OF HABEAS CORPUS

July 29, 2021

-------------------------------

BE IT REMEMBERED THAT on the July 29, 2021, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable J.D. Langley, Visiting Judge of the 21st District Court, held in Bastrop, Bastrop County, Texas.

Proceedings reported by machine shorthand by Hayley Stiteler, CSR, RPR.

1  A P P E A R A N C E S

2

   FOR THE APPLICANT:

3

4      Mr. Andrew F. MacRae
       LEVATINO | PACE LLP
5      1101 South Capital of Texas Highway
       Building K, Suite 125
6      Austin, Texas 78746
       512.6371581
7      amacrae@levatinopace.com
       SBOT NO. 00784510
8

9      Ms. Jane Pucher
       INNOCENCE PROJECT
10     40 Worth Street, Suite 701
       New York, New York 10013
11     646.227.8327
       jpucher@innocenceproject.org
12

13     Barry C. Scheck
       INNOCENCE PROJECT
14     40 Worth Street, Suite 701
       New York, New York 10013
15     212.364.5390
       bscheck@innocenceproject.org
16

17     Mr. George H. Kendall
       SQUIRE PATTON BOGGS, LLP
18     1211 Avenue of the Americas
       New York, New York 10036
19     212.872.9834
       george.kendall@squirepb.com
20

21
       Ms. Michelle L. Davis
22     SKADDEN, ARPS, SLATE, MEAGHER & FLORM, LLP
       1000 Louisiana, Suite 6800
23     Houston, Texas 77002
       713.655.5100
24     michelle.davis@skadden.com
       SBOT NO. 24038854
25

Ms. Nicole A. DiSalvo
         SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
         920 North King Street
         Wilmington, Delaware 19801
         302.651.3027
         nicole.disalvo@skadden.com
         Delaware Bar No. 4662


         Ms. Corrine Irish
         SQUIRE PATTON BOGGS
         1211 6th Avenue, 26th Floor
         New York, New York 10036
         212.872.9823
         corrine.irish@squirepb.com


         Mr. Quinncy McNeal
         HUSCH BLACKWELL LLP
         600 Travis Street, Suite 2350
         Houston, Texas 77002
         713.525.6253
         quinncy.mcneal@huschblackwell.com
         SBOT NO. 24074690


         Ms. Sarah Runnells Martin
         SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
         920 North King street
         Wilmington, Delaware 19801
         302.651.3000
         sarah.martin@skadden.com

FOR THE STATE:

         Ms. Lisa M. Tanner
         TEXAS OFFICE OF THE ATTORNEY GENERAL
         P.O. Box 12548
         Austin, Texas 78711
         512.463.2125
         lisa.tanner@oag.texas.gov
         SBOT NO. 19637700

Mr. Travis G. Bragg
TEXAS ATTORNEY GENERAL
ASSISTANT ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711
512.936.1400
SBOT NO. 24076286


Ms. Rachel L. Patton
OFFICE OF THE ATTORNEY GENERAL
CRIMINAL APPEALS DIVISION
P.O. Box 12548
Austin, Texas 78711
512.936.1400
rachel.patton@oag.texas.gov
SBOT NO. 24039030


Mr. Garrett Greene
OFFICE OF THE ATTORNEY GENERAL
CRIMINAL APPEALS DIVISION
300 West 15th Street
Austin, Texas 78701
512.936.1400
garrett.greene@oag.texas.gov
SBOT NO. 24096217

                    INDEX OF PROCEEDINGS
                         VOLUME 10
                   (WRIT OF HABEAS CORPUS)

**July 29, 2021**                                    **Page    Vol**

PROCEEDINGS.............................................    8     10


**STATE'S WITNESSES:**
                              DX          CX      VDX    VOL
TED WEEMS                    8,19         16              10
RON HAAS                    20,33        28,35            10
AGUSTIN MORENO              38,47         43              10
SANDY SEPULVEDA             50,67         59              10
DIANTHA LEE                 68,84         80              10
SARAH PALMER SMITH          88,94                         10


**STATE'S WITNESSES FOR A**
**BILL OF EXCEPTIONS:**

VIVIAN HARBOTTLE CHAPMAN    103                           10
KELLEA MILLER               117                           10
LINDA SCHLUETER             135                           10



                    BILL OF EXCEPTIONS INDEX
                                                    **Page    Vol**

STATE'S BILL OF EXCEPTIONS BY MR. BRAGG........     94     10

STATE'S BILL OF EXCEPTIONS CONCLUDED...........     94     10

STATE'S BILL OF EXCEPTIONS REGARDING THE

EXTRANEOUS OFFENSES ...........................     96     10

STATE'S BILL OF EXCEPTIONS CONCLUDED...........    161     10

APPLICANT'S BILL OF EXCEPTIONS PROFFER.........    161     10

APPLICANT'S PROFFER CONCLUDED..................    168     10

                                                    **Page    Vol**

 COURT REPORTER'S CERTIFICATE..................    177     10

ALPHABETICAL INDEX

STATE'S WITNESSES:

| | DX | CX | VDX | VOL |
|---|---|---|---|---|
| VIVIAN HARBOTTLE CHAPMAN | 103 | | | 10 |
| RON HAAS | 20,33 | 28,35 | | 10 |
| DIANTHA LEE | 68,84 | 80 | | 10 |
| KELLEA MILLER | 117 | | | 10 |
| AGUSTIN MORENO | 38,47 | 43 | | 10 |
| LINDA SCHLUETER | 135 | | | 10 |
| SANDY SEPULVEDA | 50,67 | 59 | | 10 |
| SARAH PALMER SMITH | 88,94 | | | 10 |
| TED WEEMS | 8,19 | 16 | | 10 |

EXHIBIT INDEX

APPLICANT'S EXHIBITS

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL |
|---|---|---|---|---|
| 16 | Peer-Review Report (Bill of Exceptions Exhibit) | 170 | 170 | 10 |
| 50 | Notes from Stites' Sister (Handwritten notes) | 171 | 171 | 10 |
| 51 | E-mail correspondence between Mr. Bragg and Mr. MacRae reflecting stipulations | 171 | 172 | 10 |
| 52 | Offer of Proof (Bill of Exceptions Exhibit) | 173 | 173 | 10 |

STATE'S EXHIBITS

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL |
|---|---|---|---|---|
| 102 | H-E-B New Partner Information, Stacey Stites | 22 | 23 | 10 |
| 103 | December 5, 1997 Texas DPS Crime Laboratory Report (Bill of Exceptions Exhibit) | 116 | 116 | 10 |

| | | | | | |
|---|---|---|---|---|---|
| | 104 | May 19, 1998 Texas DPS Crime Laboratory Supplemental Report (Bill of Exceptions Exhibit) | 116 | 116 | 10 |
| | 105 | April 20, 1998 LabCorp Certificate of Analysis (Bill of Exceptions Exhibit) | 116 | 116 | 10 |
| | 106 | Photo Lineup (Bill of Exceptions Exhibit) | 161 | 161 | 10 |

P R O C E E D I N G S

July 29, 2021

(Open court, Applicant present.)

THE COURT: Good morning. Please be seated.

Okay. We're resumed in Ex Parte Rodney Reed.

Is the State ready to proceed with their next witness?

MS. TANNER: Yes, Your Honor. The State calls Ted Weems.

THE COURT: Good morning, sir.

THE WITNESS: Good morning.

(Witness sworn.)

THE COURT: Please be seated. And if you could state your full name for the court reporter.

THE WITNESS: My name is Ted Weems, W-E-E-M-S.

THE COURT: Proceed.

**TED WEEMS**,

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MS. TANNER:

Q. Good morning.

A. Good morning.

Q. Can you tell us where you live.
A. I live in Justiceburg, Texas.
Q. Where is Justiceburg, Texas?
A. It's near Lubbock in Garza County. Post is the county seat.
Q. And what do you do up there?
A. I'm the county attorney of Garza County.
Q. And how long have you been the county attorney of Garza County?
A. Seven years.
Q. And prior to that, did you live in another area of Texas?
A. Yes.
Q. Where was that?
A. I lived in the Houston area immediately before that, and then I lived in Lee County for 28 years prior to that.
Q. And when did you live in Lee County, what years, approximately?
A. From 1980 to 2008.
Q. And when you were in Lee County and actually to today, are you an attorney?
A. Yes.
Q. And was there a time you were an elected official in Lee County?

```
 1         A.    Yes, ma'am.
 2         Q.    And what was the title that you had?
 3         A.    I was the county and district attorney of Lee
 4   County from 19- -- I was elected in 1996, took office
 5   January of '97 through 2008.  I had three terms.
 6         Q.    Okay.  And when you were elected in 1996 --
 7   in the 1996 election, did you win at the primary level
 8   or at the general?
 9         A.    I did not have an opponent in the general
10   election.  I won in the primary.
11         Q.    Okay.  So starting in March of 1996, you knew
12   you were going to be the county attorney of Lee
13   County, correct?
14         A.    That's correct.
15         Q.    But you did not take office until January 1st
16   of '97?
17         A.    Yes, ma'am.
18         Q.    Okay.  And you said you had lived in the area
19   for a while before that?
20         A.    Yes, ma'am.
21         Q.    Okay.  Where you aware of the Stacey Stites
22   murder investigation?
23         A.    Yes.
24         Q.    When you became DA, was it an open
25   investigation, or do you recall?
```

         A.  I do not recall.  We were -- it was not a Lee
County case, so I don't recall.  But now I know that
it was an open investigation, yes.
         Q.  And that was my next question.  Was it ever a
Lee County case?
         A.  No.
         Q.  Was it ever a Lee County investigation?
         A.  No, ma'am.
         Q.  So anything that would have occurred -- would
have occurred after January 1st of 1997, would have
been while you were the Lee County district attorney,
right?
         A.  That's correct.
         Q.  And so if there was a Lee County
investigation or case, that would have been yours,
right?
         A.  Yes, ma'am.
         Q.  And there wasn't one.
         A.  There was not.
         Q.  Okay.  Now, I want to shift gears.  I want to
ask you, when you lived in Lee County, where did you
go to church?
         A.  The First Baptist Church of Giddings.
         Q.  Whole time?
         A.  Yes, ma'am.

```
 1        Q.   Did you know a family with the surname
 2   Sappington?
 3        A.   Yes.
 4        Q.   In particular, did you know the father,
 5   William; son, Brent; his wife, Vicki?
 6        A.   Yes.
 7        Q.   Okay.  Did you know someone named Garnett
 8   Danewood?
 9        A.   Yes.  He was a police officer in Giddings.
10        Q.   Okay.
11        A.   And he went to the church as well.
12        Q.   All right.  Now, at any point in time, did
13   William Sappington and Brent Sappington approach you
14   at church to try to provide you information about
15   Stacey Stites after she was murdered?
16        A.   Bill did.
17        Q.   Okay.  And what was the information he
18   provided you?
19        A.   He came to me and then wanted to talk
20   outside, and then we stepped outside under the
21   porte cochere just outside our fellowship hall.  And I
22   don't remember Brent being part of the conversation.
23   Brent may have been in the area with the -- around the
24   corner or right there close, but he was not a part of
25   the conversation.  But Bill told me that he was a
```

neighbor to Stacey Stites.

Q. Okay.

A. And that he wanted me to know that he had heard arguing there before, loud arguing many times.

Q. Okay. And he provided you that information. What did you tell him in response?

A. I told him that it was not a Lee County case; it was a Bastrop County case. I told him that we did not have an investigator in my office. It's a small office, so we could not take a statement. But I told him he needed to go to the Bastrop County authorities, either the Bastrop County Sheriff's Office or the Texas Rangers, and provide them any information he had that might be pertinent.

Q. Do you know whether or not he did that?

A. I have no idea.

Q. Okay. Now, let me ask you this. You told the Court what your response was.

Is that a general response that you would give as an attorney to anyone who provided information on something that was outside your jurisdiction?

A. Certainly.

Q. Okay. And do you recall at the time -- if you don't, it's fine. Do you recall at the time whether you had taken office as the DA of Lee County

```
 1  or not?
 2      A.   I do not remember.
 3      Q.   Okay.
 4      A.   But I -- no, I do not remember.  I would
 5  assume, but this is not a place to assume, so...
 6      Q.   Okay.  Fair enough.
 7           Now, Mr. Weems, in response to Mr. Sappington
 8  coming to you, did you ever tell Mr. Sappington that
 9  they, Bastrop County, already had their suspect?
10      A.   No.
11      Q.   Did you ever tell Mr. Sappington that they,
12  Bastrop County, didn't need anyone's help?
13      A.   Certainly not.
14      Q.   Did you ever tell Mr. Sappington to mind his
15  business?
16      A.   No.  I would never do that.  I respected
17  Mr. Sappington, and even if I felt that way, I would
18  never say that to him.
19      Q.   Did you tell Mr. Sappington to hush his
20  mouth?
21      A.   No, I never used those words.
22      Q.   And I was fixing to ask you, would you have?
23      A.   No.
24      Q.   You say, instead, you encouraged him to go to
25  Bastrop County?
```

    A.    Yes.

    Q.    Now, everything that he provided to you, was it general information, kind of background information?

    A.    Yes, nothing specific.

    Q.    Okay. And did he provide you with any information suggesting that he could provide relevant information about the time surrounding Stacey Stites' murder?

    A.    We didn't get that far. I didn't ask him details because it wasn't a case that I had any jurisdiction over.

    Q.    Okay. But through the course of the conversation, did he give you any information to suggest that he knew about events the night Stacey -- the night before or the day of Stacey's disappearance?

    A.    No.

    Q.    Now, if Brent Sappington told this Court that he heard you tell his father to -- they already had their suspect, to mind his own business, to keep his mouth shut, that they didn't need his help, would that be accurate?

    A.    No, I've never said that. I don't know what Garnett Danewood might have told him in a separate conversation. But I certainly never said that, so

```
 1  that is not accurate information.
 2       Q.   Thank you, sir.
 3            MS. TANNER:  No further questions.
 4                    CROSS-EXAMINATION
 5  BY MR. MCNEAL:
 6       Q.   Hi, Mr. Weems.  Quinncy McNeal here.
 7            We've had a chance to talk once before.
 8            Do you recall?
 9       A.   I do not.
10       Q.   Okay.  I remember.
11       A.   I'm sorry.  I apologize.
12       Q.   I left no impression on you.
13       A.   I'm sorry.
14       Q.   Opposing counsel was talking about these
15  comments -- "mind your own business," "hush your
16  mouth" -- that were discussed.
17            And your testimony is that you didn't tell
18  Bill that?
19       A.   That's correct.  Absolutely.
20       Q.   So if law enforcement said that to him,
21  someone else said it to him; is that right?
22       A.   Yes, sir.
23       Q.   And you mentioned that when you spoke to
24  Bill, you advised that -- and when we say "Bill," Bill
25  is William Sappington --
```

A. William Sappington.
Q. -- the father?
A. The father, yes, sir.
Q. And you advised him to go and speak to Bastrop County; is that right?
A. Yes.
Q. And you told him that this was not a Lee County case?
A. Correct.
Q. But let me ask you this: When you said it wasn't a Lee County case, were you saying that the DA's office was not involved?
A. Yes, my office not was not a part of any prosecution or investigation.
Q. If the sheriff's office was involved, would you have known that?
A. I did not know that, no. So if they were involved, I didn't know that.
Q. And if Giddings Police Department was involved, would you have known that?
A. No. And I think that would be highly inappropriate if they were.
Q. So you were speaking really only as to your office --
A. Right.

```
 1      Q.   -- when you were talking about it being a Lee
 2  County case.
 3           But you don't have any control over the
 4  sheriff's office?
 5      A.   No.
 6      Q.   Nor the Giddings Police Department?
 7      A.   No, sir.
 8      Q.   Let me ask you a little bit about the
 9  Sappingtons.
10      A.   Yes, sir.
11      Q.   These are people that you like?
12      A.   Oh, absolutely.  Fine family.
13      Q.   Good, God-fearing people?
14      A.   Yes.
15      Q.   Members of church at the First Baptist Church
16  of Giddings?
17      A.   Yes, sir.
18      Q.   People with whom you worship?
19      A.   Yes, sir.
20      Q.   People you knew?
21      A.   Absolutely.
22      Q.   People who also knew your wife?
23      A.   Yes.  My wife taught both of their children
24  in Sunday school and in public school.  Cody and
25  Ashley, I think were their names, the children of
```

```
 1  Vicki and Brent.
 2       Q.   They babysit your grandbaby?
 3       A.   Yes, Vicki did.
 4       Q.   Any reason to believe that they would not be
 5  truthful at all?
 6       A.   No.  I would never disparage their
 7  truthfulness.  They're a fine family.  Like I said, it
 8  may have been a conversation with Officer Danewood,
 9  but certainly I did not tell Bill those things.  And I
10  have never used those words in my life that are in the
11  record, to anybody.
12       Q.   You advised them to go to Bastrop County.
13  They might have heard that in Bastrop County?
14       A.   I don't know where they heard it, but it
15  certainly wasn't from me.
16       Q.   Just one moment.
17            MR. MCNEAL:  I'll pass the witness.
18                    REDIRECT EXAMINATION
19  BY MS. TANNER:
20       Q.   And certainly if they were good folks, they
21  had no reason to fear going to law enforcement, did
22  they?
23       A.   No.
24       Q.   And you told them not only to go to Bastrop
25  County SO but to also go to the Texas Rangers?
```