# Exhibit 28

REPORTER'S RECORD

VOLUME 6 OF 12 VOLUMES

TRIAL COURT CAUSE NO. 8,701

COURT OF CRIMINAL APPEALS NO. WR-50,961-10

|  |  |
|---|---|
| | ) 21st DISTRICT COURT |
| | ) |
| | ) |
| | ) |
| EX PARTE RODNEY REED | ) OF |
| | ) |
| | ) |
| | ) |
| | ) BASTROP COUNTY, TEXAS |

------------------------------

WRIT OF HABEAS CORPUS

July 23, 2021

------------------------------

BE IT REMEMBERED THAT on the July 23, 2021, the
following proceedings came on to be heard in the
above-entitled and numbered cause before the Honorable
J.D. Langley, Visiting Judge of the 21st District
Court, held in Bastrop, Bastrop County, Texas.

Proceedings reported by machine shorthand by
Hayley Stiteler, CSR, RPR.

```
1                  A P P E A R A N C E S

2
    FOR THE APPLICANT:
3

4       Mr. Andrew F. MacRae
        LEVATINO | PACE LLP
5       1101 South Capital of Texas Highway
        Building K, Suite 125
6       Austin, Texas 78746
        512.6371581
7       amacrae@levatinopace.com
        SBOT NO. 00784510
8

9       Ms. Jane Pucher
        INNOCENCE PROJECT
10      40 Worth Street, Suite 701
        New York, New York 10013
11      646.227.8327
        jpucher@innocenceproject.org
12

13      Barry C. Scheck
        INNOCENCE PROJECT
14      40 Worth Street, Suite 701
        New York, New York 10013
15      212.364.5390
        bscheck@innocenceproject.org
16

17      Mr. George H. Kendall
        SQUIRE PATTON BOGGS, LLP
18      1211 Avenue of the Americas
        New York, New York 10036
19      212.872.9834
        george.kendall@squirepb.com
20


21
        Ms. Michelle L. Davis
22      SKADDEN, ARPS, SLATE, MEAGHER & FLORM, LLP
        1000 Louisiana, Suite 6800
23      Houston, Texas 77002
        713.655.5100
24      michelle.davis@skadden.com
        SBOT NO. 24038854
25
```

```
 1       Ms. Nicole A. DiSalvo
         SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
 2       920 North King Street
         Wilmington, Delaware 19801
 3       302.651.3027
         nicole.disalvo@skadden.com
 4       Delaware Bar No. 4662

 5
         Ms. Corrine Irish
 6       SQUIRE PATTON BOGGS
         1211 6th Avenue, 26th Floor
 7       New York, New York 10036
         212.872.9823
 8       corrine.irish@squirepb.com

 9
         Mr. Quinncy McNeal
10       HUSCH BLACKWELL LLP
         600 Travis Street, Suite 2350
11       Houston, Texas 77002
         713.525.6253
12       quinncy.mcneal@huschblackwell.com
         SBOT NO. 24074690
13

14       Ms. Sarah Runnells Martin
         SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
15       920 North King street
         Wilmington, Delaware 19801
16       302.651.3000
         sarah.martin@skadden.com
17

18  FOR THE STATE:

19
         Ms. Lisa M. Tanner
20       TEXAS OFFICE OF THE ATTORNEY GENERAL
         P.O. Box 12548
21       Austin, Texas 78711
         512.463.2125
22       lisa.tanner@oag.texas.gov
         SBOT NO. 19637700
23

24

25
```

Mr. Travis G. Bragg
TEXAS ATTORNEY GENERAL
ASSISTANT ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711
512.936.1400
SBOT NO. 24076286


Ms. Rachel L. Patton
OFFICE OF THE ATTORNEY GENERAL
CRIMINAL APPEALS DIVISION
P.O. Box 12548
Austin, Texas 78711
512.936.1400
rachel.patton@oag.texas.gov
SBOT NO. 24039030


Mr. Garrett Greene
OFFICE OF THE ATTORNEY GENERAL
CRIMINAL APPEALS DIVISION
300 West 15th Street
Austin, Texas 78701
512.936.1400
garrett.greene@oag.texas.gov
SBOT NO. 24096217

# INDEX OF PROCEEDINGS
## VOLUME 6
### (WRIT OF HABEAS CORPUS)

July 23, 2021                                          Page  Vol

PROCEEDINGS....................................  9   6


STATE'S WITNESSES:

| | DX | CX | VDX | VOL |
|---|---|---|---|---|
| RENAE DUNCAN | 14 | 19 | | 6 |
| NATHAN LAPHAM | 23,32 | 27,33 | | 6 |
| RODNEY MEYER | 34,56 | 36 | | 6 |
| DAVID BOARD | 58,114 | 92,124 | | 6 |
| L.R. WARDLOW | 127,175 | 176,265 | | 6 |
| | 254 | | | |


## BILL OF EXCEPTIONS INDEX


                                                      Page  Vol

STATE'S BILL OF EXCEPTIONS BY MS. TANNER...... 172   6

STATE'S BILL OF EXCEPTIONS CONCLUDED.......... 175   6


                                                      Page  Vol

COURT REPORTER'S CERTIFICATE.................. 271   6


## ALPHABETICAL INDEX

STATE'S WITNESSES:

| | DX | CX | VDX | VOL |
|---|---|---|---|---|
| DAVID BOARD | 58,114 | 92,124 | | 6 |
| RENAE DUNCAN | 14 | 19 | | 6 |
| NATHAN LAPHAM | 23,32 | 27,33 | | 6 |
| RODNEY MEYER | 34,56 | 36 | | 6 |
| L.R. WARDLOW | 127,175 | 176,265 | | 6 |
| | 254 | | | |

```
 1                        EXHIBIT INDEX

 2   APPLICANT'S EXHIBITS
         NO.      DESCRIPTION          OFFERED  ADMITTED   VOL
 3
         30   Lee County Sheriff's
 4            Department Call Logs        46       47       6

 5       31   State's Witness List        50       51       6

 6       32   Bastrop Police
              Department
 7            Investigative
              Supplemental Report by
 8            David Board                 94       116      6

 9       33   Subpoena to Custodian
              of Bank Records First
10            Interstate Bank in
              Giddings, TX               109       116      6
11
         34   Texas DPS Crime
12            Laboratory Preliminary
              Report                     208       220      6
13
         35   Bastrop Chronicle
14            Newspaper Article          216       220      6

15       36   Compilation of
              Officer's Notes            233                6
16
         37   Bastrop County
17            Sheriff's Department
              Multi-Time Request
18            Record                     242       244      6

19       38   Texas Rangers memo to
              Ms. Tanner and Missy
20            Wolfe                      246       252      6

21       39   Texas DPS Ranger
              Division Report of
22            Investigation             253       254      6

23

24

25
```

STATE'S EXHIBITS

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL |
|---|---|---|---|---|
| 22 | Disk- Trial Reporter's Record | 10 | 11 | 6 |
| 23 | Disk-State's First and Second Habeas Corpus Proceedings | 10 | 11 | 6 |
| 24 | Disk-State's Third Habeas Corpus Proceeding Record | 10 | 11 | 6 |
| 25 | Disk-State's Fourth Habeas Corpus Proceeding Record | 11 | 11 | 6 |
| 26 | Disk-State's Fifth Habeas Corpus Proceeding Record | 11 | 11 | 6 |
| 27 | Disk-State's Sixth Habeas Corpus Proceeding Record | 11 | 11 | 6 |
| 28 | Disk-State's Seventh Habeas Corpus Proceeding Record | 11 | 11 | 6 |
| 29 | Disk-State's Eighth Habeas Corpus Proceeding Record | 11 | 11 | 6 |
| 30 | Disk-State's Ninth Habeas Corpus Proceeding Record | 11 | 11 | 6 |
| 31 | Affidavit of Anna Bayardo Charlton | 12 | 12 | 6 |
| 32 | Death Certificate of Paul Alexander | 12 | 13 | 6 |
| 33 | Death Certificate of John Barton | 12 | 13 | 6 |
| 34 | Death Certificate of Suzan Byars | 12 | 13 | 6 |

| | | | | | |
|---|---|---|---|---|---|
| 35 | Death Certificate of Curtis Davis, Jr. | 12 | 13 | 6 |
| 36 | Death Certificate of Michael Kirby | 12 | 13 | 6 |
| 37 | Death Certificate of Ronald Owens | 13 | 13 | 6 |
| 38 | Death Certificate of Robert Savage | 13 | 13 | 6 |
| 39 | Death Certificate of Marvin Walther | 13 | 13 | 6 |
| 40 | Death Certificate of Karen Woodard | 13 | 13 | 6 |
| 41 | Miranda Card signed by Rodney Reed | 89 | 90 | 6 |
| 42 | Bastrop County Sheriff's Department Voluntary Statement by Rodney Reed | 89 | 90 | 6 |
| 43 | Photographs | 142 | 143 | 6 |
| 44 | Photographs | 142 | 143 | 6 |
| 45 | Photographs | 142 | 143 | 6 |
| 46 | Photographs | 142 | 143 | 6 |
| 47 | Photographs | 142 | 143 | 6 |
| 48 | Photographs | 142 | 143 | 6 |
| 49 | Photographs | 142 | 143 | 6 |
| 50 | Photographs | 142 | 143 | 6 |
| 51 | Photographs | 142 | 143 | 6 |
| 52 | Photographs | 142 | 143 | 6 |
| 53 | Photographs | 142 | 143 | 6 |

```
 1                    THE COURT:  You may step down and be
 2     excused.
 3                    Next witness?
 4                    MS. TANNER:  The State calls David
 5     Board.
 6                    THE COURT:  Good morning, sir.
 7                    THE WITNESS:  Good morning, Judge.
 8                    THE COURT:  Go ahead and have a seat
 9     there.
10             If you could raise your right hand for
11     me.
12                    (Witness sworn.)
13                    THE COURT:  If you could spell your last
14     name for the court reporter.
15                    THE WITNESS:  My last name is Board,
16     B-O-A-R-D.
17                    MS. TANNER:  May I proceed?
18                    THE COURT:  Yes, ma'am.
19                    MS. TANNER:  Thank you, Your Honor.
20                         DAVID BOARD,
21     having been first duly sworn, testified as follows:
22                    DIRECT EXAMINATION
23     BY MS. TANNER:
24        Q.   Good morning.
25        A.   Good morning.
```

Q.   Could you tell the Court -- oh, you've already told the Court your name.

Tell me, how are you employed?

A.   I'm currently a real estate agent.

Q.   Okay.  And where are you a real estate agent?

A.   In Austin and Bastrop, Central Texas area.

Q.   Are you a former law enforcement officer?

A.   Yes, ma'am.

Q.   And how long were you a law enforcement officer?

A.   Twenty-five years.

Q.   Okay.  And where were you a law enforcement officer?

A.   Here in Bastrop.

Q.   Okay.  Which agency in Bastrop, or was it multiple agencies?

A.   Yeah.  During my early career, back in -- when I first started, I spent like 12 months here at the sheriff's office and then transferred over to the police department and finished my career.

Q.   So other than 12 months at the sheriff's office here in Bastrop, your entire law enforcement career was at Bastrop Police Department?

A.   Yes, ma'am.

Q.   Okay.  And tell us kind of your career path

1  there at Bastrop PD.

2      A.   Well, I started out as a patrol officer in

3  the early -- early stages of my career.  Promoted up

4  to detective, patrol sergeant, detective sergeant,

5  lieutenant, and then on -- I retired as the police

6  chief.

7      Q.   Okay.  And did you have an assistant chief in

8  there as well?

9      A.   I did.

10      Q.   Okay.  And how long were you the chief of

11  police for Bastrop PD?

12      A.   Close to nine and a half years.

13      Q.   Okay.  And how long were you an investigator

14  with Bastrop PD, approximately?

15      A.   Gosh.  You would ask me that.  I don't know.

16  There was probably two different stints as a detective

17  investigator.  We were able to transfer at times.

18  And -- and I spent a short time as an investigator,

19  transferred back to patrol for a while as a patrol

20  sergeant, and then transferred back as an

21  investigator.

22      Q.   Okay.  Back in 1996, what was your role?

23      A.   I was an investigator.

24      Q.   Okay.  And were you a sergeant investigator

25  at that time, or do you recall?

1    A.   I don't believe so.  I think I was just an
2  investigator.
3    Q.   Okay.  And were you an investigator involved
4  in the investigation on behalf of Bastrop PD of the
5  murder of Stacey Stites?
6    A.   Yes, ma'am.
7    Q.   Okay.  And, in fact, for Bastrop PD, were you
8  a kind of collateral investigator or were you the lead
9  investigator?
10   A.   No.  My primary role was -- was support to
11 assist the primary investigator, Rocky Wardlow.
12   Q.   Okay.  And let's talk about that.
13        The case started out in the city limits of
14 Bastrop, right?
15   A.   It did, yes.
16   Q.   And how so?  Explain to the Court how that
17 is.
18   A.   Well, when Stacey Stites didn't arrive at the
19 H-E-B the early morning hours, a call was made to the
20 police department.  And her -- her truck was found at
21 the high school parking lot in the city limits of
22 Bastrop.  So that -- that put it in our jurisdiction,
23 so we initiated the investigation.
24   Q.   And you say that the high school was in the
25 city limits of Bastrop.  By the same token, the H-E-B

 1  identify this, sir.

 2      A.   Yes, it's page 1 of 42 of my report.

 3      Q.   Okay.  Why don't you keep that.  I'm going to

 4  ask you some questions.

 5      A.   Okay.

 6      Q.   Now, it's first principles in policing that

 7  it's important to write down information during the

 8  course of an investigation.

 9      A.   Correct.

10      Q.   So it's fair to say that when you were

11  conducting this investigation that produced the

12  42-page report, if there was anything that was

13  remotely important, you would intend to put that in

14  the report, correct?

15      A.   Yes.

16      Q.   Okay.  Now, you've testified that you have

17  spoken -- that you spoke to a lot of employees at the

18  H-E-B.

19      A.   A number of them, yes.

20      Q.   A number.  How many did you speak to?

21      A.   I don't think I broke it down by how many

22  H-E-B people.  I --

23      Q.   Let's start with H-E-B.

24      A.   I don't know how many.  A number of them.

25      Q.   Okay.  Do you remember testifying at trial in

1  this case?

2  A.  Yes.

3          MR. KENDALL:  Todd, trial, line 48.

4          MR. FRANK:  Which page?

5          MR. KENDALL:  Page 100.

6          MR. FRANK:  Which date?

7          MR. KENDALL:  Hold on.  May 6th.

8  Page 100.

9          Can you blow up down at the bottom.

10  Q.  (BY MR. KENDALL)  Okay.  There's a question

11  you were asked, "You spoke to the majority of the

12  H-E-B employees, did you not?"

13  A.  Yes.

14  Q.  And your answer was, "Yes, ma'am, I spoke to

15  a lot -- quite a few of them."

16      Correct?

17  A.  That's correct.

18  Q.  Okay.  Do you have any idea how many H-E-B

19  employees there were in April and May of 1996?

20  A.  I don't know.

21  Q.  Okay.  Assume for a minute that there were

22  193 employees.  You didn't speak to anywhere near --

23  A.  No.

24  Q.  -- that many?

25  A.  No.

Q.    Okay.  And in looking at your report, it wouldn't be fair to say that -- if you go through and identify the names, you spoke to 23 males and 9 females.

Do you recall that?

A.    I'm not going to argue with that.

Q.    Okay.  And that's a total of 32.  So that's well short of speaking to a lot of the 193 employees, correct?

A.    That's correct.

Q.    Okay.  Now, during the course of this investigation, did you -- when you talked to people, did you hear former work colleagues or friends of hers describe facts about Ms. Stites' relationship with Jimmy Fennell that would raise red flags that something might be wrong?

A.    No, I don't believe so.

Q.    Okay.  Could you look at page 39 of your report.

And page 39 reflects, does it not, that you spoke to a Heather Flanagan?

A.    Yes.

Q.    Okay.  And she described her as a friend and also an H-E-B employee, correct?

A.    "Part-time for H-E-B," yes.

Q.   And from your report, it's clear that that
canvass took place around 6:00 p.m. on April 29th?

A.   Okay.  Yes.

Q.   Okay.  Why did it take so long to go do a
canvass?

A.   I don't understand the question.

Q.   Well, oftentimes you try to canvass something
connected to a crime as soon as possible so that if
there are eyewitnesses, they don't leave or depart,
you lose track of them, correct?

A.   Yeah, I think we would definitely want to try
to get there as soon as possible.  That's correct,
yes.

Q.   Well, if April 29 is a week after, that's a
long time.

A.   That's a long time.

Q.   To wait for a canvass, correct?

A.   Correct.

Q.   Okay.  And your report, on pages 5 and 6 and
7, indicate that -- these are doors that you knocked
on?

A.   That's correct.

Q.   Now, you did not -- there's no accounting in
this report of the doors that others knocked on?

A.   No.

Q.   Okay.  Do you know which apartment
Mr. Fennell and Ms. Stites lived in?

A.   I don't know right offhand, no.

Q.   Okay.  Well, let me ask you this:  Assume for
a minute they lived in Apartment 502 --

A.   Okay.

Q.   -- second-story apartment.  And right beneath
them, in Apartment 501, a Mr. William Sappington lived
there.

A.   Okay.

Q.   Okay.  He might be an important door to knock
on, correct?

A.   He would be, yeah.

Q.   Okay.  And there's no evidence here, in your
report, that 501, that door was knocked on, correct?

A.   Not by me, no.

Q.   Okay.  Well, do you have any information,
during the course of your investigation, that
Mr. Sappington's apartment door was approached or
whether the police spoke to Mr. Sappington?

A.   I have no idea.

Q.   So if Mr. Sappington had heard something, had
heard fights or arguments, that also would be
important in your investigation, correct?

A.   That would have been good information, yes.

Q.   Okay.  Mr. Board, did you serve a subpoena to secure Jimmy Fennell's bank records for a grand jury in October of 1996?

A.   I don't recall.  It's possible.

(Applicant's Exhibit 33 marked.)

Q.   (BY MR. KENDALL)  Mr. Board, can I ask you to identify this document?

A.   Yes, sir.  It is a subpoena.

Q.   For what?

A.   To the custodian of records at the First National Bank in Bastrop.  And I did execute that on October the 22nd, 1996.

Q.   Okay.  And did you perform other investigative functions pursuant to that grand jury?

A.   Not that I recall, no.

Q.   You could have?

A.   Possible.

Q.   Did you testify before that grand jury?

A.   Yes, I'm sure I did.

Q.   You did?  And when did you testify in front of the grand jury?

A.   I have no idea.

Q.   But your testimony today is you did testify before that grand jury?

A.   I'm sure I did.  I -- I'm pretty positive I

1   did, yeah.

2       **Q.**   Did you perform any other searches for

3   records concerning Mr. Fennell?

4       **A.**   No, not that I'm aware of.

5       **Q.**   Did you try to obtain phone records of

6   Mr. Fennell's phone?

7       **A.**   I did not.

8       **Q.**   Okay.  That would have been important

9   information to get?

10      **A.**   That would have been important information to

11  get.

12      **Q.**   Okay.

13      **A.**   My job was not to --

14      **Q.**   Correct.

15      **A.**   -- work with Jimmy Fennell.  Jimmy Fennell

16  was a suspect in the case, and he was being

17  investigated by other officers.

18      **Q.**   You were reading other officers' reports as

19  the investigation developed, correct?

20      **A.**   Not necessarily, no.

21      **Q.**   Well, you would not read reports filed by

22  other investigators?

23      **A.**   No.  You know, when you're dealing with

24  multiple jurisdictions, you've got the sheriff's

25  department, their folks are doing their stuff; you've

```
 1    got Texas Rangers doing their stuff; and then you've
 2    got me over here doing whatever they want me to do.
 3         Q.   Well, there's no impediment to looking at
 4    reports from other investigative offices that are
 5    working jointly with you in an investigation, correct?
 6         A.   I don't know if I understand your question.
 7         Q.   If you went to Mr. Rocky Wardlow and asked
 8    him, you wanted to see some reports that he had
 9    generated, are you telling us that Mr. Wardlow would
10    not have let you have seen those reports?
11         A.   I'm sure he would have.  I don't know.
12         Q.   Okay.  Well, do you have any knowledge of
13    seeking Mr. Fennell's phone records --
14         A.   I don't have any knowledge of that, no.
15         Q.   You never saw any report that somebody --
16         A.   I did not, no.
17         Q.   Okay.  And did you ever interview
18    Jimmy Fennell?
19         A.   No.
20         Q.   Okay.  Did you ever go to his apartment and
21    inspect his apartment?
22         A.   No.
23         Q.   That would have been an important thing to
24    do, would it not?
25         A.   It would have been, yes.
```

1          MS. TANNER:  Thank you, Your Honor.

2                      **L.R. WARDLOW,**

3     having been first duly sworn, testified as follows:

4                    **DIRECT EXAMINATION**

5     BY MS. TANNER:

6          Q.   Sir, can you tell us how you're employed.

7          A.   I'm the chief of police for the City of

8     Horseshoe Bay.

9          Q.   Okay.  And how long have you been the chief

10    of police for Horseshoe Bay?

11         A.   I've been the chief for the last -- November,

12    it will be six years.

13         Q.   Okay.  And Horseshoe Bay is over west of

14    Austin on Lake LBJ, right?

15         A.   Yes, ma'am, that's correct.

16         Q.   And what did you do before you were the chief

17    of police for Horseshoe Bay?

18         A.   I was the assistant chief.

19         Q.   Okay.  And were you employed in other law

20    enforcement capacities in other ways before that?

21         A.   Yes, I was.  I retired from the Department of

22    Public Safety in 2009.

23         Q.   Okay.

24         A.   And I was a Texas Ranger at that time.

25         Q.   How long were you a Ranger?

1       A.   I believe it was about 17 years.

2       Q.   And how long were you with DPS in total?

3       A.   Right at 30.

4       Q.   Now, when you were a Texas Ranger, where were

5   you assigned?

6       A.   I was assigned to Austin, Bastrop, and later

7   Llano.

8       Q.   And when were you assigned in Bastrop?

9       A.   I actually took that -- opened that office

10  in -- I believe it was '95.

11      Q.   What do you mean by you "opened that office"?

12      A.   The office was in Austin prior to that.

13      Q.   Okay.  So then you moved to a new posting,

14  basically, in 1995?

15      A.   That's correct.

16      Q.   Okay.  And how long were you in Bastrop?

17      A.   Until 2008.

18      Q.   Okay.  Now, as the Ranger in Bastrop, were

19  you assigned to the investigation of the murder of

20  Stacey Stites?

21      A.   Yes, ma'am.

22      Q.   And were you the only Ranger on that case, or

23  were there other Rangers involved as well?

24      A.   There was one other Ranger that had a very

25  narrow portion that overlapped with a suspect.

A.   He was the last one that would have seen her,

yes.

Q.   He was the last one that would have seen her

alive?

A.   Correct.

Q.   Okay.  And speaking of that, did the

information that you had about when Ms. Stites left

her apartment, that came from Mr. Fennell?

A.   And Mrs. Stites.

Q.   Ms. Stites told you that Stacey would have

worked a shift the next day?

A.   She had told us normally what her routine

was.

Q.   Right.

Mrs. Stites didn't tell you that she saw

Stacey leave the apartment?

A.   No.

Q.   Okay.  Right.

So the information that she, in fact, left

the apartment came from Mr. Fennell?

A.   Correct.

Q.   Okay.  And at one point, I think he said she

had left at 2:45.  I think another point he said he

wasn't sure.

A.   I only recall him not being sure.  He was

asleep.

Q. You know he was asleep?

A. That's what -- that's what he said.

Q. So he told you he was asleep when she left?

A. Yes.

Q. Okay. And you took him at his word?

A. I'm sorry?

Q. And you took him at his word?

A. I'm not sure -- that's what he --

Q. You believe that to be true?

A. I don't know if it was true or not.

Q. Okay. That's all I was -- you said he was asleep and I was just trying to figure it out --

A. Yeah.

Q. -- if it was because you took him at his word that it was true or what was it he told you?

A. That's what he said.

Q. Okay. Fair -- fair enough.

So that interview that you did with Mr. Fennell and you had a homicide and it was his fiancée -- and I don't think it's any secret that fiancés and significant others are often the first person that you look at when there is a homicide.

A. Sure.

Q. Especially when they're the last person to

see the victim alive?

A. Yes.

Q. Okay. So when you had this interview with
him, did you record it?

A. I did not.

Q. Did you -- not video? not audio?

A. No.

Q. Did you ask Mr. Fennell to take a polygraph
at that point?

A. No, ma'am.

Q. Did you ask Mr. Fennell if you could take a
look at his apartment?

A. No, ma'am.

Q. Okay. Now, at that point, I think you talked
to Ms. Tanner, there were several items that appeared
to be missing from the truck.

I think you talked about an earring. I think
you mentioned there was an earring that you couldn't
find or was some -- you didn't find the entire glass?

A. Correct.

Q. Okay. So that might have been a good time to
ask him, "Can I go take a look at the apartment?"

A. Okay.

Q. You don't -- you don't agree?

A. Oh, we all believe whatever happened happened

1   inside the truck.

2      Q.   Even though there were items that were

3   missing from the truck?

4      A.   Yes.

5      Q.   And there was, I think, a piece of the belt

6   that was never found either; is that correct?

7      A.   I don't recall specifically the belt.

8      Q.   You don't recall that there were three pieces

9   of the belt and only two were found?

10      A.   I don't recall.

11      Q.   That would have also been a good item to look

12   for at that time, wouldn't you think?

13      A.   Sure.

14      Q.   Okay.  Did you ask Mr. Fennell at that point

15   to give a voluntary witness statement?

16      A.   I did not, no.

17      Q.   Okay.  Do you know if any of the other

18   officers that interviewed him with you asked him to

19   give a voluntary witness statement?

20      A.   I don't know if they did or not.

21      Q.   But that is something that is very frequently

22   done; isn't that correct?

23      A.   Yes.

24      Q.   For example, I think there were several of

25   them in this case.

1    A.   Yes.

2    Q.   Several potential suspects --

3    A.   Yes.

4    Q.   -- authored voluntary witness statements?

5    A.   Right.

6    Q.   Okay.  Do you recall if there was a

7 particular reason not to seek a witness statement from

8 Mr. Fennell?

9    A.   At that time, there was no particular reason.

10 It was two days after and we were trying to seek

11 information.

12   Q.   So you were trying to seek information from

13 Mr. Fennell as opposed to interrogating Mr. Fennell?

14        I'm just trying to understand --

15   A.   Yes, it was not an interrogation.  It was an

16 interview, simply to gain information.

17   Q.   He was not your prime suspect at that point?

18   A.   Not a prime suspect.  He was a suspect, but I

19 wouldn't call it "prime" at that time.

20   Q.   Did that ever change?

21   A.   Not really.  Logistically, we never could

22 figure out a way that he would have got back.

23   Q.   I thought -- that's a point that we'll talk

24 about a little bit later because that is a -- that is

25 a very, very interesting point.