# Exhibit 29

REPORTER'S RECORD

VOLUME 8 OF 12 VOLUMES

TRIAL COURT CAUSE NO. 8,701

COURT OF CRIMINAL APPEALS NO. WR-50,961-10

|  |  |
|---|---|
| | ) 21st DISTRICT COURT |
| | ) |
| | ) |
| EX PARTE RODNEY REED | ) OF |
| | ) |
| | ) |
| | ) |
| | ) BASTROP COUNTY, TEXAS |

------------------------------

WRIT OF HABEAS CORPUS

July 27, 2021

------------------------------

BE IT REMEMBERED THAT on the July 27, 2021, the
following proceedings came on to be heard in the
above-entitled and numbered cause before the Honorable
J.D. Langley, Visiting Judge of the 21st District
Court, held in Bastrop, Bastrop County, Texas.

Proceedings reported by machine shorthand by
Hayley Stiteler, CSR, RPR.

```
 1                    A P P E A R A N C E S

 2
      FOR THE APPLICANT:
 3

 4          Mr. Andrew F. MacRae
            LEVATINO | PACE LLP
 5          1101 South Capital of Texas Highway
            Building K, Suite 125
 6          Austin, Texas 78746
            512.6371581
 7          amacrae@levatinopace.com
            SBOT NO. 00784510
 8

 9          Ms. Jane Pucher
            INNOCENCE PROJECT
10          40 Worth Street, Suite 701
            New York, New York 10013
11          646.227.8327
            jpucher@innocenceproject.org
12

13          Barry C. Scheck
            INNOCENCE PROJECT
14          40 Worth Street, Suite 701
            New York, New York 10013
15          212.364.5390
            bscheck@innocenceproject.org
16

17          Mr. George H. Kendall
            SQUIRE PATTON BOGGS, LLP
18          1211 Avenue of the Americas
            New York, New York 10036
19          212.872.9834
            george.kendall@squirepb.com
20


21
            Ms. Michelle L. Davis
22          SKADDEN, ARPS, SLATE, MEAGHER & FLORM, LLP
            1000 Louisiana, Suite 6800
23          Houston, Texas 77002
            713.655.5100
24          michelle.davis@skadden.com
            SBOT NO. 24038854
25
```

```
 1        Ms. Nicole A. DiSalvo
          SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
 2        920 North King Street
          Wilmington, Delaware 19801
 3        302.651.3027
          nicole.disalvo@skadden.com
 4        Delaware Bar No. 4662

 5
          Ms. Corrine Irish
 6        SQUIRE PATTON BOGGS
          1211 6th Avenue, 26th Floor
 7        New York, New York 10036
          212.872.9823
 8        corrine.irish@squirepb.com

 9
          Mr. Quinncy McNeal
10        HUSCH BLACKWELL LLP
          600 Travis Street, Suite 2350
11        Houston, Texas 77002
          713.525.6253
12        quinncy.mcneal@huschblackwell.com
          SBOT NO. 24074690
13

14        Ms. Sarah Runnells Martin
          SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
15        920 North King street
          Wilmington, Delaware 19801
16        302.651.3000
          sarah.martin@skadden.com
17

18   FOR THE STATE:

19
          Ms. Lisa M. Tanner
20        TEXAS OFFICE OF THE ATTORNEY GENERAL
          P.O. Box 12548
21        Austin, Texas 78711
          512.463.2125
22        lisa.tanner@oag.texas.gov
          SBOT NO. 19637700
23

24

25
```

1      Mr. Travis G. Bragg
      TEXAS ATTORNEY GENERAL
2      ASSISTANT ATTORNEY GENERAL
      P.O. Box 12548
3      Austin, Texas 78711
      512.936.1400
4      SBOT NO. 24076286

5

6      Ms. Rachel L. Patton
      OFFICE OF THE ATTORNEY GENERAL
      CRIMINAL APPEALS DIVISION
7      P.O. Box 12548
      Austin, Texas 78711
8      512.936.1400
      rachel.patton@oag.texas.gov
9      SBOT NO. 24039030

10

11     Mr. Edward L. Marshall
      OFFICE OF THE ATTORNEY GENERAL
12     CRIMINAL APPEALS DIVISION
      P.O. Box 12548
13     Austin, Texas 78711
      512.936.1400
14     edward.marshall@oag.texas.gov
      SBOT NO. 00797004

15

16

17     Mr. Garrett Greene
      OFFICE OF THE ATTORNEY GENERAL
      CRIMINAL APPEALS DIVISION
18     300 West 15th Street
      Austin, Texas 78701
19     512.936.1400
      garrett.greene@oag.texas.gov
20     SBOT NO. 24096217

21

   ALSO PRESENT:
22

      Ms. Emma Bratman
23

24

25

# INDEX OF PROCEEDINGS
## VOLUME 8
### (WRIT OF HABEAS CORPUS)

July 27, 2021                                          Page  Vol

PROCEEDINGS....................................  9   8


**APPLICANT'S WITNESSES:**

|                        | DX      | CX      | VDX | VOL |
|------------------------|---------|---------|-----|-----|
| SUZANNA DANA, M.D.      | 11,163  | 21,178  |     | 8   |
| NORMA JEAN FARLEY, M.D. | 184,299 | 215,307 |     | 8   |
| AMBER MOSS              | 311,329 | 372     | 328 | 8   |
|                        | 385     |         |     |     |


|                                          | Page | Vol |
|------------------------------------------|------|-----|
| COURT REPORTER'S CERTIFICATE.................. | 391  | 8   |


## ALPHABETICAL INDEX

**STATE'S WITNESSES:**

|                        | DX      | CX      | VDX | VOL |
|------------------------|---------|---------|-----|-----|
| SUZANNA DANA, M.D.      | 11,163  | 21,178  |     | 8   |
| NORMA JEAN FARLEY, M.D. | 184,299 | 215,307 |     | 8   |
| AMBER MOSS              | 311,329 | 372     | 328 | 8   |
|                        | 385     |         |     |     |

## EXHIBIT INDEX

**APPLICANT'S EXHIBITS**

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL |
|-----|-------------|---------|----------|-----|
| 41 | Medical Examiners Lack Qualifications, Competence, Oversight, By Matt Clarke (Bill of Exceptions Exhibit) | 33 | | 8 |
| 42 | Affidavit of LeRoy Riddick | 171 | 172 | 8 |
| 43 | Texas Administrative Code-Code of Professional Responsibility | 96 | 172 | 8 |
| 44 | National Commission on Forensic Science: National Code of Professional Responsibility for Forensic Science and Forensic Medicine Service Providers (Bill of Exceptions Exhibit) | 97 | 172 | 8 |
| 45 | Declaration of Roberto J. Bayardo, M.D. | 172 | 173 | 8 |
| 46 | Time of Death and Postmortem Changes Article | 146 | 173 | 8 |
| 47 | Texas DPS Texas Ranger Division Report of Investigation | 224 | 225 | 8 |

| | STATE'S EXHIBITS | | | | |
|---|---|---|---|---|---|
| | NO. | DESCRIPTION | OFFERED | ADMITTED | VOL |
| | 71 | Curriculum Vitae of Suzanna Dana, M.D. | 138 | 139 | 8 |
| | 72 | Dr. Suzanna Dana's Report | 138 | 139 | 8 |
| | 73 | Curriculum Vitae of Norma Jean Farley, M.D. | 189 | 190 | 8 |
| | 74 | Dr. Norma Jean Farley's Report | 213 | 214 | 8 |
| | 76 | PowerPoint | 213 | 214 | 8 |
| | 77 | 2006 Affidavit of LeRoy Riddick, M. D. | 174 | 175 | 8 |
| | 78 | 2003 Affidavit of LeRoy Riddick, M.D. | 174 | 175 | 8 |
| | 79 | Spitz and Fisher's Medicolegal Investigation of Death | 176 | | 8 |
| | 80 | April 3, 1997 Texas DPS Crime Lab Preliminary Report | 316 | 318 | 8 |
| | 81 | May 27, 1997 Texas DPS Crime Lab Report | 316 | 318 | 8 |
| | 82 | June 18, 1997 Texas DPS Crime Lab Report | 316 | 318 | 8 |
| | 83 | July 14, 1997 Texas DPS Crime Lab Supplemental DNA Report | 316 | 318 | 8 |
| | 84 | April 14, 1998 Texas DPS Lab Report | 316 | 318 | 8 |
| | 85 | April 20, 1998 Texas DPS Crime Lab Additional Analysis | 316 | 318 | 8 |

| | | | | | |
|---|---|---|---|---|---|
| 86 | May 4, 1998 Texas DPS Crime Lab Additional Analysis and Submissions | 316 | 318 | 8 |
| 87 | December 16, 2014 Texas DPS Crime Lab Forensic Biology Lab Report | 327 | 329 | 8 |
| 88 | December 16, 2014 Texas DPS Crime Lab DNA Lab Report | 327 | 329 | 8 |
| 89 | December 16, 2014 Texas DPS Crime Lab Minifiler Lab Report | 327 | 329 | 8 |
| 90 | December 16, 2014 Texas DPS Crime Lab YSTR Lab Report | 327 | 329 | 8 |
| 91 | February 10, 2015 Texas DPS Crime Lab Supplemental DNA Lab Report | 327 | 329 | 8 |
| 92 | February 12, 2015 Texas DPS Crime Lab Supplemental Minifiler Lab Report | 327 | 329 | 8 |
| 93 | February 13, 2015 Texas DPS Crime Lab Supplemental YSTR Lab Report | 327 | 329 | 8 |
| 94 | February 18, 2015 Texas DPS Crime Lab Amended Minifiler Lab Report | 327 | 329 | 8 |
| 95 | July 12, 2016 Texas DPS Crime Lab Supplemental DNA Lab Report | 327 | 329 | 8 |
| 96 | July 14, 2016 Texas DPS Crime Lab Supplemental Minifiler Lab Report | 327 | 329 | 8 |

1          All right.  Are you ready to resume your

2   direct examination of the doctor?

3          MS. TANNER:  Yes, Your Honor.

4          THE COURT:  All right.  You may do so.

5          MS. TANNER:  Thank you, Your Honor.

6          **DIRECT EXAMINATION** (cont'd)

7   BY MS. TANNER:

8       Q.   Good morning.

9       A.   Good morning.

10      Q.   For the record, would you state your name

11  again, please.

12      A.   Dr. Suzanna Dana.

13      Q.   And, Dr. Dana, are you the same Dr. Dana who

14  testified here yesterday evening?

15      A.   Yes, I am.

16      Q.   Okay.  When we broke yesterday, we had talked

17  extensively about your opinions as it relates to the

18  time of death of Stacey Stites, correct?

19      A.   Correct.

20      Q.   Okay.  Subsequent to your release yesterday

21  evening, did I provide you with a document that the

22  Applicant had admitted into evidence as Defendant's

23  Exhibit 40, a report from the National Commission on

24  Forensic Science?

25      A.   Yes, you did.

1    Q.   Did you have an opportunity to look over

2  that?

3    A.   Yes, I did.

4    Q.   And does that report reference anything about

5  medical examiners or autopsies or anything involving

6  that field?

7    A.   No.

8    Q.   Okay.  Is there anything in it that alters

9  your opinions or changes your testimony in any way?

10   A.   No.

11   Q.   Okay.  Now, I want to talk with you about a

12  couple of other subjects.

13        In particular, did you look at photographs

14  depicting the genitalia, in particular the rectal

15  areas, of the body of Stacey Stites?

16   A.   Yes, I did.

17   Q.   And for what purpose did you look at those

18  photographs?

19   A.   Well, they were part of the autopsy report

20  and the autopsy photos.

21   Q.   Okay.  And were you familiar with the fact

22  that Dr. Bayardo testified at trial that there were

23  anal injuries on the body of Stacey Stites?

24   A.   Yes.

25   Q.   Okay.  And in looking at the photographs, can

you tell the Court were they -- what quality were they
of?

    A.   The photographs?

    Q.   Yes, ma'am.

    A.   Not very good quality.

    Q.   Okay.  And the photographs depicted a
dilation in the anus of Ms. Stites, correct?

    A.   Yes.

    Q.   Now, from your experience and from looking at
them, could you tell what that was from?

    A.   No.

    Q.   And what are some options that it could be
from?

    A.   Well, the anus will dilate naturally at the
time of death or a little bit after death.  It could
also indicate some kind of stretching of the anal
region, either by a foreign object or, say, a penis.
So there's no way to tell for sure, but it -- all I
could tell for sure was that it was wider than it
usually is immediately after death.

    Q.   And so while it could be penetration, it
could be dilation, you couldn't form an opinion one
way or the other?

    A.   That's correct.

    Q.   Okay.  And as far as any injuries go, were

1   you able to form an opinion in that regard?

2       A.   No, not from the quality of photos that I

3   saw.

4       Q.   Are you saying there definitely was not an

5   injury or that you were unable to tell one way or the

6   other?

7       A.   I -- I couldn't tell one way or the other.

8       Q.   Okay.  And you heard Dr. Baker last week

9   testify that, in his opinion, there absolutely was no

10  injury to that particular area of Stacey's body.

11          Do you recall hearing that?

12      A.   I heard that, yes.

13      Q.   And do you agree with that?

14      A.   Well, that's his opinion.  My opinion would

15  be that I can't make that call --

16      Q.   Okay.

17      A.   -- from the photo that I saw.

18      Q.   And did you also, while you were in court

19  with Dr. Baker, see some slides that he put up to

20  demonstrate his opinions?

21      A.   Yes, I did.

22      Q.   In particular, it's our Slide 45.  Is that a

23  slide that Dr. Baker put up?

24      A.   Yes.

25      Q.   And in his testimony as it relates to the two

1    A.    Absolutely.  I do not know that.

2    Q.    Right.  So when you do a controlled study

3    with live individuals, right --

4    A.    If they're being honest, yes.

5    Q.    Well, when you -- if you move on to the next

6    slide about some of these studies, the --

7                MR. SCHECK:  Go ahead to the slide on

8    the Silverman study, the graphs.

9    Q.    (BY MR. SCHECK)  All right.  In these

10   studies, right, they actually had people from their

11   own laboratories going out who were participating in

12   the experiment, and they came back with the times that

13   they had sexual intercourse and how long the intact

14   sperm --

15   A.    And that was by their report --

16   Q.    Yeah.

17   A.    -- and I'm just saying if they were totally

18   honest, then, yes, you can believe that.

19   Q.    But in these peer-reviewed journals and the

20   way you do science, there's no reason to think they're

21   lying.

22   A.    I don't have any way to know for sure that

23   they were telling the absolute truth.

24   Q.    All right.  But you saw these slides.  The

25   judge has seen these slides.  The fact of the matter

1   is that when Blakely told the jury, right,

2   categorically, that sperm could not survive more than

3   26 to -- 24 to 26 hours intact, right, given the fact

4   that the very paper she was citing from had

5   information that provided an important limitation for

6   the jury to know; fair enough?

7       A.   Yes.

8       Q.   And it was misleading?

9       A.   It could be, sure.

10      Q.   And the issue of the timing of sexual

11  intercourse was important to this case.  You know

12  that.

13          Let me put it a different way.  If intact

14  sperm with tails can be seen, will survive 48 hours,

15  right, 72 hours as these studies have shown, and there

16  was a consensual sexual relationship between

17  Rodney Reed and Stacey Stites 48 hours before the time

18  she was killed, that plainly could account for intact

19  sperm from him in her vaginal vault?

20      A.   I would not make that jump because these

21  studies were done in living individuals.  The milieu

22  environment in a dead person's vagina is totally

23  different.  I haven't seen studies done in deceased

24  individuals.

25      Q.   Right.  Well, without the studies being done

1  in deceased individuals, would it not have been
2  important to tell the jury that the categorical
3  statement that sperm -- intact sperm would not survive
4  more than 24 to 26 hours had a very important
5  limitation to it?
6      A.   In regards to this study, yes.
7      Q.   Yes.  And you're now saying, "Well, I haven't
8  seen it," and you're a forensic pathologist, right?
9      A.   I haven't seen it past about 12 hours, no --
10     Q.   Okay.
11     A.   -- in my own personal experience.  Yes.
12     Q.   Right.  But you're aware of no studies that
13  show that something going on in the vaginal vault --
14  no published studies -- mean that intact sperm will
15  not survive 24 to 26 hours?
16     A.   Right.  I haven't -- I haven't seen
17  controlled studies, no.
18     Q.   Right.  So let's go look at -- let's go look
19  at Dr. Bayardo's testimony on direct, which is 5/6
20  p.m., page 122, lines 21 to 24.
21          Okay.  You can see here that Dr. Bayardo was
22  asked, "What is the significance of having found
23  intact spermatozoa in this case?
24          "ANSWER:  That tells me the semen was placed
25  in the vagina quite recently."

1          Okay.  Now -- you see that, right?

2     A.   Yes.

3     Q.   And he's not asked what he means by "recent"?

4     A.   Correct.

5     Q.   He's not asked -- he's not asked to review

6  papers the way that -- published studies the way

7  Karen Blakely referred to them, right?

8     A.   Not in his testimony, no.

9     Q.   Okay.  Now, let's take a look at

10 Dr. Bayardo's affidavit that he filed correcting and

11 clarifying his testimony in this case.

12          MR. SCHECK:  Okay.  I'm not sure -- have

13 we marked this yet?

14          MS. TANNER:  Not to my knowledge.

15          MR. SCHECK:  We'll mark that in a

16 minute, but we'll -- it's in the record.  We'll

17 proceed with it right now.

18          Now, will you get to the -- Todd, why

19 don't you move down to the place where he gives his

20 opinion about sperm.

21     Q.   (BY MR. SCHECK)  All right.  Dr. Bayardo says

22 in regards to the survival of sperm, "At trial I

23 testified that very few spermatozoa I found in

24 Ms. Stites' vaginal cavity had been deposited there

25 quite recently."

1          Do you see that?

2     A.   Yes.

3     Q.   Ms. Blakely testified that spermatozoa can

4  remain intact in the vaginal cavity for no more than

5  26 hours.

6          Do you see that?

7     A.   Yes.

8     Q.   And Ms. Clement, Meghan Clement, testified

9  that spermatozoa can remain intact for no more than

10 24 hours.

11         Do you see that?

12    A.   Yes.

13    Q.   "I question the qualifications of these

14 witnesses to offer this testimony, and in any event,

15 they are incorrect.  I am personally aware of medical

16 literature finding that spermatozoa can remain intact

17 in the vaginal cavity for days after death.

18         "Accordingly, in my professional opinion, the

19 spermatozoa I found in Ms. Stites' vaginal cavity

20 could have been deposited days before death.  Further,

21 the fact that I found very few, as stated in the

22 autopsy report, spermatozoa in Ms. Stites' vaginal

23 cavity suggested the spermatozoa was not deposited

24 less than 24 hours before Ms. Stites' death.

25         "If the prosecuting attorneys had advised me

1　that they intended to present testimony that

2　spermatozoa can -- cannot remain intact in the vaginal

3　cavity for more than 26 hours and argue that

4　Ms. Stites died within 24 hours of the spermatozoa

5　being deposited, I would advise" -- "I would have

6　advised them that neither the testimony nor the

7　argument was medically or scientifically supported."

8　　　　　Do you see that?

9　　A.　Yes, I see it.

10　　Q.　And I think we discussed earlier situations

11　where you agreed that because questions weren't asked,

12　the limitations -- important limitations in your

13　testimony were not brought before the jury.

14　　A.　You mean Ms. Blakely's testimony?

15　　Q.　Yes, Ms. Blakely's testimony and also

16　Dr. Bayardo's testimony as well.

17　　A.　I think that's a true statement, sure.

18　　Q.　Right.　And he makes a fair point here, don't

19　you think?

20　　A.　Yes.　But I disagree with him because I would

21　not, like I said, take all these studies done in live

22　individuals and immediately use them to interpret

23　findings in a dead body.

24　　Q.　Well, I understand that's your view, and

25　you're talking about studies that have not been done

1  yet, no systematic studies.  Fair enough?

2      A.  That's true.

3      Q.  So we're only talking about 1996, right?

4      A.  Yes.

5      Q.  And we were talking about what testimony

6  ought to be put before a jury ethically and

7  appropriately, correct?

8      A.  That's true.

9      Q.  And Dr. Bayardo was complaining here that he

10  felt that the jury did not hear, from either him or

11  Ms. Blakely or Ms. Clement, the limitation that

12  studies have shown that sperm survive more than 24 to

13  26 hours.

14      A.  And I would agree with that so long as it was

15  made clear that those studies were done in live

16  individuals.

17      Q.  Well, that could have been brought out then

18  in theory, right?

19      A.  That's right.

20      Q.  But he's right to say that that should have

21  been brought out in this case?

22      A.  I think so.

23      Q.  All right.  And he also goes on to say the

24  fact that he found very few sperm with tails, right,

25  in Ms. Stites' vaginal cavity suggests that it was not

Q.   All right.  And he called into question
oftentimes -- Ms. Blakely's testimony:  "Oftentimes
one could tell if a bruise is just recent -- is recent
just by color.  If it's still red, that means the blow
is really recent, as it would be if you received a
blow.  If certain time has passed, they tend to turn a
purple color, and then if it's been days, it's often a
green color.  That is the normal progression of a
bruise in anybody.  However, that stops at the time of
death.  I did see some bruises that looked like they'd
been there for days and some looked like they were
relatively fresh."  [As read.]

MR. SCHECK:  Next slide.

Todd, can you go to the next slide.

Q.   (BY MR. SCHECK)  All right.  Now, Dr. Baker
gave citations, he offered an opinion that "red, blue,
purple, and black can appear at any time in the
evolution of a bruise.  Red has no bearing on the age
of a bruise.  Bruises of identical age and cause, even
on the same person, may appear different."  And he
gave citations there to those and explained those
experiments.

You heard that, right?

A.   Yes, I did.

Q.   You agree with him, don't you?

A.   I do.

Q.   Okay.  And that would be -- to the extent that that went in front of the jury, that was misleading?

A.   It could be, sure.

Q.   And that would be Ms. Blakely testifying beyond her own expertise?

A.   I believe that would be beyond her expertise, yes.

Q.   And that was one of those rules that we reviewed before that are now the law in the State of Texas but you agree should have been the principles followed in 1996?

A.   Yes.

Q.   Okay.  Thank you.

Now, why don't we look at Dr. Bayardo's testimony with respect to time of death.  And let's get to the May 6th p.m. session, pages 112, line 22 to 114, line 5.

MR. FRANK:  I'm sorry, what page was that?

MR. SCHECK:  Start at page 112, line 22. This is the p.m. session on May 6th.

MR. FRANK:  Yes.

MS. PUCHER:  Todd, page 113.

1     "ANSWER:  Well, I believe it occurred just

2  after strangulation."

3          Do you see that?

4     A.   Yes.

5     Q.   Is there anything that you see in the autopsy

6  report, in your knowledge of injuries, that would

7  allow a scientifically supportable assertion that anal

8  penetration happened while she was being strangled to

9  death?

10         MS. TANNER:  Objection.  Again, asked

11 and answered, and she's already testified she hasn't

12 read the whole thing.

13         THE COURT:  Within the context of what

14 she has read, I'll allow it.

15    A.   So can you repeat your question?

16    Q.   (BY MR. SCHECK) Sure.

17         Is there anything in the autopsy report,

18 anything in your review of the findings with respect

19 to the strangulation, anything with respect to the

20 injuries that could be a basis for saying that first

21 she was strangled and just after the strangulation,

22 she was penetrated anally?

23    A.   I don't know how you'd make that judgment --

24    Q.   Yeah.

25    A.   -- so I can't really say that I see

1    something -- you know, I can't second-guess

2    Dr. Bayardo and what he was thinking.  But from this,

3    I don't see how you can make that judgment.

4              MR. SCHECK:  Thank you.  No further

5    questions.

6              MS. TANNER:  Briefly, Your Honor.

7                  **REDIRECT EXAMINATION**

8    BY MS. TANNER:

9       Q.   Dr. Dana, as it relates to the question of

10   whether there were injuries or a lack of injuries in

11   the anal area of Stacey Stites, do you know of anyone

12   other than Dr. Bayardo who can legitimately opine on

13   it?

14      A.   The best person to actually know and see what

15   happened is the person at the time of autopsy looking

16   at the tissue.

17      Q.   And that would be Dr. --

18      A.   Dr. Bayardo.

19      Q.   Okay.  And counsel for the defense was asking

20   you all kinds of questions about Dr. Bayardo's

21   subsequent 2012 affidavit.

22           In looking at that affidavit, he never

23   discounted or changed his testimony that there were

24   anal injuries, did he?

25      A.   I don't recall that, no.

1    THE COURT:  Good afternoon, ma'am.

2    THE WITNESS:  Good afternoon.

3    THE COURT:  Go ahead and be seated,

4  please.

5    If you could, please raise your right

6  hand for me.

7    (Witness sworn.)

8    THE COURT:  All right.  If you could

9  state your full name and spell your last name for the

10  court reporter, please.

11    THE WITNESS:  It's Norma Jean Farley,

12  F-A-R-L-E-Y.

13    THE COURT:  Okay.  You may proceed.

14    MS. TANNER:  Thank you, Your Honor.

15    **NORMA JEAN FARLEY, M.D.,**

16  having been first duly sworn, testified as follows:

17    **DIRECT EXAMINATION**

18  BY MS. TANNER:

19    Q.   Good afternoon.

20    A.   Good afternoon.

21    Q.   Could you tell the Court what you do for a

22  living.

23    A.   I am a forensic pathologist and, right now,

24  I'm a deputy chief medical examiner at the Bexar

25  County Medical Examiner's Office.

1    A.    Can you say it again?

2    Q.    Sure.

3         What is your opinion about the usage of

4    ancillary, kind of collateral evidence to assist you

5    in coming to a determination on time of death?

6    A.    Time of death, you know, we use the rigor

7    mortis and the livor mortis.  Algor mortis is

8    whether their -- their body temperature.  In this

9    case, it wouldn't have helped much by the time she was

10   found.  So we do look at that, but as we've said, it's

11   quite variable.  And so most forensic pathologists

12   also look at other information -- where they were

13   going, what they're wearing, what's their usual time

14   frame during this time.  So basically you gather all

15   the information and then make a decision.

16        The cause of death might be easily seen at

17   autopsy.  In this case, like a ligature strangulation.

18   But if you're going to be asked about time of death,

19   then you need to ask more questions and then make sure

20   to say that, you know, this is just an estimate or an

21   opinion because it's very hard to determine exact time

22   of death.

23   Q.    And in this particular case, when you

24   considered everything, were you able to come to an

25   opinion?

A. Well, yes, but I don't know if I -- what I examined -- like the incidence report, the sheriff's office report, when I looked at that, plus the fact that she's wearing clothes that look like work clothes, she's got a left knee brace on. So she looks like she's going to work. She looks like she's going somewhere. And that the truck was found around, I don't know, just after 5:00, it looks like she's headed to work.

Now, that's just, you know, from looking at what she's wearing. But the H-E-B shirt was in the truck. One shoe, the right shoe, was in the truck. The left shoe is on her. So she looks like she's getting ready for work from that.

Q. Okay. And was there anything inconsistent with her getting ready for and traveling to work -- I need to start that question over because I'm about to mess it all up.

You said that based on everything you saw, it appeared that she was on her way to work?

A. Yes.

Q. Okay. And from the crime scene and the autopsy with the lividity, the rigor mortis, and all the other postmortem changes, was there anything about that that appeared to you to be inconsistent with the

idea that she was on her way to work at the time she
was killed?

A.   No, I didn't see anything inconsistent with
that, especially with the autopsy.  In the autopsy
report, she had very little urine in the bladder and
only about two ounces of clear fluid in the stomach.
So it didn't look like any meal or anything had been
taken, too.  So that looked more like it may have
occurred when she was getting ready to work, after she
used the restroom, maybe drank something, and then
took off.

Q.   Okay.  Now, from your review of the case, did
you learn that there were found to be intact
spermatozoa in the vaginal vault of Stacey Stites at
the time her body -- after her body was found?

A.   Yes.

Q.   Okay.  And from your understanding, were some
taken at the crime scene?

A.   Yes.  There were some taken at the crime
scene and some by Dr. Bayardo.

Q.   By Dr. Bayardo at autopsy as well?

Okay.  Now, in your report, you mention that
spermatozoa begins to degenerate within hours of
ejaculation and begins to lose its tails?

A.   Yes.

Q.   Okay.  You mentioned that you are familiar
with the literature that's out there as it relates to
spermatozoa and being found later than 24 hours,
correct?

A.   Yes.

Q.   Okay.  Do you know whether or not that
literature is literature that is -- involves live
victims or dead victims?

A.   A lot of the literature does involve live
victims because you can better pinpoint when they last
had intercourse or got inseminated.  So a lot of it is
with live patients.  Kim Collins wrote one that was
actually postmortem that deals more with what we deal
with.

Q.   Okay.  And so with regard to the fact that
Stacey Stites was found with intact spermatozoa inside
of her body some at least 16 to 18 hours after her
death, did that lead you to form any opinions about
the recency of that spermatozoa?

A.   You know, the literature varies greatly.
Some of them say that you can find spermatozoa for
five days, the intact tail with sperm attached for
five days.  The same article says the average is
23 hours.

Q.   Okay.

1  came off as she's swabbing the breasts.  So that's

2  why the skin --

3      Q.   And she's swabbing the whole area of the

4  breast, right, swabbing the top sort of near the

5  decolletage area?

6      A.   She was swabbing the breast.  I don't

7  remember exactly where.

8      Q.   Okay.  All right.  Now, I think you said on

9  direct examination that the literature about the

10  survival of intact spermatozoa recognizes that sperm

11  can survive intact for days?

12     A.   Yes.

13     Q.   Okay.  And you mentioned a report by -- or a

14  study, rather, by a fellow pathologist named

15  Kim Collins; is that right?

16     A.   Yes.

17     Q.   And that study looked specifically at the

18  survival of sperm in deceased individuals; is that

19  correct?

20     A.   Yes.

21     Q.   Okay.  Thank you.  And so for somebody to --

22  and the studies that we're talking about, those were

23  studies that were available in the late 1990s, right,

24  1996, '97, '98?

25     A.   Except for Dr. Collins.  That was 2001.

1    Q.   But the Willott & Allard study you are

2   familiar with, and that was available in 1998,

3   correct?

4    A.   Yes, it was.

5    Q.   Okay.  And so for Ms. Blakely in this trial

6   to testify that the -- that literature says that the

7   maximum that intact sperm can survive is 24 to 26

8   hours, that's a misrepresentation of the study,

9   correct?

10    A.   Of that study, yes.  I think it's on live

11   people, though.

12    Q.   Okay.  Correct.

13    A.   Living people.

14    Q.   But in terms that we're citing to that study,

15   that study itself talks about survival for 72 hours or

16   more?

17    A.   It was.

18    Q.   So that was a misrepresentation of that

19   study?

20    A.   If she quoted that study, it's a

21   misrepresentation.

22    Q.   Thank you.

23         Okay.  You said in your report -- let me see

24   if I can find exactly where it is --

25              MS. PUCHER:  Last page, Todd, last

1  paragraph, "I reviewed the autopsy photos."

2            Okay.  Thank you.

3      Q.   (BY MS. PUCHER)  So you say here, "I reviewed

4  the autopsy photographs of the anus; however, the

5  photographs are of poor quality and any injuries

6  cannot be visualized."

7            Are you assuming that there were anal injuries

8  here?

9      A.   Any injuries that -- I read the autopsy

10  report.  That's why.

11     Q.   Okay.  So you're assuming it based on the

12  autopsy report?

13     A.   No, that's why I made that comment.  In the

14  autopsy report, Dr. Bayardo mentioned that there are

15  abrasions to the posterior anus, but looking at the

16  autopsy photo, the only way to know that that was

17  visualized is to have a picture of it, and the picture

18  is of poor quality.

19     Q.   Okay.  So you're saying the picture is of

20  poor quality so you can't make a determination one way

21  or another as to whether there's an injury here?

22     A.   That's correct.

23     Q.   Is it your position that no injuries would be

24  visual in these photographs?

25     A.   That no injuries would be -- you mean, like,

1  you just can't see them?

2     Q.   That there's no kind of injury that you could

3  visualize in these photographs.

4     A.   I could not see the injuries in those

5  photographs.

6     Q.   No, I understand you're saying in these

7  photographs.  But it's possible to see injuries in

8  photographs, correct?

9     A.   Yes.

10     Q.   Okay.  So if there was some kind of

11  significant tearing, you'd be able to see that?

12     A.   Not in that photograph.  It's not -- the

13  photographs of the anus are too far back.  You needed

14  to take an out, then zoom in on what you're looking at

15  and put a scale in it so that you can see it.  And I

16  never saw a close-up picture of that anus to see it.

17           MS. PUCHER:  Todd, can you pull up the

18  slide for Dr. Baker's report, the image.  Yeah.

19     Q.   (BY MS. PUCHER)  So this image I've given

20  that's on the left we can ignore for a moment, but the

21  image on the right is the zoomed-in picture from

22  autopsy of Ms. Stites' anus.  So you're telling us

23  there's no kind of injury -- no matter what injury

24  could possibly be there or not be there, you can't

25  visualize anything?

1    A.   No.  When I say "close-up," I mean right on

2 the anus with a scale --

3    Q.   Okay.

4    A.   -- and you're actually able to see, and then

5 there's a close-up of what you see, I mean, very close

6 up of what you see.  You wouldn't see the whole anus.

7 You'd just see the injury at that point.  That's how

8 close it should be.

9    Q.   Okay.  And I think you covered this on

10 direct, but just to be clear, the anus, you recognize

11 as the sphincter, right?

12    A.   Yes.

13    Q.   Okay.  And sphincters relax after death?

14    A.   Yeah, they can tighten too.  Just like with

15 rigor mortis, it doesn't just hit skeletal muscle, it

16 hits smooth muscle.  So it can be very tight or it can

17 be loose.

18    Q.   Okay.  But it's not uncommon at autopsy, for

19 example, to see someone who has defecated in their

20 underwear or their pants because their sphincter has

21 released everything that was inside of it; is that

22 right?

23    A.   You're correct.

24    Q.   Okay.  So the fact that someone's anus is

25 dilated, you can't conclude any kind of sexual

1  activity from that dilation, right?

2      A.   No.

3      Q.   And you can't -- certainly conclude that

4  there was any kind of sexual assault from the mere

5  fact that there is dilation?

6      A.   Not of the anus, no.

7      Q.   Okay.  Now, if you talk in your report about

8  how -- criticism, I think, might be strong but some

9  comments about the fact that evidence was collected at

10  the scene in this case.

11      A.   Yes.

12      Q.   Okay.  And I think you said that this should

13  have been done -- this evidence collection should have

14  been done by a forensic pathologist at the autopsy

15  suite.

16      A.   Yes.

17      Q.   And so you're referring in part, I believe,

18  to the video that we saw of the tape being collected

19  from between Ms. Stites' legs?

20      A.   Correct.

21      Q.   And also to the vaginal swabs that were

22  collected from her vaginal cavity?

23      A.   Yes.

24      Q.   The swabbing of the breasts as well?

25      A.   Yes.

saying "dragged," so you wouldn't get one scratch with a drag through the brush. That could be a scratch. And I didn't say there weren't any on the shoulders or the arms. There are a few on the shoulders and arms.

But all that on the back, that whole diagonal area, that's pretty classic ant bites. You see where it doesn't? It's not there where the strap is because the ants didn't bite under the strap. They went over the strap and onto the other side. Those are ants.

Q. Or the strap was preventing the scratching on her skin as she's being dragged.

A. No, because if she's being dragged, then you would expect the strap to actually move. And the lividity shows you where it is, so somebody moved it out of the way to show that. But that's classic aunt bites.

Q. Okay. All ant bites?

A. Yes, all ant bites. And it gets pretty bad, like the back of her hands and back of her arms, ants.

Q. Okay. Did you review testimony that Ms. Blakely gave at trial that she could date various bruises on Ms. Stites' body? She could tell when they happened in relation to each other?

A. Yeah.

Q. Okay.

1    A.   Yes, I did.

2    Q.   And is it fair to say that that testimony is

3 incorrect, that you can't accurately date when bruises

4 are formed?

5    A.   I don't think you can accurately date when

6 bruises are formed, but people are always asked to do

7 it.  You can give generalizations, but there's no

8 great accuracy between -- just like the green face.

9 People see colors differently.  What one may see as

10 brown, one may see as green.  That's why it's mainly

11 inaccurate.

12    Pathologists agree on yellow, so we say

13 yellow is pretty accurate 48 to 72 hours.  But other

14 than that, the other colors -- I may call it brown;

15 someone else calls it pink.  That's why we say it's

16 inaccurate.

17    Q.   But you're aware of studies that existed in

18 the late '90s showing that the accuracy rate for

19 dating any kind of bruise was less than 50 percent?

20    A.   Well, that's because they're asking other

21 pathologists:  What do you think this color is?  Even

22 microscopically there's not agreement.

23    Q.   Okay.  All right.  Now, you talked about the

24 sort of other factors or other information that you

25 received in this case from the crime scene reports