# Exhibit 31

REPORTER'S RECORD

VOLUME 7 OF 12 VOLUMES

TRIAL COURT CAUSE NO. 8701

COURT OF CRIMINAL APPEALS NO. WR-50,961-10

|  |  |
|---|---|
| EX PARTE RODNEY REED | ) 21st DISTRICT COURT ) ) ) ) ) ) OF ) ) ) ) ) ) BASTROP COUNTY, TEXAS |

-------------------------------

WRIT OF HABEAS CORPUS

July 26, 2021

-------------------------------

BE IT REMEMBERED THAT on the July 26, 2021, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable J.D. Langley, Visiting Judge of the 21st District Court, held in Bastrop, Bastrop County, Texas.

Proceedings reported by machine shorthand by Hayley Stiteler, CSR, RPR.

A P P E A R A N C E S

FOR THE APPLICANT:

    Mr. Andrew F. MacRae
    LEVATINO | PACE LLP
    1101 South Capital of Texas Highway
    Building K, Suite 125
    Austin, Texas 78746
    512.6371581
    amacrae@levatinopace.com
    SBOT NO. 00784510


    Ms. Jane Pucher
    INNOCENCE PROJECT
    40 Worth Street, Suite 701
    New York, New York 10013
    646.227.8327
    jpucher@innocenceproject.org


    Barry C. Scheck
    INNOCENCE PROJECT
    40 Worth Street, Suite 701
    New York, New York 10013
    212.364.5390
    bscheck@innocenceproject.org


    Mr. George H. Kendall
    SQUIRE PATTON BOGGS, LLP
    1211 Avenue of the Americas
    New York, New York 10036
    212.872.9834
    george.kendall@squirepb.com


    Ms. Michelle L. Davis
    SKADDEN, ARPS, SLATE, MEAGHER & FLORM, LLP
    1000 Louisiana, Suite 6800
    Houston, Texas 77002
    713.655.5100
    michelle.davis@skadden.com
    SBOT NO. 24038854

```
 1          Ms. Nicole A. DiSalvo
            SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
 2          920 North King Street
            Wilmington, Delaware 19801
 3          302.651.3027
            nicole.disalvo@skadden.com
 4          Delaware Bar No. 4662

 5

            Ms. Corrine Irish
 6          SQUIRE PATTON BOGGS
            1211 6th Avenue, 26th Floor
 7          New York, New York 10036
            212.872.9823
 8          corrine.irish@squirepb.com

 9

            Mr. Quinncy McNeal
10          HUSCH BLACKWELL LLP
            600 Travis Street, Suite 2350
11          Houston, Texas 77002
            713.525.6253
12          quinncy.mcneal@huschblackwell.com
            SBOT NO. 24074690
13

14          Ms. Sarah Runnells Martin
            SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
15          920 North King street
            Wilmington, Delaware 19801
16          302.651.3000
            sarah.martin@skadden.com
17

18   FOR THE STATE:

19
            Ms. Lisa M. Tanner
20          TEXAS OFFICE OF THE ATTORNEY GENERAL
            P.O. Box 12548
21          Austin, Texas 78711
            512.463.2125
22          lisa.tanner@oag.texas.gov
            SBOT NO. 19637700
23

24

25
```

Mr. Travis G. Bragg
TEXAS ATTORNEY GENERAL
ASSISTANT ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711
512.936.1400
SBOT NO. 24076286


Ms. Rachel L. Patton
OFFICE OF THE ATTORNEY GENERAL
CRIMINAL APPEALS DIVISION
P.O. Box 12548
Austin, Texas 78711
512.936.1400
rachel.patton@oag.texas.gov
SBOT NO. 24039030


Mr. Garrett Greene
OFFICE OF THE ATTORNEY GENERAL
CRIMINAL APPEALS DIVISION
300 West 15th Street
Austin, Texas 78701
512.936.1400
garrett.greene@oag.texas.gov
SBOT NO. 24096217

```
 1                    INDEX OF PROCEEDINGS
                           VOLUME 7
 2                    (WRIT OF HABEAS CORPUS)

 3                                                    Page  Vol

 4    PROCEEDINGS.........................................  8    7

 5    IN CAMERA INSPECTED DOCUMENT SEALED..........        8    7

 6
      STATE'S WITNESSES:
 7                                DX         CX      VDX     VOL
      BRIAN SEALES              11,20        14               7
 8    DEBORAH DAVIS, Ph.D.      22,43,      159    27,48      7
                                58,136,
 9                              227
      SUZANNA DANA, MD          230                           7
10
                                                      Page  Vol
11
      COURT REPORTER'S CERTIFICATE...................  299    7
12

13
                          ALPHABETICAL INDEX
14
      STATE'S WITNESSES:
15                                DX         CX      VDX     VOL
      SUZANNA DANA, MD          230                           7
16    DEBORAH DAVIS, Ph.D.      22,43,      159    27,48      7
                                58,136,
17                              227
      BRIAN SEALES              11,20        14               7
18

19                          EXHIBIT INDEX

20    APPLICANT'S EXHIBITS
        NO.    DESCRIPTION              OFFERED  ADMITTED  VOL
21
         40    National Commission on
22             Forensic Science: Views
               of the Commission
23             Ensuring that Forensic
               Science Analysis is
24             Based Upon
               Task-Relevant
25             Information                 220      224     7
```

| STATE'S EXHIBITS NO. | DESCRIPTION | OFFERED | ADMITTED | VOL |
|---|---|---|---|---|
| 54 | Curriculum Vitae of Deborah Davis, Ph.D. | 43 | 43 | 7 |
| 55 | Newspaper Articles from 1996 to 2021 | 128 | 131 | 7 |
| 56 | Metro Monitor Reports 2002-2021 (Bill of Exceptions Exhibit) | 131 | 136 | 7 |
| 57 | Broadcast Captions from 2008, 2014, and 2019 (Bill of Exceptions Exhibit) | 135 | 136 | 7 |
| 58 | Area's of Potential Witness Memory Testimony, by Dr. Deborah Davis | 226 | 226 | 7 |
| 59 | Memory on Trial: Clues to Witness Accuracy PowerPoint presentation of Deborah Davis, Ph.D | 226 | 227 | 7 |
| 60 | Crime Scene Video | 239 | 239 | 7 |
| 61 | Photograph | 239 | 240 | 7 |
| 62 | Photograph | 239 | 240 | 7 |
| 63 | Photograph | 239 | 240 | |
| 64 | Photograph | 239 | 240 | 7 |
| 65 | Photograph | 239 | 240 | 7 |
| 66 | Photograph | 239 | 240 | 7 |
| 67 | Photograph | 239 | 240 | 7 |
| 68 | Photograph | 239 | 240 | 7 |
| 69 | Photograph | 239 | 240 | 7 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | 70 | Photograph | 239 | 240 | 7 |
| 2 | 71 | (Not offered.) | | | |
| 3 | 72 | (Not offered.) | | | |
| 4 | 73 | (Not offered.) | | | |
| 5 | 74 | (Not offered.) | | | |
| 6 | 75 | Photograph | 239 | 240 | 7 |

MS. TANNER: Thank you, Your Honor.

**SUZANNA DANA, MD,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MS. TANNER:

Q. Good afternoon.

A. Good afternoon.

Q. Would you tell the Court your profession, please.

A. I'm a forensic pathologist.

Q. And how long have you been a forensic pathologist?

A. Basically since 1983.

Q. Okay. And can you tell the Court your educational background that led you to being a forensic pathologist.

A. Well, I graduated from medical school at Southwestern Medical School in Dallas, Texas, in 1979; and I followed that with a year of training, generalized training in pathology at Baylor Medical Center in Dallas, Texas. Then I went an additional three years in training in clinical anatomic pathology at what's called Central Texas Medical Foundation in Austin, Texas. I followed that with a year of training in forensic pathology in Bexar County.

 1   Q.   Okay.  And then where did you -- once you
 2  finished your forensic training, where did you begin
 3  your career?
 4   A.   I actually stayed on in Bexar County as a
 5  deputy medical examiner under Dr. Vincent Di Maio.
 6   Q.   And how long did you do that?
 7   A.   Well, I started there in '83 and I stayed
 8  there -- I have to look back at my résumé.  But I
 9  stayed there for a number of years until there was a
10  position that opened up in Travis County.  And since I
11  lived in between San Antonio and Austin, it was more
12  convenient for me to go to Travis County.  So I took
13  that position for a number of years.  It didn't seem
14  to work out, and I was going to just retire and do
15  consulting.  But then Dr. Di Maio called me back to
16  San Antonio, where I went back for another -- I think
17  it was nine years, and a position opened again in
18  Travis County with additional doctor help.
19       So I went back and it still was not what I
20  wanted, so I opened up my own private medical facility
21  in Lockhart, Texas.
22   Q.   So you've kind of went on I-35 quite a bit
23  just --
24   A.   Quite a bit.
25   Q.   -- back and forth.

		Okay. When did you open your private company?

	A.	Well, I opened it in 2006. I started renovating the building and such. I didn't actually take a first case in until 2008.

	Q.	And what's the name of your company?

	A.	Central Texas Autopsy.

	Q.	And tell me what you-all do at Central Texas Autopsy.

	A.	Well, basically we do cases for a justice of the peace who needs an autopsy done. I work with maybe 20 different counties. It's even more now. And if an autopsy is ordered by the justice of the peace, I can do that under his order.

		I also do private family autopsies. I do exhumation autopsies. I do second-opinion autopsies. Anybody that needs an autopsy.

	Q.	And do you have other medical examiners who work with you?

	A.	Currently, no. It's just me.

	Q.	Okay. And so you're doing autopsies as part of your job up until right now?

	A.	Right.

	Q.	Okay.

	A.	Yes.

in the first 12 to 24 hours, but past that when decomposition sets in, you end up with much broader ranges. And even in the first 12 to 24, you end up with somewhat of a range.

Q. Okay. So when we're talking about time of death, we're not going to talk about a specific time, are we?

A. No.

Q. But in this case, can you give me what your opinion was as it relates to a range of time for the time of death in the instant case?

A. Okay. By looking at the crime scene video, the crime scene photos, the autopsy photos, and evaluating mostly rigor, I was able to come up with a range for time of death. But then I looked at additional ancillary materials that were supplied to me, and that helped me narrow the range.

Q. Okay. And so tell me what your range and then your narrowed range are, and then we'll get into what led you to that point.

A. Okay. Without showing anything, just talking about it?

Q. Just generally and then we'll go into the specifics.

A. Well, I looked at the crime scene video and

to me it appeared that the body, as it was being moved and manipulated at the scene, still had rigor present. So that automatically tells you you're within the first 24, maybe a little bit longer, hours of death because there's rigor present.

So then you have to decide if it's on the upslope or downslope of the rigor. It was obvious to me that it was on the downslope mainly because of the lack of rigidity that was there, the full rigor. Now, she could have been on the upslope, but there were other things such as the drying out of the skin on the breasts, the deposit of fly eggs. Other things that gave me more information that put me towards the downslope of the rigor.

Q. Okay.

A. I don't believe she was in full rigor at any -- you know, on the videos; and I don't believe she was on the upslope. So that put her on the downslope. But she did lack obvious signs of decomposition. And that, then, narrows it to the downslope, but not into the 24- to 36-hour period. So you're in between full rigor and then the 24-hour period.

Q. Okay. So when you were coming to your conclusions regarding an approximate time of death,

you say you took into account rigor mortis?

A. Yes.

Q. Did you take into account lividity patterns?

A. I took into account lividity patterns but not as to time of death. That doesn't help you a whole lot on time of death.

Q. And did you take into account a number of variables that can affect a determination of time of death?

A. I took into account several things that were in the information I was given that helped me narrow the time of death. They were not necessarily medical things, but they were facts in the case.

Q. Okay. And you said that you considered as well evidence regarding decomposition or a lack of decomposition, correct?

A. Yes, that's correct.

Q. And, then, what is ancillary evidence?

A. Additional outside the -- you know, something coming in from the outside to affect something.

Q. And did you also consider various items of ancillary evidence?

A. Yes, I did.

Q. Okay. And did all of those things in totality allow you to come to some conclusions that

you're going to share with the Court?

　　A.　Yes, it did.

　　Q.　Okay. Now, I want to talk with you about -- generally about the concept of rigor mortis, and the Court has heard a great deal of testimony about that.

　　And I want to know from you, what is the general rule, as you understand it, for rigor mortis?

　　A.　Well, as I understand it, from basic forensic textbooks and also from my experience, rigor starts at the time of death and it gradually proceeds until it reaches what's called "full rigor," where the joints become so stiff that it's extremely hard to break the rigor. And then, over the next 12 hours, it disappears. It goes away so that when you reach about 24 hours, going into the 36-hour period, you can still detect some rigor, but it's usually not much. And then it goes away completely by 36 to 48 hours.

　　Q.　Okay. And are there a number of -- well, let me back up and ask it this way.

　　You've referred to that as a general rule.

　　A.　Yes.

　　Q.　Are there a number of variables that, if present, can affect these general rules?

　　A.　Yes.

　　Q.　Can you kind of explain that to the Court.