# Exhibit 32

Writ Cause No. 50,961-10
Trial Court Cause No. 8701

| | | |
|---|---|---|
| | § | IN THE 21ST DISTRICT COURT |
| *Ex parte* | § | |
| RODNEY REED | § | OF |
| *Applicant.* | § | |
| | § | BASTROP COUNTY, TEXAS |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

In this habeas case, the Court has been tasked with gathering and reviewing evidence concerning three claims set forth below and the State's laches defense. The Court has considered the record of this case and evidence proffered at a live evidentiary hearing, at which time the Court was able to observe witnesses and assess their credibility. Below is the Court's findings of fact and conclusions of law.

## FINDINGS OF FACT

Present Procedural History

1. On May 18, 1998, Applicant, Rodney Reed, was found guilty of the capital murder of Stacey Stites. On May 28, 1998, Applicant was sentenced to death.

2. The conviction challenge presently before the Court comes from Applicant's tenth state habeas application, filed on November 11, 2019.

3. In Applicant's tenth application, he raised four grounds for relief:

   a) Ground One: The State suppressed favorable, material evidence known to Richard Derleth, Wayne Fletcher, and Jim Clampit;

   b) Ground Two: Jimmy Fennell testified falsely when he denied murdering Stacey Stites, denied knowing Applicant, and said his relationship with Stacey Stites was good;

   c) Ground Three: Applicant's trial attorneys were ineffective for failing to adequately investigate Stites's time of death, the length of time sperm remains morphologically intact, and evidence of a prior consensual relationship between Applicant and Stites; and

d)      Ground Four: Applicant is actually innocent of capital murder.

4.     Because Applicant's tenth application was filed subsequent to his initial one, the Court of Criminal Appeals considered it under Section 5 of Article 11.071 of the Code of Criminal Procedure. *Ex parte Reed*, No. WR-50,961-10, 2019 WL 6114891, at *1 (Tex. Crim. App. Nov. 15, 2019).

5.     On November 15, 2019, the Court of Criminal Appeals remanded three grounds from the tenth application:

> After reviewing the application, we find that Applicant's *Brady* [Ground One], false testimony [Ground Two], and actual innocence [Ground Four] claims satisfy the requirements of Article 11.071 § 5. Accordingly, we remand those claims to the trial court for further development.

*Ex parte Reed*, 2019 WL 6114891, at *2.

6.     On April 15, 2020, the State filed its answer. It asserted that Applicant's *Brady* claim (Ground One) was barred by laches and otherwise meritless; that Applicant's false testimony claim (Ground Two) was barred by laches, non-retroactivity principles, procedurally defaulted, and meritless; and that Applicant's actual innocence claim (Ground Four) failed. Answer 1–60.

7.     On June 17, 2021, this Court entered an order designating Applicant's *Brady* (Ground One) false testimony (Ground Two), and actual innocence (Ground Three) claims for factual development, along with the State's laches defense. Mem. Ruling & Order 1–2. The Court determined that credibility is crucial in this case, so it set the matter for a live, in-person evidentiary hearing at which the Rules of Evidence apply. *Id*. at 2.

8.     Over the course of nearly two weeks, starting on July 19, 2021, the Court heard live testimony and admitted numerous exhibits, including the records from all from Applicant's trial and all prior state habeas proceedings.

**GROUND ONE—SUPPRESSION OF FAVORABLE, MATERIAL EVIDENCE**

<u>Applicant's Allegation</u>

9.     Applicant claims that three deputy sheriffs were aware of favorable, exculpatory information that was not disclosed by the State. Appl. 77–83. First, Richard Derleth, a then-Bastrop County Deputy Sheriff, was supposedly told by unnamed and unknown HEB employees that Stites and Fennell fought. *Id*. at 79–80. Second, Charles Wayne Fletcher, also a then-Bastrop County Deputy Sheriff, claims to have observed relationship difficulties between Stites and Fennell, heard Fennell say that he believed Stites was unfaithful and having

2

an affair with a black man, and observed odd behavior by Fennell at Stites's funeral and burial services. *Id*. at 80–81. Third, Jim Clampit, a then-Lee County Deputy Sheriff, asserts that he overheard Fennell say at Stites's funeral that she got what she deserved. *Id*. at 81–82. Applicant claims this information is material because Fennell would not have waived his Fifth Amendment privilege and testified for the State, or trial counsel would have impeached Fennell if he did testify and rebutted evidence that Fennell and Stites were happily engaged. *Id*. at 82–83.

Factual Conclusions

*Richard Derleth*

10. Applicant did not call Richard Derleth to testify at the evidentiary hearing despite the Court's admonition that "credibility of the testimony is crucial to this court's resolution of these fact issues." ODI at 2.

11. The Court makes a negative credibility determination concerning Derleth because he did not testify, because he waited decades to bring forth his "recollection," and because, as a peace officer, he did not ensure that investigators on Stites's case, or those handling it postconviction, knew of his "recollection."

12. The Court finds Derleth's "recollection" suspect because it is from decades ago and is nonspecific as to who told him about a supposed alert system at HEB and who he later told about that system.

13. The Court does not believe that Derleth received information from HEB employees concerning a system designed to alert Stites when Fennell arrived at HEB.

14. There is no evidence that Derleth was part of the investigation into Stites's murder or that he told anyone involved in the investigation.

*Charles Wayne Fletcher*

15. The Court makes a negative credibility determination concerning Fletcher because he waited decades to bring forth his "recollection," and because, as a peace officer, he did not ensure that investigators on Stites's case, or those handling it postconviction, knew of this "recollection."

16. The Court finds Fletcher's recollection suspect because it is from decades ago, because it conflicts with the recollection of Etta Wiley, who the Court finds credible, and because it conflicts with the recollection of Fennell, who the Court finds credible.

17.	The Court finds Fletcher's recollection suspect because, despite his claim that he had a gut feeling about Fennell's involvement in Stites's murder, 2.RR.278, he never told his then-wife, Wiley, about these suspicions or interactions with Fennell, and he behaved contrary to such suspicion by supporting Fennell, 2.RR.179–81, including going to Stites's burial.

18.	The Court finds Fletcher's recollection suspect because, when he testified, he recalled that Curtis Davis was at the barbecue where Fennell supposedly expressed his concern over Stites's infidelity but did not mention that in his affidavit and had just found out that Davis had died. 2.RR.287.

19.	The Court credits Fletcher's testimony that he was not involved in the investigation and that he told no one involved in the investigation about his "recollection." 2.RR.288, 292.

20.	The Court finds Fletcher's testimony suspect because, as he admitted, his wife has done a lot of research in the case, and it influenced his coming forward. 2.RR.295–96.

21.	The Court finds Fletcher's testimony suspect because he believes in the conspiracy theory that Ed Selmala was murdered despite the Texas Rangers finding Selmala's death to be a suicide. 2.RR.296–97.

22.	The Court does not believe that Fennell told Fletcher about his supposed suspicion that Stites was having an affair with a black man.

23.	The Court does not believe Fletcher's recollection that Fennell and Stites were fighting.

24.	The Court puts little stock into Fletcher's recollection that Fennell was behaving oddly during Stites's memorial and burial.

25.	Generally, where Fletcher and Fennell's testimony differ, the Court finds Fennell's testimony to be more credible and, thus, finds Fletcher's testimony to be uncredible.

*Jim Clampitt*

26.	The Court makes a negative credibility determination concerning Clampitt because he waited decades to bring forth his "recollection," and because, as a peace officer, he did not ensure that investigators on Stites's case, or those handling it postconviction, knew of this "recollection."

27.	The Court makes a negative credibility determination concerning Clampitt because he improperly testified for a friend while in uniform and because the

Texas Parks and Wildlife Department determined that he committed perjury during that testimony. 2.RR.25–30; SX 16

28. The Court finds Clampitt's recollection suspect because it is from decades ago and because of Clampitt's admission that his memory "is not as clear as it should be." 2.RR.37.

29. The Court finds Clampitt's testimony suspect because, as he admitted, he has paid attention to the publicity surrounding the case, including Fennell's convictions in Williamson County, and it influenced his coming forward. 2.RR.13–14, 20, 22–23.

30. The Court credits Clampitt's testimony that he was not involved in the investigation and that he told no one involved in the investigation about his "recollection." 2.RR.15, 19–22.

31. The Court finds Clampitt's testimony suspect because he didn't think that Fennell's supposed statement that Stites "got what she deserved," which "shocked" him, was important until 2019, when there was significant media coverage about the case. 2.RR.13–1, 20, 36.

32. The Court finds that the Lee County Sheriff's Office had no involvement in the investigation, as Clampitt admitted, 2.RR.24, and as credibly testified to by Rocky Wardlow, 6.RR.169–70, and Rodney Meyer, 6.RR.36.

33. Generally, where Fletcher and Fennell's testimony differ, the Court finds Fennell's testimony to be more credible and, thus, finds Fletcher's testimony to be uncredible.

*Laches*

34. The Court finds that one of the lead investigators, John Barton, in the murder of Stacey Stites has passed away. SX.33.

35. The Court finds that another of the investigators, Ronnie Duncan, in the murder of Stacey Stites, and who was the first investigator to talk to Fennell after Stites was reported missing, has dementia. 6.RR.16.

36. The Court finds that the police officer who found Fennell's red pickup truck and half the murder weapon in the Bastrop High School, Paul Alexander, has passed away. SX.32.

37. The Court finds that the medical examiner who conducted the only autopsy of Stites, Roberto Bayardo, has dementia. SX.31.

38.  The Court finds that Fennell's friend, Curtis Davis, Jr., and primary witness at the evidentiary hearing in the eighth state habeas proceeding, has passed away. SX.35.

39.  The Court finds that a work friend of Stites, Suzan Byars, has passed away. SX.34.

40.  The Court finds that a friend of Stites, Michael Kirby, has passed away. SX.36.

41.  The Court finds that the SANE nurse, Karen Woodward, who performed a sexual assault examination on Vivian Harbottle, has passed away. SX.40.

42.  The Court finds credible the expert testimony of Dr. Deborah Davis regarding the deterioration of memory over time, and its ability to be influenced and distorted by pre-event bias and post-event information exposure. 7.RR.22–228.

43.  The Court of Criminal Appeals has found that Applicant has abused the writ on numerous occasions. *See, e.g.*, *Reed v. State*, 541 S.W.3d 759, 778 (Tex. Crim. App. 2017).

44.  The Court of Criminal Appeals has described Applicant's postconviction litigation as a "piecemeal approach." *Reed v. State*, 541 S.W.3d 759, 778 (Tex. Crim. App. 2017).

45.  The Court of Criminal Appeals affirmed a finding that Applicant's request for postconviction DNA testing was done to unreasonably delay the execution of his sentence or the administration of justice. *Reed v. State*, 541 S.W.3d 759, 777–80 (Tex. Crim. App. 2017).

46.  The United States Court of Appeals for the Fifth Circuit found that Applicant's postjudgment, district court submissions were untimely. *Reed v. Stephens*, 739 F.3d 753, 768 n.5 (5th Cir. 2014).

47.  Most of Applicant's evidence in his seventh, eighth, ninth, and tenth applications has come about at or around the time of his execution settings in March 2015 and November 2019.

48.  Applicant's seventh state habeas application was filed in February 2015, a little more than two weeks before his March 2015 execution setting.

49.  Applicant's eighth state habeas application was filed in June 2016, a little more than a year after his March 2015 execution setting.

50.  Applicant's ninth state habeas application was filed in June 2018, a little more than three years after his March 2015 execution setting.

51.     Applicant's tenth state habeas application was filed in November 2019, a little more than one week before his November 2019 execution setting.

## GROUND TWO—UNKNOWING USE OF FALSE TESTIMONY

<u>Applicant's Allegation</u>

52.     Applicant alleges that the State unknowingly presented false testimony at trial when Fennell testified that he did not kill Stites. Appl. 83–84. He also claims that Fennell lied at trial when he denied knowing Applicant. *Id*. at 84. He finally claims that Fennell offered false testimony when he said that his relationship with Stites was "good." *Id*. at 84–85. He claims that this false testimony is material because it would have assisted in presenting his consent defense. *Id*. at 85–86.

<u>Factual Conclusions</u>

*Jimmy Fennell's credibility*

53.     In general, the Court finds Fennell's testimony credible and gives it full and proper weight.

54.     The Court finds credible Fennell's testimony that the State offered nothing in return for his testimony and that he was not testifying with any sort of belief, understanding, or expectation of a return benefit. 5.RR.44.

55.     The Court finds credible Fennell's testimony that he and Stites were happy together, were excited about their upcoming wedding, and were planning for their future together. 5.RR.176–78.

56.     The Court finds credible Fennell's account of April 22 and 23. 5.RR.182–96. Where his account materially differs from his trial testimony, the Court credits his trial testimony because, as Fennell credibly testified, his memory would have been better twenty-five years ago. 5.RR.183.

57.     The Court finds credible Fennell's representation that he closed out his bank account because, when police found his vehicle after Stites's disappearance, he noticed missing checks. 5.RR.194–95.

58.     The Court credits Fennell's testimony about the emotional loss he suffered when Stites was murdered and the effect it had on Fennell's demeanor around the time of her death. 5.RR.196–97. The Court also credits Fennell's testimony—corroborated by Thelma Fennell, 9.RR.140–47, and Mark Brown, 9.RR.210—that he was taking Xanax around the time of and during the viewing, funeral, and burial, which made him feel numb and created a flat affect. 5.RR.244–45.

59. The Court credits Fennell's testimony that law enforcement considered him the prime suspect and treated him as such immediately after Stites murder. 5.RR.198–99.

60. The Court also credits Fennell's testimony that he failed the polygraph tests because he felt responsible, albeit indirectly, for Stites murder in that he did not drive her to work that morning and he failed to protect her even though he was in law enforcement. 5.RR.199–201.

61. The Court notes that in 2008, Fennell pled guilty to kidnapping and improper sexual contact with a person in custody and served day-for-day of his sentence. The Court finds credible his testimony that while incarcerated, he devoted his life and time to becoming the Christian faith and earned a bachelor's degree in ministry and master's degree in theology. 5.RR.205–06.

62. The Court notes that to the degree Applicant would point to this 2008 conviction as proof that Fennell is Stites's real murderer, Applicant's sexual assaults of the Connie York, Lucy Eipper, minor A.W., Caroline Rivas, and Vivian Harbottle, as well as his attempted assault of Linda Schlueter—as all six offenses were attested to and corroborated during the punishment phase of Applicant's trial—are closer in temporal proximity, and in the cases of Harbottle and Schlueter, more closely resemble the facts surrounding Stite's murder. SX.21, Vols.57–63. Thus, they would carry greater weight in determining potential guilt than Fennell's conviction that occurred over a decade after Stites's murder.

63. The Court finds credible Fennell's testimony that he elected not to testify under the Fifth Amendment at the evidentiary hearing in 2017 on the advice of his attorney, because he was still serving his prison sentence, and because the stress he was under affected his ability to remember at that time. 5.RR.212–13.

64. The Court finds credible Fennell's testimony that, since leaving prison, he continues to serve in the Christian faith, serving as an ordained minister, as a minister at his church, and as a minister through a recovery program, Celebrate Recovery. 5.RR.214–16.

65. The Court credits Fennell's testimony, and SX 20, that he did not work at SPJST after 1994. The Court further believes Fennell's testimony that he did not threaten Stites in front of Ruby Volek. 5.RR.166, 169–70.

66. The Court credits Fennell's testimony that he and Stites did not socialize much, that Fletcher did not visit he and Stites at their apartments, and that he never admitted to Fletcher that he knew about Stites's supposed affair with a black person. 5.RR.175.

67.     The Court credits Fennell's testimony, over the hearsay statements from Cynthia Schmidt, that he spoke to Gary Joe Bryant in a threatening manner towards Stites nor intimated knowledge of a supposed affair. 5.RR.178.

68.     The Court credits Fennell's testimony that he never had the type of public arguments as described by several of Applicant's witnesses, such as Richard Scroggins, Paul Espinoza, Suzan Hugen, and Brenda Dickenson. 5.RR.133–34

69.     The Court further credits Fennell's testimony over Schmidt's where he denied saying at the funeral that at least Stites got to wear here wedding dress. 5.RR.198.

70.     The Court credits Fennell's testimony, over Clampitt's uncredible account, that he never said Stites got what she deserved. 5.RR.197.

71.     The Court credits Fennell's testimony, over the uncredible testimony of Arthur Snow, that Fennell was never in the Aryan Brotherhood, that he never confessed to Snow that he killed Stites, and that he never confessed to Snow knowledge of Stites having an affair with Applicant. 5.RR.207–10. The Court further credits Fennell's testimony that his status as a former police officer was widely known to both inmates and prison guards. 5.RR.207–08. The Court also credits Fennell's testimony that he had friends in prison that were a different race and/or ethnic background than himself, a fact that cuts directly against his purported membership in the Aryan Brotherhood. 5.RR.208.

72.     The Court credits Fennell's testimony, over the uncredible testimony of Michael Bordelon, that Fennell knew Bordelon, but that he never confessed to Bordelon that he killed Stites nor that he had knowledge of Stites having an affair with Applicant. 5.RR.210–12.

73.     The Court credits Fennell's testimony that his relationship with Stites was good despite having occasional arguments.

74.     The Court credits Fennell's testimony that he did not know, or know of, Applicant prior to his arrest for the murder of Stites.

75.     The Court credits Fennell's testimony that he did not kill Stites.

*Credibility of State's witnesses*

76.     The Court credits Crystal Dohrmann's testimony that supports the testimony from trial that Fennell and Stites had a good relationship, and her testimony that Fennell exhibited extreme grief when Stites was murdered. 9.RR.119–22. Further, Dohrmann's testimony is consistent with what she told a reporter for the Austin-American Statesman on April 24, 1996. SX.55.

77. The Court credits Thelma Fennell's testimony that supports the testimony from trial that Fennell and Stites had a good relationship, that Fennell exhibited extreme grief when Stites was murdered, that he was taking Xanax at the time of and during Stites's funeral, and that she and Fennell's father were with him during the viewing and the funeral. 9.RR.140–47.

78. The Court credits Mark Brown's testimony that supports the testimony from trial that Fennell and Stites had a good relationship, and his testimony regarding Fennell's demeanor and state of mind on the day of the funeral and on the way to Corpus Christi. 9.RR.154–56, 159–62.

79. The Court credits Debra Oliver's testimony that supports the testimony from trial that Fennell and Stites had a good relationship, her testimony that Fennell exhibited extreme grief when Stites was murdered, and her testimony regarding Fennell's behavior at the viewing and funeral. 9.RR.194–204, 206–214.

80. The Court notes that on Stites's new employee information sheet for HEB, in the column that enquired about marital status, she wrote "going to get married." SX.102.

81. The Court credits Ron Haas's testimony that Stites took a job in the produce section, which required physical labor and demanding hours, because that position came with an increase in pay and she wanted to save that money to help pay for her wedding to Fennell. 10.RR.24.

82. The Court credits Augustin Moreno's testimony that Stites was excited about her upcoming wedding with Fennell. 10.RR.41–42.

83. The Court credits Sandy Sepulveda's testimony that Stites was excited about her upcoming wedding with Fennell. 10.RR.55–56.

84. The Court credits Diantha Lee's testimony that Stites was excited about her upcoming wedding with Fennell. 10.RR.73, 79.

85. As stated in Ground One, the Court finds credible the expert testimony of Dr. Deborah Davis regarding the deterioration of memory over time, and its ability to be influenced and distorted by pre-event bias and post-event information exposure. 7.RR.22–228.

*Credibility of Applicant's witnesses*

86. For the reasons stated in Ground One, the Court makes a negative credibility determination concerning Derleth and any purported testimony he may have offered.

87. For the reasons stated in Ground One, the Court finds Fletcher's testimony uncredible.

88. For the reasons stated in Ground One, the Court finds Clampitt's testimony uncredible.

89. Rubie Volek testified about an encounter with Stites and Fennell where they purchased insurance. 2.RR.308–09. The Court finds this occurred nineteen years prior to when she first recounted it and twenty-five years prior to her testimony; thus, it is inherently uncredible. The Court also finds that the facts surrounding her account, 2.RR.306–07, 315–16, were discredited by Fennell's testimony regarding his employment, 5.RR.167–70, and SX 20, both of which the Court finds credible. The Court further finds that Volek's assumption that Fennell made a serious threat on Stites's life, 2.RR.309, is speculative at best, and thus, inherently unreliable. The Court also finds that Volek did not come forward with any of this information until she heard about Applicant's scheduled execution in 2015. 2.RR.310.

90. For the reasons stated below in Ground Four, the Court finds Arthur Snow's testimony uncredible.

91. For the reasons stated below in Ground Four, the Court finds Michael Bordelon's testimony uncredible.

92. Victor Juarez testified that one day while driving on the road, he saw Stites and Applicant together in the parking lot of either a Dairy Queen or a Walmart. 3.RR.139. The Court finds that he worked at the HEB with Stites. 3.RR.138. The Court further finds that, following Stites's murder, the Bastrop HEB management encouraged employees to speak with police if they knew anything, 3.RR.149; the Bastrop HEB allowed officers to conduct on-site interviews, 10.RR.26; the Bastrop HEB provided on-site grief counseling, 10.RR.25; the Bastrop HEB provided extra security, 10.RR.25; and the Bastrop HEB offered a $50,000.00 reward, 5.RR.21; 10.RR.27–28. Despite this, the Court finds that Juarez did not tell anyone about this at the time of Stites's murder. The Court further finds that Juarez did not come forward until around the time he saw a special about this case on the Dr. Phil Show. 3.RR.152. The Court thus finds Juarez's testimony inherently unreliable. The Court further finds Juarez's testimony unreliable because the identification supposedly happened while he was in a moving vehicle, and he cannot remember any other details about the identification except that occurred in front of either a Dairy Queen or a Walmart.

93. Rebecca Randall testified that she worked at HEB with Stites, 3.RR.157–58; that she saw Applicant and Stites "chitchatting" in the HEB where Stites worked "a couple of times," 3.RR.159; and that she saw Stites playing

basketball with several people, one of whom, from a distance, looking like Applicant, 3.RR.160. The Court finds that Randall, like Juarez, did not tell anyone about this at the time of Stites's murder, despite working at the Bastrop HEB. The Court further finds that Randall did not come forward until over twenty years later. Thus, her testimony is unreliable. The Court also finds that her account of Stites and Applicant speaking openly in the HEB where Stites worked is directly contradicted by testimony from Applicant's other witnesses that describe Stites as afraid of Fennell finding out about the supposed affair. 4.RR.279; 5.RR.10.

94. Paul Espinoza testified he worked at the Bastrop HEB with Stites. 3.RR.176–77. He testified that he witnessed an encounter between Stites and Fennell at the HEB. 3.RR.180. Espinoza testified that Fennell approached Stites quickly, that he appeared to scold Stites, and that Espinoza saw Stites later crying in the breakroom. 3.RR.180–88. The Court again finds that Espinoza did not tell anyone, at the HEB or otherwise, at the time of Stites's murder about this encounter. The Court also finds that Espinoza did not come forward until almost twenty-five years later, and only after seeing the "newspapers and the media." 3.RR.184. The Court also credits Fennell's testimony that this did not occur. Thus, the Court finds Espinoza's testimony uncredible.

95. Suzan Hugen, nee Nichols, also worked at the Bastrop HEB with Stites. 4.RR.12–13. Hugen testified that Stites called off her bridal shower, 4.RR.15; that she witnessed an exchange between Fennell and Stites at the HEB that seemed hostile, 4.RR.15; and that Stites introduced her to Applicant while speaking with him at the HEB, 4.RR.17–18. The Court again finds that Hugen did not tell anyone, at the HEB or otherwise, at the time of Stites's murder about these events. The Court also finds that Hugen did not come forward until almost twenty-five years later. Thus, the Court finds her testimony uncredible. The Court also finds that her account of Stites and Applicant speaking openly in "Action Alley," 4.RR.34, of the HEB where Stites worked, is directly contradicted by testimony from Applicant's other witnesses that describe Stites as afraid of Fennell finding out about the supposed affair. 4.RR.279; 5.RR.10. The Court also finds that her account of Stites cancelling the bridal shower is directly contradicted by the testimony of Debora Oliver, Stites's sister.

96. Richard Scroggins testified that he saw Fennell and Stites have an altercation in front of a Whataburger where Fennell used profane and threatening language towards Stites. 4.RR.168–70. Scroggins testified that he did not know who either person was at the time. 4.RR.177. He stated the first time he knew it was Fennell was when he saw his picture in a 2005 article in the Austin Chronicle. 4.RR.165. The Court finds Scroggins's testimony uncredible. The Court first notes that Brian Seales, an investigator for the Office of the Attorney General, credibly testified that there was only one article involving Fennell in 2005, and it did not contain a picture. 7.RR.12–13. He further

testified that beginning in 2001, the first instance of an article in the Austin Chronicle containing a picture of Fennell was in 2008 discussing his arrest. *Id.* The Court further notes that Scroggins testified it was this picture that jogged his memory of these events, which inherently impairs the credibility of the testimony. The Court further notes that Applicant's counsel, not Scroggins, wrote the affidavit that Applicant presented to the CCA and to this Court. 4.RR.175. The Court also credits Fennell's testimony that this did not occur.

97.   Brent Sappington testified that he knew of Fennell and Stites because his father William Sappington lived in the apartment under theirs at the Rolling Oaks Apartments. 4.RR.190–91. He testified that on one occasion visiting his father, they heard a "commotion" upstairs that sounded like fighting, presumably between Fennell and Stites. 4.RR.194. He further testified that after Stites's death, his father told a Giddings police officer, Garnett Danewood, and the District Attorney for Lee County, Ted Weems, about this. 4.RR.197. Sappington stated that they told his father "that they already had their suspect, that they didn't need nobody's help, that they -- to mind your own business, to hush his mouth." 4.RR.198. The Court notes that Ted Weems testified that William Sappington did approach him and told him about the argument William Sappington heard. 10.RR.13. Weems said that he explained to Wiliam Sappington that he was not a part of the investigation, but that he should go to the appropriate authorities and report what he knew. *Id.* However, Weems denied ever telling William Sappington to mind his business or hush his mouth. 10.RR.14. The Court finds Weems to be credible. Thus, the Court finds credible that parts of Brent Sappington's testimony that can be corroborated by Ted Weems. However, the Court find uncredible Sappington's recitation of the discussion with Weems where it differs. The Court also finds uncredible Sappington's own judgment about the degree or level to which Fennell and Stites argued. The Court also notes that Sappington's testimony differs from his declaration in that Sappington was able to recount important details on the stand that were not in his declaration. This also makes uncorroborated parts of his testimony highly suspect, and thus, uncredible.

98.   Vicki Sappington's testimony is a recitation of much of Brent Sappington's testimony. 4.RR.210–21. However, her testimony is based entirely on hearsay. As such, Brent Sappington's testimony is the better evidence, to the degree that it is credible. As such, the Court does not consider Vicki Sappington's testimony in its decision here.

99.   Cynthia Schmidt worked at Giddings Police Department (GPD) when Fennell began as an officer there. 4.RR.224–26. She testified that she did not like Fennell and that he gave her "the willies." 4.RR.226–27. She also testified about a comment that Fennell supposedly made at Stites's viewing while standing over her casket. 4.RR.234. She further testified that another officer at GPD believed that Fennell murdered Stites. 4.RR.238. She stated that she

had a meeting with Texas Rangers investigating Stites's murder and that, despite telling them she did not think Fennell was the murderer, she tried to convey otherwise through non-verbal cues. 4.RR.233–34. The Court finds Schmidt's testimony uncredible. The Court notes that her own impression about Fennell's personality, even if it is to be credited, has no real bearing on the issues before the Court. The Court finds that Schmidt's testimony regarding the funeral is bellied by the testimony of Thelma Fennell, Debora Oliver, and Jimmy Fennell, all of whom the Court finds credible. The Court finds that Schmidt's testimony regarding Gary Joe Bryant is rank hearsay and, thus, inherently unreliable. It also conflicts with the credible testimony of Nathan Lapham, an officer with GPD, that Bryant was not conducting an independent investigation into Stites's murder and it would have been improrper for Bryant to do so. 6.RR.24–25. Like many of Applicant's witnesses, Schmidt waited an unreasonable amount of time before coming forward with this information, especially considering she worked for law enforcement. The Court finds Schmidt's account of her conversation with the Texas Rangers to be suspect and uncredible.

100.   Alicia Slater worked with Stites at the Bastrop HEB. 4.RR.273–74. She testified about a conversation she had with Stites in the breakroom of the HEB shortly before Stites was murdered. 2.RR.277. During this conversation, Stites apparently told Slater that she was not excited to get married because she was "sleeping with a black man named Rodney," that she was scared Fennell would find out about the affair, and that Stites knew she need to be careful so that Fennell did not find out. 4.RR.278–79. The Court finds Slater uncredible. The Court finds her testimony is inherently uncredible in that Stites is worried that Fennell would discover the supposed affair and knew that she had to be careful, and yet, Stites would share this information with Slater, whom according to Slater, Stites did not know well, 4.RR.279, 303. Slater gave a statement to the Bastrop Police Department in 1995 and did not share this information with them at that time. 4.RR.275, 280. She also did not share this information with friends or family, even many years later. 4.RR.281. The Court also finds that Slater only came forward after reading and watching much of the media surrounding this case. 2.RR.283, 292, 296–97. The Court notes that Slater was also internally inconsistent in her testimony in that in 1995, she was so adamant to not be involved in the case that she apparently lied to police officers, but yet in 2019, she was comfortable appearing on the Dr. Phil show. 4.RR.292. The Court also notes that she received a monetary benefit from the Dr. Phil show for coming forward over two decades later. 4.RR.311–12. The Court finds that Slater had become so intimately familiar with this case through the media that she believed details about the case to be true that are otherwise wholly unsupported by the record. *See, e.g.*, 4.RR.299 (asserting that black skin was found under Stites's fingernails). Slater further has no memory of several events at the HEB that occurred shortly after Stites's murder—such as management encouraging cooperation with law enforcement, the $50,000.00

reward, the pink ribbons memoriam, the increased presence of law enforcement—which were testified to by Ron Haas and corroborated by several other HEB employees, including Applicant's own witnesses. 4.RR.304.

101. Calvin Horton is Stites's cousin. 4.RR.319. He testified that sometime in October 1995, he saw Stites and a black man, who he now believes to be Applicant, leaving Dairy Queen. 4.RR.321–22. He claimed to call out to Stites, but she did not acknowledge him. 4.RR.321. The Court finds that Horton did not recount these events until nineteen years after Stites's murder, 4.RR.327, and as such, it is inherently uncredible. The Court further finds that he did not tell anyone at the time simply because, "I mean, what would I tell them." 4.RR.325. The Court also notes that, like many of Applicant's witnesses, Horton did not come forward until after watching media regarding Applicant's case. 4.RR.324, 328. The Court finds that Horton's testimony regarding statements made to him by his father and Carol Stites, the victim's mother, are rank hearsay and, thus, inherently unreliable. The Court also finds that Horton's testimony regarding Carol Stites is belied by her testimony at Applicant's trial and during Applicant's prior evidentiary hearing on his eighth state habeas application. The Court credits Carol Stites's testimony in both instances.

102. Brenda Dickinson also worked at the Bastrop HEB with Stites. 5.RR.9. She testified that Stites was having second thoughts about the wedding, that Stites was scared of how jealous and controlling Fennell had become, that Fennell would come to HEB and yell at Stites, and that workers in the store would alert Stites if they saw Fennell so that she could hide. 5.RR.10–12. Dickenson further testified that she witnessed Stites talking to a black man in the HEB, whom Stites introduced as "Rodney." 5.RR.13. The Court finds Dickinson's testimony uncredible. Despite almost fainting at work when she heard about Stites's murder, 5.RR.13, she did not tell anyone, including law enforcement, about these events at that time. She claimed that she was simply never interviewed by law enforcement and that she didn't think this information was important at the time, stating: "I was just her friend. I had nothing to do with the case." 5.RR.14, 17. However, she also recalled that Ron Haas, her manager, told employees to cooperate with police. 5.RR.28. She also testified that the $50,000.00 reward offered by HEB was common knowledge among employees. 5.RR.21. Thus, the Court finds her testimony is inherently inconsistent. The Court also finds that her testimony was inconsistent from the affidavit that she executed. 5.RR.28. The Court notes that counsel for Applicant wrote her affidavit for her. 5.RR.17. The Court finds that her testimony that everyone at HEB "kept pretty quiet" about the case, such that she did not know that Applicant was arrested for the murder, is inconsistent from Applicant's other witnesses who testified that the events surrounding the murder and the case were widely known at HEB. 5.RR.32.

103. To the degree necessary to resolve Ground Two, the Court also finds credits the testimony of Drs. Dana and Farley over the testimony of Drs. Baker and Davis for the reasons discussed in Ground Four.

*Procedural Default*

104. The Court finds that facts relating to this claim were known to the Applicant during his trial and before the filing of his other applications for habeas relief.

105. The Court finds that during trial, Applicant pointed the finger at Fennell as an alternative suspect.

*Laches*

106. The Court enters the same factual findings regarding laches as discussed in Ground One.

# GROUND FOUR—ACTUAL INNOCENCE

Applicant's Allegation

107. Applicant alleges that he is actually innocent. He utilizes some of the evidence in his prior state habeas applications, combined with the evidence presented for this first time in this application, to assert actual innocence. Stated broadly, Applicant claims that the State's forensic case is flawed and that Fennell, not Applicant, killed Stites. Appl. 90–93.

Factual Conclusions

108. The Court of Criminal Appeals has repeatedly considered Applicant's allegations of innocence in the context of Article 11.071, Section 5, and found them wanting, including drawing credibility determinations that this Court accepts.

109. In that context, the Court of Criminal Appeals noted more than a decade ago:

> [W]hat separates this case from the majority of gateway-innocence cases is the complete lack of a cohesive theory of innocence. [Applicant's] claim of innocence is seriously disjointed and fragmented—he presents numerous alternative but critically incomplete theories. By focusing on a romantic relationship between himself and St[ites] as well as pointing to several alternative suspects—Fennell, Lawhon, and some unknown dark-skinned man—the new evidence before us fails to tell a complete, rational exculpatory narrative.

*Ex parte Reed*, 271 S.W.3d 698, 746 (Tex. Crim. App. 2008). The Court finds that Applicant has continued this practice.

*Inconsistent theories*

110. Applicant has suggested multiple alternative suspects as Stites's murderer, Fennell, Lawhon, and an unknown, dark-skinned man. *Ex parte Reed*, 271 S.W.3d 698, 746 (Tex. Crim. App. 2008). The inconsistency between these alternative suspects diminishes the credibility of Applicant's actual innocence theory.

111. Applicant has suggested multiple alternative co-conspirators in assisting Fennell with the murder of Stites, including Curtis Davis, David Hall, and other, unknown individuals. The inconsistent and scattershot approach diminishes the credibility of Applicant's actual innocence theory.

112. Applicant has been inconsistent in how he has treated some of the alternative co-conspirators. While previously suggesting that Davis and Hall helped Fennell commit the murder of Stites, he called them as his witnesses at the evidentiary hearing in the eighth habeas proceeding and did not accuse them of conspiracy. This inconsistent, and opportunistic, treatment of supposed co-conspirators diminishes the credibility of Applicant's actual innocence theory.

113. Applicant's current theory concerning Stites's time of death is inconsistent with the theory he presented in his third habeas application. There, Applicant claimed that Stites was alive between 4:45am and 5:30am on April 23, 1996, based on the testimony of Martha Barnett. *Ex parte Reed*, 271 S.W.3d 698, 717, 719–20 (Tex. Crim. App. 2008). Applicant now, based on his various experts, asserts that Stites was deceased "hours before 3:00am" (Dr. Baker); 6:00 pm to 10:00pm on April 22, 1996 (Dr. Spitz); before midnight on April 22, 1996 (Dr. Baden); and 9:15 pm on April 22, 1996, to 1:15 am on April 23, 1996 (Dr. Riddick). The inconsistency between Applicant's time-of-death theories, not to mention the inconsistency between his own experts, and shifting theories, diminishes the credibility of Applicant's actual innocence theory.

114. Applicant's current theory concerning Stites's time of death is inconsistent with his prior theory that time of death could not be determined in this case because of a lack of details.

*Applicant's credibility*

115. Applicant executed an affidavit in 2014, attached to his seventh state habeas application, claiming that he had a clandestine affair with Stites and had sex with her late April 21, 1996, or early April 22, 1996, i.e., a day before her murder.

116. Applicant's failure to provide live testimony, instead relying on an affidavit, diminishes his credibility.

117. Applicant's testimony via affidavit lacks credibility given that it was produced for the first time 18 years after the events it claims occurred.

118. Applicant's claim of a clandestine affair is inconsistent with his sworn statement to police that he did not know Stites.

119. Applicant's claim of having sex with Stites in the late hours of April 21, 1996, the early hours of April 22, 1996, is inconsistent with what he told transport officers in 1998, including Rene Maldonado, that he had last seen Stites a few days before her murder.

120. Applicant's specificity in 2014 about when and where he had sex with Stites is inconsistent with what he told Austin American Statesman reporters in 2001, that he had sex with Stites "the day or day and a half before" her murder.

121. Applicant's affidavit references a supposed encounter with Fennell, claiming that his cousin Chris Aldridge witnessed, that was found unbelievable when relayed by Aldridge in the first state habeas application. Applicant's recitation of an event found unbelievable diminishes his credibility.

122. Applicant has previously said he did not know a woman, Connie York, who claimed that Applicant sexually assaulted her, only to change his story that there was consensual sex when confronted with a claim of biological evidence.

123. Applicant's testimony via affidavit is not reliable.

124. Applicant is not credible.

*Credibility of other witnesses*

125. The Court incorporates all credibility determinations made of witnesses in Grounds One and Two here.

*Supposed recantations*

126. Applicant claims that Dr. Roberto Bayardo, Karen Blakely, and Meghan Clement have recanted their testimony.

### *Roberto Bayardo*

127. Applicant asserts that Dr. Bayardo recanted several portions of his 1998 trial testimony via a 2012 declaration.

128. Dr. Bayardo testified at trial that his time of death estimate was exactly that, an estimate. His 2012 declaration does not withdraw that estimate.

129. Dr. Bayardo testified at trial that finding intact sperm from the vaginal swab taken during Stites's autopsy meant the sperm had been deposited "quite recently." His 2012 declaration does not withdraw that testimony.

130. Dr. Bayardo testified at trial that he believed he saw sperm via microscopic observation from a rectal swab taken during Stites's autopsy that did not test positive for acid phosphatase. His 2012 declaration does not withdraw that testimony.

131. Dr. Bayardo testified at trial that he believed there were injuries to Stites's anus that occurred near her time of death. His 2012 declaration does not withdraw that testimony.

132. The Court finds that, after reviewing Dr. Bayardo's 2012 declaration, he has not recanted his testimony.

_Karen Blakely_

133. Applicant asserts that Blakely's 1998 trial testimony concerning the timing of intact sperm has been recanted via her former employer, the Texas Department of Public Safety.

134. The 2018 letter from Assistant Division Director Brady Mills says that the Texas Department of Public Safety does "not believe that Ms. Blakely's testimony constitutes professional negligence or professional misconduct" and no "duty to correct."

135. The Court finds that, after reviewing the 2018 letter from Assistant Division Director Brady Mills, the Texas Department of Public Safety has not recanted Blakely's trial testimony about the length of time that intact sperm may be found in the vaginal cavity.

_Meghan Clement_

136. Applicant asserts that Clement's 1998 trial testimony concerning the length of time in which she had observed intact sperm from sexual assault kits was recanted by her former employer, LabCorp (now Bode Cellmark).

137. The 2018 letter from Technical Leader Stephane Sivak says that certain statements made by Clement at Applicant's trial are "unsatisfactory" without any specific explanation.

138. The Court finds that, after reviewing the unexplained 2018 letter from Technical Leader Stephane Sivak, LabCorp, (now Bode Cellmark), has not recanted Clement's trial testimony about the length of time in which she had observed intact sperm from sexual assault kits.

139. The Court finds that none of the testimony by Dr. Bayardo, Blakely, and Clement has been recanted by the witness or the witness's then-employer.

*Supposed confessions*

140. Applicant claims that Fennell confessed to two fellow inmates, Arthur Snow and Michael Bordelon.

   <u>*Arthur Snow*</u>

141. In his affidavit, Snow claims that, while he and Fennell were prisoners at the Stevenson Unit, Fennell said that his fiancé "had been sleeping around with a black man behind his back" and that he "had to kill [his] n*****-loving fiancé." This conflicts with Fennell's credible testimony that he did not know Snow or confess to the murder of Stites.

142. Also in his affidavit, Snow claims that Fennell sought out protection from the Aryan Brotherhood, of which Snow claims to have been a member and that this was known by prison guards. This conflicts with the credible testimony of Jay Hart, who stated that there is no evidence that Snow is a member of the Aryan Brotherhood.

143. Also in his affidavit, Snow claims that after the Aryan Brotherhood could no longer protect Fennell, Fennell claimed the Aryan Brotherhood was extorting him, which led to Snow's transfer to the Connally Unit. This conflicts with the credible testimony of Kelly Enloe, who stated that Snow left the Stevenson Unit on a bench warrant.

144. Also in his affidavit, Snow claims that he first learned of Applicant's conviction when he read a newspaper while in the Hays County Jail "a few years ago."

145. Also in his affidavit, Snow claims that he came forward after seeing another newspaper article about Applicant's case while in the Hays County Jail.

146. Snow's affidavit was executed about 10 years after he supposedly interacted with Fennell at the Stevenson Unit.

147. At the evidentiary hearing, Snow testified that Fennell told him "that you wouldn't believe how easy a man's belt would break when you strangle a n*****-loving whore." This conflicts with his affidavit where he didn't mention a belt and didn't call his fiancé a "whore."

148. At the evidentiary hearing, Snow testified that he wasn't floored by Fennell's supposed confession because you hear a lot of war stories in prison in which inmates inflate their crimes.

149. At the evidentiary hearing, Snow testified that he was in the Aryan Brotherhood for 20 years starting in 1987, i.e., until 2007. This contradicts his affidavit stating that he was in the Aryan Brotherhood in 2010 when he claims to have met and interacted with Fennell.

150. At the evidentiary hearing, Snow testified that TDCJ knew he was a member of the Aryan Brotherhood. This conflicts with the credible testimony of Jay Hart, who stated that there is no evidence that Snow is a member of the Aryan Brotherhood.

151. At the evidentiary hearing, Snow testified that Fennell did not approach him personally. This contradicts his affidavit stating that Fennell approached him personally.

152. At the evidentiary hearing, Snow testified that he only spoke with Fennell once. This contradicts his affidavit stating that they spoke occasionally.

153. At the evidentiary hearing, Snow attempted to invoke his Fifth Amendment right to silence.

154. At the evidentiary hearing, Snow testified that he wasn't sure if Fennell claimed extortion and that this led to his transfer to the Connally Unit. This contradicts his affidavit stating that Fennell's assertion of extortion led to Snow's transfer to the Connally Unit.

155. At the evidentiary hearing, Snow testified that Applicant's case was "all over the news" and was "all over the" jail.

156. At the evidentiary hearing, Snow admitted to convictions for (1) family violence; (2) violation of a protection order; (3) theft by check; (4) DWI; (5) possession of methamphetamine; (6) credit card abuse; (7) marijuana possession; (8) forgery of a commercial instrument; (9) forgery of a commercial instrument; (10) forgery by passing; (11) forgery; (12) forgery; (13) forgery (two counts); (14) forgery; (15) credit card abuse (16) bail jumping; (17) forgery; (18) forgery; and (19) theft by check.

157. At the evidentiary hearing, Snow testified he had not been offered anything for his testimony, but later said that a French documentary film crew offered him money.

158. The records from the Hays County Jail do not show a visitation to Snow on the day he supposedly signed his affidavit.

159. From personal observation, the Court notes that Snow was belligerent when questioned by the State's attorney.

160. Snow is not a credible or reliable witness, and his assertion that Fennell confessed to the murder of Stites is not credible or reliable.

### *Michael Bordelon*

161. In his affidavit, Bordelon claims that, while he and Fennell were prisoners at the Sanders Estes Unit, Fennell said his fiancé "was screwing a n***** and that he couldn't take it anymore so he just got rid of her" and that he "took care of the problem."

162. Also in his affidavit, Bordelon said that he came forward because of what he saw in the news about Applicant's case.

163. Also in his affidavit, Bordelon said that Fennell claimed to be associated with the Aryan Brotherhood and used racial epithets for black people.

164. Bordelon's affidavit was executed about 8 years after he supposedly interacted with Fennell at the Sanders Estes Unit.

165. At the evidentiary hearing, Bordelon could not recall what Fennell supposedly said to him about Stites having an affair with a black man until his memory was refreshed with his affidavit, something that was executed only about 1.5 years prior to his testimony.

166. At the evidentiary hearing, Bordelon testified that Fennell said a "damn n***** is going to do the time." This conflicts with his affidavit where Bordelon made no such assertion.

167. At the evidentiary hearing, Bordelon said that Fennell positioned his hands in a choking motion when he was talking with Bordelon. This conflicts with his affidavit where Bordelon made no such assertion.

168. At the evidentiary hearing, Bordelon said that he came forward after watching a special about Applicant's case on the Dr. Phil show. This conflicts with his affidavit where Bordelon said he saw Applicant's case on the "news."

169. At the evidentiary hearing, Bordelon admitted that he testified differently than his affidavit, where he said he didn't want to pry into how Fennell's fiancé died.

170. Bordelon's belief that his memory got better 1.5 years after his affidavit because he concentrated on the memory and followed his heart conflicts with

Dr. Davis's credible expert testimony that memory does not get better over time.

171. Bordelon is necessarily a felon to have been incarcerated at the Sanders Estes Unit.

172. Bordelon is not a credible or reliable witness, and his assertion that Fennell confessed to the murder of Stites is not credible or reliable.

*Forensic Science*

173. At Applicant's trial, Dr. Bayardo testified that he estimated Stites's time of death to be 3:00am on April 23, 1996, give or take an hour or two. The Court finds that Dr. Bayardo has not retracted his time of death estimate.

174. The Court finds that over his decades of litigation, Applicant has proffered several experts offering varying theories on time of death. In his report, Dr. Baden asserts that Stites was deceased before midnight on April 22, 1996. During his testimony at the evidentiary in Applicant's eighth habeas proceeding, Dr. Baden admitted that reasonable forensic pathologists could look at the same evidence and come up with a different time of death. In his report, Dr. Spitz asserted that Stites was deceased between 6:00pm to 10:00pm on April 22, 1996. In his fourth affidavit, Dr. Riddick asserted that Stites was deceased between 9:15 pm on April 22, 1996, to 1:15am April 23, 1996. In Dr. Riddick's prior affidavits, Dr. Spitz asserted that no reliable time of death could be discerned from the evidence in this case.

175. At this hearing, Applicant called Drs. Baker and Davis to undermine Dr. Bayardo's trial testimony regarding time of death. The State called Drs. Dana and Farley to rebut Applicant's experts and to opine on the correctness of Dr. Bayardo's trial testimony.

176. Considering the live testimony of the experts, in addition to the evidence submitted with their testimony, the Court credits the testimony of Drs. Dana and Farley over Drs. Baker and Davis on the issue of time of death. The Court notes that a large disagreement occurred between the experts regarding the consideration of extrinsic evidence in arriving at an opinion on time of death. Drs. Dana and Farley credibly testified that the extrinsic evidence in this case is important to consider and properly guided their opinion that Dr. Bayardo's time-of-death estimate of between 1:00 and 5:00 A.M. and closer to 3:00 A.M. was not incorrect.

177. At Applicant's trial, Dr. Bayardo also testified that Stites anus appeared to have injuries that could be consistent with anal penetration.

178. Applicant called Drs. Baker and Davis to undermine Dr. Bayardo's trial testimony regarding injuries to Stites's anus. The State called Drs. Dana and Farley to rebut Applicant's experts and to opine on Dr. Bayardo's trial testimony.

179. Considering the live testimony of the experts, in addition to the evidence submitted with their testimony, the Court credits the testimony of Drs. Dana and Farley over Drs. Baker and Davis on the issue of anal injuries. Specifically, the Court finds credible the testimony of Drs. Dana and Farley that the autopsy photos of Stites's anus were not of high enough quality to determine whether the anal injuries detected by Dr. Bayardo were present. Both Drs. Dana and Farley agreed that Dr. Bayardo was in the best position to make that determination, since he could view the perceived injuries in person, and that no evidence provided in 2021 could undermine that opinion.

180. At Applicant's trial, Dr. Bayardo also testified regarding the timing inference to be drawn between deposit and collection of intact sperm from Applicant found in Stite's vaginal cavity.

181. Applicant called Drs. Baker and Davis to undermine Dr. Bayardo's trial testimony regarding this timing inference. The State called Drs. Dana and Farley to rebut Applicant's experts and to opine on Dr. Bayardo's trial testimony.

182. Considering the live testimony of the experts, in addition to the evidence submitted with their testimony, the Court credits the testimony of Drs. Dana and Farley over Drs. Baker and Davis on the significance of finding intact sperm from Applicant inside Stites's vaginal cavity and the timing inference to be drawn.

183. The Court further finds that all four doctors agree that their opinions regarding time of death, anal injury, *and* the timing inference between deposit and collection of intact spermatozoa are not based on new science. Rather, the Court finds, based on the testimony of all four experts, that this science was readily available at the time of trial and, indeed, some of it was put before the jury. For example, the article on which Drs. Baker and Davis largely rely on for their opinions on the time significance of intact sperm was the very article discussed at trial.

184. The Court makes a specific credibility finding against Dr. Davis because he did not write a report. Rather, Applicant's counsel wrote a peer review report, which amounts to nothing more than counsel's argument, onto which Dr. Davis signed. The Court finds this undermines his credibility as an expert and the validity of his testimony.

185.  Amber Moss is the DNA section supervisor of the Texas Department of Public Safety (DPS) Crime Laboratory in Garland, Texas. Allion Heard is the DNA section supervisor of the DPS Crime Laboratory in Austin, Texas. Both testified regarding the retesting and reanalysis of DNA samples from Applicant's case. Of note, the Court finds that the testimony of both Moss and Heard continues to support the irrefutable evidence that Applicant's DNA was found inside Stites's corpse and on and around her body.

*Extraneous Offenses*

186.  The Court notes that during the punishment phase of Reed's trial, five victims—Connie York, Lucy Eipper, minor A.W., Caroline Rivas, and Vivian Harbottle—credibly testified that Applicant sexually assaulted them. The Court also notes that Linda Schlueter testified that Applicant attempted to sexually assault her, but she was able to escape. SX.21, Vols.57–63. The Court finds that the State did not call these witnesses during the guilt phase because Applicant did not open the door to such rebuttal testimony.

187.  The Court finds credible the testimony of David Board that Reed's prior sexual assault history was crucial in law enforcement developing him as a suspect almost a year after Stites's murder. 6.RR.82–88.

188.  The Court finds that Applicant made a full-throated challenge to identity and consent during the evidentiary hearing, something he did not do at trial. The Court further finds that this is a clearly new defensive theory than what was presented at trial.

189.  The Court finds that had Applicant presented this new defensive theory at trial, at least some, and probably all, of Applicant's extraneous victims would be allowed to testify for the State in rebuttal.

190.  The Court finds the testimony of York, Eipper, minor A.W., Rivas, Harbottle, and Schlueter presented during Applicant's punishment phase at trial to be credible.[1] The Court further finds credible the testimony of several other witnesses who corroborated the accounts of these women.

---

[1]    The Court notes that the State presented the testimony of Harbottle and Schlueter under a bill of exception. The State also presented the testimony of Kellea Miller, an officer related to Schlueter's case under the bill. The Court notes that their testimony at the hearing is not considered here for purposes of these findings.

## CONCLUSIONS OF LAW

## GROUND ONE—SUPPRESSION OF FAVORABLE, MATERIAL EVIDENCE

<u>Laches Legal Standard</u>

1.  The common law doctrine of laches applies. *Ex parte Perez*, 398 S.W.3d 206, 215 (Tex. Crim. App. 2013). Laches, in this context,

    > "is defined as 'neglect to assert right or claim which, taken together with lapse of time and other circumstances causing prejudice to an adverse party, operates as a bar in a court of equity. Also, it is the neglect for an unreasonable and unexplained length of time under circumstances permitting diligence, to do what in law, should have been done.'"

    *Id.* at 210 (quoting *Ex parte Carrio*, 992 S.W.2d 486, 487–88 (Tex. Crim. App. 1999)). The State is not required "to make a 'particularized showing of prejudice,'" but may rely on "anything that places the State in a less favorable position, including prejudice to the State's ability to retry a defendant[.]" *Id.* at 215. This includes "the diminished memories of trial participants and the diminished availability of the State's evidence[.]" *Id.* at 216. And, "the longer an applicant delays filing his application, and particularly when an applicant delays filing for much more than five years after conclusion of direct appeals, the less evidence the State must put forth in order to demonstrate prejudice." *Id.* at 217–18. "Furthermore, . . . in determining whether habeas relief is warranted, we must afford adequate weight to the State's broad interest in the finality of a long-standing conviction." *Id.* at 218.

<u>Laches Legal Conclusions</u>

2.  The Court finds that Ground One is barred by laches for the reasons discussed in the corresponding laches factual findings.

3.  Because the claim is barred by laches, the merits review of Ground One, found below, occurs in the alternative.

<u>Suppression Legal Standard</u>

4.  This claim is governed by *Brady v. Maryland*, 373 U.S. 83 (1963). *Pena v. State*, 353 S.W.3d 797, 809 (Tex. Crim. App. 2011). To prove a "*Brady* violation," an applicant must demonstrate (1) the suppression of (2) favorable evidence (3) that is material, meaning that there is a reasonable probability of a different result had the suppressed evidence been disclosed. *Id.* "Additionally, . . . the evidence central to the *Brady* claim [must] be admissible in court." *Pena v. State*, 353 S.W.3d 797, 809 (Tex. Crim. App. 2011).

## Suppression Legal Conclusions

### *Richard Derleth*

5.    Applicant has failed to prove, by a preponderance of the evidence, that Derleth possessed favorable evidence because the Court disbelieves his recollection that unnamed HEB employees told him about an alert system. *See, e.g., United States v. Edwards*, 442 F.3d 258, 266 (5th Cir. 2006) ("Because '[t]he prosecution has no duty to turn over to the defense evidence that does not exist,' we reject Appellants' *Brady* claims with respect to Robert Guidry." (quoting *Brogdon v. Blackburn*, 790 F.2d 1164, 1168 (5th Cir. 1986)); *Hafdahl v. State*, 805 S.W.2d 396, 399 (Tex. Crim. App. 1990) ("*Brady* and its progeny do not require prosecuting authorities to disclose exculpatory information to defendants that the State does not have in its possession and that is not known to exist.").

6.    Assuming that Derleth was told about an alert system, the Court finds that the State cannot be imputed with this knowledge as Derleth was not part of the investigation into Stites's murder, he did not tell anyone involved in the investigation about this information, and did not state that this information came to him in his peace officer capacity. *Compare Ex parte Castellano*, 863 S.W.2d 476, 484–85 (Tex. Crim. App. 1993) (finding imputation where police officer's "participation in the investigation was considerable" despite being motivated by personal reasons for committing perjury, knowing about perjury, and altering evidence).

7.    Assuming that Derleth was told about an alert system, and assuming imputation to the State, the Court finds that Derleth's knowledge about an alert system is hearsay, so the State was not required to disclose it. *See Pena*, 353 S.W.3d at 814 ("The State does not have a duty to disclose favorable, material evidence if it would be inadmissible in court.").

8.    Assuming that Derleth was told about an alert system, that such information is imputed to the State, and that such should have been disclosed, the evidence is not material. The vague and hearsay description of an alert system by unknown HEB employees would not have undermined the substantial case against Applicant by a reasonable probability.

### *Charles Wayne Fletcher*

9.    Applicant has failed to prove, by a preponderance of the evidence, that Fletcher possessed favorable evidence because the Court disbelieves his recollection that Fennell confessed his belief that Stites was having an affair with a black man and that Stites and Fennell were arguing. *See, e.g., Edwards*, 442 F.3d at 266; *Hafdahl*, 805 S.W.2d at 399.

10. The Court does not find that Fletcher's opinion of Fennell's behavior surrounding Stites's burial to be favorable information because it does not "justify, excuse, or clear [Applicant] from fault." *Harm v. State*, 183 S.W.3d 403, 408 (Tex. Crim. App. 2006).

11. Assuming that Fletcher heard Fennell confess to concern about infidelity, observed Fennell and Stites arguing, and observed Fennell behave suspiciously around Stites's burial, the Court finds that the State cannot be imputed with this knowledge as Fletcher was not part of the investigation into Stites's murder, he did not tell anyone involved in the investigation about this information, and did not learn of it through his peace officer capacity. *Compare Ex parte Castellano*, 863 S.W.2d at 484–85.

12. Assuming that Fletcher heard Fennell confess to concern about infidelity, observed Fennell and Stites arguing, and observed Fennell behave suspiciously around Stites's burial, the Court finds the evidence is not material. The suspicion of infidelity does not name Applicant as the other man and does not prove that Fennell knew Applicant was having an affair with Stites; Fennell, at trial, admitted that he and Stites argued, so Fletcher's observation of argument is cumulative, and belief about suspicious behavior at Stites's burial is of little import. This information does not make it reasonably probable that Applicant would have been acquitted.

*Jim Clampitt*

13. Applicant has failed to prove, by a preponderance of the evidence, that Clampitt possessed favorable evidence because the Court disbelieves his recollection that Fennell said Stites "got what she deserved." *See, e.g., Edwards*, 442 F.3d at 266; *Hafdahl*, 805 S.W.2d at 399.

14. Assuming that Clampitt heard Fennell say that Stites "got what she deserved," the State cannot be imputed with this knowledge because Clampitt was not part of the investigation into Stites's murder, he did not tell anyone involved in the investigation about this information, he did not learn of it through in his peace officer capacity, and his employer, the Lee County Sheriff's Office, was not part of the investigation into Stites's murder. *Compare Ex parte Castellano*, 863 S.W.2d at 484–85.

15. Assuming that Clampitt heard Fennell say that Stites "got what she deserved," that such information is imputed to the State, and that such should have been disclosed, the evidence is not material. Clampitt's heavily impeachable testimony would not have undermined the substantial case against Applicant by a reasonable probability.

## GROUND TWO—UNKOWING USE OF FALSE TESTIMONY

Nonretroactivity Legal Standard

16. The nonretroactivity doctrine of *Teague v. Lane*, 489 U.S. 288 (1989) is followed "as a general matter of state habeas practice." *Ex parte De Los Reyes*, 392 S.W.3d 675, 679 (Tex. Crim. App. 2013).

> In *Teague* and its progeny, the Supreme Court laid out the framework to decide whether a "new rule" announced in one of its opinions should be applied retroactively to criminal convictions that were already final on direct review. Under the *Teague* framework, a "new rule" applies retroactively in a collateral proceeding only if the rule . . . is substantive[.]"

*Ex parte Maxwell*, 424 S.W.3d 66, 70 (Tex. Crim. App. 2014) (footnotes omitted). There used to be a "watershed" rule exception to *Teague*, but the Supreme Court has eliminated it. *Edwards v. Vannoy*, 141 S. Ct. 1547, 1560 (2021) ("New procedural rules do not apply retroactively on . . . collateral review. The watershed exception is moribund. It must 'be regarded as retaining no vitality.'" (quoting *Herrera v. Wyoming*, 136 S. Ct. 1686, 1697 (2019))).

Nonretroactivity Legal Conclusions

17. Applicant's conviction became final on October 9, 2001, "when the availability of direct appeal to the state courts has been exhausted and . . . a timely filed petition [for writ of certiorari] has been finally denied." *Beard v. Banks*, 542 U.S. 406, 411 (2004) (quoting *Caspari v. Bohlen*, 501 U.S. 383, 390 (1994)).

18. The Court of Criminal Appeals "recognize[d] a due-process claim of unknowing use of false testimony" for the first time in 2009 in *Ex parte Chabot*, 300 S.W.3d 768 (Tex. Crim. App. 2009), almost a decade after Applicant's conviction became final. *Ex parte Chavez*, 371 S.W.3d 200, 206–07 (Tex. Crim. App. 2012). The Court therefore finds that an unknowing-use-of-false-testimony claim is a "new" rule for purposes of *Teague*.

19. The Court finds that an unknowing-use-of-false-testimony claim is not a substantive rule because it "neither decriminalize[s] a class of conduct nor prohibits imposition of capital punishment on a particular class of persons." *Saffle v. Parks*, 494 U.S. 484, 495 (1990).

20. Because the unknowing-use-of-false-testimony claim is a new rule arising after Applicant's conviction became final, and because it is not a substantive rule, the Court finds the claim barred by nonretroactivity principles.

21. Because Applicant's claim is barred by non-retroactivity grounds, the merits analysis below is in the alternative.

## Laches Legal Standard

22. The common law doctrine of laches applies. *Ex parte Perez*, 398 S.W.3d 206, 215 (Tex. Crim. App. 2013). Laches, in this context,

> "is defined as 'neglect to assert right or claim which, taken together with lapse of time and other circumstances causing prejudice to an adverse party, operates as a bar in a court of equity. Also, it is the neglect for an unreasonable and unexplained length of time under circumstances permitting diligence, to do what in law, should have been done.'"

*Id.* at 210 (quoting *Ex parte Carrio*, 992 S.W.2d 486, 487–88 (Tex. Crim. App. 1999)). The State is not required "to make a 'particularized showing of prejudice,'" but may rely on "anything that places the State in a less favorable position, including prejudice to the State's ability to retry a defendant[.]" *Id.* at 215. This includes "the diminished memories of trial participants and the diminished availability of the State's evidence[.]" *Id.* at 216. And, "the longer an applicant delays filing his application, and particularly when an applicant delays filing for much more than five years after conclusion of direct appeals, the less evidence the State must put forth in order to demonstrate prejudice." *Id.* at 217–18. "Furthermore, . . . in determining whether habeas relief is warranted, we must afford adequate weight to the State's broad interest in the finality of a long-standing conviction." *Id.* at 218.

## Laches Legal Conclusions

23. The Court finds that Ground Two is barred by laches for the reasons discussed in the corresponding laches factual findings.

24. Because the claim is barred by laches, the merits review of Ground Two, found below, occurs in the alternative.

## Procedural Default Legal Standard

25. "As a general matter, th[e Court of Criminal Appeals] has long held that a convicted person may not raise a claim for the first time in a habeas-corpus proceeding if he had a reasonable opportunity to raise the issue at trial or on direct appeal and failed to do so." *Ex parte De La Cruz*, 466 S.W.3d 855, 864 (Tex. Crim. App. 2015). "Even claims of a constitutional dimension are 'forfeited [on habeas] if the applicant had the opportunity to raise the issue on appeal. This is because the writ of habeas corpus is an extraordinary remedy that is available only when there is no other adequate remedy at law.'" *Id.*

(alteration in original) (quoting *Ex parte Townsend*, 137 S.W.3d 79, 81–82 (Tex. Crim. App. 2004)).

<u>Procedural Default Legal Conclusions</u>

26. Because the evidence that Applicant claims proves false certain parts of Fennell's trial testimony, except for the hearing testimony of Arthur Snow and Michael Bordelon, the claim is barred because Applicant could have presented the contradictory evidence at trial and raised the claim on direct appeal.

27. Because the claim is procedurally defaulted for failing to preserve and present it earlier, the merits review of Ground Two, found below, occurs in the alternative.

<u>Unknowing Use of False Testimony Legal Standard</u>

28. To prove a false testimony claim, an applicant must prove that (1) "the testimony was, in fact, false, and, if so, (2) whether the testimony was material." *Ex parte Weinstein*, 421 S.W.3d 656, 665 (Tex. Crim. App. 2014). As to the latter, the applicant "must prove that the false testimony was material and thus it was reasonably likely to influence the judgment of the jury." *Id*.

<u>Unknowing Use of False Testimony Legal Conclusions</u>

29. Applicant has not proven by a preponderance of the evidence that Fennell lied or misleadingly testified at trial when he denied killing Stites.

30. Applicant has not proven by a preponderance of the evidence that Fennell lied or misleadingly testified at trial when he denied knowing, or knowing of Applicant, prior to Applicant's arrest for the murder of Stites.

31. Applicant has not proven by a preponderance of the evidence that Fennell lied or misleadingly testified at trial when he said that his relationship with Stites was good.

## GROUND FOUR—ACTUAL INNOCENCE

<u>Actual Innocence Legal Standard</u>

32. A freestanding-innocence claim is also referred to as a "*Herrera*-type claim" based on *Herrera v. Collins*, 506 U.S. 390 (1993). *Ex parte Franklin*, 72 S.W.3d 671, 674 (Tex. Crim. App. 2002). "[A]n exceedingly high standard applies to the assessment of claims of actual innocence that are not accompanied by a claim of constitutional error at trial." *Ex parte Elizondo*, 947 S.W.2d 202, 209 (Tex. Crim. App. 1996). Thus, an applicant "must show by clear and convincing evidence that no reasonable juror would have convicted him in light of the new

evidence." *Id*. This "is a Herculean task." *Ex parte Brown*, 205 S.W.3d 538, 545 (Tex. Crim. App. 2006). And it requires that an applicant rely upon "'newly discovered' or 'newly available'" evidence in making his freestanding claim of innocence, meaning "[h]e cannot rely upon evidence or facts that were available at the time of his trial, plea, or post-trial motions." *Id*. Importantly, "[a] claim of actual innocence is not an open window through which an applicant may climb in and out of the courthouse to relitigate the same claim before different judges at different times." *Id*. at 545–46.

<u>Actual Innocence Legal Conclusions</u>

33.  Applicant has not proven clearly and convincingly that he is actually innocent.

**RECOMMENDATION**

The court recommends that Applicant's grounds for relief remanded to this

Court—Applicant's Grounds One, Two, and Four—be denied.

Signed this _____ day of _____, 202___.

_____

J.D. Langley
Presiding Judge
21st District Court
Bastrop County, Texas

Sitting by Assignment

Writ Cause No. 50,961-08
Trial Court Cause No. 8701

|                     |   |                              |
|---------------------|---|------------------------------|
|                     | § | IN THE 21ST DISTRICT COURT   |
| *Ex parte*          | § |                              |
| RODNEY REED         | § | OF                           |
| *Applicant.*        | § |                              |
|                     | § | BASTROP COUNTY, TEXAS        |

## ORDER

The clerk is hereby ORDERED to prepare a supplemental state habeas record in writ cause number 50,961-08 (trial court cause number 8701) and transmit the same to the Court of Criminal Appeals, as provided in Article 11.071 of the Texas Code of Criminal Procedure. The state habeas record shall include certified copies of:

1. All of the parties' pleadings filed in writ cause number 50,961-08 (trial court cause number 8701) since June 7, 2016;

2. All transcripts and evidence from evidentiary hearings in writ cause number 50,961-08 (trial court cause number 8701) since June 7, 2016;

3. The recommended findings of facts and conclusions of law denying relief made by this court in writ cause number 50,961-08 (trial court cause number 8701);

The clerk is further ORDERED to send a copy of the court's recommended findings of fact and conclusions of law to the parties:

Matthew Ottoway
Travis G. Bragg
OFFICE OF THE ATTORNEY GENERAL
Post Office Box 12548, Capitol Station
Austin, Texas 78711
*matthew.ottoway@oag.texas.gov*
*travis.bragg@oag.texas.gov*

Andrew F. MacRae
LEVATINO PACE LLP
1101 South Capital of Texas Highway
Building K, Suite 125
Austin, Texas 78746
*amacrae@levatinopace.com*

Barry C. Scheck
Jane Pucher
INNOCENCE PROJECT
40 Worth Street, Suite 701
New York, New York, 10013
*bscheck@innocenceproject.org*
*jpucher@innocenceproject.org*

Michelle L. Davis
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1000 Louisiana, Suite 6800
Houston, Texas 77002
*michelle.davis@skadden.com*

Nicole A. DiSalvo
Sarah Runnells Martin
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
920 North King Street
Wilmington, Delaware 19801
*nicole.disalvo@skadden.com*
*sarah.martin@skadden.com*

George H. Kendall
Corrine Irish
SQUIRE PATTON BOGGS, LLP
1211 Avenue of the Americas
New York, New York 10036
*george.kendall@skadden.com*
*corrine.irish@skadden.com*

Quinncy McNeal
HUSCH BLACKWELL LLP
600 Travis Street, Suite 2350
Houston, Texas 77002
*quinncy.mcneal@huschblackwell.com*

Signed this _____ day of _____, 202___.

 

 

_____
J.D. Langley
Presiding Judge
21st District Court
Bastrop County, Texas

Sitting by Assignment